Jeffrey W. Dulberg (CA Bar No. 181200)
John W. Lucas (CA State Bar No. 271038)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California 90067-4003
Telephone: 310-277-6910
Facsimile:  310-201-0760
Email: jdulberg@pszjlaw.com
        jlucas@pszjlaw.com

*Counsel to Bradley D. Sharp, Liquidation Trustee
of the Klein Creditors' Liquidation Trust*

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. 2:23-bk-10990-NB |
| LESLIE KLEIN, | Chapter 11 |
| Debtor. | |
| BRADLEY D. SHARP, Liquidation Trustee, | Adv. Case No.: 2:26-ap-01186-NB |
| Plaintiff, | **NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION PENDING THIS COURT'S DETERMINATION OF LIQUIDATION TRUST'S INTEREST IN LIFE INSURANCE POLICY; DECLARATION OF BRADLEY D. SHARP IN SUPPORT THEREOF** |
| v. | |
| LINCOLN NATIONAL LIFE INSURANCE COMPANY, THE LESLIE KLEIN LIFE INSURANCE IRREVOCABLE TRUST DATED 6-01-2021, YACOV LUNGER AS TRUSTEE OF THE LESLIE KLEIN LIFE INSURANCE IRREVOCABLE TRUST DATED 6-01-2021, CONGREGATION OF ZWEHIL MONSEY, ROBERT ESTHER AND MERMELSTEIN, AND WILMINGTON TRUST, N.A., | DATE: August 4, 2026<br>TIME:   2:00 p.m.<br>PLACE: 255 East Temple Street, Los Angeles, California<br>CTRM:  1545 (*or via Zoom per posted procedures*) |
| Defendants. | |

**TO THE HONORABLE NEIL W. BASON, UNITED STATES BANKRUPTCY JUDGE, THE DEBTOR, THE OFFICE OF THE UNITED STATES TRUSTEE AND ALL PARTIES REQUESTING SPECIAL NOTICE:**

**PLEASE TAKE NOTICE** that on August 4, 2026 at 2:00 p.m., or as soon thereafter as the matter may be heard, in Courtroom 1575 of the United States Bankruptcy Court, 255 East Temple Street, Los Angeles, California, Bradley D. Sharp, Bradley D. Sharp, in his capacity as liquidation

4929-8289-0172.1 78512.001

trustee (the "**Liquidation Trustee**") of the Klein Creditors' Liquidation Trust (the "**Liquidation Trust**"), will and hereby does move the Court under section 105(a) of the Bankruptcy Code, Rule 7065 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Section 12.3 of the plan of liquidation [Docket No. 1351] (the "**Plan**"), for an order for a preliminary injunction to enjoin the above-referenced defendants from distributing the proceeds of that certain life insurance policy, # JJ7033900 (the "**Policy**") issued by Lincoln National Life Insurance Company ("**Lincoln**") or altering or transferring any interest in the Leslie Klein Life Insurance Irrevocable Trust dated 6-01-2021 (the "**Klein Trust**"), until the Trustee resolves, or the Court issues an order determining, the estate's (the "**Estate**") and ultimately the Liquidation Trust's rights and interest in the Policy and the Klein Trust (the "**Motion**"). The Motion is based upon this notice of motion, the Motion, the Memorandum of Points and Authorities, the Declaration of Bradley D. Sharp (the "**Sharp Declaration**"), the papers and pleadings in the Debtor's Case, and such other evidence that may be presented at the hearing.

**PLEASE TAKE FURTHER NOTICE** that pursuant to Local Bankruptcy Rule 9013-1(f), any response or opposition must be in writing and filed with the Court and served upon undersigned counsel to the Trustee no later than fourteen (14) days prior to the hearing date.  Pursuant to Local Bankruptcy Rule 9013-1(h), the failure to timely file any response or opposition may be deemed by the Court to be consent to the approval of the Motion.

Dated:  July 13, 2026

PACHULSKI STANG ZIEHL & JONES LLP

By    /s/ *John W. Lucas*
        John W. Lucas

        Counsel to Bradley D. Sharp,
        Chapter 11 Trustee

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

4929-8289-0172.1 78512.001

2

# **TABLE OF CONTENTS**

I. BACKGROUND .................................................................................................. 3

   A. The Debtor, the Bankruptcy Filing, and the Appointment of the Trustee ......................... 3

   B. The Policy ............................................................................................................ 4

II. THE NEED FOR THE REQUESTED RELIEF ............................................................ 5

   A. The Substantial Risk Imposed on the Liquidation Trust ............................................. 5

   B. Adversary Proceeding ............................................................................................ 6

III. RELIEF REQUESTED ....................................................................................... 7

IV. ARGUMENT ..................................................................................................... 7

   A. The Court Has Subject Matter Jurisdiction Over This Matter ..................................... 8

   B. A Preliminary Injunction Is Warranted To Enjoin Defendants From
Distributing Policy Proceeds Pending Final Adjudication of the Issues
Presented in the Adversary Proceeding ................................................................... 10

   C. The Liquidation Trustee has Satisfied the Requirements Necessary for the
Issuance of a Preliminary Injunction Enjoining Defendants from Distributing
the Policy Proceeds Until the Court Adjudicates the Claims in the Adversary
Proceeding ......................................................................................................... 12

      1. Likelihood of Success on the Merits ................................................................ 12

      2. Liquidation Trust Will Suffer Irreparable Injury Absent the Requested
Injunctive Relief ......................................................................................... 13

      3. The Balance of the Hardships Favors the Liquidation Trust ................................ 14

      4. The Public Interest Favors Proper Administration of the Liquidation Trust ............ 15

   D. No Bond is Required in Connection with the Requested Injunctive Relief .................... 16

V. CONCLUSION ................................................................................................... 16

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# TABLE OF AUTHORITIES

## Cases

*Casner v. Chase Manhattan Mortg. Corp. (In re Casner)*
  302 B.R. 695 (Bankr. E.D. Cal. 2003) ................................................................................ 11

*FDIC v. Garner*
  125 F.3d 1272 (9th Cir. 1997) ............................................................................................ 11

*FTC v. Affordable Media, LLC*
  179 F.3d 1228 (9th Cir. 1999) ............................................................................................ 11

*Gathering Restaurant, Inc. v. First Nat'l Bank (In re Gathering Restaurant, Inc.)*
  79 B.R. 992 (Bankr. N.D. Ind. 1986) ................................................................................. 15

*In re American Hardwoods, Inc.*
  885 F.2d 621 (9th Cir. 1989) ........................................................................................... 8, 9

*In re Continental Airlines*
  177 B.R. 475 (D. Del. 1993) .............................................................................................. 14

*In re Marley Orchards Income Fund I, Ltd. P'ship*
  120 B.R. 566 (Bankr. E.D. Wash. 1990) ........................................................................... 12

*In re Otero Mills, Inc.*
  25 B.R. 1018 (D. N.M. 1982) .............................................................................................. 9

*In re PTI Holding Corp.*
  346 B.R. 820 (Bankr. D. Nev. 2006) .................................................................................. 15

*Rehabworks, Inc. v. Lee (In re Integrated Health Servs., Inc.)*
  281 B.R. 231 (Bankr. D. Del. 2002) .................................................................................. 15

*Rubin v. Pringle (In re Focus Media Inc.)*
  387 F.3d 1077 (9th Cir. 2004) ............................................................................................ 11

*Save Our Sonoran, Inc. v. Flowers*
  408 F.3d 1113 (9th Cir. 2005) ....................................................................................... 11, 13

*Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc.)*
  502 F.3d 1086 (9th Cir. 2007) ...................................................................................... 10, 12

## Statutes

11 U.S.C. §105(a) ..................................................................................................... 7, 10
11 U.S.C. §362(a) ......................................................................................................... 10
28 U.S.C. §1334(b) ...................................................................................................... 7, 8
28 U.S.C. §157 ............................................................................................................. 7, 8

## Other Authorities

2 Collier On Bankruptcy, §105.03[1][b] (16th Ed. 2020) ................................................... 14

## Rules

Fed. R. Bankr. P. 7065 ......................................................................... 2, 7, 8, 10, 12, 16
Fed. R. Bankr. P. 9013-1(f) .......................................................................................... 2
Fed. R. Bankr. P. 9013-1(h) .......................................................................................... 2
Fed. R. Civ. Proc. 65 ................................................................................................. 12

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

4929-8289-0172.1 78512.001

ii

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### BACKGROUND

**A.     The Debtor, the Bankruptcy Filing, and the Appointment of the Trustee**

The Debtor has a long history of conducting fraudulent schemes involving life insurance policies that are commonly referred to as "death benefits policies."  Upon the death of a named insured, such policies distribute the policy benefits to designated beneficiaries. As a licensed attorney and accountant, the Debtor, acting either in his individual capacity or as a (purported) trustee or fiduciary, acquired and maintained numerous death benefits policies.  Given the face value of the death benefit policies, and other investment benefits available under those policies, the Debtor's standard practice was to represent to his investor victims that the costs of the associated premiums for these policies was an "investment opportunity."

The Debtor often retained these policies for his benefit and, at times, held the policies through various trusts or companies that he owned and controlled. In other instances, the Debtor solicited investors to whom he would sell or transfer some or all of the interests in the death benefit policies so that the related death benefits would be allocated between the Debtor and such investors.

On February 22, 2023, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

On April 10, 2023, the Debtor filed his schedules of assets and liabilities and statement of financial affairs [Docket No. 70] (the "**Schedules**"). The Debtor did not disclose any interest in the Policy or the Klein Trust, or the proceeds therefrom, in the Schedules.  Sharp Declaration at Para. 10.

On May 17, 2023, in response to a motion to dismiss the Debtor's chapter 11 Case, the Court ruled that the appointment of a chapter 11 trustee, and not dismissal of the Case, was in the best interests of the Estate. On May 23, 2023, the Office of the United States Trustee ("**UST**") filed a Notice of Appointment of Chapter 11 Trustee [Docket No. 151], appointing Bradley D. Sharp to serve as chapter 11 Trustee. On May 24, 2023, the UST Filed an Application for Order Approving Appointment of Trustee and Fixing Bond [Docket No. 154], which was approved by order entered

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

the same day [Docket No. 155]. On that same day, the Trustee accepted his appointment [Docket No. 156] and has been administering the Debtor's Estate to date.

On April 28, 2026, the Court entered an order [Docket No. 1366] that approved and confirmed the Plan. The Plan became effective on May 1, 2026 (the "**Effective Date**").

**B.      The Policy**

On or about August 28, 2008, a life insurance policy, # JJ7033900 (*i.e.*, the "**Policy**") was issued by Lincoln on the life of an individual (the "**Insured**") who is currently 95 years of age.[1]  The Policy has a death benefit of $10 million plus other potential benefits. These benefits may include the reimbursement of premiums and other investments that have accrued during the life of the Policy that are due to the beneficiaries upon the Policy's maturity date. Sharp Declaration at Paras. 8-9.

At its origination, the Policy was owned by a trust that was formed in the name of the Insured with the Insured's spouse acting at the trustee of such trust.  Sharp Declaration at Para. 11.

In April 2012, the Policy was transferred to Safety Coverage, LLC as the owner. *See* Sharp Declaration at Para. 12. On or about July 31, 2012, BW Life Settlements, LLC ("**BW Life**") acquired the ownership interest in the Policy.  *See* Sharp Declaration at Para. 13.

BW Life is a California limited liability company that was formed in April 2010. The operating agreement for BW Life, dated May 7, 2010, reflects that it is 50% owned by the Debtor and 50% owned by Bay Area Development Co., a company that was wholly owned and controlled by the Debtor.  *See* Sharp Declaration at Para. 14.

On or about December 4, 2017, the Bank of Utah acquired ownership of the Policy and a 65% beneficiary interest therein while BW Life maintained a 35% beneficiary interest in the Policy. *See* Sharp Declaration at Para. 14.

On or about December 21, 2021, the 35% beneficiary interest in the Policy held by BW Life was changed so that the Mermelsteins held 25%, the Klein Trust held 9%, and the Congregation of Zwehil Monsey (the "**Congregation**") held 1%.  *See* Sharp Declaration at Para. 15.

<div style="margin-left:2em; font-style:italic;">
PACHULSKI STANG ZIEHL & JONES LLP<br/>
ATTORNEYS AT LAW<br/>
LOS ANGELES, CALIFORNIA
</div>

---

[1] The Trustee has no reason to identify the insured by name and believes it is important to preserve the insured's personally identifiable information. If the Court or another party in interest believes the name of the insured needs to be disclosed the Trustee will make such disclosure to the Court under seal.

4929-8289-0172.1 78512.001

4

On or about March 22, 2022, Wilmington Trust, N.A. ("**Wilmington**") acquired ownership of the Policy and a 65% beneficiary interest therein, which was previously held by Bank of Utah. *See* Sharp Declaration at Para. 16.

The Liquidation Trustee has not been able to obtain any useful information from the Debtor about the Klein Trust.

The Liquidation Trustee has not been able to obtain any useful information from Yacov Lunger ("**Lunger**") about the Klein Trust despite him being listed as the Liquidation Trustee.

The Congregation has been non-responsive to all efforts by the Liquidation Trustee to determine the basis of its potential interest in the Policy.

At all relevant times, the Debtor has provided the Liquidation Trustee with very little information regarding his dealings with respect to various insurance policies including the Policy.

On December 7, 2023, the Chapter 11 Trustee filed his *Motion For Rule 2004 Examination of Lincoln* [Docket No. 511]. The foregoing Rule 2004 motion was approved on December 27, 2023. [Docket No. 544]. Thereafter, Lincoln produced responsive documents to the Liquidation Trustee.

The documents produced by Lincoln reflect that, as of the date of this Motion, Wilmington Trust holds a 65% interest in the Policy, the Mermelsteins hold a 25% interest in the Policy, the Klein Trust holds a 9% interest in the Policy, and the Congregation holds a 1% interest in the Policy.

## II.

## THE NEED FOR THE REQUESTED RELIEF

### A.    The Substantial Risk Imposed on the Liquidation Trust

Absent this Court's intervention, there is a substantial risk that once the contingency under the Policy is triggered, property of the Liquidation Trust, namely an undetermined interest in the Policy or the Klein Trust, will be transferred to the Klein Trust or another defendant when, instead, it should be transferred to the Liquidation Trustee for the benefit of the Liquidation Trust.

Prior to commencing this Case, the Debtor refused to comply with various state court orders with respect to disclosures of his financial investments and dealings. The record of the refusal of the Debtor to cooperate with the Chapter 11 Trustee, who is now currently the Liquidation Trustee, is well documented.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

4929-8289-0172.1 78512.001

5

In connection with the Debtor's *Motion to Convert* [Docket No. 596] and *Motion to Abandon* [Docket No. 594], and the Chapter 11 Trustee's oppositions thereto [Docket Nos. 656 and 657], the Court previously determined that the Debtor uses other companies that he controls, as well as his law firm, to pay for his living expenses and to shield assets that should be property of the Estate. *See* [Docket No. 684]. Annexed to the Sharp Declaration as **Exhibit "K"** is a transcript of the hearing of the above-described motions, which include the Court's findings regarding the Debtor's shielding of Estate assets.

This Court also determined that the Debtor's living trust is "self-settled" and, as a result, the property of such trust is property of the Estate. *See*, Adv. Case No. 24-01140, Adv. Docket Nos. 62 and 92. Attached to the Sharp Declaration as **Exhibit "L"** is a transcript of the summary judgment hearing regarding the Debtor's "self-settled" trust.

Given the advanced age of the Insure[2] and the Debtor's unwillingness to provide information as part of his fiduciary duty to his creditors, a substantial risk of harm to the Estate and ultimately to creditors exists if the Policy matures and proceeds that are due and payable to the Estate are instead paid to the Klein Trust or another party.

**B.      Adversary Proceeding**

Immediately prior to filing this Motion, the Liquidation Trustee commenced the Adversary Proceeding by filing a complaint against:

- Leslie Klein, the Debtor in the above captioned Case;

- Lincoln, the insurer and issuer of the Policy;[3]

- The Mermelsteins, individuals that assert a 25% interest in the Policy;

- The Klein Trust, a trust that asserts a 9% interest in the Policy;

- Lunger, alleged to be the trustee of the Klein Trust;

---

[2] The Insured is approximately 95 years of age.

[3] The Trustee is suing Lincoln for the limited purpose of ensuring that when the Policy matures that the Policy's proceeds are held by Lincoln until there is a determination, by way of settlement or by the Court, of the Liquidation Trust's rights under the Policy and the proceeds therefrom.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

- The Congregation, an entity of unknown form, registered as tax exempt, and operating out of a single family residence located in Rockland County, New York that asserts a 1% interest in the Policy; and

- Wilmington, alleged to be the owner of the Policy and holds a 65% interest therein.[4]

**III.**

**RELIEF REQUESTED**

By this Motion, the Liquidation Trustee is seeking, pursuant to Section 105(a) of the Bankruptcy Code, Rule 7065 of the Federal Rules of Bankruptcy Procedure, and Section 12.3 of the Plan, entry of an order (a) granting the Motion; (b) preliminarily enjoining the Defendants from disbursing the proceeds of the Policy with respect to the Klein Trust's 9% interest and the Congregation's 1% interest until (i) the Court determines the Liquidation Trust's interest in the Policy or the Klein Trust or (ii) the Liquidation Trustee settles the causes of action in the Complaint in whole or on a party by party basis and the Court approves such settlements; and (c) granting the Liquidation Trustee such other and further relief as the Court deems just and proper.

**IV.**

**ARGUMENT**

The Court should preliminarily enjoin the Debtor, Lincoln, Wilmington Trust, the Klein Trust, Lunger, the Mermelsteins, and the Congregation (collectively, the "**Defendants**") from distributing the disputed 10% share of the proceeds of the Policy absent further order of the Court or a settlement among the Liquidation Trustee and the Defendants (collectively or individually). As set forth herein, the Liquidation Trustee believes that if the Policy matures and the Liquidation Trust holds an interest in the Policy's proceeds or the Klein Trust itself, any distribution to the wrong parties will result in irreparable harm to the Liquidation Trust.

This Court has subject matter jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334(b).  Further, preliminary injunctive relief is warranted under 11 U.S.C. § 105(a)Bankruptcy

---

[4] The Trustee is suing Wilmington Trust and the Mermelsteins for the limited purpose of ensuring that when the Policy matures that the Policy's proceeds are held until there is a determination, by way of settlement or Court order, of the Liquidation Trust's rights under the Policy and the proceeds therefrom. The Trustee is not challenging Wilmington Trust's ownership of, and 65% interest in, the Policy, or the Mermelstein's 25% interest in the Policy. It is the Liquidation Trustee's intention to enter into a stipulation with the foregoing parties to ensure that 10% of the Policy proceeds are held and not distributed until this Court determines the rightful beneficiaries of the Policy.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

4929-8289-0172.1 78512.001

7

Rule 7065, and Section 12.3 of the Plan because the Liquidation Trust will suffer irreparable injury if Policy's proceeds purportedly payable to the Klein Trust and the Congregation are distributed before the Court determines the Liquidation Trust's interest in such Policy and the Klein Trust.

**A.      The Court Has Subject Matter Jurisdiction Over This Matter**

Before reaching the issue of the propriety of preliminary injunctive relief, this Court must first determine whether it has subject matter jurisdiction over the Motion. *In re American Hardwoods, Inc.*, 885 F.2d 621, 624 (9th Cir. 1989). This Court has subject matter jurisdiction because the Liquidation Trustee's Motion seeking preliminary injunctive relief is "related to" a proceeding under title 11 of the United Stated Code. *See* 28 U.S.C. §§ 157 and 1334(b); *American Hardwoods*, 885 F.2d at 623.

As set forth by the Ninth Circuit:

> The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome of the proceeding could conceivably have any effect on the estate being administered in bankruptcy*. Thus, the proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.

*American Hardwoods*, 885 F.2d at 623 (citations omitted; emphasis in original). Thus, this Court has jurisdiction over the Motion seeking to preliminarily enjoin the Defendants because if the Liquidation Trust has an interest in the Policy and proceeds therefrom, or the Klein Trust itself, and the Liquidation Trust's share is not directed to the Liquidation Trustee, the diversion of Liquidation Trust assets "could conceivably have an effect" on the Liquidation Trustee's administration of Liquidation Trust by depriving the Liquidation Trustee of cash that could be used to administer the Liquidation Trust and pay the holders of allowed claims who have beneficial interests in the Liquidation Trust. *Id.*

To facilitate and implement the process by which the Policy proceeds will be distributed, the Liquidation Trustee requires cooperation from the Defendants until this Court determines the Liquidation Trust's interest in the Policy or the Klein Trust. If the Policy matures and the proceeds are distributed to the Klein Trust, which the Debtor presumably controls, there is no assurance that

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

the Debtor or Lunger will turnover the proceeds to the Liquidation Trustee – particularly given the Debtor's history of impeding the Chapter 11 Trustee's and the Liquidation Trustee's efforts to obtain and monetize assets during the course of the Case. Similarly, absent an injunction by the Court, Lincoln, as the issuer of the Policy, and Wilmington Trust, as the owner of the Policy, might not have any discretion to holdback distributions from the Policy because the terms of the Policy could require Lincoln to pay the Policy proceeds to Wilmington Trust upon maturity and Wilmington Trust's contractual obligations with the other beneficiaries require it to distribute the proceeds to the wrong parties.

As detailed in the Sharp Declaration, the Liquidation Trustee has sought information regarding the Klein Trust from both the Debtor and Lunger, who both represented they do not know anything about such trust. In addition, the Liquidation Trustee has sought information about the Estate's and now the Liquidation Trust's interest in the Klein Trust from Lincoln, which produced a substantial amount of information, but such information did not clarify the owner or the beneficiary of the Klein Trust. Given the Debtor's past efforts to oppose the Chapter 11 Trustee's and now Liquidation Trustee's efforts to administer the Estate and the Liquidation Trust, respectively, *e.g.*, his repeated stay violations where the Debtor and his counsel have attempted to convert property of the Estate, it is essential that the Court enjoin all the Defendants until the Court determines the Estate's interest in the Policy and the Klein Trust. Absent an injunction, the wrongful distribution of the Policy's proceeds will adversely affect the Liquidation Trust and ultimately the distributions made to the holders of allowed claims that hold beneficial interests in the Liquidation Trust.

Thus, this Court has subject matter jurisdiction over the Motion for preliminary injunctive relief. *See American Hardwoods*, 885 F.2d at 624 (finding subject matter jurisdiction over the debtor's motion for injunctive relief against a third-party creditor where debtor's officers and the officers' assets were vital to the success of the debtor's reorganization plan); *In re Otero Mills, Inc.*, 25 B.R. 1018, 1021 (D. N.M. 1982) (finding subject matter jurisdiction over debtor's request for an injunction against a creditor; creditor's action against debtor's president and shareholder who had guaranteed debtor's loans was "related to" the bankruptcy proceeding because the president/shareholder's pledge of assets to the debtor was vital to the reorganization plan).

**B.     A Preliminary Injunction Is Warranted To Enjoin
Defendants From Distributing Policy Proceeds Pending
<u>Final Adjudication of the Issues Presented in the Adversary Proceeding</u>**

The Liquidation Trustee requests that this Court enjoin the Defendants from distributing any proceeds of the Policy, under section 105(a) of the Bankruptcy Code and Bankruptcy Rule 7065, until this Court determines the Liquidation Trust's interest in the Policy. The circumstances regarding the Liquidation Trust's interest in the Policy and any improper distribution to the wrong party will adversely affect the Liquidation Trustee's administration of the Case and ultimately harm distributions to creditors because there is no assurance the Liquidation Trustee would be able to recover any distribution made to the wrong party once the Court in fact determines that the Liquidation Trust holds an interest in the Policy.

Under 11 U.S.C. 105(a), a bankruptcy court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  Section 105(a) gives a bankruptcy court broad power to stay proceedings or parties that are not subject to the section 362(a) of the Bankruptcy Code, but nevertheless "threaten the integrity of the bankruptcy estate."  *Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc.)*, 502 F.3d 1086, 1093 (9th Cir. 2007) (citations omitted).

Outside the bankruptcy court context, the Ninth Circuit Court of Appeals has consistently required trial courts deciding preliminary injunction motions to balance the moving party's likelihood of success on the merits and the relative hardship of the parties. The moving party must show:

> (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases). Alternatively, a court may grant the injunction if the plaintiff demonstrates either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor.
>
> As we have said many times regarding the two alternative formulations of the preliminary injunction test:  **These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases.**  They are not separate tests but rather outer reaches of a single continuum.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

*Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1120 (9th Cir. 2005) (emphasis added; citations and internal quotation marks omitted). In the bankruptcy court context, the Ninth Circuit has applied this usual approach in reviewing a preliminary injunction issued by a bankruptcy court to prevent the debtor's shareholder from dissipating assets claimed by the estate. *Rubin v. Pringle (In re Focus Media Inc.)*, 387 F.3d 1077, 1085-86 (9th Cir. 2004).

In *Focus Media*, after a trustee was appointed in the debtor's bankruptcy case, the trustee commenced an adversary proceeding against the debtor's sole shareholder to avoid certain transfers. *Focus Media*, 387 F.3d at 1080. On the same day the complaint was filed, the trustee filed a motion seeking a temporary restraining order and a preliminary injunction enjoining the debtor's sole shareholder from dissipating his assets, which might be subject to recovery if the trustee prevails in his underlying action. *Id.* The Ninth Circuit affirmed the bankruptcy court's issuance of a preliminary injunction enjoining the debtor's sole shareholder from dissipating his assets because (a) the trustee was able to show his constructive fraudulent transfer claim had a reasonable chance of prevailing and (b) the balance of the hardships weighed in favor of the Trustee because there was reason to believe that the debtor's sole shareholder would not preserve the cash he was transferred on the eve of the bankruptcy and the estate would be subject to irreparable harm because there was no other means of recovering the cash if it was subsequently transferred. *Id.* 1085-87; *see also*, *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1236-37 (9th Cir. 1999) (concluding that given petitioners' history of spiriting away funds, the district court's finding that they were likely to dissipate assets was not clearly erroneous); *FDIC v. Garner*, 125 F.3d 1272, 1279-80 (9th Cir. 1997) (giving "substantial deference" to lower court's finding that there was "at least a possibility" of dissipation of assets absent an asset-freezing injunction, and consequently concluding that the possibility of irreparable injury had been adequately demonstrated).

Relying on their section 105 powers, courts in this and other Circuits have enjoined actions as to non-debtors parties where such protection is necessary to protect the debtor's estate. *See e.g.*, *Casner v. Chase Manhattan Mortg. Corp. (In re Casner)*, 302 B.R. 695, 701 (Bankr. E.D. Cal. 2003) ("The court has ample power to enjoin actions excepted from the automatic stay if the actions would interfere with the rehabilitative process, whether **in a liquidation** or reorganization case.")

4929-8289-0172.1 78512.001

11

(emphasis added); *In re Marley Orchards Income Fund I, Ltd. P'ship*, 120 B.R. 566, 570 (Bankr. E.D. Wash. 1990) ("an injunction may be appropriate when the non-debtor owns assets which will either be a source of funds for the debtor or when the preservation of the non-debtor credit standing will play a significant role in the debtor's attempt to reorganize").

Without the entry of an order granting the relief requested herein, the Liquidation Trustee submits if the Policy matures the Liquidation Trust is at risk of the Defendants either distributing the Policy proceeds to the wrong party or any such wrong party using or transferring the proceeds to a party from whom they cannot be recovered.

**C.     The Liquidation Trustee has Satisfied the Requirements Necessary for the Issuance of a Preliminary Injunction Enjoining Defendants from Distributing the Policy Proceeds Until the Court Adjudicates the Claims in the Adversary Proceeding**

Rule 65 of the Federal Rules of Civil Procedure, made applicable herein by Bankruptcy Rule 7065, sets forth the requirements governing the issuance of a preliminary injunctions in adversary proceedings.

> (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases). Alternatively, a court may grant the injunction if the plaintiff demonstrates *either* a combination of probable success on the merits and the possibility of irreparable injury *or* that serious questions are raised and the balance of hardships tips sharply in his favor.
>
> As we have said many times regarding the two alternative formulations of the preliminary injunction test:  These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases.  They are not separate tests but rather outer reaches of a single continuum.

*Excel Innovations*, 502 F.3d at 1093.  In this Case, the Liquidation Trustee satisfies the Ninth Circuit's preliminary injunctive relief standard.

**1.     Likelihood of Success on the Merits**

In the Ninth Circuit, a party seeking an injunction must show a reasonable likelihood of a success on the merits. It is difficult for the Liquidation Trustee to show that he has a likelihood of succeeding on the merits of his causes of action in the Adversary Proceeding because he has not been able to obtain a copy of the Klein Trust or the transaction documents showing how the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Congregation purportedly obtained any interest in the Policy. The Liquidation Trustee has taken reasonable steps to obtain the Klein Trust documents from all the Defendants in the Adversary Proceeding. Both Lincoln and Wilmington Trust have been helpful in response to the Liquidation Trustee's document and information requests, formally and informally. The Liquidation Trustee obtained  information from the Mermelsteins, and he expects that they will continue to cooperate.

Meanwhile, the Debtor has built an awful track record when it comes to maintaining Estate assets, which are now Liquidation Trust assets, and this Court has already found that the Debtor's living trust was "self-settled" thereby rendering all of the assets therein, including the Debtor's home, property of the Estate. Further, this Court has found that the Debtor uses companies that he owns and/or controls, as well as his law firm, to pay for his living expenses and to shield assets that should be property of the Estate [*see* Docket No. 684], and now the Liquidation Trust.

The Liquidation Trustee's administration of the Liquidation Trust should not be prevented from collecting additional Liquidation Trust assets simply because the Debtor and others refuse to turnover documents and refuse to cooperate in response to the Liquidation Trustee's request regarding the Liquidation Trust's interest in the Policy.

As the Ninth Circuit has held regarding the "two alternative formulations of the preliminary injunction test: **These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases**. They are not separate tests but rather outer reaches of a single continuum. *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1120 (9th Cir. 2005) (emphasis added), the Liquidation Trustee believes that the irreparable injury is so great that it counterbalances the Liquidation Trustee's current inability to show he will succeed on the merits.

**2.**      **Liquidation Trust Will Suffer Irreparable Injury Absent the Requested Injunctive Relief**

The Liquidation Trustee's efforts to effectively administer the Liquidation Trust will be irreparably impaired if this Court does not enjoin the Defendants from distributing the Policy's proceeds until this Court determines the Liquidation Trust's interest in the Policy and the Klein

Trust. The Liquidation Trustee is administering a Liquidation Trust that has limited assets and claims that are expected to exceed the value ultimately distributed to the holders of allowed claims.

The Liquidation Trustee estimates that if the Liquidation Trust owns the Klein Trust's interest in the Policy that the Liquidation Trust can expect to receive at least $900,000 and arguably more given that the Policy is a "universal life" policy where some or all of the premiums plus interest are paid to the beneficiaries. Thus, if the Policy matures and the proceeds are distributed to the wrong parties, the Liquidation Trust will stand to lose a substantial amount of value that would otherwise be used to administer the Liquidation Trust and satisfy the holders of allowed claims who hold beneficial interests in the Liquidation Trust. It is beyond question that preventing the Liquidation Trustee from administering a bankruptcy estate is the type of irreparable harm that injunctive relief should protect against. *See In re Continental Airlines*, 177 B.R. 475, 481 (D. Del. 1993) ("In a bankruptcy context, irreparable harm may be discerned if the action sought to be enjoined would so consume the time, energy and resources of the debtor that it would substantially hinder the debtor's reorganization effort."); 2 Collier On Bankruptcy, §105.03[1][b] (16th Ed. 2020) (injunctive relief is appropriate where "the requested injunction seeks to halt actions which if unchecked could effectively reduce assets available for reorganization or distribution to creditors").

### 3. The Balance of the Hardships Favors the Liquidation Trust

The Liquidation Trustee, on behalf of the Liquidation Trust, stands to lose much more than any of the Defendants if this Court were to deny the request for injunctive relief.

First, Lincoln will not lose anything, nor does it stand to gain anything, upon the Policy's maturity. Lincoln is required to distribute the Policy's proceeds to the proper beneficiaries when the Policy matures. Upon the Policy's maturity, Lincoln will simply be required to continue to hold the Policy's proceeds and not distribute to any of the beneficiaries until further order of the Court.

Second, Wilmington is not harmed by the relief requested because, like Lincoln, the Liquidation Trustee is not challenging Wilmington's or the Mermelsteins' ownership of or interest in the Policy but rather seeking to enjoin Wilmington and the Mermelsteins from making any distributions of the Policy's proceeds absent further order of the Court.

Third, the Policy has been outstanding for approximately 20 years. It is the Liquidation Trustee's understanding that the Mermelsteins, Langer, the Klein Trust, and the Congregation are not responsible for making any ongoing premium payments to maintain the Policy. After 20 years, the foregoing parties will not be prejudiced if they are required to wait an additional six to nine months so that the Court can determine the rightful beneficiaries of the Policy.

Fourth, the Liquidation Trustee, on behalf of the Liquidation Trust, stands to suffer a significant loss if the Court determines the Liquidation Trust has an interest in the Policy or the Klein Trust but the proceeds are distributed to the wrong parties instead of the Liquidation Trust. The Liquidation Trustee has no assurance that any of the parties will hold, preserve, and turnover the proceeds of the Policy if the Court determines that the Liquidation Trust holds a rightful interest in the Policy.

Fifth, as things presently stand, the Policy has not matured, and Lincoln is not in the process of making any distributions of the Policy's proceeds. Thus, until the Policy matures, which could be tomorrow or several years from now, no Defendant is subject to hardship by entry of an order enjoining the distribution of the Policy's proceeds until this Court determines the Liquidation Trust's interest in the Policy and the Klein Trust

### 4.      The Public Interest Favors Proper Administration of the Liquidation Trust

The public interest will be served by granting the Liquidation Trustee's requested injunctive relief. "In the context of a bankruptcy case, promoting a successful reorganization is one of the most important public interests." *Rehabworks, Inc. v. Lee (In re Integrated Health Servs., Inc.*), 281 B.R. 231, 239 (Bankr. D. Del. 2002).  Similarly, "public interest" means the promoting of a successful reorganization which should be one of the paramount concerns of a bankruptcy court." *Gathering Restaurant, Inc. v. First Nat'l Bank (In re Gathering Restaurant, Inc.),* 79 B.R. 992, 999 (Bankr. N.D. Ind. 1986) (involving preliminary injunction request in adversary proceeding to enjoin creditor from pursuing action against debtor's guarantor).  *See also In re PTI Holding Corp.*, 346 B.R. 820, 832 (Bankr. D. Nev. 2006) ("The public interest in successful reorganizations is significant.").

In this Case, while the Liquidation Trustee is not seeking to "reorganize" the Debtor *per se*, the Liquidation Trustee's ability to make distributions to creditors revolves around the Liquidation

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Trustee maximizing assets of the Liquidation Trust. This Adversary Proceeding is aimed at capturing assets that belong to the Liquidation Trust and preventing parties from receiving the Policy's proceeds when they are not entitled to them at the expense of creditors. Enjoining the Defendants from distributing the Policy's proceeds until further order of the Court will facilitate the Liquidation Trustee's administration of the Liquidation Trust and, if successful, augment the Liquidation Trust's assets for the benefit of all creditors.

**D.      No Bond is Required in Connection with the Requested Injunctive Relief**

Rule 7065 expressly exempts the security requirement of Federal Rule of Civil Procedure 65. Fed. R. Banker. P. 7065.  As such, Rule 7065 provides that no security is required for a debtor or a trustee to obtain a preliminary injunction absent an order specifically requiring such security.  In the instant Case, the Liquidation Trustee should not be required to post a bond as a condition to the injunctive relief because he is not contemplating holding or using the Policy proceeds. Instead, if the Policy matures, the Liquidation Trustee is only asking the Court to enjoin the Defendants from distributing the Policy's proceeds until this Court determines the Liquidation Trust's interest therein.

**V.**

**CONCLUSION**

For the reasons stated herein, the Liquidation Trustee request entry of an order approving the Motion and such other relief as the Court determines is necessary.

Dated:   July 13, 2025

PACHULSKI STANG ZIEHL & JONES LLP

By: */s/ John W. Lucas*
        John W. Lucas

*Attorneys for Plaintiff, Bradley D. Sharp,
Chapter 11 Liquidation Trustee*

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

4929-8289-0172.1 78512.001

# DECLARATION OF BRADLEY D. SHARP

I, Bradley D. Sharp, declare as follows:

1. I was the duly appointed, authorized and acting chapter 11 trustee (the "**Chapter 11 Trustee**") of the estate (the "**Estate**") of Leslie Klein, the debtor herein (the "**Debtor**"), and after the approval and effective date of the plan of liquidation [Docket No. 1350] (the "**Plan**") I became the liquidation trustee (the "**Liquidation Trustee**") of the liquidation trust (the "**Liquidation Trust**") that was formed under the Plan. The Plan became effective on May 1, 2026.

2. I make this Declaration in support of the *Motion for Preliminary Injunction Pending this Court's Determination of the Bankruptcy Estate's Interest in Life Insurance Policy* (the "**Motion**")[5] to which this Declaration is annexed. All matters set forth herein are based on either my personal knowledge, my review of relevant documents and information, including, without limitation, documents and information supplied to me by my professionals, and the record in this Case for which judicial notice is sought. All capitalized terms herein which are otherwise not defined herein shall have the same meaning ascribed to them in the Motion. If called upon to testify, I could and would testify competently to the facts set forth herein.

3. On February 22, 2023, the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of United States Code.

4. On May 23, 2023, in response to certain motions to dismiss the Case, the Court entered an order directing the UST to appoint a chapter 11 trustee [Docket No. 142]. On that same day, the UST filed a *Notice of Appointment of Chapter 11 Trustee* [Docket No. 151], appointing me to serve as chapter 11 Trustee. On May 23, 2023, the UST filed an *Application for Order Approving Appointment of Trustee and Fixing Bond* [Docket No. 154], approved by order entered the same day [Docket No. 155]. On that same day, I accepted this appointment [Docket No. 156].

5. In the course of my administration of the Estate in my former capacity as Chapter 11 Trustee, I was able to determine that the Debtor has a long history of conducting fraudulent schemes involving life insurance policies that are commonly referred to as "death benefits policies." Upon the death of a named insured, such policies distribute the policy benefits to designated beneficiaries.

---

[5] Capitalized terms not defined herein shall have the same meaning ascribed to them in the Motion.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

As a licensed attorney and accountant, the Debtor, acting either in his individual capacity or as a (purported) trustee or fiduciary, acquired and maintained numerous death benefits policies.  Given the face value of the death benefit policies ranging in value from $1,000,000.00 to more than $10,000,000.00, and other investment benefits available under those policies, the Debtor's standard practice was to represent to his investor victims that the costs of the associated premiums for these policies was an "investment opportunity."

6.      The Debtor often retained these policies for his benefit and, at times, held the policies through various trusts or companies that he owned and controlled. In other instances, the Debtor solicited investors to whom he would sell or transfer some or all of the interests in the death benefit policies so that the related death benefits would be allocated between the Debtor and such investors.

7.      On December 7, 2023, I caused my counsel to file the *Motion For Rule 2004 Examination of Lincoln* [Docket No. 511]. The foregoing Rule 2004 motion was approved on December 27, 2023. [Docket No. 544]. Thereafter, Lincoln produced responsive documents to the Trustee.

8.      Through the review of documents produced by Lincoln, I was able to determine that, on or about August 28, 2008, a life insurance policy, # JJ7033900 (the "**Policy**") was issued by Lincoln on the life of an individual (the "**Insured**"), who is currently 95 years of age. Lincoln produced a true and correct copy of the Policy that is annexed hereto as **Exhibit "A"**.

9.      The Policy has a death benefit of $10 million plus other potential benefits. These benefits may include the reimbursement of premiums and other investments that have accrued during the life of the Policy that are due to the beneficiaries upon the Policy's maturity date (*i.e.*, the death of the Insured).

10.     On April 10, 2023, the Debtor filed his schedules of assets and liabilities and statement of financial affairs [Docket No. 70] (the "**Schedules**"). A true and correct copy of the Debtor's Schedules is annexed hereto as **Exhibit "B"**.  In my review of the Schedules, I did not see that the Debtor disclosed any interest in the Policy or any interest in the Leslie Klein Life Insurance Irrevocable Trust dated 6-01-2021 (the "**Klein Trust**").

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

11.     Section 11 of the Plan preserved the Debtor's Estate's interest in all "Causes of Action." The Policy is among the various Causes of Action that were preserved under the Plan and transferred to the Liquidation Trustee for the benefit of holders of allowed claims under the Liquidation Trust and the Plan.

12.     Through the documents produced by Lincoln I was able to determine that at its origination, the Policy was owned by a trust that was formed in the name of the Insured with the Insured's spouse acting at the trustee of such trust. *See* **Exhibit "C"**.

13.     In April 2012, the Policy was transferred to Safety Coverage, LLC as the owner. *See* **Exhibit "D".**

14.     On or about July 31, 2012, BW Life Settlements, LLC ("**BW Life**") acquired the ownership interest in the Policy.  *See* **Exhibit "E"**.

15.     BW Life is a California limited liability company that was formed in April 2010. *See* **Exhibit "F"**.  The operating agreement for BW Life, dated May 7, 2010, reflects that it is 50% owned by the Debtor and 50% owned by Bay Area Development Co.  *See* **Exhibit "G"**.  Bay Area Development Co. was wholly owned and controlled by the Debtor.  *See* Schedules at A/B, Part 4, #19.

16.     On or about December 4, 2017, the Bank of Utah acquired ownership of the Policy and a 65% beneficiary interest therein while BW Life maintained a 35% beneficiary interest in the Policy.  *See* **Exhibit "H"**.

17.     On or about December 21, 2021, the 35% beneficiary interest in the Policy held by BW Life was changed so that the Mermelsteins held 25%, the Klein Trust held 9%, and the Congregation of Zwehil Monsey (the "**Congregation**") held 1%.  *See* **Exhibit "I"**.

18.     On or about March 22, 2022, Wilmington Trust, N.A. ("Wilmington") acquired ownership of the Policy and a 65% beneficiary interest therein, which was previously held by Bank of Utah.  *See* **Exhibit "J"**.

19.     On February 28, 2024, the Court denied the Debtor's motions to convert and abandon where the Court made findings regarding the Debtor's shielding of Estate assets. A transcript of that ruling is annexed hereto at **Exhibit "K"**.

4929-8289-0172.1 78512.001

19

20. On December 18, 2024, the Court found that the Debtor's living trust was "self-settled" and that any assets held by such trust were property of the Estate. A transcript of that ruling is annexed hereto as **Exhibit "L"**.

21. I have not been able to obtain any useful information from the Debtor about the Klein Trust.

22. I have not been able to obtain any useful information from Yacov Lunger ("**Lunger**") about the Klein Trust despite him being listed as the Trustee.

23. The Congregation has been non-responsive to all efforts by me and my counsel to determine the basis of the Congregation's potential interest in the Policy.

24. At all relevant times, the Debtor has provided me or my counsel with very little information regarding his dealings with respect to various insurance policies including the Policy.

25. It is my understanding that, as of the date of this Motion, Wilmington Trust holds a 65% interest in the Policy, the Mermelsteins hold a 25% interest in the Policy, the Klein Trust holds a 9% interest in the Policy, and the Congregation holds a 1% interest in the Policy.

26. If the Liquidation Trust owns a portion the Policy or the proceeds therefrom or owns or has an interest in the Klein Trust, the Liquidation Trust stands to lose no less than 9% of the Policy's proceeds, which could be valued at more than $1,000,000.00. In absence of enjoining the Defendants from disbursing the Policy's proceeds until this Court determines the Liquidation Trust's interest in the Policy and the Klein Trust, the Liquidation Trust will be harmed along with the creditors holding beneficial interests in the Liquidation Trust.

27. As things stand now, a preliminary injunction does not harm any of the Defendants because the Insured has not died and Lincoln is not poised to immediately disburse the Policy's proceeds. Nevertheless, it is imperative that I maintain the status quo for the benefit of the Liquidation Trust and ensure that there is not an inadvertent or wrongful disbursement of the Liquidation Trust's interest in the Policy to a party that is not entitled to such share.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

4929-8289-0172.1 78512.001

20

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this _9_ th day of July, 2026 at San Juan Capistrano, California.

_____
Bradley D. Sharp

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

21

4899-1086-0398.2 78512.001

# EXHIBIT  A

# The Lincoln National Life Insurance Company

(the "Company")

**DUPLICATE OR SUBSTITUTE POLICY ISSUED IN ACCORDANCE WITH OWNER'S REQUEST**

Service Office: 100 North Greene Street
P.O. Box 21008
Greensboro, NC 27420

### A Stock Company

This certificate has been issued to the Certificate Owner at the request of the Group Policyholder. This certificate provides information about Group Policy GRP 10.LWL. This is a legal certificate of group life insurance between the Certificate Owner and the Company. **It is important that You read Your contract carefully.**

We will pay the proceeds of this certificate to the beneficiary upon receipt of due proof that the death of the Insured occurred while this certificate was in force. This payment and all other rights, options and benefits will be subject to the terms of this certificate.

**Right to Cancel Certificate   Within 20 days after You receive this certificate, You may have it cancelled by returning it to Us, to the agent from whom You bought it, or to any of Our agents.   The return of this certificate will void it from the beginning and We will refund any premiums paid.**

| Table of Contents | Page No. |
|---|---|
| Benefits and Premiums | 3 |
| Coverage Protection Guarantee Provisions | 11 |
| Definitions | 5 |
| General Provisions | 6 |
| Insurance Coverage Provisions | 8 |
| Death Benefit | |
| Death Benefit Qualification Test | |
| Death Benefit Options | |
| Continuation of Certificate After Age 121 | |
| Nonforfeiture Provisions | 9 |
| Surrender and Surrender Value | |
| Partial Surrender | |
| Owner and Beneficiary | 5 |
| Certificate Loans | 12 |
| Certificate Specifications | 3 |
| Premium Provisions | 7 |
| Grace Period | |
| Reinstatement | |
| Settlement Options | 12 |
| Summary of Certificate Features | 2 |
| Table of Maximum Insurance Rates | 13 |

Riders providing supplemental benefits or certificate changes, if any, and a copy of the application follow Page 14.

President

Secretary

Group Policyholder:  The Lincoln National Group Life Insurance Trust V

Insured:            Rosalia Feldman

Certificate Number:   JJ7033900

**FLEXIBLE PREMIUM
ADJUSTABLE LIFE INSURANCE CERTIFICATE WITH COVERAGE PROTECTION GUARANTEE**

**Proceeds payable at death. Adjustable Death Benefit. Flexible premiums payable to the earlier of the death of the Insured or the Insured's Attained Age 121. Account Values may increase or decrease as determined by declared interest and risk rates. Non-participating – No Dividends.**

Form GUL 4070                Page 1

LINCOLN007899

# Summary of Certificate Features

This Summary is an overview of the important features and operations of Your certificate. It is meant to give You a basic understanding of Your certificate. Specific details regarding these features are only provided in the certificate provisions and cannot be fully described in a summary. **This summary is not a substitute for reading the entire certificate carefully.**

**Flexible Premium Adjustable Life Insurance** – This title is Our generic name for universal life insurance. "Flexible premium" means that You may pay premiums by any method agreeable with Us, at any time prior to the Insured's Attained Age 121 and in any amount subject to certain limitations. "Adjustable life insurance" means that You, with Our agreement, can change the death benefit to meet Your changing needs.

**Coverage Duration** – Your certificate will remain in effect to the Insured's death if You have a positive Cash Surrender Value or if the Coverage Protection Guarantee test is met.

**Account Value** – The Account Value is a key component of Your certificate. It's where Your premiums go and where We assess Our charges for providing coverage. We apply a charge to each premium You pay, then add the balance to the Account Value. We deduct the cost of providing the coverage (the cost of insurance) plus the cost of any additional benefits and/or riders and administrative expense charges from this value each month as a "monthly deduction". We then credit interest to the difference.

Simply put  - premium and interest additions increase the Account Value, Our charges decrease the Account Value. If additions exceed deductions, Your Account Value increases; if deductions exceed additions, Your Account Value decreases. If the Account Value, less surrender charge, less Debt (Cash Surrender Value) becomes so small that We cannot take an entire monthly deduction, Your certificate may terminate; see, however, the Coverage Protection Guarantee below and the certificate provisions describing the Grace Period.

**Coverage Protection Guarantee** – Your certificate provides an important Coverage Protection Guarantee which can ensure that Your coverage will continue even if Your Cash Surrender Values are insufficient to cover the monthly deductions.

How does the Coverage Protection Guarantee work? The guarantee references an "alternate" account value calculated in the same manner as the actual Account Value but utilizing different charges (cost of insurance, cost of additional benefits and/or riders, administrative expense charges) and interest rates. All charges used in this alternate account value calculation are guaranteed not to increase and all interest rates used in this alternate account value calculation are guaranteed not to decrease.

The alternate account value is not used in determining the actual Account Value, it is simply a reference value used to determine whether the Coverage Protection Guarantee is in effect.

Note that the length of time the Coverage Protection Guarantee can continue Your certificate in force may vary based upon the following factors:

- changes in premium frequency, timing or amount;
- certificate changes such as loans, partial surrenders, changes in the death benefit and addition of riders.

In addition, if You have allowed the certificate to lapse longer than 90 days, the guarantee is permanently lost.

We will provide You with an annual notification of the status of Your Coverage Protection Guarantee, which You should review carefully.

**Variables** - Many variables affect Your certificate's performance. The better You understand these variables, the better You will be able to monitor Your certificate's performance and take advantage of its flexibility:

- **Credited Interest Rates.** Interest is a significant component of Your certificate. Do not assume that interest rates will remain constant for any extended period of time or that interest rates credited to this Certificate will correlate with changes in interest rates on other policies owned by You. We can change interest rates at any time based on certain contractually identified factors subject to a minimum rate.
- **Monthly Cost of Insurance and Expense Charges.** These charges are assessed against Your Account Value to cover the company's cost of insurance and other expenses. These charges will be detailed in Your annual Statement of Account. We can change these charges based on certain contractually identified factors subject to the maximum guaranteed factors shown in Your certificate.
- **Premium Payments.** Payment of premiums, even planned premiums, may not result in Account Value performance as originally expected. Premium payments are only one variable affecting the performance of Your Account Value. Your certificate could perform better or worse than expected due to the effect of changes in interest rates, monthly cost of insurance and expense charges, as well as the timing, amount and frequency of Your premium payments. Obviously, if You choose to pay lower premiums or skip premium payments, such actions will have the impact of slowing Your Account Value growth and increasing the potential that Your certificate will lapse.

G4071

Certificate Number JJ7033900

LINCOLN007900

## Summary of Certificate Features (Cont'd)

**Monitoring Your Certificate's Performance** - We will send You an annual Statement of Account to help You monitor Your certificate's performance and compare it to Your objectives when You purchased Your certificate. Begin by verifying that Your planned premiums will accomplish Your insurance objective. Ask Your life insurance agent to explain anything You do not understand. You may need to adjust Your premiums to achieve Your insurance objectives. You may request a projection of future death benefits and Account Values from Us at any time. We are also available to answer Your questions and assist You in making changes to Your certificate.

G4071

LINCOLN007901

SCHEDULE OF BENEFITS AND PREMIUMS – CERTIFICATE NUMBER   JJ-7033900

| FORM NUMBER | BENEFIT | | ISSUE DATE | MONTHLY DEDUCTION | RATE CLASS | YEARS PAYABLE |
|---|---|---|---|---|---|---|
| GUL 4070 | INITIAL SPECIFIED AMOUNT | 10,000,000 | AUG 28, 2008 | SEE PAGE 9 | STD NON-TOBACCO USER | 43 |

CERTIFICATE SPECIFICATIONS

NOTE:   THIS CERTIFICATE PROVIDES LIFE INSURANCE COVERAGE TO THE DEATH OF THE INSURED IF SUFFICIENT PREMIUMS ARE PAID.  THE DURATION OF COVERAGE WILL DEPEND ON THE AMOUNT, TIMING AND FREQUENCY OF PREMIUM PAYMENTS, INTEREST CREDITED, COST OF INSURANCE, EXPENSE CHARGES, ANY LOANS OR WITHDRAWALS AND THE COST OF ADDITIONAL BENEFITS.  THE PLANNED PREMIUM MAY NEED TO BE INCREASED TO KEEP THIS CERTIFICATE AND THE COVERAGE IN FORCE.

OWNER                    BW LIFE SETTLEMENTS LLC

BENEFICIARY              AS STATED IN THE APPLICATION UNLESS LATER CHANGED

INSURED                  ROSALIA FELDMAN

CERTIFICATE NUMBER       JJ-7033900                 CERTIFICATE DATE     AUGUST 28, 2008

AGE AND SEX              78   FEMALE

SPECIFIED AMOUNT         $10,000,000

DEATH BENEFIT OPTION     I

PLAN OF INSURANCE        FLEXIBLE PREMIUM
                         ADJUSTABLE LIFE

G4170-A.1106                           PAGE 3

LINCOLN007902

INSURED                             ROSALIA FELDMAN

CERTIFICATE NUMBER                  JJ-7033900

FORM NUMBER                         GUL 4070

PLANNED PREMIUM                     $33,333.00      MONTHLY

MINIMUM SPECIFIED AMOUNT            $100,000

FACTORS USED IN THE CALCULATION OF ACCOUNT VALUES


MONTHLY ADMINISTRATIVE CHARGES:

     $14.00 FOR CERTIFICATE MONTHS 1-12
     $ 4.00 FOR CERTIFICATE MONTHS 13 & LATER

GUARANTEED NET PREMIUM FACTOR
     70 % OF GROSS PREMIUM PAID IN ALL CERTIFICATE YEARS

MORTALITY TABLE USED TO CALCULATE MINIMUM CASH SURRENDER VALUES –
     2001 CSO MALE OR FEMALE NONSMOKER OR SMOKER

INTEREST RATE USED TO CALCULATE MINIMUM CASH SURRENDER VALUES –  3.00%


PLAN OF INSURANCE        FLEXIBLE PREMIUM
                     ADJUSTABLE LIFE

G4170-A.1106                        PAGE 4A

LINCOLN007903

INSURED                         ROSALIA FELDMAN

CERTIFICATE NUMBER              JJ-7033900

FORM NUMBER                     GUL 4070

TABLE OF SURRENDER CHARGES PER $1,000 OF INITIAL SPECIFIED AMOUNT

| CERTIFICATE MONTH | SURRENDER CHARGE |
|---|---|
| 1-12 | 45.43 |
| 13-24 | 43.27 |
| 25-36 | 41.11 |
| 37-48 | 39.01 |
| 49-60 | 36.96 |
| 61-72 | 34.94 |
| 73-84 | 32.96 |
| 85-96 | 31.01 |
| 97-108 | 29.05 |
| 109-120 | 27.15 |
| 121-132 | 25.29 |
| 133-144 | 23.45 |
| 145-156 | 21.56 |
| 157-168 | 19.46 |
| 169-180 | 17.18 |
| 181-192 | 14.72 |
| 193-204 | 12.00 |
| 205-216 | 8.88 |
| 217-228 | 5.04 |
| 229 and after | 0.00 |

THE SURRENDER CHARGES ABOVE ARE BASED ON THE INITIAL SPECIFIED AMOUNT. ADDITIONAL SURRENDER CHARGES RELATED TO ANY INCREASE IN SPECIFIED AMOUNT WILL BEGIN FROM THE EFFECTIVE DATE OF THE INCREASE IN COVERAGE. THESE ADDITIONAL SURRENDER CHARGES WILL BE SHOWN ON A SUPPLEMENTAL CERTIFICATE SPECIFICATIONS PAGE.

CERTIFICATE LOAN INTEREST RATE CHARGED IN ARREARS 6.50%

CERTIFICATE LOAN INTEREST RATE CHARGED IN ARREARS ON PREFERRED LOANS 5.50%

INTEREST RATE CREDITED TO ACCOUNT VALUE HELD FOR CERTIFICATE LOAN COLLATERAL IS 3.00% IN ALL CERTIFICATE YEARS.

PARTIAL SURRENDER MINIMUM AMOUNT $500.00

PARTIAL SURRENDER FEE $25.00

MAXIMUM ATTAINED AGE FOR AN INCREASE: 85

PLAN OF INSURANCE        FLEXIBLE PREMIUM
                         ADJUSTABLE LIFE

G4170-A.1106                          PAGE 4B

LINCOLN007904

INSURED                          ROSALIA FELDMAN

CERTIFICATE NUMBER               JJ-7033900

FORM NUMBER                      GUL 4070

DEATH BENEFIT QUALIFICATION TEST – CASH VALUE ACCUMULATION TEST

TABLE OF CORRIDOR FACTORS

| ATTAINED AGE | CORRIDOR FACTOR |
|---|---|
| 78 | 1.53 |
| 79 | 1.50 |
| 80 | 1.47 |
| 81 | 1.44 |
| 82 | 1.41 |
| 83 | 1.38 |
| 84 | 1.36 |
| 85 | 1.33 |
| 86 | 1.31 |
| 87 | 1.29 |
| 88 | 1.27 |
| 89 | 1.25 |
| 90 | 1.23 |
| 91 | 1.22 |
| 92 | 1.20 |
| 93 | 1.18 |
| 94 | 1.16 |
| 95 | 1.14 |
| 96 | 1.12 |
| 97 | 1.10 |
| 98 | 1.08 |
| 99 | 1.04 |
| 100 | 1.00 |
| 101 And After | 1.00 |

PLAN OF INSURANCE      FLEXIBLE PREMIUM
                       ADJUSTABLE LIFE

G4170-A.1106                        PAGE 4C

LINCOLN007905

INSURED                    ROSALIA FELDMAN

CERTIFICATE NUMBER         JJ-7033900

FORM NUMBER                GUL 4070

FACTORS USED IN THE CALCULATION OF COVERAGE PROTECTION GUARANTEE:

CPA I, II, III INTEREST RATES: 5.35% FOR CERTIFICATE YEARS 1-10; 5.60% FOR CERTIFICATE YEARS 11-30; AND 5.60% FOR CERTIFICATE YEARS 31 AND THEREAFTER.

IF THE TOTAL VALUE OF THE CPA ACCOUNTS ON A MONTHLY ANNIVERSARY IS LESS THAN ZERO, WE WILL NOT APPLY NEGATIVE INTEREST TO THE ACCOUNTS.

COVERAGE PROTECTION GUARANTEE NET PREMIUM FACTOR 100.00% OF GROSS PREMIUM PAID IN ALL CERTIFICATE YEARS

COVERAGE PROTECTION GUARANTEE REINSTATEMENT PROVISIONS PERIOD: WITHIN 90 DAYS AFTER THE DATE OF TERMINATION AND PRIOR TO THE INSURED'S ATTAINED AGE 121

PLAN OF INSURANCE      FLEXIBLE PREMIUM
                       ADJUSTABLE LIFE

G4170-A.1106                          PAGE 4D

LINCOLN007906

INSURED                          ROSALIA FELDMAN

CERTIFICATE NUMBER               JJ-7033900

FORM NUMBER                      GUL 4070

COVERAGE PROTECTION GUARANTEE
COST OF INSURANCE RATES PER 1,000 OF SPECIFIED AMOUNT

| CERT YEAR | TABLE A MONTHLY RATE | TABLE B MONTHLY RATE | CERT YEAR | TABLE A MONTHLY RATE | TABLE B MONTHLY RATE | CERT YEAR | TABLE A MONTHLY RATE | TABLE B MONTHLY RATE |
|---|---|---|---|---|---|---|---|---|
| 1 | 0.68975 | 0.68975 | 16 | 5.55226 | 11.81333 | 31 | 18.29793 | 42.55333 |
| 2 | 0.80011 | 0.80011 | 17 | 5.97310 | 12.98500 | 32 | 19.55783 | 45.48333 |
| 3 | 0.95650 | 0.95650 | 18 | 6.42412 | 14.27583 | 33 | 20.84640 | 48.48000 |
| 4 | 1.15689 | 1.15689 | 19 | 6.90176 | 15.68583 | 34 | 22.08480 | 51.36000 |
| 5 | 1.40021 | 1.40021 | 20 | 7.41893 | 17.25333 | 35 | 23.28593 | 54.15333 |
| 6 | 1.68245 | 2.10596 | 21 | 8.15674 | 18.96916 | 36 | 24.37956 | 56.69666 |
| 7 | 2.00573 | 3.34026 | 22 | 8.97087 | 20.86250 | 37 | 25.92111 | 60.28166 |
| 8 | 2.36683 | 4.30333 | 23 | 9.86169 | 22.93416 | 38 | 27.35516 | 63.61666 |
| 9 | 2.76030 | 5.11166 | 24 | 10.66220 | 24.79583 | 39 | 28.84296 | 67.07666 |
| 10 | 3.19060 | 6.02000 | 25 | 11.53439 | 26.82416 | 40 | 30.47410 | 70.87000 |
| 11 | 3.64260 | 7.00500 | 26 | 12.50726 | 29.08666 | 41 | 31.97910 | 74.37000 |
| 12 | 4.12505 | 8.08833 | 27 | 13.56650 | 31.55000 | 42 | 33.50810 | 77.92583 |
| 13 | 4.45000 | 8.90000 | 28 | 14.71173 | 34.21333 | 43 | 35.83333 | 83.33333 |
| 14 | 4.79465 | 9.78500 | 29 | 15.88563 | 36.94333 | | | |
| 15 | 5.15560 | 10.74083 | 30 | 17.08820 | 39.74000 | | | |

PLAN OF INSURANCE        FLEXIBLE PREMIUM
                         ADJUSTABLE LIFE

G4170-A.1106                           PAGE 4E

LINCOLN007907

INSURED                          ROSALIA FELDMAN

CERTIFICATE NUMBER               JJ-7033900

FORM NUMBER                      GUL 4070

COVERAGE PROTECTION GUARANTEE
TABLE OF ADMINISTRATIVE CHARGES

| CERTIFICATE YEAR | MONTHLY RATE | CERTIFICATE YEAR | MONTHLY RATE |
|---|---|---|---|
| 1 | 21,204.16 | 36 | 10.00 |
| 2 | 20,100.50 | 37 | 10.00 |
| 3 | 18,536.66 | 38 | 10.00 |
| 4 | 16,532.75 | 39 | 10.00 |
| 5 | 14,099.50 | 40 | 10.00 |
| 6 | 8,467.00 | 41 | 10.00 |
| 7 | 2,424.00 | 42 | 10.00 |
| 8 | 10.00 | 43 | 10.00 |
| 9 | 10.00 | | |
| 10 | 10.00 | | |
| 11 | 10.00 | | |
| 12 | 10.00 | | |
| 13 | 10.00 | | |
| 14 | 10.00 | | |
| 15 | 10.00 | | |
| 16 | 10.00 | | |
| 17 | 10.00 | | |
| 18 | 10.00 | | |
| 19 | 10.00 | | |
| 20 | 10.00 | | |
| 21 | 10.00 | | |
| 22 | 10.00 | | |
| 23 | 10.00 | | |
| 24 | 10.00 | | |
| 25 | 10.00 | | |
| 26 | 10.00 | | |
| 27 | 10.00 | | |
| 28 | 10.00 | | |
| 29 | 10.00 | | |
| 30 | 10.00 | | |
| 31 | 10.00 | | |
| 32 | 10.00 | | |
| 33 | 10.00 | | |
| 34 | 10.00 | | |
| 35 | 10.00 | | |

PLAN OF INSURANCE        FLEXIBLE PREMIUM
                         ADJUSTABLE LIFE

G4170-A.1106                          PAGE 4F

LINCOLN007908

## Definitions

Where the terms below appear in this certificate, We define them as follows:

**Account Value**   As defined in the Nonforfeiture Provisions on Page 9.

**Age**   The Insured's age, nearest birthday, on the Certificate Date.

**Attained Age**   The Insured's age as measured from the Certificate Date plus the number of completed certificate years.

**Cash Surrender Value**   The Account Value as of the date of surrender less the charge, if any, for full surrender, and less any Debt.

**Cash Value**   Account Value less any surrender charge.

**Certificate Date**   The date We use to determine certificate anniversaries and monetary values. If a requested Certificate Date should fall on the 29th, 30th or 31st of a month, the Certificate Date will be the 28th of such month.

**Coverage Protection Guarantee**   A certificate feature that provides that the certificate will remain in effect to the death of the Insured subject to the requirements as stipulated in the Coverage Protection Guarantee Provisions on Page 11.

**Debt**   The principal of a certificate loan together with interest due.

**Insured**   The person whose life is insured under this certificate.

**Irrevocable Beneficiary**   A beneficiary, named by You as irrevocable, whose written consent is necessary for You to exercise any right specified in this certificate.

**Issue Date**   The date the certificate is issued at Our Service Office as stated on Page 3.

**Monthly Anniversary Day**   The same day in each month as the Certificate Date.

**Nonparticipating**   No dividends will be paid on this certificate.

**Notice, Election, Request**   Writings satisfactory to Us that have been received at Our Service Office. We will not be held responsible for any payment or other action We have taken before Your writings are recorded at Our Service Office.

**Proceeds**   The money We will pay as a death benefit or if the certificate is surrendered for its Cash Surrender Value.

1. As a Death Claim   The proceeds will be the amount of insurance as described on page 8.

2. Upon Surrender   The proceeds will be the Cash Surrender Value.

**Service Office**   Our principal place of business as shown on Page 1.

**"We", "Our", "Us"**   The Company.

**"You", "Your"**   The Owner of this certificate.

## Certificate Owner and Beneficiary

**Certificate Owner**   The Certificate Owner is shown on page 3 or in a rider attached to this certificate. While the Insured is alive, the Certificate Owner may exercise every right and option and receive every benefit provided by this certificate. These rights, however, are subject to the written consent of any Irrevocable Beneficiary. Certificate owner refers only to those rights of beneficial interest granted under The Lincoln National Life Insurance Trust as amended or added to.

**Beneficiary**   The beneficiary is as stated in the application unless later changed.

**Change of Certificate Owner or Beneficiary**   While the Insured is alive, the Certificate Owner or beneficiary may be changed. Any change will take effect as of the date the request is signed. The Insured need not be living when the requested change is recorded at Our Service Office, however the requested change must be delivered to Us prior to the death of the Insured.

**Death of the Certificate Owner or Beneficiary**   If a Certificate Owner other than the Insured dies while the Insured is living, all rights and options of the Certificate Owner will belong to the Certificate Owner's executors or administrators or to the Certificate Owner's successor in interest (if the Certificate Owner is a non-natural person) unless otherwise provided. The interest of any beneficiary, including any Irrevocable Beneficiary, who dies before the Insured, will belong to the Certificate Owner unless otherwise provided.

G4270

Certificate Number   JJ7033900

LINCOLN007909

# General Provisions

**The Certificate**   This certificate is issued in consideration of the application and payment of the initial premium. This certificate, the attached copy of the application and/or endorsements, and any attached supplemental applications and riders form the entire certificate. All statements made by or for the Insured are, in the absence of fraud, considered to be representations and not warranties. We will not use any statement by or for the Insured to void this certificate or to deny a claim unless it is contained in an application.

**Certificate Changes**   . Only an authorized officer of the Company can change the terms or waive provisions of this certificate. A change must be in writing.

**Incontestability**   We will not contest this certificate after it has been in force during the Insured's lifetime for 2 years from the Issue Date. An increase in the Specified Amount will not be contested after it has been in force during the Insured's lifetime for 2 years from its effective date.

**Suicide**   If the Insured, while sane or insane, commits suicide within 2 years from the Issue Date, the amount payable will be no more than the sum of the premiums paid less any Debt and any partial surrenders. If the Insured, while sane or insane, commits suicide within 2 years from the effective date of an increase in the Specified Amount, the amount payable under such increase will be the sum of the monthly deductions for such increase. The amount payable under this provision will be paid to the Beneficiary. Any amount payable will first be used to pay the interest of anyone to whom the certificate has been assigned.

**Assignment**   Only You have the right to assign this certificate. We are not bound by an assignment unless it has been recorded at Our Service Office. We are not responsible for the validity or effect of any assignment.

**Misstatement of Age or Sex**   If the age or sex of the Insured has been misstated, the amount of death benefit will be adjusted to the amount which would have been provided by the most recent cost of insurance deduction at the true age and sex. The Account Value will not be affected.

**Compliance with the Internal Revenue Code**   This certificate is intended to qualify as life insurance under the Internal Revenue Code. The death benefit provided by this certificate is intended to qualify for the Federal income tax exclusion. If at any time the premium paid under this certificate exceeds the amount allowable for such qualification, We will refund the premium to You with interest within sixty days after the end of the certificate year in which the premium was received. If, for any reason, We do not refund the excess premium within sixty days after the end of such certificate year, the excess premium will be held in a separate deposit fund and credited with interest until refunded to You. The interest rate used on any refund or credited to the separate deposit fund created by this provision will be the current rate of interest We are paying on this certificate.

We also reserve the right to refuse to make any change in the Specified Amount or the Death Benefit Option or any other change if such change would cause this certificate to fail to qualify as life insurance under the Internal Revenue Code.

**Modified Endowment**   This certificate will be allowed to become a modified endowment contract under the Internal Revenue Code only with Your consent. Otherwise, if at any time the premiums paid under the certificate exceed the limit for avoiding modified endowment contract status, the excess premium will be refunded to You with interest within sixty days after the end of the certificate year in which the premium was received. If, for any reason, We do not refund the excess premium within sixty days after the end of such certificate year, the excess premium will be held in a separate deposit fund and credited with interest until refunded to You. The interest rate used on any refund or credited to the separate deposit fund created by this provision will be the current rate of interest We are paying on this certificate.

**Annual Report**   We will provide an Annual Report to You. This report will show the activity of the certificate for the past certificate year. It will list premiums paid, expenses charged, monthly deductions, interest credited, and partial surrenders. It will show the then current death benefit, Account Values and Debt, as well as any other information required by state law and regulation. By comparing the actual Account Values to the projection of values received when this certificate was purchased You can determine whether this certificate is performing as planned.

Upon request, We will provide a projection of illustrative future death benefits and Account Values. The first illustration in any certificate year will be furnished free of charge. If You request more than one illustration in a certificate year We reserve the right to apply a charge for this service.

**Settlement**   Payment or settlement under this certificate will be made at Our Service Office in a lump sum payment unless You elect to receive proceeds under a Settlement Option as stated in the Settlement Options provision. At the time of settlement, any Debt will be deducted. At the time of settlement, We reserve the right to require surrender of this certificate.

**Deferment**   We may defer making a partial surrender or certificate loan up to 6 months after We receive Your request, however a partial surrender or loan for payment of premiums to Us will not be deferred.

G4270

LINCOLN007910

# Premium Provisions

**Premium Payment**   The initial premium is due on the Certificate Date and is payable on or before delivery of this certificate. Thereafter, premiums may be paid at any time and in any amount, subject to the following conditions, unless otherwise agreed to in writing by Us, however sufficient premium must be paid to keep this certificate in force.

The amount of each premium must be at least $25.

We reserve the right to limit the amount of premiums paid in accordance with the Compliance with the Internal Revenue Code and Modified Endowment provisions. We also reserve the right to require evidence of insurability satisfactory to Us for any premium payment that would result in an immediate increase in the difference between the Death Benefit and the Account Value. If satisfactory evidence of insurability is not received, the premium or portion thereof may be returned.

Your premiums are payable in United States currency. Premium payments, after the first, can be made as follows:

1. through prearranged withdrawals by contacting the Service Office;
2. sent to any premium address designated by Us;
3. made to Our authorized agent. A receipt signed by one of Our Officers will be provided upon request.

**Grace Period**   If on a Monthly Anniversary Day the Cash Surrender Value is less than the monthly deduction due, Your certificate will enter the grace period unless the Coverage Protection Guarantee is in effect. A grace period of 60 days from the date that the certificate enters the grace period will be allowed for the payment of the minimum amount needed to continue the certificate. If the Coverage Protection Guarantee is in effect, the grace period will not begin and this certificate will not be subject to termination under this provision.

We will notify You and any assignee of the minimum amount due at least 30 days before the end of the grace period. If the amount specified is not paid within the grace period, this certificate will terminate without value at the end of such period. If the Insured dies within the grace period, the amount needed to continue this certificate to the end of the certificate month of death will be deducted from the amount otherwise payable.

**Reinstatement**   Application to reinstate this certificate may be made within 5 years after the date of termination and prior to the Insured's Attained Age 121 provided this certificate has not been surrendered for its Cash Surrender Value. Limitations exist for reinstatement of the Coverage Protection Guarantee Provisions as stated in this provision. You may apply to reinstate this certificate even if the Coverage Protection Guarantee Provisions can no longer be reinstated.

In addition to the application, reinstatement will require all of the following:

1. You must furnish evidence of insurability satisfactory to Us;

2. You must pay an amount that results in a Cash Surrender Value on the date of reinstatement that is sufficient to keep this certificate in force for at least 2 months;

3. You must pay or reinstate any Debt.

The Cash Surrender Value on the date of reinstatement will equal:

(a) The Account Value at the time of certificate termination; plus

(b) Net Premiums credited at the time of reinstatement; less

(c) The surrender charge at the time of reinstatement; less

(d) Any Debt at the time of reinstatement.

The surrender charge will be based on the duration from the original Certificate Date as though the certificate had never lapsed.

Reinstatement will be effective on the date We approve the application unless another date acceptable to Us is requested. In addition to the required payment to keep the certificate in force as stated in 2. above, We recommend that You resume Your modal premium payments in order to provide coverage beyond the initial period following the date of reinstatement.

We will not contest this certificate for misrepresentations made in the application for reinstatement after this certificate has been in force during the lifetime of the Insured for 2 years from the date of the last reinstatement.

The Coverage Protection Guarantee Provisions may be reinstated at the time of certificate reinstatement if application for reinstatement is received during the Coverage Protection Guarantee Provisions Reinstatement Period as shown on page 4. In order to reinstate the Coverage Protection Guarantee Provisions We will require payment at the time of certificate reinstatement of the lesser of:

(i) the amount stipulated in 2. above; and
(ii) an amount required to reinstate the Coverage Protection Guarantee Provisions on the date of reinstatement that is sufficient to keep the Coverage Protection Guarantee in effect for at least 2 certificate months.

You will be advised at the time of reinstatement of the amount required. In order for the guarantee described in the Coverage Protection Guarantee Provisions to become effective, additional payment may be required. Your request for reinstatement of the Coverage Protection Guarantee Provisions must be received during the specified time period.

**Premium Refund at Death**   Any premium paid after the beginning of the certificate month of death will be refunded as part of the proceeds, unless You request otherwise prior to such payment.

G4370

Certificate Number   JJ7033900

LINCOLN007911

## Insurance Coverage Provisions

**Death Benefit**   The death benefit of this certificate is the larger of:

(a) The death benefit under the Death Benefit Option in effect; or

(b) The Account Value at the beginning of the certificate month of death times the Corridor Factor shown in the table on page 4.

The death benefit will be reduced by any Debt on the date of death. The Account Value at the beginning of the certificate month of death used in calculating the death benefit is after subtracting all parts of the monthly deduction for the certificate month except for the cost of insurance.

**Death Benefit Qualification Test**   This certificate is intended to qualify as life insurance under the Internal Revenue Code. The death benefit provided by this certificate is intended to qualify for the Federal Income tax exclusion. Two methods of qualifying as life insurance are the Cash Value Accumulation Test and the Guideline Premium Test, as defined in Internal Revenue Code Section 7702. The Death Benefit Qualification Test for this certificate is shown on page 4 and cannot be changed. Unless You elected otherwise, the Death Benefit Qualification Test is the Guideline Premium Test.

**Death Benefit Options**   There are three death benefit options as described in this provision. The death benefit option for this certificate is shown on page 3.

- **Option I**   The death benefit is the Specified Amount on the date of death.

- **Option II**   The death benefit is the Specified Amount on the date of death plus the Account Value at the beginning of the certificate month of death.

- **Option III**   The death benefit is the Specified Amount on the date of death plus the total of the premiums paid prior to the Insured's Attained Age 100 less the total of any partial surrenders taken to the date of death. If the total of the partial surrenders taken to the date of death is greater than the total of premiums paid prior to the Insured's Attained Age 100, then the death benefit will be less than the Specified Amount.

**Continuation of Certificate After Age 121**   If this certificate is in force at the Attained Age 121 of the Insured (but not in the grace period) the following will occur:

(a) Your certificate will continue in force for the lifetime of the Insured unless You surrender this certificate;

(b) the Death Benefit Option in effect may not be changed;

(c) no further premium payments may be made;

(d) no further monthly deductions will be taken;

(e) Certificate loans and partial surrenders can continue to be taken. Loan rates will apply as stated on Page 4;

(f) All supplemental riders and benefits will terminate.

If this certificate is in the grace period at Attained Age 121 You will need to pay the minimum amount required to remove this certificate from the grace period in order to guarantee continuation of this certificate beyond Attained Age 121.

**Changes in Insurance Coverage**   Upon request, the insurance coverage may be changed at any time after the first certificate year as described in this provision.

- **Increases In Specified Amount**   The Maximum Attained Age for an increase in Specified Amount is as shown on Page 4. If a change would result in an increase in the amount payable at death, such change will be subject to satisfactory evidence of insurability.

- **Decreases In Specified Amount**   A decrease in Specified Amount may be made prior to the Attained Age 121 of the Insured. The Specified Amount may not be decreased below the minimum shown on page 4. A decrease in the Specified Amount will apply first against insurance with the most recent effective date, with the Initial Specified Amount being last to be decreased. A surrender charge will be applied as specified in the Surrender Charges provision.

- **Changes in Death Benefit Option**   Prior to Attained Age 121 You may request a change in death benefit option to Option I or Option II. Changes to Option III are not permitted. If a change would result in an increase in the amount payable at death, such change will be subject to satisfactory evidence of insurability.

Rating class changes that may occur upon your request (such as a change in Tobacco User status) can be made at any time after the first certificate year and prior to the Insured's Attained Age 121. Changes in insurance coverage will be effective on the Monthly Anniversary Day on or next following the date of approval by Us of the request for the change, unless another date acceptable to Us is requested.

**Certificate Changes and the Coverage Protection Guarantee**   Rating class changes that result in a more favorable mortality rating will require a change to Table A, B and the Table of Coverage Protection Guarantee Administrative Charges used in determining the Coverage Protection Guarantee. A new specifications page will be sent to You after such change. Decreases in Specified Amount for the certificate or any attached rider and death benefit option changes will not require a change to Table A, B or the Table of Coverage Protection Guarantee Administrative Charges. A charge will be applied in determining the Coverage Protection Guarantee following an increase in Specified Amount as stipulated in the Coverage Protection Guarantee provisions.

G4370

LINCOLN007912

## Nonforfeiture Provisions

**Account Value**   The Account Value on the Certificate Date will be equal to all net premiums paid for this certificate. The Account Value of this certificate is then determined on each Monthly Anniversary Day by accumulating with interest the Account Value for the prior month increased by net premiums credited and decreased by monthly deductions and by the reduction in Account Value caused by any partial surrender since the preceding Monthly Anniversary Day.

On any day other than a Monthly Anniversary Day, the Account Value will be the Account Value as of the preceding Monthly Anniversary Day minus both the monthly deduction for the current certificate month and the reduction in Account Value caused by any partial surrender since the preceding Monthly Anniversary Day.

In addition, if the surrender is processed as of the preceding Monthly Anniversary Day We will refund any premium received since the preceding Monthly Anniversary Day.

**Net Premium**   Each net premium will be computed by multiplying each gross premium by the guaranteed net premium factor shown on page 4.  A higher net premium factor may be applied as determined by Us.

**Interest Rate**   The interest rate used in the calculation of the Account Value will never be less than the Interest Rate Used to Calculate Minimum Cash Surrender Values as shown on page 4. Interest in excess of the guaranteed rate may be applied as determined by Us. Such interest is referred to in this certificate as excess interest.

Interest will begin to accumulate as of the date the net premium is credited.

**Monthly Deduction**   The monthly deduction for a certificate month will be computed as (1) plus (2) where:

(1)  is the cost of insurance and the cost of any additional benefits provided by rider for the certificate month.

(2)  is the sum of all administrative charges for the certificate  and any attached riders shown on page 4 as being due for the certificate month.

If there is an increase in the Specified Amount, additional charges will be in effect for the increase as shown on page 4. A new specifications page will be sent to You following an increase in Specified Amount.

**Cost of Insurance**   The cost of insurance is determined on a monthly basis as the cost of insurance rate for the month multiplied by the net amount at risk for the month. The net amount at risk for the Account Value calculation is computed as (1) minus (2) where:

(1)  is the death benefit for the month before reduction for any Debt, discounted to the beginning of the month at the guaranteed interest rate.

(2)  is the Account Value at the beginning of the month.

For months in which Death Benefit Option I is in effect, for the purpose of allocating the cost of insurance between different parts of the Specified Amount, the Account Value will be considered as part of the Initial Specified Amount. If such value exceeds the Initial Specified Amount, any excess will be considered part of the earliest addition to the Specified Amount. This allocation will continue in order of all additions to the Specified Amount until all value is allocated.

**Cost of Insurance Rates**   The monthly cost of insurance rates are determined by Us. The table of guaranteed maximum rates is shown on pages 13 and 14. We may use rates lower than these guaranteed maximum rates. We will never use higher rates. The guaranteed maximum rates are based on the mortality table shown on page 4.

**Continuation of Insurance**   This certificate and all riders will continue in force according to the terms as long as either the Cash Surrender Value is sufficient to cover the monthly deduction or the total of the Coverage Protection Accounts equals or exceeds Debt. If neither amount is sufficient, the certificate will terminate according to the grace period provision. If premiums are discontinued on any date, the Cash Surrender Value on that date will be used to provide insurance under this provision.

**Basis of Values**   Minimum Account Values are based on the mortality assumptions and interest rates shown on page 4. The values for this certificate are at least equal to the minimum required by law. If required, a detailed statement of the method used to determine Account Values and reserves has been filed with the states in which this certificate is delivered.

**Changes in Rates**   At Our sole discretion, We may change the monthly cost of insurance rates or excess interest rate at any time. We will base any change on Our future expectations as to investment earnings, mortality, persistency, expenses and taxes. We will not make any change in order to distribute past gains or recoup prior losses. Any change in the monthly cost of insurance rates will apply to all Insureds with the same combination of the following: Attained Age, sex, Initial Specified Amount, length of time the certificate has been in force and rate class. Changes in rates will affect the Account Value. Changes in rates may also affect length of insurance coverage.

G4470

Certificate  Number  JJ7033900

LINCOLN007913

## Nonforfeiture Provisions (Continued)

**Surrender and Surrender Value**   Upon request, You may surrender this certificate for its Cash Surrender Value. Surrender within 31 days after a certificate anniversary date will be treated as a surrender on that date, otherwise the surrender request will be effective on the Monthly Anniversary Day nearest the date We receive Your request.

**Partial Surrender**   Upon request, You may make a partial surrender of this certificate. The partial surrender may be for any amount equal to or greater than the Partial Surrender Minimum Amount shown on page 4, not to exceed the Cash Surrender Value less $500.

When a partial surrender is made:

1. the Account Value will be reduced by the amount of the partial surrender, plus the partial surrender fee shown on page 4;

2. the death benefit will be reduced by the amount at least equal to the reduction in Account Value. Such a reduction may be produced without changing the Specified Amount. If not, We will reduce the Specified Amount so that the reduction in death benefit is equal to the reduction in value. If Death Benefit Option III is in effect and the total of the partial surrenders is greater than the premiums paid, then the Death Benefit will be less than the Specified Amount. A partial surrender cannot be allowed if it would reduce the Specified Amount below the minimum shown on page 4.

**Surrender Charges**   The charge for full surrender will be the amount shown on Page 4 for the number of completed certificate months preceding surrender. There will be a partial charge if there is a decrease in the Specified Amount while there is a surrender charge in effect. If there is an increase in the Specified Amount, an additional surrender charge may be in effect for the increase. If there is an additional surrender charge in effect for an increase in Specified Amount, a new schedule of surrender charges will be provided after such increase.

Surrender charges are computed based on the number of thousands of Specified Amount. The partial charge for a decrease in Specified Amount will be based on the per thousand charge for the number of thousands of the decrease. A decrease in Specified Amount will apply first against insurance with the most recent effective date.

A new schedule of surrender charges will be provided after a change in such charges.

LINCOLN007914

## Coverage Protection Guarantee Provisions

**Coverage Protection Guarantee**   When the Coverage Protection Guarantee is in effect, this guarantee will provide that this certificate will not enter the grace period because the certificate's Cash Surrender Value is insufficient to cover the current monthly deductions as defined in the certificate. The Coverage Protection Guarantee is in effect if the total of the Coverage Protection Accounts (herein referred to as "CPA I", "CPA II" and "CPA III" or the "account(s)") equals or exceeds Debt. The total of the Coverage Protection Accounts is a value equal to what the Account Value would have been if calculated using the provisions described below. The Coverage Protection Accounts are used only for determining if the Coverage Protection Guarantee is in effect and are not used in calculating the actual Account Value provided under this certificate.

**Coverage Protection Value**   The value of CPA I, CPA II and CPA III on the Certificate Date will be equal to all net premiums allocated to each account. The value of each account is then determined on each Monthly Anniversary Day by accumulating with interest the value for the prior month increased by net premiums credited to that account and decreased by monthly deductions charged to that account and by the reduction in value caused by any partial surrender charged to that account since the preceding Monthly Anniversary Day. The total of the Coverage Protection Accounts may become less than zero.

On any day other than a Monthly Anniversary Day, the value of the account will be the value as of the preceding Monthly Anniversary Day minus both the monthly deduction for the current certificate month charged to that account and the reduction in value caused by any partial surrender charged to that account since the preceding Monthly Anniversary Day.

**Net Premium**   Each net premium will be computed by multiplying each gross premium by the Coverage Protection Guarantee Net Premium Factor on Page 4.

**Interest Rate**   The interest rate for all accounts is shown on Page 4.

Interest will begin to accumulate as of the date the net premium is credited.

**Monthly Deduction**   The monthly deduction for a certificate month will be computed as (1) plus (2) where

(1) is the cost of insurance and the guaranteed maximum cost of any additional benefits provided by rider for the certificate month.

(2) is the administrative charges. The Coverage Protection Guarantee Administrative Charges on Page 4 will be used, plus the maximum guaranteed administrative charges for any attached riders shown on page 4 as being due for the certificate month.

This amount will include any Coverage Protection Guarantee charge in effect for an increase. Such charge will be based upon the Attained Age, sex, class of the Insured and the amount of the increase and will be shown on a supplemental specifications page that We will send to You.

**Cost of Insurance**   The cost of insurance is determined on a monthly basis as the cost of insurance rate for the month multiplied by the net amount at risk for the month.

The net amount at risk for an account is computed as (1) minus (2) where

(1) is the death benefit for the month before reduction for any Debt, discounted to the beginning of the month at the CPA III guaranteed interest rate.

(2) is the total of all Coverage Protection Accounts at the beginning of the month.

**Cost of Insurance Rates**   The monthly cost of insurance rates for use in the account calculations are shown in the Coverage Protection Guarantee Cost of Insurance Table A and B on Page 4. Table B will be applied if CPA III is not equal to zero otherwise Table A will be applied. The rate in the designated Table will apply to all accounts.

**Changes in Rates**   The cost of insurance rates and the interest rates described in the Coverage Protection Guarantee provisions are fixed and guaranteed and not subject to change.

**Allocation Among Accounts**   Net premiums, partial surrenders and monthly deductions will be allocated among the accounts by the following rules:

- **Net Premiums**
a) If the initial premium, allocate to CPA I.
b) If any other premium paid in the first certificate year while the total of all accounts exceeds zero, allocate to CPA I.
c) If any other premium paid while the total of the accounts is equal to or less than zero, allocate to CPA III.
d) Otherwise, allocate to CPA II.

- **Partial Surrenders**
  Each account will be reduced by the same proportion as the Cash Value.

- **Monthly Deductions**
a) Allocate to CPA III until it is reduced to zero.
b) Allocate balance to CPA II until it is reduced to zero.
c) Allocate any additional balance to CPA I until it is reduced to zero.
d) Allocate remaining balance to CPA III (in addition to any allocation to CPA III made in a) above).

G4571

Certificate Number: JJ7033900

LINCOLN007915

## Coverage Protection Guarantee Provisions Continued

**Disability Waiver Benefits**   If a Disability Waiver of Monthly Deduction Benefit is attached to this certificate and if You qualify for a Disability Waiver Benefit, monthly deductions due for the purposes of determining if the Coverage Protection Guarantee is in effect will be waived. If a Disability Waiver of Specified Premium Benefit is attached to this certificate, any premium paid to this certificate will be applied as premium for the purposes of determining if the Coverage Protection Guarantee is in effect.

## Certificate Loans

**When Available**   A loan may be obtained by request when this certificate has a loan value. This certificate will be the sole security for the loan.

**Amount Available**   The loan value at any time is the then current Account Value if this certificate were surrendered on the date of determination.

The maximum additional loan at any time is the loan value at that time less:

1. any existing loan;

2. accrued interest on any existing loan; and

3. interest on the total outstanding loan to the end of the certificate year.

**Loan Interest**   Interest on a certificate loan is due and payable on each certificate anniversary. If You do not pay the interest when it is due, We will add the amount of interest to the loan. We will charge interest on this amount at the same interest being charged on the loan.

The effective annual certificate loan interest rate is shown on page 4.

You must assign this certificate to Us to the extent of the outstanding loan. If the Insured dies, We will deduct the outstanding loan from the death benefit before We pay the death benefit to the beneficiary.

**Loan Repayments**   You may repay all or part of a loan at any time while this certificate is in force. Each partial repayment must be at least $25.

Every payment to Us on this certificate will be considered a premium payment unless clearly marked for loan repayment or for payment of loan interest.

**Preferred Loan Amounts**  Beginning with the 21st certificate year, all loan balances will be considered to be preferred loan amounts at the certificate loan interest rate for preferred loans as shown on page 4.

**Maximum Loan Amount**   If the Debt at any time equals or exceeds the loan value, this certificate will enter the grace period.

## Settlement Options

When the Insured dies while the certificate is in force, certificate proceeds may be paid in a lump sum or left with Us for payment under a settlement option that We make available.

The amount applied under an option for the benefit of any beneficiary must be at least $2,500. The amount of each payment under an option must be at least $50.

You may make, change or revoke an election at any time while the Insured is alive. Following the death of the Insured, the beneficiary may elect an option if You have not elected one or if proceeds are payable in one sum. A beneficiary may make a change in payment under a settlement option You elect only if You provided for it in Your election.

A change of beneficiary automatically cancels a previous election of a settlement option.

If this certificate is assigned, the assignee's portion of proceeds will be paid in one sum. Any balance of proceeds may be applied under a settlement option.

To the extent allowed by law, all payments under the certificate will be free from creditor claims or legal process.

G4571

LINCOLN007916

## Table of Guaranteed Maximum Cost of Insurance Rates – Male

**Basis of Calculation**
Non-Tobacco User:   2001 CSO Male Nonsmoker Table
Tobacco-User:       2001 CSO Male Smoker Table

| Attained Age | Monthly Rate Per $1,000 *Non-Tobacco-User | Monthly Rate Per $1,000 Tobacco-User | Attained Age | Monthly Rate Per $1,000 *Non-Tobacco-User | Monthly Rate Per $1,000 Tobacco-User | Attained Age | Monthly Rate Per $1,000 *Non-Tobacco-User | Monthly Rate Per $1,000 Tobacco-User | Attained Age | Monthly Rate Per $1,000 *Non-Tobacco-User | Monthly Rate Per $1,000 Tobacco-User |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.08087 | 0.08087 | 30 | 0.08504 | 0.15012 | 60 | 0.74639 | 1.36774 | 90 | 16.90881 | 19.88006 |
| 1 | 0.04668 | 0.04668 | 31 | 0.08421 | 0.15012 | 61 | 0.83045 | 1.50744 | 91 | 18.41631 | 21.37882 |
| 2 | 0.03251 | 0.03251 | 32 | 0.08421 | 0.15179 | 62 | 0.93311 | 1.67620 | 92 | 20.01527 | 22.93445 |
| 3 | 0.02250 | 0.02250 | 33 | 0.08671 | 0.15597 | 63 | 1.04853 | 1.86399 | 93 | 21.73361 | 24.57148 |
| 4 | 0.01750 | 0.01750 | 34 | 0.08838 | 0.16181 | 64 | 1.17000 | 2.05643 | 94 | 23.58543 | 26.30185 |
| 5 | 0.01750 | 0.01750 | 35 | 0.09088 | 0.16682 | 65 | 1.29840 | 2.24672 | 95 | 25.57306 | 28.25727 |
| 6 | 0.01834 | 0.01834 | 36 | 0.09588 | 0.17600 | 66 | 1.42867 | 2.43056 | 96 | 27.43188 | 30.02008 |
| 7 | 0.01834 | 0.01834 | 37 | 0.10006 | 0.18602 | 67 | 1.56083 | 2.60963 | 97 | 29.45788 | 31.91763 |
| 8 | 0.01834 | 0.01834 | 38 | 0.10756 | 0.20022 | 68 | 1.70337 | 2.79851 | 98 | 31.67269 | 33.96660 |
| 9 | 0.01917 | 0.01917 | 39 | 0.11424 | 0.21442 | 69 | 1.85123 | 2.98606 | 99 | 34.09954 | 36.18444 |
| 10 | 0.01917 | 0.01917 | 40 | 0.12175 | 0.23113 | 70 | 2.03086 | 3.21370 | 100 | 36.77137 | 38.58954 |
| 11 | 0.02250 | 0.02250 | 41 | 0.13176 | 0.25285 | 71 | 2.23220 | 3.46356 | 101 | 38.95131 | 40.45553 |
| 12 | 0.02750 | 0.02750 | 42 | 0.14428 | 0.27792 | 72 | 2.49735 | 3.80444 | 102 | 41.33540 | 42.46701 |
| 13 | 0.03251 | 0.03251 | 43 | 0.15847 | 0.30802 | 73 | 2.77788 | 4.14835 | 103 | 43.94625 | 44.63067 |
| 14 | 0.03918 | 0.03918 | 44 | 0.17517 | 0.34398 | 74 | 3.07394 | 4.49708 | 104 | 46.81288 | 46.96694 |
| 15 | 0.05085 | 0.05085 | 45 | 0.19437 | 0.38163 | 75 | 3.39865 | 4.90432 | 105 | 49.92533 | 50.07476 |
| 16 | 0.06169 | 0.06586 | 46 | 0.21275 | 0.41679 | 76 | 3.75405 | 5.33991 | 106 | 53.36259 | 53.50743 |
| 17 | 0.07086 | 0.08087 | 47 | 0.23280 | 0.45614 | 77 | 4.16842 | 5.84602 | 107 | 57.17347 | 57.31532 |
| 18 | 0.07670 | 0.09255 | 48 | 0.24450 | 0.47792 | 78 | 4.65484 | 6.43457 | 108 | 61.41905 | 61.55471 |
| 19 | 0.07837 | 0.10089 | 49 | 0.25787 | 0.50306 | 79 | 5.21978 | 7.10897 | 109 | 66.17321 | 66.30603 |
| 20 | 0.07920 | 0.10589 | 50 | 0.27709 | 0.53910 | 80 | 5.63986 | 7.63478 | 110 | 71.52939 | 71.65768 |
| 21 | 0.07920 | 0.11090 | 51 | 0.29966 | 0.58186 | 81 | 6.55095 | 8.65446 | 111 | 72.70979 | 72.82524 |
| 22 | 0.07920 | 0.11674 | 52 | 0.33060 | 0.64059 | 82 | 7.29756 | 9.48906 | 112 | 73.89017 | 73.99281 |
| 23 | 0.08004 | 0.12175 | 53 | 0.36406 | 0.70691 | 83 | 8.10961 | 10.37259 | 113 | 75.07057 | 75.16037 |
| 24 | 0.08087 | 0.12842 | 54 | 0.40674 | 0.79009 | 84 | 9.01738 | 11.34326 | 114 | 76.25096 | 76.32793 |
| 25 | 0.08170 | 0.13593 | 55 | 0.45949 | 0.88429 | 85 | 10.04235 | 12.49853 | 115 | 77.43136 | 77.49550 |
| 26 | 0.08504 | 0.14261 | 56 | 0.51311 | 0.98027 | 86 | 11.19223 | 13.78043 | 116 | 78.61176 | 78.66307 |
| 27 | 0.08921 | 0.15096 | 57 | 0.57096 | 1.08225 | 87 | 12.46504 | 15.17947 | 117 | 79.79214 | 79.83064 |
| 28 | 0.08754 | 0.15179 | 58 | 0.62045 | 1.16240 | 88 | 13.84938 | 16.67389 | 118 | 80.97254 | 80.99820 |
| 29 | 0.08587 | 0.15096 | 59 | 0.67752 | 1.25530 | 89 | 15.33342 | 18.24676 | 119 | 83.33333 | 83.33333 |
|  |  |  |  |  |  |  |  |  | 120 | 83.33333 | 83.33333 |

*Applies to Preferred Plus Rate Classes

Certificate Number  JJ7033900

LINCOLN007917

## Table of Guaranteed Maximum
## Cost of Insurance Rates - Female

**Basis of Calculation**
Non-Tobacco User:  2001 CSO Female Nonsmoker Table
Tobacco-User:       2001 CSO Female Smoker Table

| Attained Age | Monthly Rate Per $1,000 | | Attained Age | Monthly Rate Per $1,000 | | Attained Age | Monthly Rate Per $1,000 | | Attained Age | Monthly Rate Per $1,000 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | *Non-Tobacco-User | Tobacco-User | | *Non-Tobacco-User | Tobacco-User | | *Non-Tobacco-User | Tobacco-User | | *Non-Tobacco-User | Tobacco-User |
| 0 | 0.04001 | 0.04001 | 30 | 0.05335 | 0.08587 | 60 | 0.61877 | 1.17169 | 90 | 10.65716 | 13.74743 |
| 1 | 0.02917 | 0.02917 | 31 | 0.05668 | 0.09338 | 61 | 0.67164 | 1.26544 | 91 | 11.13848 | 13.93102 |
| 2 | 0.02167 | 0.02167 | 32 | 0.06002 | 0.09922 | 62 | 0.72959 | 1.37113 | 92 | 12.09273 | 14.68487 |
| 3 | 0.01667 | 0.01667 | 33 | 0.06336 | 0.10673 | 63 | 0.78925 | 1.47694 | 93 | 13.52742 | 15.91312 |
| 4 | 0.01583 | 0.01583 | 34 | 0.06836 | 0.11591 | 64 | 0.85400 | 1.58881 | 94 | 15.37195 | 17.50492 |
| 5 | 0.01500 | 0.01500 | 35 | 0.07420 | 0.12759 | 65 | 0.92553 | 1.71101 | 95 | 17.70248 | 19.96740 |
| 6 | 0.01500 | 0.01500 | 36 | 0.07920 | 0.13760 | 66 | 1.00470 | 1.84103 | 96 | 19.97365 | 22.27967 |
| 7 | 0.01750 | 0.01750 | 37 | 0.08587 | 0.14929 | 67 | 1.09153 | 1.98741 | 97 | 22.37368 | 24.66466 |
| 8 | 0.01750 | 0.01750 | 38 | 0.08921 | 0.15680 | 68 | 1.18857 | 2.14854 | 98 | 22.79151 | 24.78100 |
| 9 | 0.01750 | 0.01750 | 39 | 0.09422 | 0.16682 | 69 | 1.29502 | 2.32363 | 99 | 24.20411 | 25.97065 |
| 10 | 0.01834 | 0.01834 | 40 | 0.10006 | 0.17684 | 70 | 1.41259 | 2.51963 | 100 | 26.49423 | 28.05419 |
| 11 | 0.01917 | 0.01917 | 41 | 0.10589 | 0.18853 | 71 | 1.54811 | 2.74352 | 101 | 29.00286 | 30.33527 |
| 12 | 0.02250 | 0.02250 | 42 | 0.11257 | 0.20273 | 72 | 1.69997 | 2.99122 | 102 | 31.88786 | 32.91627 |
| 13 | 0.02500 | 0.02500 | 43 | 0.12091 | 0.21943 | 73 | 1.86484 | 3.25861 | 103 | 35.14321 | 35.77169 |
| 14 | 0.02750 | 0.02750 | 44 | 0.13093 | 0.23865 | 74 | 2.04621 | 3.55277 | 104 | 38.87265 | 38.97711 |
| 15 | 0.02917 | 0.02917 | 45 | 0.14261 | 0.26121 | 75 | 2.24758 | 3.84964 | 105 | 43.09248 | 43.19536 |
| 16 | 0.03251 | 0.03417 | 46 | 0.15597 | 0.28628 | 76 | 2.46909 | 4.17453 | 106 | 47.64149 | 47.74134 |
| 17 | 0.03417 | 0.03834 | 47 | 0.17266 | 0.31806 | 77 | 2.71347 | 4.52511 | 107 | 52.56350 | 52.66166 |
| 18 | 0.03501 | 0.04168 | 48 | 0.19103 | 0.35737 | 78 | 2.98433 | 4.90432 | 108 | 57.81604 | 57.91236 |
| 19 | 0.03751 | 0.04501 | 49 | 0.21108 | 0.40172 | 79 | 3.27761 | 5.31604 | 109 | 63.65206 | 63.74660 |
| 20 | 0.03751 | 0.04835 | 50 | 0.23447 | 0.45028 | 80 | 3.60652 | 5.76162 | 110 | 70.06599 | 70.15869 |
| 21 | 0.03834 | 0.05085 | 51 | 0.26037 | 0.50306 | 81 | 4.05506 | 6.39253 | 111 | 71.39272 | 71.47616 |
| 22 | 0.04001 | 0.05418 | 52 | 0.28963 | 0.56089 | 82 | 4.56366 | 7.08284 | 112 | 72.71945 | 72.79362 |
| 23 | 0.04001 | 0.05585 | 53 | 0.32140 | 0.62212 | 83 | 5.07336 | 7.76030 | 113 | 74.04619 | 74.11108 |
| 24 | 0.04168 | 0.06002 | 54 | 0.35486 | 0.68927 | 84 | 5.64004 | 8.49414 | 114 | 75.37292 | 75.42854 |
| 25 | 0.04168 | 0.06419 | 55 | 0.39084 | 0.75983 | 85 | 6.28261 | 9.23953 | 115 | 76.69966 | 76.74601 |
| 26 | 0.04418 | 0.06753 | 56 | 0.43269 | 0.83550 | 86 | 6.86953 | 9.86560 | 116 | 78.02639 | 78.06348 |
| 27 | 0.04751 | 0.07253 | 57 | 0.47625 | 0.91627 | 87 | 7.76030 | 10.86742 | 117 | 79.35313 | 79.38094 |
| 28 | 0.04835 | 0.07670 | 58 | 0.52317 | 0.99459 | 88 | 8.70032 | 11.87864 | 118 | 80.67986 | 80.69840 |
| 29 | 0.05168 | 0.08254 | 59 | 0.57012 | 1.08141 | 89 | 9.71331 | 12.90713 | 119 | 83.33333 | 83.33333 |
| | | | | | | | | | 120 | 83.33333 | 83.33333 |

*Applies to Preferred Plus Rate Classes

G4671

LINCOLN007918

The Lincoln National Life Insurance Company,  100 North Greene St., PO Box 21008, Greensboro, NC 27401

The Rosalia Feldman Life Ins Tst
Willie Feldman, Ttee
112 Clifton Ave #165
Lakewood,  NJ 08701

# ENDORSEMENT

Name of Insured:  Rosalia Feldman                              Certificate Number JJ7033900

Effective Date:  08/28/2008

This Endorsement is effective on the Effective Date shown above.  This Endorsement is attached to and becomes a part of Your certificate.

Your Certificate Date has been changed from 08/15/2008, to 08/28/2008.

On 08/28/2008, We received all of the necessary information, including the premium, to place Your certificate in force. 08/28/2008 is the effective date of Your coverage.

The Issue Date/Effective Date has been changed to correspond with the new Certificate Date.

This Endorsement will terminate upon termination of the certificate.

Secretary

END-2878G                                          cai

# EXHIBIT  B

| Attorney or Party Name, Address, Telephone & FAX Nos.,State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| **Michael Jay Berger (SBN 100291)**<br>**Law Offices of Michael Jay Berger**<br>**9454 Wilshire Boulevard, 6th floor**<br>**Beverly Hills, CA 90212**<br>**(310) 271-6223 Fax:  (310) 271-9805**<br>**michael.berger@bankruptcypower.com** | |
| ☐ *Individual appearing without attorney*<br>☑ *Attorney for Debtor* | |

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| In re:<br><br>**Leslie Klein**<br><br><br><br>Debtor(s) | CASE NO.: **2:23-bk-10990-SK**<br><br>CHAPTER: **11** |
|---|---|
| | **SUMMARY OF AMENDED SCHEDULES,**<br>**MASTER MAILING LIST,**<br>**AND/OR STATEMENTS**<br>**[LBR 1007-1(c)]** |

A filing fee is required to amend Schedules D, or E/F (see Abbreviated Fee Schedule on the Court's website www.cacb.uscourts.gov). A supplemental master mailing list (do not repeat any creditors on the original) is also required as an attachment if creditors are being added to the Schedule D or E/F. Are one or more creditors being added? ☐ Yes ☑ No

The following schedules, master mailing list or statements (check all that apply) are being amended:

☑ Schedule A/B          ☐ Schedule C          ☐ Schedule D          ☐ Schedule E/F          ☐ Schedule G

☐ Schedule H          ☐ Schedule I          ☐ Schedule J          ☐ Schedule J-2          ☑ Statement of Financial Affairs

☐ Statement About Your Social Security Number(s)          ☐ Statement of Intentions          ☐ Master Mailing List

☐ Other (*specify*) _____

I/we declare under penalty of perjury under the laws of the United States that the amended schedules, master mailing list, and or statements are true and correct.

Date: _____**3/29/2023**_____          _____
                                        **Leslie Klein**
                                        Debtor 1 Signature

                                        _____
                                        Debtor 2 (Joint Debtor) Signature (if applicable)

**NOTE:** It is the responsibility of the Debtor, or the Debtor's attorney, to serve copies of all amendments on all creditors listed in this Summary of Amended Schedules, Master Mailing List, and/or Statements, and to complete and file the attached Proof of Service of Document.

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

Fill in this information to identify your case and this filing:

| | | | |
|---|---|---|---|
| Debtor 1 | **Leslie Klein** | | |
| | First Name | Middle Name | Last Name |
| Debtor 2 | | | |
| (Spouse, if filing) | First Name | Middle Name | Last Name |

United States Bankruptcy Court for the:    CENTRAL DISTRICT OF CALIFORNIA

Case number    **2:23-bk-10990-SK**

☐ Check if this is an amended filing

# Official Form 106A/B

# Schedule A/B: Property                                                     12/15

In each category, separately list and describe items. List an asset only once. If an asset fits in more than one category, list the asset in the category where you think it fits best. Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

**Part 1:**   Describe Each Residence, Building, Land, or Other Real Estate You Own or Have an Interest In

1. Do you own or have any legal or equitable interest in any residence, building, land, or similar property?

☐ No. Go to Part 2.

■ Yes. Where is the property?

1.1

**322 N. June Street**

Street address, if available, or other description

**Los Angeles**    **CA**    **90004-0000**

City    State    ZIP Code

**Los Angeles**

County

**What is the property?** Check all that apply

■ Single-family home
☐ Duplex or multi-unit building
☐ Condominium or cooperative
☐ Manufactured or mobile home
☐ Land
☐ Investment property
☐ Timeshare
☐ Other _____

**Who has an interest in the property?** Check one

☐ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
■ At least one of the debtors and another

Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property.*

| Current value of the entire property? | Current value of the portion you own? |
|---|---|
| **$4,900,000.00** | **$2,450,000.00** |

Describe the nature of your ownership interest (such as fee simple, tenancy by the entireties, or a life estate), if known.

**50% is held in by Debtor and 50% held by his Erika's irrevocable marital deduction trust**

☐ Check if this is community property (see instructions)

Other information you wish to add about this item, such as local property identification number:

**Debtor's principal residence; paid in full. The property is held in the marital deduction trust. The Debtor's current spouse, Barbara Klein, has a life estate interest in the residence.**

Debtor 1    **Leslie Klein**                                                    Case number *(if known)*   **2:23-bk-10990-SK**

**If you own or have more than one, list here:**

1.2

**315 N. Martel Avenue**
Street address, if available, or other description

**Los Angeles       CA       90036-0000**
City                State       ZIP Code

**Los Angeles**
County

**What is the property?** Check all that apply

☑ Single-family home
☐ Duplex or multi-unit building
☐ Condominium or cooperative

☐ Manufactured or mobile home
☐ Land
☐ Investment property
☐ Timeshare
☐ Other _____

**Who has an interest in the property?** Check one

☑ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another

Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property.*

| Current value of the entire property? | Current value of the portion you own? |
|---|---|
| **$2,500,000.00** | **$2,500,000.00** |

Describe the nature of your ownership interest (such as fee simple, tenancy by the entireties, or a life estate), if known.

**100%**

☐ Check if this is community property (see instructions)

Other information you wish to add about this item, such as local property identification number:

**Single family residence; rental property.  Debtor collects $5,500/month.**

**If you own or have more than one, list here:**

1.3

**143 S. Highland Drive**
Street address, if available, or other description

**Los Angeles       CA       90036-0000**
City                State       ZIP Code

**Los Angeles**
County

**What is the property?** Check all that apply

☑ Single-family home
☐ Duplex or multi-unit building
☐ Condominium or cooperative

☐ Manufactured or mobile home
☐ Land
☐ Investment property
☐ Timeshare
☐ Other _____

**Who has an interest in the property?** Check one

☑ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another

Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property.*

| Current value of the entire property? | Current value of the portion you own? |
|---|---|
| **$2,200,000.00** | **$2,200,000.00** |

Describe the nature of your ownership interest (such as fee simple, tenancy by the entireties, or a life estate), if known.

**100%**

☐ Check if this is community property (see instructions)

Other information you wish to add about this item, such as local property identification number:

**Single family residence; rental property. Debtor collects $4,000 per month in rental income.**

Official Form 106A/B                     Schedule A/B: Property                                     page 2

Debtor 1    **Leslie Klein**                                                                                          Case number *(if known)*    **2:23-bk-10990-SK**

**If you own or have more than one, list here:**

**1.4**

**161 N. Poinsettia Place**
Street address, if available, or other description

**What is the property?** Check all that apply

- ■ Single-family home
- ☐ Duplex or multi-unit building
- ☐ Condominium or cooperative
- ☐ Manufactured or mobile home
- ☐ Land
- ☐ Investment property
- ☐ Timeshare
- ☐ Other _____

**Los Angeles**    **CA**    **90036-0000**
City    State    ZIP Code

**Who has an interest in the property?** Check one

- ■ Debtor 1 only
- ☐ Debtor 2 only
- ☐ Debtor 1 and Debtor 2 only
- ☐ At least one of the debtors and another

**Los Angeles**
County

Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property*.

| Current value of the entire property? | Current value of the portion you own? |
|---|---|
| **$2,000,000.00** | **$2,000,000.00** |

Describe the nature of your ownership interest (such as fee simple, tenancy by the entireties, or a life estate), if known.

**100%**

- ☐ **Check if this is community property** (see instructions)

Other information you wish to add about this item, such as local property identification number:

**Single family residence; rental property. Debtor collects $3,000 per month rental income.**

---

**If you own or have more than one, list here:**

**1.5**

**2560-B Whitewater Club Drive**
Street address, if available, or other description

**What is the property?** Check all that apply

- ☐ Single-family home
- ☐ Duplex or multi-unit building
- ■ Condominium or cooperative
- ☐ Manufactured or mobile home
- ☐ Land
- ☐ Investment property
- ☐ Timeshare
- ☐ Other _____

**Palm Springs**    **CA**    **92262-0000**
City    State    ZIP Code

**Who has an interest in the property?** Check one

- ■ Debtor 1 only
- ☐ Debtor 2 only
- ☐ Debtor 1 and Debtor 2 only
- ☐ At least one of the debtors and another

**Riverside**
County

Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property*.

| Current value of the entire property? | Current value of the portion you own? |
|---|---|
| **$350,000.00** | **$350,000.00** |

Describe the nature of your ownership interest (such as fee simple, tenancy by the entireties, or a life estate), if known.

**100%**

- ☐ **Check if this is community property** (see instructions)

Other information you wish to add about this item, such as local property identification number:

**A condo with 2 bedrooms and 2 bathrooms; vacation home.**

---

Debtor 1    **Leslie Klein**    Case number *(if known)*    **2:23-bk-10990-SK**

**If you own or have more than one, list here:**

1.6

**3752 Ocean Drive**

Street address, if available, or other description

| | |
|---|---|
| **Oxnard** | **CA** | **93035-0000** |
| City | State | ZIP Code |

**Ventura**

County

**What is the property?** Check all that apply

- ☒ Single-family home
- ☐ Duplex or multi-unit building
- ☐ Condominium or cooperative
- ☐ Manufactured or mobile home
- ☐ Land
- ☐ Investment property
- ☐ Timeshare
- ☐ Other _____

**Who has an interest in the property?** Check one

- ☒ Debtor 1 only
- ☐ Debtor 2 only
- ☐ Debtor 1 and Debtor 2 only
- ☐ At least one of the debtors and another

Other information you wish to add about this item, such as local property identification number:

**Single family home; vacation home.**

Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property.*

| Current value of the entire property? | Current value of the portion you own? |
|---|---|
| **$2,400,000.00** | **$2,400,000.00** |

Describe the nature of your ownership interest (such as fee simple, tenancy by the entireties, or a life estate), if known.

**100%**

- ☐ Check if this is community property (see instructions)

---

**If you own or have more than one, list here:**

1.7

**Leonardo Plaza Hotel Jerusalem Suite 1323**

Street address, if available, or other description

| | |
|---|---|
| **Jerusalem** | | |
| City | State | ZIP Code |

**Israel**

County

**What is the property?** Check all that apply

- ☐ Single-family home
- ☐ Duplex or multi-unit building
- ☐ Condominium or cooperative
- ☐ Manufactured or mobile home
- ☐ Land
- ☒ Investment property
- ☐ Timeshare
- ☒ Other    **Unit in a hotel**

**Who has an interest in the property?** Check one

- ☒ Debtor 1 only
- ☐ Debtor 2 only
- ☐ Debtor 1 and Debtor 2 only
- ☐ At least one of the debtors and another

Other information you wish to add about this item, such as local property identification number:

**Debtor owns a unit in the Leanoardo Plaza Hotel. Vacation home.**

Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property.*

| Current value of the entire property? | Current value of the portion you own? |
|---|---|
| **$450,000.00** | **$225,000.00** |

Describe the nature of your ownership interest (such as fee simple, tenancy by the entireties, or a life estate), if known.

**50% by Debtor and 50% by deceased wife's irrevocable trust**

- ☐ Check if this is community property (see instructions)

---

| Debtor 1 | **Leslie Klein** | Case number *(if known)* | **2:23-bk-10990-SK** |

**If you own or have more than one, list here:**

1.8

**Dan Boutique Hotel Jerusalem Suite 505**

Street address, if available, or other description

**Jerusalem**

| City | State | ZIP Code |

**Israel**

County

**What is the property?** Check all that apply

☐ Single-family home
☐ Duplex or multi-unit building
☐ Condominium or cooperative
☐ Manufactured or mobile home
☐ Land
☐ Investment property
☐ Timeshare
■ Other    **Unit in a hotel**

**Who has an interest in the property?** Check one

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another

Other information you wish to add about this item, such as local property identification number:

**Debtor owns a unit in the Leanoardo Plaza Hotel. Vacation home.**

Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property.*

| Current value of the entire property? | Current value of the portion you own? |
|---|---|
| **$200,000.00** | **$100,000.00** |

**Describe the nature of your ownership interest** (such as fee simple, tenancy by the entireties, or a life estate), if known.

**50% by Debtor and 50% by deceased spouse's irrevocable trust**

☐ Check if this is community property (see instructions)

2. Add the dollar value of the portion you own for all of your entries from Part 1, including any entries for pages you have attached for Part 1. Write that number here..........................................................=>    **$12,225,000.00**

---

**Part 2:    Describe Your Vehicles**

Do you own, lease, or have legal or equitable interest in any vehicles, whether they are registered or not? Include any vehicles you own that someone else drives. If you lease a vehicle, also report it on *Schedule G: Executory Contracts and Unexpired Leases.*

3. Cars, vans, trucks, tractors, sport utility vehicles, motorcycles

☐ No
■ Yes

3.1  Make:  **Lexus**
Model:  **LS500**
Year:  **2021**
Approximate mileage:  **n/a**
Other information:
**Leased vehicle. Monthly payment is $1,319.00.**

**Who has an interest in the property?** Check one

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another

☐ Check if this is community property (see instructions)

Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property.*

| Current value of the entire property? | Current value of the portion you own? |
|---|---|
| **$0.00** | **$0.00** |

3.2  Make:  **Lexus**
Model:  **LS**
Year:  **2021**
Approximate mileage:  **n/a**
Other information:
**Leased vehicle. Debtor's spouse drives this vehicle. Monthly payment is $500.**

**Who has an interest in the property?** Check one

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another

☐ Check if this is community property (see instructions)

Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property.*

| Current value of the entire property? | Current value of the portion you own? |
|---|---|
| **$0.00** | **$0.00** |

Debtor 1    **Leslie Klein**                                                    Case number *(if known)*    **2:23-bk-10990-SK**

4. **Watercraft, aircraft, motor homes, ATVs and other recreational vehicles, other vehicles, and accessories**
   *Examples:* Boats, trailers, motors, personal watercraft, fishing vessels, snowmobiles, motorcycle accessories

   ■ No
   ☐ Yes

5  Add the dollar value of the portion you own for all of your entries from Part 2, including any entries for
   .pages you have attached for Part 2. Write that number here............................................................=>    | **$0.00** |

---

**Part 3:** Describe Your Personal and Household Items

| Do you own or have any legal or equitable interest in any of the following items? | Current value of the portion you own? Do not deduct secured claims or exemptions. |
|---|---|

6. **Household goods and furnishings**
   *Examples:* Major appliances, furniture, linens, china, kitchenware
   ☐ No
   ■ Yes. Describe.....

| Debtor's residence: Debtor's residence: Couches, coffee tables, dining room table with chairs, mattresses with bedframes, wall mirrors, desk with chairs, lamps, rugs, dressers, kitchen table, patio furniture,  cabinets, refrigerators, and other household goods and furnishings | $8,000.00 |
|---|---|
| 2560-B Whitewater Club Drive, Palm Spring vacation home: living room sofa, table, chairs, dining room table and chairs, TV, phone, kitchen appliances, china, beds and side tables, mirrors, paintings, and miscellaneous household goods and furnishings. | $5,000.00 |
| 3752 Ocean Drive, Oxnard CA vacation home: living room sofa, table, chairs, dining room table and chairs, TV, phone, kitchen appliances, china, beds and side tables, mirrors, paintings, and miscellaneous household goods and furnishings. | $5,000.00 |

7. **Electronics**
   *Examples:* Televisions and radios; audio, video, stereo, and digital equipment; computers, printers, scanners; music collections; electronic devices including cell phones, cameras, media players, games
   ☐ No
   ■ Yes. Describe.....

| TVs, phones, computers | $3,000.00 |
|---|---|

8. **Collectibles of value**
   *Examples:* Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; stamp, coin, or baseball card collections; other collections, memorabilia, collectibles
   ☐ No
   ■ Yes. Describe.....

| Books and art objects | $4,000.00 |
|---|---|

9. **Equipment for sports and hobbies**
   *Examples:* Sports, photographic, exercise, and other hobby equipment; bicycles, pool tables, golf clubs, skis; canoes and kayaks; carpentry tools; musical instruments
   ☐ No
   ■ Yes. Describe.....

---

Official Form 106A/B                    Schedule A/B: Property                    page 6

Debtor 1    **Leslie Klein**                                                                         Case number *(if known)*    **2:23-bk-10990-SK**

| **Sports and Hobyy equipment** | **$2,000.00** |
|---|---|

**10. Firearms**
*Examples:* Pistols, rifles, shotguns, ammunition, and related equipment
■ No
☐ Yes. Describe.....

**11. Clothes**
*Examples:* Everyday clothes, furs, leather coats, designer wear, shoes, accessories
☐ No
■ Yes. Describe.....

| **Debtor's residence: Clothes and shoes** | **$2,000.00** |
|---|---|

**12. Jewelry**
*Examples:* Everyday jewelry, costume jewelry, engagement rings, wedding rings, heirloom jewelry, watches, gems, gold, silver
☐ No
■ Yes. Describe.....

| **Debtor's residence: Furs, diamond ring, gold necklace, diamond earrings, gold rings and costume jewelry** | **$20,000.00** |
|---|---|

**13. Non-farm animals**
*Examples:* Dogs, cats, birds, horses
■ No
☐ Yes. Describe.....

**14. Any other personal and household items you did not already list, including any health aids you did not list**
■ No
☐ Yes. Give specific information.....

**15. Add the dollar value of all of your entries from Part 3, including any entries for pages you have attached for Part 3. Write that number here** ...............................................................................

| **$49,000.00** |
|---|

| Part 4: | **Describe Your Financial Assets** |
|---|---|

**Do you own or have any legal or equitable interest in any of the following?**

Current value of the portion you own?
Do not deduct secured claims or exemptions.

**16. Cash**
*Examples:* Money you have in your wallet, in your home, in a safe deposit box, and on hand when you file your petition
■ No
☐ Yes.............................................................................................................

**17. Deposits of money**
*Examples:* Checking, savings, or other financial accounts; certificates of deposit; shares in credit unions, brokerage houses, and other similar institutions. If you have multiple accounts with the same institution, list each.
☐ No
■ Yes........................              Institution name:

| | | | |
|---|---|---|---|
| 17.1. | **Checking account ending in 9401** | **Bank of America** | **$4,000.00** |
| 17.2. | **Stock account ending in 4523** | **Morgan Stanley** | **$11,190.00** |

Debtor 1    **Leslie Klein**                                                                                    Case number *(if known)*    **2:23-bk-10990-SK**

18. **Bonds, mutual funds, or publicly traded stocks**
    *Examples:* Bond funds, investment accounts with brokerage firms, money market accounts

    ■ No
    ☐ Yes.................                    Institution or issuer name:

19. **Non-publicly traded stock and interests in incorporated and unincorporated businesses, including an interest in an LLC, partnership, and joint venture**
    ☐ No
    ■ Yes.  Give specific information about them...................

| Name of entity: | % of ownership: | |
|---|---|---|
| Debtor has a 100% ownership interest in Bay Area Development, Co.  Bay Area Development, Co. filed  a chapter 11 bankruptcy petition on 9/12/2022, Case No.: 2:22-bk-15031-SK.  On December 6, 2022, Bay Area entered into a stipulation with its secured creditor Scott Capital Management Fund 1, LLC and OUST to dismiss the case.  The order dismissing the case with a 180 day bar (due to pending RFS motion) was entered on 12/6/2022.  The real property owned by Bay Area Development, Co. went into foreclosure.  The company currently does not own any assets. | 100%          % | $0.00 |
| Debtor has a membership interest in Life Capital Group, LLC, which is an investment company.  The LLC buys insurance policies on other people's lives and upon passing, the LLC collects the funds and makes a distribution to its members. | 5% membershi p interest     % | Unknown |

20. **Government and corporate bonds and other negotiable and non-negotiable instruments**
    *Negotiable instruments* include personal checks, cashiers' checks, promissory notes, and money orders.
    *Non-negotiable instruments* are those you cannot transfer to someone by signing or delivering them.

    ■ No
    ☐ Yes. Give specific information about them
                            Issuer name:

21. **Retirement or pension accounts**
    *Examples:* Interests in IRA, ERISA, Keogh, 401(k), 403(b), thrift savings accounts, or other pension or profit-sharing plans

    ■ No
    ☐ Yes. List each account separately.
                            Type of account:          Institution name:

22. **Security deposits and prepayments**
    Your share of all unused deposits you have made so that you may continue service or use from a company
    *Examples:* Agreements with landlords, prepaid rent, public utilities (electric, gas, water), telecommunications companies, or others

    ■ No
    ☐ Yes. .....................                Institution name or individual:

23. **Annuities** (A contract for a periodic payment of money to you, either for life or for a number of years)
    ■ No
    ☐ Yes.............                Issuer name and description.

24. **Interests in an education IRA, in an account in a qualified ABLE program, or under a qualified state tuition program.**
    26 U.S.C. §§ 530(b)(1), 529A(b), and 529(b)(1).
    ■ No
    ☐ Yes.............                Institution name and description. Separately file the records of any interests.11 U.S.C. § 521(c):

25. **Trusts, equitable or future interests in property (other than anything listed in line 1), and rights or powers exercisable for your benefit**
    ☐ No

Official Form 106A/B                              Schedule A/B: Property                                                  page 8

Debtor 1    **Leslie Klein**    Case number *(if known)*    **2:23-bk-10990-SK**

■ Yes. Give specific information about them...

> **Klein Living Trust dated April 8, 1990. The Settlors of the Trust are
> Leslie Klein and Erika Noemi Klein, husband and wife. Erika Klein
> passed away several years ago, and pursuant to the trust
> provision, Erika Klein's interest in the assets is now in an
> irrevocable trust ("Marital Deduction Trust"). The assets of the
> trust are listed on Schedule A/B, item #1 for each property that is
> part of the Trust.**                                    **$0.00**

26. **Patents, copyrights, trademarks, trade secrets, and other intellectual property**
    *Examples:* Internet domain names, websites, proceeds from royalties and licensing agreements

    ■ No
    ☐ Yes. Give specific information about them...

27. **Licenses, franchises, and other general intangibles**
    *Examples:* Building permits, exclusive licenses, cooperative association holdings, liquor licenses, professional licenses

    ■ No
    ☐ Yes. Give specific information about them...

**Money or property owed to you?**                    **Current value of the
                                                       portion you own?**
                                                       Do not deduct secured
                                                       claims or exemptions.

28. **Tax refunds owed to you**

    ■ No
    ☐ Yes. Give specific information about them, including whether you already filed the returns and the tax years.......

29. **Family support**
    *Examples:* Past due or lump sum alimony, spousal support, child support, maintenance, divorce settlement, property settlement

    ■ No
    ☐ Yes. Give specific information......

30. **Other amounts someone owes you**
    *Examples:* Unpaid wages, disability insurance payments, disability benefits, sick pay, vacation pay, workers' compensation, Social Security
            benefits; unpaid loans you made to someone else

    ☐ No
    ■ Yes. Give specific information..

> **Isaac Kirzner. Debtor entered into an agreement with Isaac
> Kirzner whereby he paid the insurance premiums for Mr.
> Kirzner, and upon Mr. Kirzner's passing, the Debtor would
> receive $1 Million. The current Trustee is Sol Majer.**        **$1,000,000.00**

> **Judith Bittman. Debtor entered into an agreement with
> Judith Bittman whereby he paid the insurance premiums for
> Ms. Bittmanm and upon Ms. Bittman's passing, the Debtor
> would receive $1 Million. The current Trustee is Sol Majer.**   **$1,000,000.00**

> **Debtor intends to file a complaint against Frank Menlo for
> unpaid trustee fees in the amount of $3,000,000.00 -
> $4,000,000.00. Debtor is unlikely to collect due to the ongoing
> litigation with Mr. Menlo.**                                    **Unknown**

31. **Interests in insurance policies**
    *Examples:* Health, disability, or life insurance; health savings account (HSA); credit, homeowner's, or renter's insurance

    ■ No

Debtor 1    **Leslie Klein**                                                 Case number *(if known)*  **2:23-bk-10990-SK**

☐ Yes. Name the insurance company of each policy and list its value.
          Company name:                                    Beneficiary:                      Surrender or refund
                                                                                              value:

32. **Any interest in property that is due you from someone who has died**
    If you are the beneficiary of a living trust, expect proceeds from a life insurance policy, or are currently entitled to receive property because someone has died.
    ■ No
    ☐ Yes. Give specific information..

33. **Claims against third parties, whether or not you have filed a lawsuit or made a demand for payment**
    *Examples:* Accidents, employment disputes, insurance claims, or rights to sue
    ■ No
    ☐ Yes. Describe each claim.........

34. **Other contingent and unliquidated claims of every nature, including counterclaims of the debtor and rights to set off claims**
    ■ No
    ☐ Yes. Describe each claim.........

35. **Any financial assets you did not already list**
    ■ No
    ☐ Yes. Give specific information..

36. **Add the dollar value of all of your entries from Part 4, including any entries for pages you have attached for Part 4. Write that number here**.................................................................................................................

|  |
|---|
| **$2,015,190.00** |

**Part 5:** Describe Any Business-Related Property You Own or Have an Interest In. List any real estate in Part 1.

37. **Do you own or have any legal or equitable interest in any business-related property?**
    ■ No. Go to Part 6.
    ☐ Yes. Go to line 38.

**Part 6** Describe Any Farm- and Commercial Fishing-Related Property You Own or Have an Interest In.
        If you own or have an interest in farmland, list it in Part 1.

46. **Do you own or have any legal or equitable interest in any farm- or commercial fishing-related property?**
    ■ No. Go to Part 7.
    ☐ Yes. Go to line 47.

**Part 7:**     Describe All Property You Own or Have an Interest in That You Did Not List Above

53. **Do you have other property of any kind you did not already list?**
    *Examples:* Season tickets, country club membership
    ■ No
    ☐ Yes. Give specific information.........

54. **Add the dollar value of all of your entries from Part 7. Write that number here** ....................................

|  |
|---|
| **$0.00** |

Official Form 106A/B                          Schedule A/B: Property                                      page 10

Debtor 1    **Leslie Klein**                                         Case number *(if known)*    **2:23-bk-10990-SK**

| Part 8: | List the Totals of Each Part of this Form |
|---------|--------------------------------------------|

55.  **Part 1: Total real estate, line 2** ..............................................................................................                    **$12,225,000.00**

56.  **Part 2: Total vehicles, line 5**                                                          **$0.00**

57.  **Part 3: Total personal and household items, line 15**                         **$49,000.00**

58.  **Part 4: Total financial assets, line 36**                                     **$2,015,190.00**

59.  **Part 5: Total business-related property, line 45**                                **$0.00**

60.  **Part 6: Total farm- and fishing-related property, line 52**                       **$0.00**

61.  **Part 7: Total other property not listed, line 54**                    +          **$0.00**

62.  **Total personal property. Add lines 56 through 61...**          **$2,064,190.00**    Copy personal property total    **$2,064,190.00**

63.  **Total of all property on Schedule A/B. Add line 55 + line 62**                                        **$14,289,190.00**

Official Form 106A/B                         Schedule A/B: Property                                         page 11

<table>
<tr><td colspan="4"><strong>Fill in this information to identify your case:</strong></td></tr>
</table>

| Debtor 1 | **Leslie Klein** | | |
|---|---|---|---|
| | First Name | Middle Name | Last Name |
| Debtor 2 | | | |
| (Spouse if, filing) | First Name | Middle Name | Last Name |
| United States Bankruptcy Court for the: | CENTRAL DISTRICT OF CALIFORNIA | | |
| Case number (if known) | **2:23-bk-10990-SK** | | |

☑ Check if this is an
amended filing

# Official Form 107
# Statement of Financial Affairs for Individuals Filing for Bankruptcy

04/22

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

## Part 1:    Give Details About Your Marital Status and Where You Lived Before

**1.    What is your current marital status?**

■ Married
☐ Not married

**2.    During the last 3 years, have you lived anywhere other than where you live now?**

■ No
☐ Yes. List all of the places you lived in the last 3 years. Do not include where you live now.

| Debtor 1: | Dates Debtor 1 lived there | Debtor 2 Prior Address: | Dates Debtor 2 lived there |
|---|---|---|---|

**3.    Within the last 8 years, did you ever live with a spouse or legal equivalent in a community property state or territory?** (*Community property states and territories* include Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington and Wisconsin.)

☐ No
■ Yes. Make sure you fill out *Schedule H: Your Codebtors* (Official Form 106H).

## Part 2    Explain the Sources of Your Income

**4.    Did you have any income from employment or from operating a business during this year or the two previous calendar years?**
Fill in the total amount of income you received from all jobs and all businesses, including part-time activities.
If you are filing a joint case and you have income that you receive together, list it only once under Debtor 1.

☐ No
■ Yes. Fill in the details.

| | Debtor 1 | | Debtor 2 | |
|---|---|---|---|---|
| | **Sources of income** Check all that apply. | **Gross income** (before deductions and exclusions) | **Sources of income** Check all that apply. | **Gross income** (before deductions and exclusions) |
| **From January 1 of current year until the date you filed for bankruptcy:** | ☐ Wages, commissions, bonuses, tips | $4,000.00 | ☐ Wages, commissions, bonuses, tips | |
| | ■ Operating a business | | ☐ Operating a business | |

Debtor 1    **Leslie Klein** _____    Case number *(if known)*    **2:23-bk-10990-SK**

| | Debtor 1 | | Debtor 2 | |
|---|---|---|---|---|
| | **Sources of income**<br>Check all that apply. | **Gross income**<br>(before deductions and exclusions) | **Sources of income**<br>Check all that apply. | **Gross income**<br>(before deductions and exclusions) |
| **For last calendar year:**<br>(January 1 to December 31, 2022 ) | ☐ Wages, commissions, bonuses, tips<br><br>■ Operating a business | $24,000.00 | ☐ Wages, commissions, bonuses, tips<br><br>☐ Operating a business | |
| **For the calendar year before that:**<br>(January 1 to December 31, 2021 ) | ☐ Wages, commissions, bonuses, tips<br><br>■ Operating a business | $24,000.00 | ☐ Wages, commissions, bonuses, tips<br><br>☐ Operating a business | |

5.  **Did you receive any other income during this year or the two previous calendar years?**
    Include income regardless of whether that income is taxable. Examples of *other income* are alimony; child support; Social Security, unemployment, and other public benefit payments; pensions; rental income; interest; dividends; money collected from lawsuits; royalties; and gambling and lottery winnings. If you are filing a joint case and you have income that you received together, list it only once under Debtor 1.

    List each source and the gross income from each source separately. Do not include income that you listed in line 4.

    ☐  No
    ■  Yes. Fill in the details.

| | Debtor 1<br>**Sources of income**<br>Describe below. | **Gross income from each source**<br>(before deductions and exclusions) | Debtor 2<br>**Sources of income**<br>Describe below. | **Gross income**<br>(before deductions and exclusions) |
|---|---|---|---|---|
| **From January 1 of current year until the date you filed for bankruptcy:** | **Social Security** | $6,666.00 | | |
| | **Rental Income** | $25,000.00 | | |
| **For last calendar year:**<br>(January 1 to December 31, 2022 ) | **Social Security** | $40,000.00 | | |
| | **Rental Income** | $144,000.00 | | |
| **For the calendar year before that:**<br>(January 1 to December 31, 2021 ) | **Social Security** | $40,000.00 | | |
| | **Rental Income** | $144,000.00 | | |

**Part 3:    List Certain Payments You Made Before You Filed for Bankruptcy**

6.  **Are either Debtor 1's or Debtor 2's debts primarily consumer debts?**
    ■  **No.    Neither Debtor 1 nor Debtor 2 has primarily consumer debts.** *Consumer debts* are defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose."

    During the 90 days before you filed for bankruptcy, did you pay any creditor a total of $7,575* or more?
    ■  **No.**    Go to line 7.
    ☐  **Yes**    List below each creditor to whom you paid a total of $7,575* or more in one or more payments and the total amount you paid that creditor. Do not include payments for domestic support obligations, such as child support and alimony. Also, do not include payments to an attorney for this bankruptcy case.
    * Subject to adjustment on 4/01/25 and every 3 years after that for cases filed on or after the date of adjustment.

Debtor 1    **Leslie Klein**                                                                    Case number (*if known*)    **2:23-bk-10990-SK**

☐   **Yes.    Debtor 1 or Debtor 2 or both have primarily consumer debts.**
During the 90 days before you filed for bankruptcy, did you pay any creditor a total of $600 or more?

☐   No.    Go to line 7.
☐   Yes    List below each creditor to whom you paid a total of $600 or more and the total amount you paid that creditor. Do not include payments for domestic support obligations, such as child support and alimony. Also, do not include payments to an attorney for this bankruptcy case.

| Creditor's Name and Address | Dates of payment | Total amount paid | Amount you still owe | Was this payment for ... |
|---|---|---|---|---|

7.   **Within 1 year before you filed for bankruptcy, did you make a payment on a debt you owed anyone who was an insider?**
*Insiders* include your relatives; any general partners; relatives of any general partners; partnerships of which you are a general partner; corporations of which you are an officer, director, person in control, or owner of 20% or more of their voting securities; and any managing agent, including one for a business you operate as a sole proprietor. 11 U.S.C. § 101. Include payments for domestic support obligations, such as child support and alimony.

■   No
☐   Yes. List all payments to an insider.

| Insider's Name and Address | Dates of payment | Total amount paid | Amount you still owe | Reason for this payment |
|---|---|---|---|---|

8.   **Within 1 year before you filed for bankruptcy, did you make any payments or transfer any property on account of a debt that benefited an insider?**
Include payments on debts guaranteed or cosigned by an insider.

■   No
☐   Yes. List all payments to an insider

| Insider's Name and Address | Dates of payment | Total amount paid | Amount you still owe | Reason for this payment Include creditor's name |
|---|---|---|---|---|

**Part 4:    Identify Legal Actions, Repossessions, and Foreclosures**

9.   **Within 1 year before you filed for bankruptcy, were you a party in any lawsuit, court action, or administrative proceeding?**
List all such matters, including personal injury cases, small claims actions, divorces, collection suits, paternity actions, support or custody modifications, and contract disputes.

☐   No
■   Yes. Fill in the details.

| Case title Case number | Nature of the case | Court or agency | Status of the case |
|---|---|---|---|
| In re Matter of the Franklin Henry Menlo Irrevocable Trust, et al. v. Leslie Klein BP136769 | Trust | Superior Court of California 111 Hill St. Los Angeles, CA 90012 | ■ Pending  ☐ On appeal  ☐ Concluded |
| The Scott Trust DTD 12/24/1992 - Trust BP172432 | Trust | Superior Court of California 111 Hill St. Los Angeles, CA 90012 | ■ Pending  ☐ On appeal  ☐ Concluded |
| Joseph Vago, Et Al vs. Leslie Klein 20STCV25050 | Fraud | Superior Court of California 111 Hill St Los Angeles, CA 90012 | ☐ Pending  ■ On appeal  ☐ Concluded |
| Leslie Klein, et al v. Rechnitz, et al 22STCV18787 | | | ☐ Pending  ☐ On appeal  ☐ Concluded |

Official Form 107    Statement of Financial Affairs for Individuals Filing for Bankruptcy    page 3

Debtor 1    **Leslie Klein**                                    Case number *(if known)*    **2:23-bk-10990-SK**

10. **Within 1 year before you filed for bankruptcy, was any of your property repossessed, foreclosed, garnished, attached, seized, or levied?**
Check all that apply and fill in the details below.

- ■ No. Go to line 11.
- ☐ Yes. Fill in the information below.

| Creditor Name and Address | Describe the Property | Date | Value of the property |
|---|---|---|---|
| | Explain what happened | | |

11. **Within 90 days before you filed for bankruptcy, did any creditor, including a bank or financial institution, set off any amounts from your accounts or refuse to make a payment because you owed a debt?**

- ■ No
- ☐ Yes. Fill in the details.

| Creditor Name and Address | Describe the action the creditor took | Date action was taken | Amount |
|---|---|---|---|

12. **Within 1 year before you filed for bankruptcy, was any of your property in the possession of an assignee for the benefit of creditors, a court-appointed receiver, a custodian, or another official?**

- ■ No
- ☐ Yes

### Part 5:    List Certain Gifts and Contributions

13. **Within 2 years before you filed for bankruptcy, did you give any gifts with a total value of more than $600 per person?**

- ■ No
- ☐ Yes. Fill in the details for each gift.

| Gifts with a total value of more than $600 per person | Describe the gifts | Dates you gave the gifts | Value |
|---|---|---|---|
| Person to Whom You Gave the Gift and Address: | | | |

14. **Within 2 years before you filed for bankruptcy, did you give any gifts or contributions with a total value of more than $600 to any charity?**

- ■ No
- ☐ Yes. Fill in the details for each gift or contribution.

| Gifts or contributions to charities that total more than $600 Charity's Name Address (Number, Street, City, State and ZIP Code) | Describe what you contributed | Dates you contributed | Value |
|---|---|---|---|

### Part 6:    List Certain Losses

15. **Within 1 year before you filed for bankruptcy or since you filed for bankruptcy, did you lose anything because of theft, fire, other disaster, or gambling?**

- ■ No
- ☐ Yes. Fill in the details.

| Describe the property you lost and how the loss occurred | Describe any insurance coverage for the loss Include the amount that insurance has paid. List pending insurance claims on line 33 of *Schedule A/B: Property*. | Date of your loss | Value of property lost |
|---|---|---|---|

### Part 7:    List Certain Payments or Transfers

16. **Within 1 year before you filed for bankruptcy, did you or anyone else acting on your behalf pay or transfer any property to anyone you consulted about seeking bankruptcy or preparing a bankruptcy petition?**
Include any attorneys, bankruptcy petition preparers, or credit counseling agencies for services required in your bankruptcy.

- ☐ No
- ■ Yes. Fill in the details.

| Person Who Was Paid Address Email or website address Person Who Made the Payment, If Not You | Description and value of any property transferred | Date payment or transfer was made | Amount of payment |
|---|---|---|---|

Official Form 107    Statement of Financial Affairs for Individuals Filing for Bankruptcy    page 4

Debtor 1    **Leslie Klein**    Case number (*if known*)    **2:23-bk-10990-SK**

| Person Who Was Paid<br>Address<br>Email or website address<br>Person Who Made the Payment, if Not You | Description and value of any property transferred | Date payment or transfer was made | Amount of payment |
|---|---|---|---|
| **Law Offices of Michael Jay Berger**<br>**9454 Wilshire Boulevard, 6th floor**<br>**Beverly Hills, CA 90212**<br>**michael.berger@bankruptcypower.com** | **Attorney Fees** | **2/15/2023 +<br>the filing fee** | **$21,738.00** |
| **Levene, Neale, Bender, Yoo &<br>Golubchik<br>2818 La Cienega Ave<br>Los Angeles, CA 90034** | **$15,000.00 for legal services** | **01/2023** | **$15,000.00** |

17. **Within 1 year before you filed for bankruptcy, did you or anyone else acting on your behalf pay or transfer any property to anyone who promised to help you deal with your creditors or to make payments to your creditors?**
Do not include any payment or transfer that you listed on line 16.

■ No
☐ Yes. Fill in the details.

| Person Who Was Paid<br>Address | Description and value of any property transferred | Date payment or transfer was made | Amount of payment |
|---|---|---|---|

18. **Within 2 years before you filed for bankruptcy, did you sell, trade, or otherwise transfer any property to anyone, other than property transferred in the ordinary course of your business or financial affairs?**
Include both outright transfers and transfers made as security (such as the granting of a security interest or mortgage on your property). Do not include gifts and transfers that you have already listed on this statement.

■ No
☐ Yes. Fill in the details.

| Person Who Received Transfer<br>Address<br><br>Person's relationship to you | Description and value of property transferred | Describe any property or payments received or debts paid in exchange | Date transfer was made |
|---|---|---|---|

19. **Within 10 years before you filed for bankruptcy, did you transfer any property to a self-settled trust or similar device of which you are a beneficiary?** (These are often called *asset-protection devices.*)

■ No
☐ Yes. Fill in the details.

| Name of trust | Description and value of the property transferred | Date Transfer was made |
|---|---|---|

**Part 8:    List of Certain Financial Accounts, Instruments, Safe Deposit Boxes, and Storage Units**

20. **Within 1 year before you filed for bankruptcy, were any financial accounts or instruments held in your name, or for your benefit, closed, sold, moved, or transferred?**
Include checking, savings, money market, or other financial accounts; certificates of deposit; shares in banks, credit unions, brokerage houses, pension funds, cooperatives, associations, and other financial institutions.

■ No
☐ Yes. Fill in the details.

| Name of Financial Institution and Address (Number, Street, City, State and ZIP Code) | Last 4 digits of account number | Type of account or instrument | Date account was closed, sold, moved, or transferred | Last balance before closing or transfer |
|---|---|---|---|---|

Debtor 1    Leslie Klein    Case number (if known)    2:23-bk-10990-SK

21. Do you now have, or did you have within 1 year before you filed for bankruptcy, any safe deposit box or other depository for securities, cash, or other valuables?

■ No
☐ Yes. Fill in the details.

| Name of Financial Institution<br>Address (Number, Street, City, State and ZIP Code) | Who else had access to it?<br>Address (Number, Street, City, State and ZIP Code) | Describe the contents | Do you still have it? |
|---|---|---|---|

22. Have you stored property in a storage unit or place other than your home within 1 year before you filed for bankruptcy?

■ No
☐ Yes. Fill in the details.

| Name of Storage Facility<br>Address (Number, Street, City, State and ZIP Code) | Who else has or had access to it?<br>Address (Number, Street, City, State and ZIP Code) | Describe the contents | Do you still have it? |
|---|---|---|---|

## Part 9:  Identify Property You Hold or Control for Someone Else

23. Do you hold or control any property that someone else owns? Include any property you borrowed from, are storing for, or hold in trust for someone.

■ No
☐ Yes. Fill in the details.

| Owner's Name<br>Address (Number, Street, City, State and ZIP Code) | Where is the property?<br>(Number, Street, City, State and ZIP Code) | Describe the property | Value |
|---|---|---|---|

## Part 10:  Give Details About Environmental Information

For the purpose of Part 10, the following definitions apply:

■ *Environmental law* means any federal, state, or local statute or regulation concerning pollution, contamination, releases of hazardous or toxic substances, wastes, or material into the air, land, soil, surface water, groundwater, or other medium, including statutes or regulations controlling the cleanup of these substances, wastes, or material.

■ *Site* means any location, facility, or property as defined under any environmental law, whether you now own, operate, or utilize it or used to own, operate, or utilize it, including disposal sites.

■ *Hazardous material* means anything an environmental law defines as a hazardous waste, hazardous substance, toxic substance, hazardous material, pollutant, contaminant, or similar term.

Report all notices, releases, and proceedings that you know about, regardless of when they occurred.

24. Has any governmental unit notified you that you may be liable or potentially liable under or in violation of an environmental law?

■ No
☐ Yes. Fill in the details.

| Name of site<br>Address (Number, Street, City, State and ZIP Code) | Governmental unit<br>Address (Number, Street, City, State and ZIP Code) | Environmental law, if you know it | Date of notice |
|---|---|---|---|

25. Have you notified any governmental unit of any release of hazardous material?

■ No
☐ Yes. Fill in the details.

| Name of site<br>Address (Number, Street, City, State and ZIP Code) | Governmental unit<br>Address (Number, Street, City, State and ZIP Code) | Environmental law, if you know it | Date of notice |
|---|---|---|---|

Debtor 1    **Leslie Klein**                                          Case number (*if known*)    **2:23-bk-10990-SK**

---

26. Have you been a party in any judicial or administrative proceeding under any environmental law? Include settlements and orders.

■ No

☐ Yes. Fill in the details.

| Case Title Case Number | Court or agency Name Address (Number, Street, City, State and ZIP Code) | Nature of the case | Status of the case |
|---|---|---|---|

---

**Part 11:** Give Details About Your Business or Connections to Any Business

---

27. Within 4 years before you filed for bankruptcy, did you own a business or have any of the following connections to any business?

  ☐ A sole proprietor or self-employed in a trade, profession, or other activity, either full-time or part-time

  ☐ A member of a limited liability company (LLC) or limited liability partnership (LLP)

  ☐ A partner in a partnership

  ☐ An officer, director, or managing executive of a corporation

  ☐ An owner of at least 5% of the voting or equity securities of a corporation

☐ No. None of the above applies. Go to Part 12.

■ Yes. Check all that apply above and fill in the details below for each business.

| Business Name Address (Number, Street, City, State and ZIP Code) | Describe the nature of the business Name of accountant or bookkeeper | Employer Identification number Do not include Social Security number or ITIN. Dates business existed |
|---|---|---|
| Bay Area Development, Co. 14245 Ventura Blvd Sherman Oaks, CA 91423 | real estate holding company | EIN:      95-2816693 From-To |
| Life Capital Group, LLC 7223 Beverly Blvd., Suite 205 Los Angeles, CA 90036 | investment company | EIN: From-To |

28. Within 2 years before you filed for bankruptcy, did you give a financial statement to anyone about your business? Include all financial institutions, creditors, or other parties.

■ No

☐ Yes. Fill in the details below.

| Name Address (Number, Street, City, State and ZIP Code) | Date Issued |
|---|---|

---

**Part 12:** Sign Below

---

I have read the answers on this *Statement of Financial Affairs* and any attachments, and I declare under penalty of perjury that the answers are true and correct. I understand that making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

| | |
|---|---|
| **Leslie Klein** Signature of Debtor 1 | Signature of Debtor 2 |
| Date _____ | Date _____ |

Did you attach additional pages to *Your Statement of Financial Affairs for Individuals Filing for Bankruptcy* (Official Form 107)?

■ No

☐ Yes

Did you pay or agree to pay someone who is not an attorney to help you fill out bankruptcy forms?

■ No

Debtor 1 Leslie Klein Case number [illegible]

26. Have you been a party in any judicial or administrative proceeding under any environmental law? Include settlements and orders.

- [x] No
- [ ] Yes. Fill in the details.

| Case Title / Case Number | Court or agency Name / Address (Number, Street, City, State and ZIP Code) | Nature of the case | Status of the case |
|---|---|---|---|

**Part 11: Give Details About Your Business or Connections to Any Business**

27. Within 4 years before you filed for bankruptcy, did you own a business or have any of the following connections to any business?

- [ ] A sole proprietor or self-employed in a trade, profession, or other activity, either full-time or part-time
- [ ] A member of a limited liability company (LLC) or limited liability partnership (LLP)
- [ ] A partner in a partnership
- [ ] An officer, director, or managing executive of a corporation
- [ ] An owner of at least 5% of the voting or equity securities of a corporation

- [ ] No. None of the above applies. Go to Part 12.
- [x] Yes. Check all that apply above and fill in the details below for each business.

| Business Name Address (Number, Street, City, State and ZIP Code) | Describe the nature of the business / Name of accountant or bookkeeper | Employer Identification number Do not include Social Security number or ITIN. / Dates business existed |
|---|---|---|
| Bay Area Development, Co. 14245 Ventura Blvd Sherman Oaks, CA 91423 | Real estate holding company | EIN: [illegible] From-To |
| Life Capital Group, LLC 7223 Beverly Blvd., Suite [illegible] Los Angeles, CA [illegible] | Investment company | EIN From-To |

28. Within 2 years before you filed for bankruptcy, did you give a financial statement to anyone about your business? Include all financial institutions, creditors, or other parties.

- [x] No
- [ ] Yes. Fill in the details below.

| Name Address (Number, Street, City, State and ZIP Code) | Date issued |
|---|---|

**Part 12: Sign Below**

I have read the answers on this Statement of Financial Affairs and any attachments, and I declare under penalty of perjury that the answers are true and correct. I understand that making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

Leslie Klein [signature]
Signature of Debtor 1

Signature of Debtor 2

Date 3/[illegible]/2023 Date ____________

Did you attach additional pages to Your Statement of Financial Affairs for Individuals Filing for Bankruptcy (Official Form 107)?

- [x] No
- [ ] Yes

Did you pay or agree to pay someone who is not an attorney to help you fill out bankruptcy forms?

- [x] No

Debtor 1    **Leslie Klein**                                                                                        Case number *(if known)*    **2:23-bk-10990-SK**

☐ Yes. Name of Person _____. Attach the *Bankruptcy Petition Preparer's Notice, Declaration, and Signature* (Official Form 119).

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
**9454 Wilshire Boulevard, 6th floor**
**Beverly Hills, CA 90212**

A true and correct copy of the foregoing document entitled (*specify*): __**Summary of Amended Schedules, Master Mailing List, and or Statements**__  will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) _3/31/23_, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☑ Service information continued on attached
page

**2.  SERVED BY UNITED STATES MAIL**: On (*date*) ____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached
page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) ____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached
page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| | | |
|---|---|---|
| _3/31/23_ | **Yathida Nipha** | _/s/Yathida Nipha_ |
| Date | *Printed Name* | Signature |

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*December 2015*                                   Page 2                                   F 1007-1.1.AMENDED.SUMMARY

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

**Goe Forsythe & Hodges: Reem J Bello**   rbello@goeforlaw.com, kmurphy@goeforlaw.com
**Goe Forsythe & Hodges Robert P Goe**   kmurphy@goeforlaw.com,
rgoe@goeforlaw.com;goeforecf@gmail.com
**Interested Party: Alan G Tippie**   Alan.Tippie@gmlaw.com,
atippie@ecf.courtdrive.com;Karen.Files@gmlaw.com,patricia.dillamar@gmlaw.com,
denise.walker@gmlaw.com
**Debtor's Counsel: Michael Jay Berger**   michael.berger@bankruptcypower.com,
yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com
**Interested Party: Greg P Campbell**   ch11ecf@aldridgepite.com,
gc@ecf.inforuptcy.com;gcampbell@aldridgepite.com
**Counsel for Wilmington Savings Fund: Theron S Covey**   tcovey@raslg.com, sferry@raslg.com
**Interested Party: Dane W Exnowski**   dane.exnowski@mccalla.com,
bk.ca@mccalla.com,mccallaecf@ecf.courtdrive.com
**U.S. Trustee: Michael Jones**   michael.jones4@usdoj.gov
**U.S. Trustee: Ron Maroko**   ron.maroko@usdoj.gov
**Counsel for Ajax Mortgage: Joshua L Scheer**   jscheer@scheerlawgroup.com,
jscheer@ecf.courtdrive.com
**Subchapter V Trustee: Mark M Sharf (TR)**   mark@sharflaw.com,
C188@ecfcbis.com;sharf1000@gmail.com
**United States Trustee (LA)**   ustpregion16.la.ecf@usdoj.gov
**Interested Party: Michael L Wachtell**   mwachtell@buchalter.com
**U.S. Bank: John P. Ward**   jward@attleseystorm.com, ezhang@attleseystorm.com
**Interested Party: Paul P Young**   paul@cym.law, jaclyn@cym.law

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

# EXHIBIT  C



The Lincoln National Life Insurance Company
P.O. Box 21008
Greensboro, NC 27420-1008

September 8, 2017

Bw Life Settlements Llc
14245 Ventura Blvd, 3rd FL
Sherman Oaks, CA 91423

Sent via Fax
Issuing Company: The Lincoln National
Life Insurance Company
Policy: JJ7033900
Insured: Rosalia Feldman

Dear Policyowner:

This letter is in response to your request for information on this policy.

| | |
|---|---|
| Type of Coverage : | Universal Life |
| Base Plan Coverage : | $10,000,000.00 |
| Status : | Active |
| Issued : | 08/28/2008 |

The ownership of this policy was changed effective April 23, 2012 from The Rosalia Feldman Life Insurance Trust to Safety Coverage, LLC.

The ownership of this policy was changed effective July 31, 2012 from Safety Coverage, LLC to BW Life Settlements, LLC.

We are committed to providing you with quality customer service. If you have any questions or comments, please contact Customer Service at 800-487-1485 between the hours of 8:00 a.m. and 6:00 p.m. Eastern Time, Monday through Friday, or contact your financial representative.

Sincerely,

Marilyn B. Gillespie
Written Communications
Customer Solutions
Life and Customer Solutions

To access your information, visit www.LincolnFinancial.com

*Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates. www.LincolnFinancial.com*
*The Lincoln National Life Insurance Company is domiciled in Fort Wayne, IN.*

LINCOLN006595

# EXHIBIT  D

**Lincoln**
Financial Group®

<div align="right">

The Lincoln National Life Insurance Company
P.O. Box 21008
Greensboro, NC 27420-1008

Bus: 800-487-1485

</div>

April 23, 2012

SAFETY COVERAGE LLC
199 LEE AVENUE STE 308
BROOKLYN NY 11211

RE:    Policy #JJ7033900

Rosalia Feldman, Insured

Dear Policyowner:

The ownership and payor of this policy has been changed as requested. Please retain a copy of this confirmation letter for your records.

Our system now reflects the following:

Owner/Payor: SAFETY COVERAGE LLC

The new owner should submit a current beneficiary designation using the enclosed form. It should be noted that the title used in the signature section of a change request form should be Member as outlined in the operating agreement instead of President.

This policy has entered the grace period. If the policy lapses, reinstatement of the life insurance coverage is subject to approval by the Company. Please contact our office immediately for the premium requirement to bring this policy to a current premium paying status.

If you have any questions or need further assistance, please contact our office toll free at 800-487-1485.

Sincerely,

Linda Simmons
Customer Service Unit

CC:    Edward Pinkesz
       C-O Crump Life Ins Svcs
       4250 Crums Mill Rd
       Harrisburg PA 17112
       .

LINCOLN006483

# EXHIBIT E



The Lincoln National Life Insurance Company
P.O. Box 21008
Greensboro, NC 27420-1008

Bus: 800-487-1485

August 8, 2012

Joseph Perlman
FAX: 347 955-4555

RE:   Policy #JJ7033900
      Rosalia Feldman, Insured

Dear Mr. Perlman:

This letter is in response to your request for information on this policy.

Our records indicate the ownership designation of the policy was changed July 31, 2012, to BW Life Settlements LLC.

If you have any questions or need further assistance, please contact our office toll free at 800-487-1485.

Sincerely,

Lynn Gates
Customer Service Professional

CC:   Edward Pinkesz
      C-O Crump Life
      4135 N Front St
      Harrisburg PA 17110
      (800) 692-7307

**To access your information 24 hours a day 7 days a week call InfoNow directly at 1-866-INFO-003 (1-866-463-6003) or visit www.LincolnFinancial.com**

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates. www.LincolnFinancial.com
The Lincoln National Life Insurance Company's Home Office is located in Fort Wayne, IN.

LINCOLN006493

# EXHIBIT  F

LLC-1   File # 2 0 1 0 1 0 6 1 0 1 3 5



## State of California
### Secretary of State

## LIMITED LIABILITY COMPANY
## ARTICLES OF ORGANIZATION

**ENDORSED · FILED**
In the office of the Secretary of State
of the State of California

**APR 1 5 2010**

A $70.00 filing fee must accompany this form.

**IMPORTANT** – Read Instructions before completing this form.

This Space For Filing Use Only

**ENTITY NAME** (End the name with the words "Limited Liability Company," or the abbreviations "LLC" or "L.L.C." The words "Limited" and "Company" may be abbreviated to "Ltd." and "Co.," respectively.)

1. NAME OF LIMITED LIABILITY COMPANY

BW Life Settlements LLC

**PURPOSE** (The following statement is required by statute and should not be altered.)

2. THE PURPOSE OF THE LIMITED LIABILITY COMPANY IS TO ENGAGE IN ANY LAWFUL ACT OR ACTIVITY FOR WHICH A LIMITED LIABILITY COMPANY MAY BE ORGANIZED UNDER THE BEVERLY-KILLEA LIMITED LIABILITY COMPANY ACT.

**INITIAL AGENT FOR SERVICE OF PROCESS** (If the agent is an individual, the agent must reside in California and both items 3 and 4 must be completed. If the agent is a corporation, the agent must have on file with the California Secretary of State a certificate pursuant to Corporations Code section 1505 and Item 3 must be completed (leave Item 4 blank).)

3. NAME OF INITIAL AGENT FOR SERVICE OF PROCESS

Leslie Klein

4. IF AN INDIVIDUAL, ADDRESS OF INITIAL AGENT FOR SERVICE OF PROCESS IN CALIFORNIA   CITY   STATE   ZIP CODE

14245 Ventura Blvd., Floor 3   Sherman Oaks   CA   91423

**MANAGEMENT** (Check only one)

5. THE LIMITED LIABILITY COMPANY WILL BE MANAGED BY:

☐ ONE MANAGER

☐ MORE THAN ONE MANAGER

☑ ALL LIMITED LIABILITY COMPANY MEMBER(S)

**ADDITIONAL INFORMATION**

6. ADDITIONAL INFORMATION SET FORTH ON THE ATTACHED PAGES, IF ANY, IS INCORPORATED HEREIN BY THIS REFERENCE AND MADE A PART OF THIS CERTIFICATE.

**EXECUTION**

7. I DECLARE I AM THE PERSON WHO EXECUTED THIS INSTRUMENT, WHICH EXECUTION IS MY ACT AND DEED.

April 12, 2010
DATE

SIGNATURE OF ORGANIZER

Luis A. Jimenez
TYPE OR PRINT NAME OF ORGANIZER

LLC-1 (REV 04/2007)   APPROVED BY SECRETARY OF STATE

LINCOLN007170

# EXHIBIT  G

**OPERATING AGREEMENT**

**OF**

**LIMITED LIABILITY COMPANY** *LIFE SETTLEMENTS*

This Operating Agreement ("Agreement") of *B W* LLC (the "Company") effective as of this _7_ day of _MAY_, _2010_, by, between and among the undersigned confirms our understanding as to the matters contained herein.

The parties hereto agree as follows:

**ARTICLE I**

**Definitions**

SECTION 1.1. As used herein, the following terms and phrases shall have the meanings indicated:

A.  "Act" shall mean the Limited Liability Company Act of the State of organization, as amended.

B.  "Capital Account" shall mean, with respect to each Member, the account established for each Member pursuant to Section 6.5, which will initially equal the Capital Contributions of such Member and will be (a) increased by the amount of Net Profits allocated to such Member and (b) reduced by the amount of Net Losses allocated to such Member and the amount of Cash Flow distributed to such Member. Members' Capital Accounts shall be determined and maintained in accordance with the rules of paragraph (b)(2)(iv) of Regulation Section 1.704-1 of the Code.

C.  "Capital Contributions" shall mean the fair market value of the amounts contributed by the Members pursuant to Section 6.1.

D.  "Cash Flow" shall have the meaning provided in Section 7.1.

E.  "Code" shall mean the Internal Revenue Code of 1986, as amended, or corresponding provisions of subsequent revenue laws.

F.  "Operating Managers" shall mean the Member or Members selected by the Members in accordance with this Agreement to serve as Operating Manager or Operating Managers of the Company.

G.  "Members" shall mean the persons designated as such in Schedule A of this Agreement, any successor(s) to their interests as such in the Company; and any other person who pursuant to this Agreement shall become a Member, and any reference to a "Member" shall be to any one of the then Members.

6

LINCOLN007171

H.     "Net Profits" and "Net Losses" shall mean the net profit or net loss, respectively, of the Company determined in accordance with Section 8.1.

I.     The words "Membership Interest" shall mean a Member's interest in the Company which shall be in the proportion that the Member's share of the profits and losses of the Company bears to the aggregate shares of all the Members. A Membership Interest may be evidenced by a certificate issued by the Company. A Membership Interest may be expressed on a certificate as "Units" where a Member's Units bears the same relationship to the aggregate Units of all Members that the Member's Membership Interest bears to the aggregate Membership Interests of all Members. A Member's Interest may be a certificated security or an uncertificated security within the meaning of section 8-102 of the Uniform Commercial Code if the requirements of section 8-103(c) are met, and if the requirements are not met such interest shall, for purposes of the Uniform Commercial Code, be deemed to be a general intangible asset.

J.     "Company" shall mean this Limited Liability Company.

K.     "Person" shall mean any natural person, corporation, partnership, joint venture, association, limited liability company or other business or legal entity.

## ARTICLE II

### Organization of the Company

SECTION 2.1.  The purpose of the Company is to conduct any lawful business for which limited liability companies may be organized and to do all things necessary or useful in connection with the foregoing.

SECTION 2.2.  The Company name shall be "_BW    HHE  SETJN/HMLLC_".

SECTION 2.3.  The Members shall be Members in the Company and shall continue to do business under the name of the Company until the Operating Managers shall change the name or the Company shall terminate.

SECTION 2.4.  The principal address of the Company shall be such place or places as the Operating Managers may determine. The Operating Managers will give notice to the Members promptly after any change in the location of the principal office of the Company.

SECTION 2.5.  The Company shall terminate on the date provided in the Certificate of Formation/Articles of Organization, except that the Company may terminate prior to such date as provided in this Agreement.

7

LINCOLN007172

## ARTICLE III

### Status of Members

SECTION 3.1. No Member will be bound by, or be personally liable for the expenses, liabilities or obligations of the Company.

SECTION 3.2. No Member will be entitled to withdraw any part of his Capital Account or to receive any distributions from the Company except as expressly provided in this Agreement.

SECTION 3.3. No Member will have the right to require partition of the Company property or to compel any sale or appraisal of the Company's assets or any sale of a deceased Member's interest in the Company's assets, notwithstanding any provision of law to the contrary.

## ARTICLE IV

### Meeting of Members

SECTION 4.1. An annual meeting of Members shall be held within five (5) months after the close of the fiscal year of the Company on such date and at the time and place (either within or without the state of its organization) as shall be fixed by the Members. At the annual meeting, the Members shall elect the Operating Managers and transact such other business as may properly be brought before the meeting.

SECTION 4.2. A special meeting of Members may be called at any time by the Operating Managers and shall be called by the Operating Managers at the request in writing of that Membership interest specified in Schedule C of the Members entitled to vote at such meeting. Any such request shall state the purpose or purposes of the proposed meeting. Business transacted at any special meeting of Members shall be confined to the purposes set forth in the notice thereof.

SECTION 4.3. Written notice of the time, place and purpose of every meeting of Members (and, if other than an annual meeting, the person or persons at whose direction the meeting is being called), shall be given by the Operating Managers to each Member of record entitled to vote at such meeting, not less than ten nor more than sixty days prior to the date set for the meeting. Notice shall be given either personally or by mailing said notice by first class mail to each Member at his address appearing on the record book of the Company or at such other address supplied by him in writing to the Operating Managers of the Company for the purpose of receiving notice.

A written waiver of notice setting forth the purposes of the meeting for which notice is waived, signed by the person or persons entitled to such notice, whether before or after the time of the meeting stated therein, shall be deemed equivalent to the giving of such notice. The attendance by a Member at a meeting either in person or by proxy without protesting the lack of notice thereof shall constitute a waiver of notice of such Member.

8

LINCOLN007173

All notices given with respect to an original meeting shall extend to any and all adjournments thereof and such business as might have been transacted at the original meeting may be transacted at any adjournment thereof; no notice of any adjourned meeting need be given if an announcement of the time and place of the adjourned meeting is made at the original meeting.

SECTION 4.4. The holders of a majority in interest of the Members present in person or represented by proxy, shall be requisite and shall constitute a quorum at all meetings of members except as otherwise provided by statute or the Certificate of Formation/Articles of Organization. If, however, a quorum shall not be present or represented at any meeting of Members, the Members entitled to vote thereat, present in person or represented by proxy, shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally notified. When a quorum is once present to organize a meeting, such quorum is not deemed broken by the subsequent withdrawal of any Members.

SECTION 4.5. Every Member entitled to vote at any meeting shall be entitled to vote in accordance with his membership interest in the Company held by him of record on the date fixed as the record date for said meeting and may so vote in person or by proxy. Any Company action shall be authorized by a majority in interest of the votes cast by the Members entitled to vote thereon except as may otherwise be provided by statute, the Certificate of Formation/Articles of Organization or this Operating Agreement.

SECTION 4.6. Every proxy must be signed by the Member entitled to vote or by his duly authorized attorney-in-fact and shall be valid only if filed with the Operating Managers of the Company prior to the commencement of voting on the matter in regard to which said proxy is to be voted. No proxy shall be valid after the expiration of eleven months from the date of its execution unless otherwise expressly provided in the proxy. Every proxy shall be revocable at the pleasure of the person executing it except as otherwise provided by statute. Unless the proxy by its terms provides for a specific revocation date and except as otherwise provided by statute, revocation of a proxy shall not be effective unless and until such revocation is executed in writing by the Member who executed such proxy and the revocation is filed with the Operating Managers of the Company prior to the voting of the proxy.

SECTION 4.7. All meetings of Members shall be presided over by the Operating Managers, or if not present, by a Member thereby chosen by the Members at the meeting. The Operating Managers or the person presiding at the meeting shall appoint any person present to act as secretary of the meeting.

SECTION 4.8. For the purpose of determining the Members entitled to notice of, or to vote at any meeting of Members or any adjournment thereof or to express consent or dissent from any proposal without a meeting, or for the purpose of determining the Members entitled to receive payment of any distribution of Cash Flow or the allotment of any rights, or for the purpose of any other action, the Members may fix, in advance, a date as the record date for any



LINCOLN007174

such determination of Members. Such date shall not be more than fifty nor less than ten days before the date of any meeting nor more than fifty days prior to any action taken without a meeting, the payment of any distribution of Cash Flow or the allotment of any rights, or any other action. When a determination of Members of record entitled to notice of, or to vote at any meeting of Members has been made as provided in this Section, such determination shall apply to any adjournment thereof, unless the Members fix a new record date under this Section for the adjourned date.

SECTION 4.9. The Company shall be entitled to treat the holder of record of any Membership Interest as the holder in fact thereof and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such Membership Interest on the part of any other person whether or not it shall have express or other notice thereof, except as otherwise provided by the Act.

## ARTICLE V

### Management

SECTION 5.1. Management of the Company shall be vested in all of the Members who shall also serve as Operating Managers of the Company. The Operating Managers shall vote in proportion to their Membership Interests in the Company. Except as otherwise provided in this Agreement, all decisions of the Operating Managers shall be by a majority in interest of the Members. All Operating Managers must be Members of the Company. No Member will take part in or interfere in any manner with the conduct or control of the business of the Company or have any right or authority to act for or bind the Company except as provided in this Agreement.

SECTION 5.2. The Operating Managers shall hold office for the term for which elected and until a successor has been elected and qualified. A vacancy in the office of Operating Manager arising from any cause may be filled for the unexpired portion of the term by the Members.

SECTION 5.3. Any Operating Manager may resign at any time by giving written notice to the Members. Any such resignation shall take effect at the time specified therein or, if the time is not specified therein, upon the receipt thereof, irrespective of whether any such resignations shall have been accepted.

SECTION 5.4. The Company shall be managed by the Operating Managers and the conduct of the Company's business shall be controlled and conducted solely and exclusively by the Operating Managers in accordance with this Agreement. In addition to and not in limitation of any rights and powers conferred by law or other provisions of this Agreement, the Operating Managers shall have and may exercise on behalf of the Company all powers and rights necessary, proper, convenient or advisable to effectuate and carry out the purposes, business and objectives of the Company, and to maximize Company profits.

SECTION 5.5. Notwithstanding the foregoing, the Operating Managers may not make any of the management decisions stated in Schedule B without obtaining the consent of that Membership Interest stated in Schedule B.

10

LINCOLN007175

SECTION 5.6. The Operating Manager shall serve as Tax Matters Member as such term is defined in Code Section 6231 (a)(7).

SECTION 5.7. Any person made or threatened to be made a party to an action or proceeding, whether civil or criminal, by reason of the fact that he, his testator or intestate, then, is, or was a manager, Member, employee or agent of the Company, or then serves or has served on behalf of the Company in any capacity at the request of the Company, shall be indemnified by the Company against reasonable expenses, judgments, fines and amounts actually and necessarily incurred in connection with the defense of such action or proceeding or in connection with an appeal therein, to the fullest extent permissible by the Act. Such right of indemnification shall not be deemed exclusive of any other rights to which such person may be entitled.

## ARTICLE VI

### Capital

SECTION 6.1. The Members have contributed to the Company in exchange for their membership interests, the cash and other property as set forth on Schedule A, annexed hereto.

SECTION 6.2. The fair market value and the adjusted basis of the contributing Member of any property other than cash contributed to the Company by a Member shall be set forth on Schedule A, annexed hereto.

SECTION 6.3. Except as expressly provided in this Agreement, no Member shall be required to make any additional contributions to the capital of the Company.

SECTION 6.4. No interest shall be paid on the Capital Account of any Member.

SECTION 6.5. A Capital Account shall be established for each Member on the books and records of the Company. If any assets of the Company are distributed to the Members in kind, the Capital Accounts of the Members shall be adjusted to reflect the difference between the fair market value of such assets on the date of distribution and the basis of the Company in such assets.

## ARTICLE VII

### Distributions of Cash

SECTION 7.1. The Company shall distribute to the Members from time to time all cash (regardless of the source thereof) of the Company which is not required for the operation or the reasonable working capital requirements of the Company (such cash is sometimes referred to herein as "Cash Flow"). For purposes of this Agreement all Cash Flow allocated to the Members shall be allocated among them in proportion to their respective Membership Interests.



11

LINCOLN007176

SECTION 7.2. Distributions of Cash Flow shall be made from time to time in such manner as determined by the Operating Managers.

## ARTICLE VIII

### Profits and Losses

SECTION 8.1. The Net Profits and Net Losses of the Company shall be the net profits and net losses of the Company as determined for Federal income tax purposes.

SECTION 8.2. The Net Profits and Net Losses of the Company and each item of income, gain, loss, deduction or credit entering into the computation thereof, shall be allocated to the Members in the same proportions that they share in distributions of Cash Flow pursuant to Section 7.1, or if there is no Cash Flow, that they would have shared if there had been Cash Flow.

SECTION 8.3. References herein to "Reg. Sec.", are to the regulations promulgated by the United States Treasury to the Code.   The terms "minimum gain", "minimum gain chargeback", "qualified income offset", "nonrecourse deduction" and "nonrecourse liability" are to be interpreted consistent with the definitions and use of such terms in Reg. Sec. 1.704-2 and Reg. Sec. 1.704-1. The following special allocations shall be made in the following order:

A.      Except as otherwise set forth in Reg. Sec. 1.704-2(f), if there is a net decrease in minimum gain, during the fiscal year of the Company, each Member, shall be specially allocated items of gross income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that Member's share of the net decrease of minimum gain determined in accordance with Reg. Sec. 1.704-2(g).  Allocations in accordance with this Section shall be made first from the disposition of Company assets subject to nonrecourse liabilities, to the extent of the minimum gain attributable to those assets, and thereafter, from a pro-rata portion of the Company's other items of income and gain for the taxable year.  This Section is intended to comply with the minimum gain chargeback requirement of Reg. Sec. 1.704-2(f).

B.      Except as otherwise set forth in Reg. Sec. 1.704-2(i)(4), if there is a net decrease in a Member's nonrecourse liability minimum gain attributable to Members' nonrecourse liabilities during any fiscal year, each Member who has a share of the Member nonrecourse liability minimum gain attributable to Member nonrecourse liability shall be specially allocated items of gross income and gain for such fiscal year (and, if necessary, subsequent fiscal years)in an amount equal to that Member's share of the net decrease in Members' nonrecourse debt minimum gain attributable to such Member nonrecourse debt.  Allocations pursuant to this Section shall be made first from gain recognized from the disposition of Company assets subject to Member nonrecourse liabilities to the extent of Member minimum gain attributable to those assets, and thereafter, from a pro-rata portion of the Company's other items of income and gain for the fiscal year.  This section is intended to comply with the minimum gain chargeback requirements of Reg. Sec. 1.704-2(i).



12

LINCOLN007177

C.    A Member who unexpectedly receives an adjustment, allocation or distribution described in (4), (5) or (6) of Reg. Sec. 1.704-1(b)(2)(ii)(d) will be allocated items of income and gain in an amount and manner sufficient to eliminate such deficit balance as quickly as possible. An allocation shall be made pursuant to this Section and if and to the extent a Member would have a deficit in his adjusted Capital Account after all other allocations provided for in this Section 8.3 were made as if this paragraph were not in the Agreement.

D.    Nonrecourse deductions shall be allocated among the Members in the same proportion in which they share the Cash Flow of the Company.

E.    Any nonrecourse deduction shall be allocated to any Member who bears the economic risk of loss with respect to the Member nonrecourse liability to which such deduction is attributable.

SECTION 8.4. Any Company gain or loss realized with respect to property, other than money, contributed to the Company by a Member shall be shared among the Members pursuant to Code section 704(c) and regulations to be promulgated thereunder so as to take account of the difference between the Company basis and the fair market value of the property at the time of the contribution ("built-in gain or loss"). Such built-in gain or loss shall be allocated to the contributing Member upon the disposition of the property.

## ARTICLE IX

## Admission and Withdrawal of a Member

SECTION 9.1. A Member may transfer his interest in the Company to another person or entity only with the prior unanimous consent of the other Members either in writing or at a meeting called for such purpose. If all of the other Members do not approve of the transfer, the transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member. The transferee shall be entitled to receive the share of profits, losses and Cash Flow or other compensation by way of income and the return of contributions to which the transferor otherwise would be entitled.

SECTION 9.2. The Members agree to sign such additional documents as may be required in order to admit additional Members to the Company, pursuant to section 9.1 as well as, among other things, to provide for the division of profits, losses and Cash Flow among the Members.

SECTION 9.3. All costs and expenses incurred by the Company in connection with the assignment of a Member's interest, including any filing fees and publishing costs and the fees and disbursements of counsel, shall be paid by the assigning Member.

SECTION 9.4. Each person who becomes a Member in the Company, by becoming a Member, shall and does hereby ratify and agree to be bound by the terms and conditions of this Agreement.

13

## ARTICLE X

### Termination or Dissolution of Company

SECTION 10.1. The Company shall be terminated prior to the date of expiration of the term as provided in Section 2.5 if (a) a majority in interest of the Members consent that the Company should be terminated and dissolved, or (b) the Company is dissolved pursuant to this Agreement.

SECTION 10.2. The Company shall be terminated in the event any Member (i) withdraws, resigns or is expelled from the Company; (ii) makes an assignment for the benefit of creditors, is the subject of an order for relief under Title 11 of the United States Code, files a petition or answer seeking for himself any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law or regulation, files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against him in any proceeding of this nature, seeks, consents to, or acquiesces in the appointment of a trustee, receiver or liquidator for of all or any substantial part of his properties; (iii) dies; or (iv) a judgment is entered by a court of competent jurisdiction adjudicating him incompetent to manage his person or his property.

SECTION 10.3. If the Company is dissolved, the owners of a majority in interest of the remaining Members may elect to reconstitute and continue the Company as a successor Company upon the same conditions as are set forth in this Agreement.  Any such election to continue the Company will not result in the creation of a new Company among the remaining Members, nor will such election require the amendment of this Agreement or the execution of an amended Agreement.

SECTION 10.4. Upon the termination and dissolution of the Company, the then Operating Manager, or Operating Managers, if any, or, if there is no Operating Manager, any person elected to perform such liquidation by the written consent of the owners of a majority in interest of the Members, shall proceed to the liquidation of the Company.  The proceeds of such liquidation shall be applied and distributed as follows:

A.      If any assets of the Company are to be distributed in kind, such assets shall be distributed on the basis of the fair market value thereof, and any Member entitled to any interest in such assets shall receive such interest therein as a tenant-in-common with all other Members so entitled.  The fair market value of such assets shall be determined by an independent appraiser to be selected by the Company's independent public accountants.  The amount by which the fair market value of any Property to be distributed in kind to the Members exceeds or is less than the basis of such Property, shall, to the extent not otherwise recognized by the Company, be taken into account in computing Net Profits or Net Losses (and shall be allocated among the Members in accordance with Section 8.2) for purposes of crediting or charging the Capital Accounts of, and liquidating distributions to, the Members under Section 10.4.B.

B.      All distributions upon liquidation of the Company shall be distributed as follows: to each of the Members, in proportion to the amounts of their respective positive Capital Accounts, as such accounts have been adjusted (i) in accordance with Section 6.5 to reflect the

14

Net Profit or Net Loss realized or incurred upon the sale of the Company's property or assets and any deemed sale pursuant to Section 10.4.A; (ii) in accordance with Section 8.2 to reflect all Net Profits or Net Losses with respect to the year of liquidation. No Member shall be liable to repay the negative amount of his Capital Account.

SECTION 10.5. Each of the Members shall be furnished with a statement, reviewed by the Company's independent public accountants, which shall set forth the assets and liabilities of the Company as of the date of the Company's liquidation. Upon completion of the liquidation, the Operating Managers shall execute and cause to be filed a Certificate of Dissolution of the Company and any and all other documents necessary with respect to termination of the Company.

## ARTICLE XI

### Books and Reports

SECTION 11.1. The Operating Managers shall cause the Company to maintain the following records:

A.    Complete and accurate books of account, in which shall be entered, fully and accurately, each and every transaction of the Company, shall be kept by the Operating Managers at the principal office of the Company. The fiscal year of the Company shall be the calendar year. The books of account of the Company shall be kept in accordance with sound accounting practices and principles applied in a consistent manner by the Company; provided, however, that all methods of accounting and treating particular transactions shall be in accordance with the methods of accounting employed for Federal income tax purposes. All determinations by the Operating Managers with respect to the treatment of any item or its allocation for Federal, state or local tax purposes shall be binding upon all the Members unless the determination is inconsistent with any express provision of this Agreement.

B.    A current list of the full name and last known mailing address of each Member set forth in alphabetical order together with the contribution and share in profits and losses of each Member; a copy of the Certificate of Formation or Articles of Organization of the Company and any amendments thereto; a copy of the Company Operating Agreement and any amendments thereto; a copy of the Company's federal, state and local income tax returns for the three most recent fiscal years.

C.    Any Member shall have the right from time to time at his expense to have his accountants and representatives examine and/or audit the books and records of the Company and the information referred to in this Section, and the Operating Managers will make such books and records and information available for such examinations and/or audits.

SECTION 11.2. No value shall be placed for any purpose upon the Company name or the right to its use, or upon the goodwill of the Company or its business. Upon termination or dissolution of the Company (without reconstitution thereof) as provided in this Agreement, neither the Company name or the right to its use, nor the goodwill of the Company, shall be considered as an asset of the Company.



15

LINCOLN007180

SECTION 11.3. The Operating Managers will cause to be sent to the Members within a reasonable period after the close of each year the following: (a) annual statements of the Company's gross receipts and operating expenses, and the capital accounts of each Member, prepared by the Company's independent public accountants, to be transmitted to each Member; and (b) a report to be transmitted to each Member indicating the Member's share of the Company's profit or loss for that year and the Member's allocable share of all items of income, gain, loss, deduction, and credit, for Federal income tax purposes.

## ARTICLE XII

### Tax Elections

SECTION 12.1. In the event of a transfer of a Member's interest, or upon the death of a Member, or in the event of the distribution of Company property to any party hereto, the Company may (but need not necessarily) file an election, in accordance with Section 754 of the Code to cause the basis of the Company Property to be adjusted for Federal income tax purposes, as provided by Sections 734 and 743 of the Code.

## ARTICLE XIII

### Miscellaneous

SECTION 13.1. Any notice or other communication under this Agreement shall be in writing and shall be considered given when mailed by registered or certified mail, return receipt requested, to the parties at the following addresses (or at such other address as a party shall have previously specified by notice to the others as the address to which notice shall be given to him):

A.   If to the Company, to it in care of the Operating Managers at the address of the Company.

B.   If to the Operating Managers, to them at the address of the Company.

C.   If to any Member, to him at his address set forth on the books and records of the Company.

SECTION 13.2. This Agreement contains a complete statement of all of the arrangements among the parties with respect to the Company and cannot be changed or terminated orally or in any manner other than by a written agreement executed by all of the Members. There are no representations, agreements, arrangements or understandings, oral or written, between or among the parties relating to the subject matter of this Agreement which are not fully expressed in this Agreement.

SECTION 13.3. This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted.

LINCOLN007181

SECTION 13.4. This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations of the jurisdiction in which the Company does business. If any provision of this Agreement, or the application thereof to any person or circumstance, shall for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of that provision to other persons or circumstances shall not be affected, but rather shall be enforced to the extent permitted by law.

SECTION 13.5. Anything hereinbefore in this Agreement to the contrary notwithstanding, all references to the Property of the Company are deemed to include the profits, losses and Cash Flow of the Property.

SECTION 13.6. Irrespective of the place of execution or performance, this Agreement shall be governed by and construed in accordance with the laws of the State of organization of the Company applicable to agreements made and to be performed in the State of organization of the Company.

SECTION 13.7. The captions, headings and table of contents in this Agreement are solely for convenience of reference and shall not affect its interpretation.

SECTION 13.8. This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which shall be deemed to constitute a single document.

SECTION 13.9. Whenever the context so requires, the male gender when used herein shall be deemed to include the female gender, the female gender shall be deemed to include the male gender, the singular shall be deemed to include the plural and the plural shall be deemed to include the singular.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the day and year first above written.

Name: _____
Member

Name: _____
Member

Name: _____
Member

17

LINCOLN007182

## SCHEDULE A

In alphabetical order, list name of Member, Membership Interest, address, Taxpayer I.D. number, and amount of capital contribution (Please use a separate page for each Member):

LESLIE KLEIN

**Name of Member**

50 %

**Membership Percentage Interest**

322 N. JUNE ST

**Street Address**

LA CALIF 90004

**City, State and Zip code**

<br>

**Taxpayer I.D. Number (Social Security Number)**

**Name of Principal if Entity**

100,000

**Capital Contribution**

<br>

BAY AREA DEV W

**Name of Member**

50 %

**Membership Percentage Interest**

1424 VENTURA BLD

**Street Address**

SHERMAN OAKS CALIF

**City, State and Zip code**

<br>

**Taxpayer I.D. Number (Social Security Number)**

SETH BIENSTOCK

**Name of Principal if Entity**

100,000

**Capital Contribution**

18

LINCOLN007183

# EXHIBIT  H



The Lincoln National Life Insurance Company
P.O. Box 21008
Greensboro, NC 27420-1008

December 5, 2017

Bw Life Settlements Llc
14245 Ventura Blvd, 3rd FL
Sherman Oaks, CA 91423

Issuing Company: The Lincoln National
Life Insurance Company
Policy: JJ7033900
Insured: Rosalia Feldman

Dear Policyowner:

This letter is in response to a request to change the beneficiary on this policy. The beneficiary change request has been processed. Beneficiary Designation as of 12-04-2017:

   35% Irrevocable: BW Life Settlements LLC, 65% Not Irrevocable: Bank of Utah

This is your beneficiary designation as we understand it.  If this is not the intent for the beneficiary designation, please contact our office as soon as possible.

This confirmation should be placed with the policy as it is now considered a permanent part of the contract.

We are committed to providing you with quality customer service. If you have any questions or comments, please contact Customer Service at 800-487-1485 between the hours of 8:00 a.m. and 6:00 p.m. Eastern Time, Monday through Friday, or contact your financial representative.

Sincerely,

Fred H Shiflett III
Customer Solutions
Life Customer Service


To access your information, visit www.LincolnFinancial.com


*Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates. www.LincolnFinancial.com*
*The Lincoln National Life Insurance Company is domiciled in Fort Wayne, IN.*


LCN-1236278-062615 UL                     Page 1 of 1

LINCOLN006614

# EXHIBIT I

# Lincoln
## Financial Group®

The Lincoln National Life Insurance Company
100 North Greene Street
P.O. Box 21008
Greensboro, NC 27420-1008

December 21, 2021

Bank Of Utah
50 South 200 East Ste 110
Salt Lake City, UT 84111

Issuing Company: The Lincoln National
Life Insurance Company
Policy: JJ7033900
Insured: Rosalia Feldman

Dear Policyowner:

The beneficiary designation for your policy has been changed to the following:

**Beneficiary:**

| Beneficiary Name | Beneficiary Designation | Relationship | Beneficiary % | Effective Date |
|---|---|---|---|---|
| BANK OF UTAH | Primary Beneficiary | | 65% | 12/09/2021 |
| ROBERT MERMELSTEIN | Primary Beneficiary | | 25% | 12/09/2021 |
| LESLIE KLEIN LIFE INSURANCE IRRECOCABLE TRUST DATED 06-01-2021 | Primary Beneficiary | | 9% | 12/09/2021 |
| CONGREGATION ZWEHIL OF MONSEY | Primary Beneficiary | | 1% | 12/09/2021 |

**Additional Beneficiary Designation:**
IRREVOCABLE BENEFICIARIES: CONGREGATION ZWEHIL OF MONSEY (1%), LESLIE KLEIN
INSURANCE IRREVOCABLE TRUST (9%), ROBERT MERMELSTEIN (25%)

If you have any questions, please call us at the phone number listed below and we will be happy to assist
you. Our Customer Care Representatives are available Monday through Friday between the hours of 8:00
a.m. and 6:00 p.m. (Eastern Time).

For additional information about Lincoln Financial Group, visit our website at LincolnFinancial.com.

Sincerely,
Life Customer Service and Claims
800-487-1485

*Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates. LincolnFinancial.com*
*The Lincoln National Life Insurance Company is domiciled in Fort Wayne, IN.*

LCN-1228467-061615 UL                    Page 1 of 1

LINCOLN006708

# EXHIBIT  J

**Lincoln**
**Financial Group®**

The Lincoln National Life Insurance Company
100 North Greene Street
P.O. Box 21008
Greensboro, NC 27420-1008

March 24, 2022

Wilmington Trust, Na
300 Park Street Ste 390
Birmingham, MI 48009

Issuing Company: The Lincoln National
Life Insurance Company
Policy: JJ7033900
Insured: Rosalia Feldman

Dear Policyowner:

The beneficiary designation for your policy has been changed to the following:

**Beneficiary:**

| Beneficiary Name | Beneficiary Designation | Relationship | Beneficiary % | Effective Date |
|---|---|---|---|---|
| WILMINGTON TRUST NA | Primary Beneficiary | | 65% | 12/09/2021 |
| ROBERT MERMELSTEIN | Primary Beneficiary | | 25% | 12/09/2021 |
| LESLIE KLEIN LIFE INSURANCE IRRECOCABLE TRUST DATED 06-01-2021 | Primary Beneficiary | | 9% | 12/09/2021 |
| CONGREGATION ZWEHIL OF MONSEY | Primary Beneficiary | | 1% | 12/09/2021 |

If you have any questions, please call us at the phone number listed below and we will be happy to assist you. Our Customer Care Representatives are available Monday through Friday between the hours of 8:00 a.m. and 6:00 p.m. (Eastern Time).

For additional information about Lincoln Financial Group, visit our website at LincolnFinancial.com.

Sincerely,
Life Customer Service and Claims
800-487-1485

*Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates. LincolnFinancial.com*
*The Lincoln National Life Insurance Company is domiciled in Fort Wayne, IN.*

LCN-1228467-061615 UL                    Page 1 of 1

LINCOLN006717

# EXHIBIT  K

1

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

-oOo-

In Re:                          ) Case No. 2:23-10990
                                ) Chapter 11
LESLIE KLEIN                    )
                                ) Los Angeles, California
                    Debtor.    ) Wednesday, February 28, 2024
_____ ) 9:00 AM

                                 #15.00 HEARING RE MOTION TO
                                 CONVERT CASE FROM CHAPTER 11
                                 TO 7

                                 #16.00 HEARING RE MOTION TO
                                 COMPEL ABANDONMENT OF
                                 PROPERTY BY TRUSTEE

                  TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE SANDRA R. KLEIN
              UNITED STATES BANKRUPTCY JUDGE

APPEARANCES (All present by video or telephone):
For the Debtor:              MARC A. LIEBERMAN, ESQ.
                             FLP Law Group LLP
                             1875 Century Park East
                             Suite 2230
                             Los Angeles, CA 90067
                             (310)284-7350

For the U.S. Trustee:        RON MAROKO, ESQ.
                             (Telephonically)
                             Office of the United States
                             Trustee
                             915 Wilshire Blvd, Suite 1850
                             Los Angeles, CA 90017
                             (213)894-4520

For the Chapter 11           JEFFREY W. DULBERG, ESQ.
Trustee:                     (Telephonically)
                             Pachulski Stang Ziehl & Jones LLP
                             10100 Santa Monica Boulevard
                             13th Floor
                             Los Angeles, CA 90067
                             (310)277-6910

**eScribers, LLC**

2

For the Chapter 11          JOHN W. LUCAS, ESQ.
Trustee:                    (Telephonically)
                            Pachulski Stang Ziehl & Jones LLP
                            One Sansome Street
                            Suite 3430
                            San Francisco, CA 94104
                            (415)263-7000

For Franklin Menlo:         NIKKO SALVATORE STEVENS, ESQ.
                            (Telephonically)
                            Chora Young & Manasserian LLP
                            650 Sierra Madre Villa Ave
                            Suite 304
                            Pasadena, CA 91107
                            (626)744-1838

Also Present:               Bradley Sharp, Esq.,
                            (Telephonically)
                            Chapter 11 Trustee

                            Nicholas Troszak,
                            (Telephonically)
                            Development Specialists, Inc.

Court Recorder:             DINA JOHNSON
                            United States Bankruptcy Court
                            Edward R. Roybal Federal Building
                            255 East Temple Street
                            Room 940
                            Los Angeles, CA 90012
                            (855)460-9641

Transcriber:                HANA COPPERMAN
                            eScribers, LLC
                            7227 N. 16th Street
                            Suite #207
                            Phoenix, AZ 85020
                            (800) 257-0885

Proceedings recorded by electronic sound recording;
transcript provided by transcription service.

**Leslie Klein**

3

LOS ANGELES, CALIFORNIA, WEDNESDAY, FEBRUARY 28, 2024, 10:06 AM

-oOo-

(Call to order of the Court.)

THE COURT:  Recalling matters number 15 and 16.   I see Mr. Dulberg has turned his video on.  Mr. Dulberg.

MR. DULBERG:  Good morning, Your Honor.  Jeffrey Dulberg, Pachulski Stang Ziehl & Jones, on behalf of Mr. Brad Sharp, the trustee.  I am joined today by my partner, John Lucas, who will actually be arguing the motion number 15 when we get there.  And as you see, Your Honor, Mr. Sharp has joined us today, as well as Nick Troszak from DSI.

Your Honor, the reason I sort of jumped the gun here is we filed a motion to disqualify Mr. Lieberman.  I don't know if Your Honor has filed along, but there were two weeks ago some disclosures filed.  We filed an objection.  A response was immediately filed saying the proper way to deal with this is a motion.  And we filed a motion saying Your Honor has the ability to do this sua sponte, of course, naturally, and here we are.  I thought it being appropriate to, sort of, jump in and say perhaps this should be dealt with before, before number 15.

THE COURT:  Understood.  And Mr. Dulberg, I'm very familiar with the pleadings.  I intend to address it as a preliminary matter, I'm just going to go and take appearances now.

**Leslie Klein**

4

So I see Mr. Stevens.

MR. STEVENS:  Yes, Your Honor.  Good morning.

THE COURT:  Good morning.

MR. STEVENS:  Nikko S. Stevens, Chora Young & Manasserian LLP, appearing on behalf of creditor Franklin H. Menlo, co-trustee of the Franklin Menlo Irrevocable Trust, established March 1st, 1983.

THE COURT:  Good morning, Mr. Stevens.

Mr. Troszak.  You're muted, Mr. Troszak.

MR. TROSZAK:  Good morning, Your Honor.  Nicholas Troszak, Development Specialists Inc.  We're the financial advisors or forensic accountants to Bradley Sharp, the Chapter 11 Trustee.

THE COURT:  Good morning.  Mr. Maroko.

MR. MAROKO:  Good morning, Your Honor.  Ron Maroko, appearing for Peter C. Anderson, the United States Trustee.

THE COURT:  Good morning. Mr. Sharp.

MR. SHARP:  Good morning, Your Honor.  Bradley Sharp, Chapter 11 Trustee.

THE COURT:  Good morning.  Mr. Lucas.

MR. LUCAS:  Good morning, Your Honor.  John Lucas, Pachulski Stang Ziehl & Jones, counsel to Mr. Sharp, the Chapter 11 trustee.

THE COURT:  Good morning.  And in the courtroom I understand is Mr. Lieberman.

5

MR. LIEBERMAN:  Yes.  Your Honor Mark Lieberman, FLP Law Group LLP, appearing for debtor-not-in possession, Leslie Klein, and I am present at the lectern.

THE COURT:  Good morning.  All right.  So Mr. Dulberg alluded to a preliminary issue.  It is the attorney disclosure of post-petition compensation arrangement with debtor.  That's docket 663.  It was filed on February 15th.

On February 22nd, counsel to Mr. Sharp filed an objection to FLP Law Group's disclosure.  On February 23rd, Mr. Lieberman filed an opposition to trustee's objection to FLP Law Group, and one of the issues raised was the procedural posture and that according to the trustee, it was inappropriate to bring -- excuse me.  According to FLP, it was inappropriate to bring the trustee's objection the way it was done.  It needed to be done via motion.  And that yesterday in the afternoon there was a motion for order disqualifying FLP, and there was an application for order shortening time to have that matter heard this morning.

I'm very familiar with what the arguments are.  This is how we're going to proceed.  I intend to rule on today's motion, motion being the motion to convert.  I will allow Mr. Lieberman to argue.  I did consider the reply.  And the reason why I'm moving forward today is because this case has been pending for almost a year.  There are adversary proceedings and individuals who have been waiting to try to get what they're

6

owed or allegedly owed for almost a decade in one case.  I don't want to delay this any further.  And I am ready to rule.  And the matter is fully briefed.

If, Mr. Lieberman, you intend to continue representing the debtor in any way, shape, or form -- that means filing one pleading for him, that means doing a proof of service for him, that means any type of assistance to the debtor -- you will need to, one, respond to this motion, because it will be set for hearing on regular notice, and you will need to file a declaration, signed under penalty of perjury, explaining specifically what you have been retained to do.

MR. LIEBERMAN:  Yes, Your Honor.

THE COURT:  And I don't want, in my allowing you to argue today or considering the reply, for you to take anything from that.  This is no waiver because I'm allowing you to argue.  I am allowing you to argue, in this one situation, so that this case can proceed and will not be further delayed.  But if you intend to, in any way, continue to represent the debtor, provide any advice, file one paper, file a proof of service, whatever it is, you will need to respond to the motion.

And then, Mr. Dulberg or Mr. Lucas, it will be set for hearing on regular notice.  So that is how we'll proceed with that matter.

And Mr. Lieberman, if you do intend to continue to

7

represent the debtor, not only do you need to file a response to the motion that was filed yesterday, but you will also need to file a declaration, signed under penalty of perjury, providing specific information regarding how you intend to continue to represent the debtor.

So we will proceed.

Mr. Lieberman, it's your motion.  I'll give you an opportunity to argue briefly.

MR. LIEBERMAN:  Thank you, Your Honor.

THE COURT:  And please don't reiterate what's either in the motion or the reply.  I can promise you that I have reviewed all of the arguments, all of the cases, and all of the evidence.

MR. LIEBERMAN:  Okay.

THE COURT:  Please just highlight any points that you believe are salient and the Court should know.

MR. LIEBERMAN:  Yes, Your Honor.  Before I do, may I ask just for some clarification?  I, of course, believe the Court is correct, and we will do exactly what the Court says if we continue to represent Mr. Klein after this hearing in terms of disclosures, et cetera.

But what I did not hear the Court say, and what I understand is in the motion to disqualify, is that counsel, trustee's counsel, believes that the debtor's counsel needs to file an employment application as opposed to merely making all

8

of these disclosures.  That issue is before the Court, I suppose, in some way or another.  You haven't asked me to file an employment application.  You've merely asked me to file significant disclosures, which is, of course, reasonable and appropriate here.

THE COURT:  Mr. Lieberman, I am not ruling on that issue.

MR. LIEBERMAN:  Okay.

THE COURT:  That is an issue that will be addressed, if necessary, during the hearing on the motion.  So if you believe you don't have to file an employment application, that's certainly your argument, and you can substantiate that if you deem appropriate.

MR. LIEBERMAN:  Well, I would --

THE COURT:  I am not ruling on that.  Again, Mr. Lieberman, as I mentioned, because I do not want to delay this quickly aging case with parties who have been litigating with your client for many, many, many years.  I will allow you to argue today, and I will also consider the reply that you filed.

MR. LIEBERMAN:  Thank you.

THE COURT:  Again, that does not indicate what my ruling may be if the motion is set for hearing and if you continue to seek to represent the debtor.

MR. LIEBERMAN:  I appreciate it.

THE COURT:  Everything's on the table at that point,

9

Mr. Lieberman.  So it's up to you to make the arguments that you deem appropriate.

MR. LIEBERMAN:  Thank you, Your Honor.  The Court's invited me to not repeat what's in the papers, but to underscore what I think are the most important points, and so I'm going to underscore one point and make one additional point, and then I will I will cease arguing.

The first is the In re Clemente case, which addresses the debtor working for an estate when the debtor is not in possession.  I think that case is extraordinarily important.  The reasoning in that case suggests that this case should be converted so that Mr. Klein can earn a living, be with whatever disclosures the Court requires, but he should be able to earn a living and not work for his creditors for the rest of his life, which is what this requires, the pendency of this case in Chapter 11.

The second issue that I'd like to point out is that while this case remains in Chapter 11, and while Mr. Klein continues to practice law, while he continues to drive, while he continues to do anything, he is a potential liability for the estate.  If he commits malpractice, and there's a five-million-dollar judgment, that's an administrative claim.  If he hits somebody in a car, and there's not enough insurance, that's an administrative claim.  His income is part of the bankruptcy estate.  And to suggest that just because there's a

Case 2:26-ap-01186-NB   Doc 3   Filed 07/13/26   Entered 07/13/26 14:53:22   Desc
Main Document    Page 108 of 242
**Leslie Klein**

10

trustee appointed here that somehow the estate can't incur administrative expenses is not true.

He, Mr. Klein, is an instrument at this point of the trustee.  He is working and earning a living.  Whatever monies he makes belong to the bankruptcy estate.  And the estate can't have it both ways.  It can't have whatever money Mr. Klein earns post-petition and at the same time absolve itself of any responsibility for his actions and torts.

And so I would suggest, Your Honor, that, by itself, is an independent reason to simply convert this case to Chapter 7.  I recognize the Court is ready to rule.  I have nothing more to add to the papers.

THE COURT:  Thank you.  Mr. Lucas, I believe you were going to argue on behalf of the trustee.

MR. LUCAS:  Thank you, Your Honor.  John Lucas on behalf of Bradley Sharp, the Chapter 11 trustee.

Your Honor, in response to Mr. Lieberman's first point about the Clemente case I'm citing to In re Gordon, which is 465 B.R. 683. Your Honor, in that case -- and we didn't have a chance to brief this, as this was brought up in his reply, not in his motion -- but Your Honor, in that case, there was an individual Chapter 7 debtor, and the creditor body, in that case, filed a motion to convert the case from a 7 to an 11. And the debtor had the same laundry list of complaints that the debtor has in this case.

11

In that ruling, Your Honor the bankruptcy court said that the conversion from a 7 to an 11 was justified and acknowledged that the only difference is that the post-petition assets become property of the estate.  But all the other, sort of, laundry list of complaints that the debtor had, that the debtor is going to be, sort of, a slave to labor for the rest of his life, that the debtor will be required to commit his disposable income for five years pursuant to 1129(a)(15) of the Bankruptcy Code, or even in the event that the debtor might refuse to make payments in accordance with the plan, and in all those instance, which are potentially true or not true here, those are issues for another day.

As Mr. Sharp said in his declaration that we filed in connection with our objection is that Mr. Sharp is ready to start preparing a plan and getting a litigation trust, as he is beginning to get his arms around the assets of the estate.  The debtor should not be rewarded here, Your Honor, for his refusal to cooperate, his responsibility to cooperate with the estate about the assets of the estate, and to convert the case to only put the case in a new phase, different phase, to foster or facilitate further delay and confusion in the case.

The debtor is upset that the case was taken away from him, and he's no longer able to control, and now that the trustee and his advisers are gaining control of the assets and understanding where the assets are being hidden, we've reached

12

a point where the debtor is trying to pivot and cover that up.

And Your Honor, as we said in our objection, and this was said in the preliminary statement, we understand that the debtor is a human being.  We understand that the debtor has to feed his mouth, feed his family, put a roof over his head, buy car insurance, and carry on whatever professional or vocational activities that he needs.  But he can't do that just, sort of, carte blanche without any restrictions.

One of the first things that Mr. Sharp, Mr. Troszak, and my firm tried to do at the outset of this case is engage with the debtor -- first with Mr. Olson.  Then it was Mr. Kogan, who I think is even here at the hearing today, and we're not quite sure why, because he's no longer counsel to the debtor.  He filed a motion to withdraw -- of engaging with the debtor to try to get a sense of what his assets are, what his income is, what his outgoing expenses are, so that we can come to terms with what a budget is.

Mr. Lieberman has complained to both Mr. Dulberg and I on a number of occasions that he can't retain counsel because everything is property of the estate, and that we wouldn't consent to the payment of some portion of his income towards fees for an individual attorney.  And we told him that's just false, that he needs to come to the table and work with us.  And there's nothing but the straight arm, Your Honor.  Nothing but the straight arm.

13

And so I won't repeat everything that's said in the pleadings, but I think it's important to address the Clemente case and the citation that I had at 465 B.R. 683, which I think is important that the issues that the debtor is bringing up about the Thirteenth Amendment to the Constitution are issues that aren't ripe, and they're issues for another day.  And we're here to answer --

Oh, and one other thing, Your Honor, that was also said in the objection is that the estate has money.  The estate has been paid over 2.1 million dollars from Life Capital.  The estate received 885,000 dollars from the sale of the Oxford Park (phonetic) property.  The estate received over 142,000 dollars from the sale of the Poinsettia (phonetic) property.  The estate is in the process of marketing and preparing for sale another property in the Palm Desert.  And there are other properties that are also going on, that are on, sort of, that the trustee is trying to deal with evictions and will sell those properties as the time comes.

The estate's interest in Life Capital is substantial. In connection with the discovery disputes that we've had there and the pleadings that we filed there, we've made known to the Court and everybody that the debtor has an interest in what has a face value of over thirty million dollars in unmatured policies.  And one of them recently matured, Your Honor, that has a face amount of eight million dollars, and so there's

**Leslie Klein**

14

going to be distribution that's going to be coming into the estate from Life Capital thereto.

So to say, on the one hand, that the estate is insolvent, is it accurate? But at the same time, Your Honor, the debtor can't argue that the estate is insolvent when the debtor is doing absolutely zero to help us report about what he has and where it is and what's coming in, and then say, oh, look, the estate has nothing.

THE COURT: Thank you, Mr. Lucas. And Mr. Stevens, you filed a opposition on behalf of Menlo. I'd say at least fifty percent is similar to what the trustee argued, but if there's anything you'd like to add, Mr. Steves, briefly.

MR. STEVENS: I don't think there's anything other than what's in the papers. I mean, this isn't the typical case, et cetera, et cetera.

THE COURT: All right. Thank you, Mr. Stevens. And Mr. Lieberman again, it's the debtor's motion. Briefly, you have the last word.

MR. LIEBERMAN: Yes, Your Honor. Frankly, I think Mr. Lucas is making debtor's case for the debtor here. He is saying how much money the estate has. He's explaining how none of it has come from the sweat of the debtor's brow, how it's all within the estate's control, all of which suggests that this should be a Chapter 7, not an 11. The idea of keeping the case in Chapter 11 to punish Mr. Klein for his perceived

15

noncooperation is not the way to go here.  If Mr. Lucas believes that Mr. Klein has failed to provide information or documents or failed to cooperate, the Court has tools to deal with that.  Holding him hostage in a Chapter 11 is not one of those tools.  And I would suggest, Your Honor, that if the debtor has not behaved, if the debtor is doing something improper, that the Court has ways to fashion remedies that are very, very different than the idea of keeping the case in a Chapter 11.

So for those reasons, Your Honor, despite the issues that the trustee has with the debtor, it seems to me that the motion really does have merit, that the trustee's counsel's attempt to distinguish the Clemente case from this case is without merit, and that this case should be converted to Chapter 7.

Finally, Your Honor, if the Court is ready to rule, I would ask also that the Court rule on the evidentiary objections to the declarations that were submitted in support of the opposition.

THE COURT:  The Court intends to.  Thank you, Mr. Lieberman.

MR. LIEBERMAN:  Thank you, Your Honor.

THE COURT:  All right.  I'm ready to rule.  Before the Court is a motion to convert this case to Chapter 11 (sic).  There was an NTF issued because of some procedural

16

discrepancies, and Klein filed an amended motion on January 25th. On February 14th, the Chapter 11 trustee filed an objection to the conversion motion. The opposition included supporting declarations by Mr. Troszak, Mr. Lucas, and Mr. Sharp, the Chapter 11 trustee.

On February 14th, the Menlo Trust filed a response to the motion. On February 21st, Klein filed an omnibus reply to the oppositions and evidentiary objections to Mr. Troszak's declaration, and the next day, evidentiary objections to Mr. Sharp's declaration.

Mr. Klein filed a Subchapter V Chapter 11 case about a year ago, on February 22nd, and on May 24th, the Court appointed Mr. Sharp as the Chapter 11 trustee. In terms of the arguments, Klein highlights that his only significant assets are real estate interest, potential insurance policies through Life Capital Group avoidance actions, which the trustee can continue to litigate under a Chapter 7. He asserts his only other significant asset is his firm, Les Klein & Associates, which is not in bankruptcy, and it is his primary source of income. He argues that he cannot practice law and run LKA, but even if he wanted to, Klein could resign and practice elsewhere or create a new firm.

He highlights that reorganization is unlikely. He contends that the nondischargeability actions can proceed under Chapter 7, which would be cost effective, and the trustee can

17

be the Chapter 7 trustee.  He argues that 1112(b)(1) requires the Court to convert the case to a Chapter 7 if cause is met. He asserts that on May 17th, the Court found cause to appoint Mr. Sharp as trustee.  He claims he has a twenty-five percent interest in Life Capital, which invests in and receives benefits from insurance policies, and Life Capital entered a stipulation with the trustee regarding payments owed to Klein. He argues that cause exists, because there's no reasonable likelihood that he will rehabilitate.  He is defunct and cannot emerge as an operating entity.  He filed bankruptcy as a litigation, not rehabilitation strategy, and any action the trustee wishes to pursue can be done in a 7.

He contends that conversion would lessen administrative costs.  He claims that 1112(b)(4)(A) is met, because debtors are no longer operating any business and are not generating any income or have any assets to sell.  He argues that the unusual circumstances exception under 1112(b)(2) is inapplicable, because cause exists, and regardless, conversion is in the best interest.

In opposition, the trustee asserts that per 1112(a)(1), Klein doesn't have an automatic right to convert, because he's no longer debtor-in-possession.  He also has not demonstrated that there is cause under 1112(b).  The trustee argues that Klein's use of nondebtor entities as a way to shield cash from the estate and fund his lifestyle, which

18

doesn't justify conversion.  The trustee highlights that Klein voluntarily filed bankruptcy and demonstrated that a trustee was required.  He should not be rewarded with conversion because he is unhappy that he lacks control over his assets.

The trustee acknowledges that Klein needs income, but it cannot be without limits, because his pre-petition conduct is what led him to bankruptcy.  The trustee argues that Klein has not provided the trustee with information regarding income, expenses or his companies.  The trustee argues that Klein continues to divert estate property into nondebtor entities to fund his lifestyle, including LKA, Bay Area Development Company, that's BADCO (phonetic), Big Boyz Legal, LLC (phonetic), and Doctors Marketing Group (phonetic).

The trustee asserts that he received information that Klein was illegally paying pre-petition claims, which his former attorney, Michael Kogan, confirmed.  He argues that Klein is diverting personal credit card refunds and Social Security benefits into LKA, which is not listed on Klein's schedule.  The trustee highlights that LKA pays Klein's homeowners insurance and owns or has an interest in life insurance policies.  He believes that Klein's assets held in nondebtor entities would be payable to creditors.  He highlights various examples of different bank accounts and transfers with nondebtor entities, demonstrating Klein's conduct and misuse of the entities to divert property that

19

should have been directed to the estate.

Transfers of money, Klein's little to no cooperation, and his failure to report (indiscernible) assets, have led the trustee to believe that Klein is using cash held or controlled by nondebtor entities.  He contends that whether Chapter 7 might be less costly is immaterial when considering Klein's assets and their values.  He argues that client assumes administration would be less expensive in a 7, but provides no evidence or explanation why.

He asserts that the MORs do not show regular income, because Klein refuses to provide financial information.  He contends that Klein's argument regarding rehabilitation or winding up is nonsensical, because Klein is an individual, and the cases cited involved entities.

He argues that Klein doesn't explain how absence of rehabilitation relates to the nondischargeability actions and how that would change the administration of the case.

He highlights that Klein doesn't state what assets he owns, but concedes that LKA pays his living expenses, which suggest that LKA has value.

He asserts that Klein has a fifty percent interest in Life Capital rather than twenty-five percent.

He contends that even if Klein established cause, the trustee argues there are unreasonable circumstances which are sufficient to deny the motion.  He highlights that once he

Case 2:26-ap-01186-NB   Doc 3   Filed 07/13/26   Entered 07/13/26 14:53:22   Desc
Main Document    Page 118 of 242
**Leslie Klein**

20

takes control of all assets, he likely will file a plan that creates a liquidating trust, and he contends he will seek FRBP 2005 relief if Klein remains uncooperative.

The Menlo response is substantially similar to the arguments in the trustee's opposition.  The Court will only summarize issues not raised by the trustee.  The Menlo Trust highlights that the motion expressly admits wrongdoing.  They argue that debtors like Klein are often denied the relief they request under 523 and 727, because bankruptcy is for honest debtors, and there is a starting presumption that debtors do not ordinarily engage in fraudulent activity.  They contend that post-petition income is property of the estate, but if the case is converted, then Klein's post-petition income would be his, and he will use it to wash money through LKA.

Menlo Trust highlights that Klein wants to avoid the trustee's ability to go near LKA.  They assert that if Klein wanted to liquidate, he should have filed Chapter 7.  They highlight that Klein forfeited his right to proceed under Chapter 7, citing Marrama, and they highlight that Klein's good faith in wanting to convert shouldn't be considered.

In the reply, which was filed by Mr. Lieberman, it highlights Klein's negative cash flow, which is depleting estate assets.  He argues that he has no ability to hire counsel, because his post-petition income is estate property. He asserts that cause exists to convert, because conversion

21

would materially reduce the estate's administrative claims, such as preparing monthly MORs, complying with the UST requirements, and preparing disclosure statements and negotiating a plan.

He argues that although the trustee wants to continue investigating and recovering assets, remaining in a Chapter 11 will result in continuing losses.  He argues that the trustee can continue investigating under Chapter 7.  He argues there's no likelihood of rehabilitation, because LKA is estate property, has insufficient business, and will wind up.

He contends the nondischargeability actions against him place his future income in jeopardy, making it unlikely that there will be any cash flow.  He asserts the trustee didn't present evidence that Klein owns other companies, nor does he state the cash amounts held by them.  He argues the trustee implies that Klein must contribute his post-petition income to fund a plan.  He contends he also has the right to no longer work, because he's seventy-six, which further supports the lack of rehabilitation.

He argues that the objecting parties point to naked allegations that Klein is acting in bad faith, and even if that were the case, Klein's cooperation has no bearing on the motion.  He asserts that the Menlo's Trust reference to Marrama is inapplicable, because it dealt with a motion to convert from 7 to 13, and he argues that continuing in Chapter 11 would

22

violate the Thirteenth Amendment, because he would be required to contribute his post-petition income to a hypothetical plan. He asserts that once cause is established, the burden shifts to the trustee, and the trustee has not presented any unusual circumstances to establish that conversion is not in the estate's best interest.

He highlights that creating a litigation trust empowered to collect and liquidate the debtor's assets can be achieved in a Chapter 7, and he contends that the trustee failed to present evidence that a plan can be confirmed in a reasonable period of time.

As a preliminary matter, Klein raised seven objections to the Troszak declaration and six to the Sharp declarations, both of which were filed on February 14th, and those objections assert lack of personal knowledge, foundation, and hearsay. The Court has considered and overrules each of those objections.  Turning to the statutory provisions at issue, Section 1112(a) provides, the debtor may convert a case under this chapter to a case under Chapter 7, unless the debtor is not a debtor-in-possession.  The term debtor-in-possession is intended to refer to a debtor who, during the pendency of a case, prior to confirmation, retains property in the fiduciary capacity of trustee or estate.

It is undisputed Klein is no longer a debtor-in-possession, which means that he could not move to convert the

23

case under 1112(a).  Turning to 1112(b) it provides, on request of a party-in-interest and after notice and a hearing, the Court shall convert a case under this chapter to a case under Chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause, unless the Court determines that the appointment under Section 1104(a) of a trustee or examiner is in the best interests of creditors and the estate.

The movant has the burden of demonstrating, by a preponderance of the evidence, that cause exists to dismiss or convert.  Although 1112(b)(4) contains a nonexclusive list of conduct constituting cause, bankruptcy courts have broad discretion in determining what constitutes cause to convert or dismiss.

Under 1112(b)(4)(A), to establish cause the moving party must demonstrate both, one, a substantial or continuing loss to or diminution of estate assets, and two, absence of reasonable likelihood of rehabilitation.  The Court must deny a motion to convert if the movant fails to satisfy either prong.

In terms of substantial or continuing loss to or diminution of estate assets, the moving party must show the debtor continues to incur losses, maintains a negative cash flow, or assets have been declining in value since the case was filed.  The loss may be substantial or continuing, but need not be both to constitute cause.  All that needs to be found is the

24

estate has suffered some diminution in value.  When examining this prong, courts often look at the debtor's track record and including the financial prospects of the debtor and the financial records filed with the court.

Klein's assertion that he has no assets and is operating at a loss is not persuasive.  The evidence and his company's bank statements demonstrate significant money transfers between companies he owns at or controls.  As an initial matter, and this is important to the Court, Klein failed to list LKA on his initial schedules, which he filed on 3/8/23, and his amended schedules, which he filed on 4/10/23. Klein signed both of those schedules under penalty of perjury.

In Klein's amended Schedule A/B, in response to question 19, which required Klein to describe his financial assets, providing do you own or have any legal or equitable interest in nonpublicly traded stock and interests in incorporated and unincorporated businesses, including an interest in an LLC partnership and joint venture, Klein listed a one hundred percent ownership interest in BADCO and a five percent membership interest in LCG, which he now admits is at least twenty-five percent, but he omitted LKA.

In response to question 25, which required Klein to provide information about any legal or equitable interest in trusts, equitable or future interest in property, and any rights or powers exercisable for his benefit, he indicated that

25

he held an interest in the Klein Living Trust dated April 8th, 1990.  Although Klein disclosed LCG, BADCO, and the Klein Living Trust in his amended schedules, he omitted LKA and at least twenty-three other entities which he wholly owns or owns an interest in.

As previously noted, Klein did not acknowledge having any interest in LKA in either of his schedules.  In the amended motion, however, Klein contends that the only significant assets of the bankruptcy estate are real estate interests he owns, potential payments on life insurance policies that he has an interest in via LCG and avoidance actions, and he also contends that the only other significant asset that debtor's estate possesses is that of the law practice of the debtor, LKA, which is not in bankruptcy and is the primary source of employment and revenue for debtor.

Regarding Klein's personal Bank of America credit card ending in 6416, between June 17th and July 16th of last year, Klein received a $3,295.02 refund, which was deposited into LKA's trust account at Bank of America ending in 9404. Further, Klein's Social Security benefits at various times were deposited into both Klein's personal Bank of America account, ending in 941, and the LKA BofA account 9404.

Pre-petition, on January 11th, '23 and February 8th, 2023, the Social Security Administration deposited 3,430 dollars into the Klein BofA 9401 account.  Post-petition, on

26

7/10/23, the Social Security Administration deposited 7,519 dollars into the LKA BofA account ending 9404.  The LKA BofA account shows a $784.40 payment to Bamboo Insurance on 7/11/23.

During Klein's 12/19 deposition, he testified that LKA paid $784.40 for his homeowner's insurance, which he acknowledged insured his personal residence.  Most significantly, LKA owns or has the right to payment from unmatured insurance policies totaling thirty million dollars. On 12/19, Klein testified that LKA expects to receive 3.5 million on a policy on Roselio Feldman (phonetic) and one million from a policy on Isaac Kerzner (phonetic).

Further, in Klein's amended schedules, he admits that he has a hundred percent ownership interest in BADCO.  A credit card statement for BADCO's Chase account, ending in 1810, contains 16,000 dollars of charges made by LKA in two days.  On January 22nd, '19, 9,500 dollars, on January 23rd, '19, 2,000 dollars, and January 24th, '19, 5,000 dollars.  It also contains travel related expenses for what appeared to be food and transportation costs incurred in Israel from January 15, '19 to January 21st, '19, and gas, grocery and office supply expenses incurred in the U.S.

In January '23, there were also several transfers between BADCO and LKA.  On January 18, '23, 80,000 dollars was transferred from BADCO's Bank of America account ending in 4099 to the LKA BofA account ending in 9409.  On January 30th and

27

January 31st, '23, a total of 9,000 dollars was transferred from the LKA BofA account, ending in 9040 and transferred into the BADCO BofA account 9044.

April 21st, '23 to July 31st, '23 net cash activity summary, which included review of the LKA BofA account 9404, California IOLTA trust accounts from LKA ending in 8144, the LKA payroll account ending in 9405, and the LKA account ending in 6978 demonstrate there were significant transfers from at least three nondebtor entities into the LKA account and numerous transfers out of the LKA account as well.

Big Boyz made fourteen transfers totaling 314,000 dollars into the LKA account. Doctors Marketing made seven transfers totaling 40,500 dollars into the LKA account. There were also seven miscellaneous transfers, totaling 27,463 dollars into the LKA account. During that same time period, LKA made 176 distributions totaling $428,454.74 to various individuals and entities. Including in those transfers were sixteen transfers totaling 92,000 to BADCO.

In total, there were 112 intracompany transfers, totaling 399,652 during that time period. Further, a summary of the net cash activity in the BADCO BofA account 4099 from April 1st, '23 through July 31st, '23 indicates that LKA made sixteen transfers totaling 92,000 to BADCO, and Doctors Marketing received 10,000 dollars in transfers. During that same period, BADCO dispersed 99,183.31 towards professional

28

fees, cash, clothing, and travel.

Finally, Klein owns real property in Israel, and his former attorney Kogan acknowledged that he made a 11,822 payment to a hotel management company for "2023 use fees and the 2022 capital participation".  Although it is unclear when those payments may have been made, the hotel management company sent Klein an invoice dated July 2nd, '23, stating that 15,458 was the amount due and requested payment by July 31st of '23.

Based on the evidence, it appears that there are assets that could be considered estate property (audio interference) Klein, not providing sufficient information to the trustee, while at the same time money is being transferred, significant money is being transferred post-petition between entities that Klein wholly owns or owns an interest in, including LKA, which he acknowledges is the only other significant asset that his estate possesses, and he claims to have an undisclosed interest in BADCO, which he a hundred percent owns.

As the movant, Klein has the burden of demonstrating that there is either a substantial or continuing loss to or diminution of estate assets, which he has not done.  Based on the evidence presented, the Court finds that there appear to be significant assets that might be property of the estate, and based upon that fact, the Court finds that Klein has not demonstrated cause under 1112(b)(4)(A), and therefore the

29

motion, on that basis, is denied.

To satisfy the second prong, the movant must demonstrate that a debtor has a reasonable likelihood of rehabilitation.  The Court need not address the second prong of 1112(b)(4)(A), because the test is conjunctive, and Klein failed to show there was a substantial or continuing loss to or diminution of the estate.

In terms of unusual circumstances, if the movant were to demonstrate they were caused, the Court must dismiss or convert the case unless the debtor demonstrates there are unusual circumstances under 1112(b).  The unusual circumstances exception is inapplicable here, because cause has not been shown.

For the first time, in the reply, Klein argued it would violate the Thirteenth Amendment for him to be forced to remain in Chapter 11 and contribute his post-petition income to a future plan.  The Court finds that this argument was waived under the local rules, as well as numerous cases.  New arguments raised for the first time in a reply need not be considered.  That's LBR 9013-1(g)(4) and numerous other cases, including Nathanson v. Polycom, 2015 WL 12964727 (N.D. Cal. Apr. 2015).

Even though the Court finds that the Thirteenth Amendment argument was raised, the Court did review the case cited by Klein, both in the brief and cited by Mr. Lieberman

30

today, and on which he relied heavily, the Clemente case, a case from the bankruptcy court in the District of New Jersey. The Court did not find that case persuasive, and it is clearly not controlling authority on this Court.  And there are no other courts that have affirmatively cited that case for the proposition that the inability to convert from an 11 to a 7 constitutes involuntary servitude.

So as analyzed, the Court finds that the motion should be denied.

Mr. Dulberg, you're the prevailing party.  I'll ask that you please upload an order within seven days via LEW (phonetic).

MR. DULBERG:  Thank you, Your Honor.  I will do that. And we'll make a reference to the findings made on the record today.

THE COURT:  Thank you.  And again --

Yes, Mr. Lucas.

MR. LUCAS:  I was going to say, Your Honor, thank you, but I wanted to say something on behalf of the Chapter 11 trustee.  And I don't know if the debtor is present here, on phone, or in the courtroom or not, but Mr. Sharp wants to engage with the debtor, whether it's the debtor personally or through whatever counsel he has, Mr. Sharp wants to work and to make this case move forward as smoothly and in the most cost effective manner as possible.  And effectively, the debtor

31

holds the keys to that.

And so, for what it's worth, Your Honor, we want to, sort of, put that out there and say we want to work with the debtor here.  We're not here to be in a fight with the debtor. We're here to administer the estate as a fiduciary to the estate and all the creditors.

THE COURT:  Thank you, Mr. Lucas.  All right.  So that's the ruling on matter number 15.

Matter number 16 was the motion to compel abandonment. In the reply, Mr. Lieberman, you indicated that Mr. Klein wished to withdraw the motion.  As noted, there must be a voluntary dismissal within seven days of today's hearing.  So I am going to continue this for a couple of weeks, until March 6th, for the debtor to file a voluntary dismissal of the motion.  And that would be March 6th at 9.  If a voluntary dismissal hasn't been filed, then will we be back here on that date.

MR. LIEBERMAN:  Your Honor. I'm sorry. Go ahead.  I didn't want to interrupt.

THE COURT:  Yes.  And I actually misspoke, because that's next week.  So that's what happens when you don't have your calendar readily available in front of you.  So it actually would be, March 13th, I believe, the next Wednesday. It's not next week.  March 13th.

MR. LIEBERMAN:  Your Honor, this is a housekeeping

32

matter and terminology matter.  The Court, in its tentative ruling and just now, asks that the debtor file a voluntary dismissal.  With regards to a motion, my understanding is that the proper -- it's a withdrawal.  I'm unaware of any difference between the two, but would the Court like the order to say the debtor voluntarily dismisses or voluntarily withdraws the motion?

THE COURT:  Why don't you put both words in there so there's no confusion?

MR. LIEBERMAN:  Okay.  The next question I have, for Your Honor, has to do with the procedural matter.  The proposed scope of our employment in the case, as we disclosed in the 329 disclosures, is that we would represent the debtor in connection with this motion, that we would represent the debtor in seeking to withdraw or dismiss the motion to compel abandonment.  And with the Court's ruling today, once we upload the orders, our representation would be complete.

Nevertheless, the case continues.  And I'm asking the Court whether the Court is -- if we are to back out of the case and not respond to Mr. Lucas', or rather, Mr. Sharp's pending motion, should we file a motion to withdraw, or can I just simply file a substitution of attorney?  How would the Court and the trustee like me to proceed?

THE COURT:  Well, what the Court would like is a declaration by you a week from today, which would be March 6th,

33

indicating that you will no longer represent the debtor in any matter at all.  And then there needs to be a substitution of attorney.  I don't even know if you substituted in.  You filed the post-petition declaration, but I don't believe there was actually a substitution of attorney for you, Mr. Lieberman, unless I missed.

MR. LIEBERMAN:  We may have filed a notice of appearance as opposed to a substitution of attorney, because there was no -- Mr. Kogan had already substituted out by that time.  We will file a declaration.

The only other matter in which we would represent the debtor would be in connection with a resolution of mediation with the bankruptcy estate and in the pending adversary matters.  I will discuss that with the debtor and provide the information in a declaration by the deadline set by the Court.

THE COURT:  And if you do intend to represent the debtor, and you raise a good point, because the disclosure was only up till today, right, up --

MR. LIEBERMAN:  Yes.

THE COURT:  -- until the hearing on both of these motions.  So if you do intend to represent the debtor in any manner, file one paper, give him any advice, do anything, you have to file the post-petition disclosure.

MR. LIEBERMAN:  Sure.

THE COURT:  Then, Mr. Dulberg, Mr. Lucas can file

34

whatever they deem appropriate, and it will be set for hearing on regular notice.  If you don't think you need to file an employment application, that's up to you, Mr. Lieberman.  You've certainly been put on notice what the trustee's counsel believes is the appropriate procedure.  If you don't think it is, then you get to raise that issue.  But we're not going to be here again on this type of does he or doesn't he?  It needs to be clear what you're doing and what you're not doing.

MR. LIEBERMAN:  Your Honor, it's been perfectly clear.  Thank you very much.  I have nothing else to add or ask.

THE COURT:  All right.  Thank you.  I'll go around one more time.

Mr. Dulberg, anything further from your perspective?

MR. DULBERG:  No.  Thank you, Your Honor.

THE COURT:  Thank you.  Mr. Troszak?

MR. TROSZAK:  Nothing.  Thank you, Your Honor.

THE COURT:  Thank you.  Mr. Sharp?

MR. SHARP:  (Audio interference), Your Honor.  All good.

THE COURT:  Thank you.  Mr. Lucas?

MR. LUCAS:  Yes.  Your Honor, I have one question.  If, for example, Mr. Lieberman or his firm doesn't file anything but is wanting to engage with the trustee or negotiating X, Y, and Z, which relates to the bankruptcy case, does that trigger your requirement about what it is he may or

35

may not have to do with respect to his representation of the debtor in this case, even though he hasn't technically filed a paper?

THE COURT:  Yeah, I believe it does.  Mr. Lieberman, if you pick up the phone, if you text, if you email, if you send smoke signals, anything that you do on behalf of the debtor, you need to file something with the Court so it's --

MR. LIEBERMAN:  Yes, Your Honor.

THE COURT:  -- abundantly clear what's happening.

MR. LIEBERMAN:  Well understood, Your Honor.

THE COURT:  Okay.  Thank you.

MR. LUCAS:  And Your Honor, I have one other question, then, on that point.  Does that also -- never mind.  Nothing further, Your Honor.  Nothing further.

THE COURT:  Okay.  Thank you.  Mr. Stevens?

MR. STEVENS:  Nothing, Your Honor.  Thank you.

THE COURT:  Thank you.  All right.  So that concludes the Klein matters.

(Whereupon these proceedings were concluded at 10:58 AM)

36

I N D E X

RULINGS:                                               PAGE LINE

Motion to convert case from Chapter 11 to        30      8

Chapter 7 is denied

37

C E R T I F I C A T I O N

I, Hana Copperman, certify that the foregoing transcript is a true and accurate record of the proceedings.

_____

/s/ HANA COPPERMAN, CET-487

eScribers

7227 N. 16th Street, Suite #207

Phoenix, AZ 85020

Date:  March 31, 2024

**$**

**$3,295.02 (1)**
25:18
**$428,454.74 (1)**
27:16
**$784.40 (2)**
26:3,5

**A**

**A/B (1)**
24:13
**abandonment (2)**
31:9;32:16
**ability (3)**
3:18;20:16,23
**able (2)**
9:13;11:23
**absence (2)**
19:15;23:17
**absolutely (1)**
14:6
**absolve (1)**
10:7
**abundantly (1)**
35:9
**accordance (1)**
11:10
**according (2)**
5:12,13
**account (20)**
25:19,21,22,25;
26:2,3,14,24,25;27:2,
3,5,7,7,9,10,12,13,15,
21
**accountants (1)**
4:12
**accounts (2)**
18:23;27:6
**accurate (1)**
14:4
**achieved (1)**
22:9
**acknowledge (1)**
25:6
**acknowledged (3)**
11:3;26:6;28:3
**acknowledges (2)**
18:5;28:15
**acting (1)**
21:21
**action (1)**
17:11
**actions (6)**
10:8;16:16,24;
19:16;21:11;25:11
**activities (1)**
12:7
**activity (3)**
20:11;27:4,21
**actually (4)**

3:9;31:20,23;33:5
**add (3)**
10:12;14:12;34:10
**additional (1)**
9:6
**address (3)**
3:23;13:2;29:4
**addressed (1)**
8:9
**addresses (1)**
9:8
**administer (1)**
31:5
**administration (4)**
19:8,17;25:24;26:1
**administrative (5)**
9:22,24;10:2;17:14;
21:1
**admits (3)**
20:7;24:20;26:12
**adversary (2)**
5:24;33:13
**advice (2)**
6:19;33:22
**advisers (1)**
11:24
**advisors (1)**
4:12
**affirmatively (1)**
30:5
**afternoon (1)**
5:15
**Again (5)**
8:15,21;14:17;
30:16;34:7
**against (1)**
21:11
**aging (1)**
8:17
**ago (2)**
3:14;16:12
**ahead (1)**
31:18
**allegations (1)**
21:21
**allegedly (1)**
6:1
**allow (2)**
5:21;8:18
**allowing (3)**
6:13,15,16
**alluded (1)**
5:5
**almost (2)**
5:24;6:1
**along (1)**
3:14
**although (4)**
21:5;23:11;25:2;
28:5
**amended (6)**
16:1;24:11,13;25:3,
7;26:12

**Amendment (4)**
13:5;22:1;29:15,24
**America (4)**
25:16,19,21;26:24
**amount (2)**
13:25;28:8
**amounts (1)**
21:15
**analyzed (1)**
30:8
**Anderson (1)**
4:16
**ANGELES (1)**
3:1
**appear (1)**
28:22
**appearance (1)**
33:8
**appearances (1)**
3:24
**appeared (1)**
26:18
**appearing (3)**
4:5,16;5:2
**appears (1)**
28:9
**application (5)**
5:17;7:25;8:3,11;
34:3
**appoint (1)**
17:3
**appointed (2)**
10:1;16:13
**appointment (1)**
23:6
**appreciate (1)**
8:24
**appropriate (6)**
3:19;8:5,13;9:2;
34:1,5
**Apr (1)**
29:22
**April (3)**
25:1;27:4,22
**Area (1)**
18:11
**argue (9)**
5:22;6:14,16,16;
7:8;8:19;10:14;14:5;
20:8
**argued (2)**
14:11;29:14
**argues (18)**
16:20;17:1,8,17,24;
18:7,9,16;19:7,15,24;
20:23;21:5,7,8,15,20,
25
**arguing (2)**
3:9;9:7
**argument (4)**
8:12;19:12;29:17,
24
**arguments (6)**

5:19;7:12;9:1;
16:14;20:5;29:19
**arm (2)**
12:24,25
**arms (1)**
11:16
**around (2)**
11:16;34:11
**arrangement (1)**
5:6
**assert (2)**
20:16;22:15
**assertion (1)**
24:5
**asserts (10)**
16:17;17:3,20;
18:14;19:10,21;
20:25;21:13,23;22:3
**asset (3)**
16:18;25:12;28:16
**assets (26)**
11:4,16,19,24,25;
12:15;16:14;17:16;
18:4,21;19:3,7,18;
20:1,23;21:6;22:8;
23:17,21,23;24:5,15;
25:9;28:10,21,23
**assistance (1)**
6:7
**Associates (1)**
16:18
**assumes (1)**
19:7
**attempt (1)**
15:13
**attorney (8)**
5:5;12:22;18:16;
28:3;32:22;33:3,5,8
**audio (2)**
28:10;34:18
**authority (1)**
30:4
**automatic (1)**
17:21
**available (1)**
31:22
**avoid (1)**
20:15
**avoidance (2)**
16:16;25:11
**away (1)**
11:22

**B**

**back (2)**
31:16;32:19
**bad (1)**
21:21
**BADCO (11)**
18:12;24:19;25:2;
26:13,23;27:3,18,21,
23,25;28:17

**BADCO's (2)**
26:14,24
**Bamboo (1)**
26:3
**bank (6)**
18:23;24:7;25:16,
19,21;26:24
**bankruptcy (15)**
9:25;10:5;11:1,9;
16:19;17:10;18:2,7;
20:9;23:12;25:9,14;
30:2;33:13;34:24
**Based (3)**
28:9,21,24
**basis (1)**
29:1
**Bay (1)**
18:11
**bearing (1)**
21:22
**become (1)**
11:4
**beginning (1)**
11:16
**behalf (7)**
3:7;4:5;10:14,16;
14:10;30:19;35:6
**behaved (1)**
15:6
**believes (4)**
7:24;15:2;18:21;
34:5
**belong (1)**
10:5
**benefit (1)**
24:25
**benefits (3)**
17:6;18:18;25:20
**best (4)**
17:19;22:6;23:5,7
**Big (2)**
18:12;27:11
**blanche (1)**
12:8
**body (1)**
10:22
**BofA (9)**
25:22,25;26:2,2,25;
27:2,3,5,21
**both (10)**
10:6;12:18;22:14;
23:16,25;24:12;
25:21;29:25;32:8;
33:20
**Boyz (2)**
18:12;27:11
**BR (2)**
10:19;13:3
**Brad (1)**
3:7
**Bradley (3)**
4:12,18;10:16
**brief (2)**

10:20;29:25
**briefed (1)**
    6:3
**briefly (3)**
    7:8;14:12,17
**bring (2)**
    5:13,14
**bringing (1)**
    13:4
**broad (1)**
    23:12
**brought (1)**
    10:20
**brow (1)**
    14:22
**budget (1)**
    12:17
**burden (3)**
    22:3;23:9;28:19
**business (2)**
    17:15;21:10
**businesses (1)**
    24:17
**buy (1)**
    12:5

### C

**Cal (1)**
    29:21
**calendar (1)**
    31:22
**CALIFORNIA (2)**
    3:1;27:6
**Call (1)**
    3:3
**can (14)**
    6:17;7:11;8:12;
    9:12;12:16;16:16,24,
    25;17:12;21:8;22:8,
    10;32:21;33:25
**capacity (1)**
    22:23
**Capital (8)**
    13:10,19;14:2;
    16:16;17:5,6;19:22;
    28:5
**car (2)**
    9:23;12:6
**card (3)**
    18:17;25:16;26:14
**carry (1)**
    12:6
**carte (1)**
    12:8
**case (56)**
    5:23;6:1,17;8:17;
    9:8,10,11,11,15,18;
    10:10,18,19,21,23,23,
    25;11:19,20,21,22;
    12:10;13:3;14:15,20,
    25;15:8,13,13,14,24;
    16:11;17:2;19:17;

20:13;21:22;22:18,
    19,22;23:1,3,3,4,23;
    29:10,24;30:1,2,3,5,
    24;32:12,18,19;
    34:24;35:2
**cases (4)**
    7:12;19:14;29:18,
    20
**cash (9)**
    17:25;19:4;20:22;
    21:13,15;23:22;27:4,
    21;28:1
**cause (16)**
    17:2,3,8,18,23;
    19:23;20:25;22:3;
    23:5,10,12,13,15,25;
    28:25;29:12
**caused (1)**
    29:9
**cease (1)**
    9:7
**certainly (2)**
    8:12;34:4
**cetera (3)**
    7:21;14:15,15
**chance (1)**
    10:20
**change (1)**
    19:17
**Chapter (36)**
    4:12,19,23;9:16,18;
    10:10,16,22;14:24,25;
    15:4,9,15,24;16:2,5,
    11,13,17,25;17:1,2;
    19:5;20:17,19;21:6,8,
    25;22:9,19,19;23:3,4,
    4;29:16;30:19
**charges (1)**
    26:15
**Chase (1)**
    26:14
**Chora (1)**
    4:4
**circumstances (6)**
    17:17;19:24;22:5;
    29:8,11,11
**citation (1)**
    13:3
**cited (4)**
    19:14;29:25,25;
    30:5
**citing (2)**
    10:18;20:19
**claim (2)**
    9:22,24
**claims (5)**
    17:4,14;18:15;21:1;
    28:16
**clarification (1)**
    7:18
**clear (3)**
    34:8,9;35:9
**clearly (1)**

30:3
**Clemente (5)**
    9:8;10:18;13:2;
    15:13;30:1
**client (2)**
    8:18;19:7
**clothing (1)**
    28:1
**Code (1)**
    11:9
**collect (1)**
    22:8
**coming (2)**
    14:1,7
**commit (1)**
    11:7
**commits (1)**
    9:21
**companies (3)**
    18:9;21:14;24:8
**Company (3)**
    18:12;28:4,6
**company's (1)**
    24:7
**compel (2)**
    31:9;32:15
**compensation (1)**
    5:6
**complained (1)**
    12:18
**complaints (2)**
    10:24;11:5
**complete (1)**
    32:17
**complying (1)**
    21:2
**concedes (1)**
    19:19
**concluded (1)**
    35:19
**concludes (1)**
    35:17
**conduct (3)**
    18:6,25;23:12
**confirmation (1)**
    22:22
**confirmed (2)**
    18:16;22:10
**confusion (2)**
    11:21;32:9
**conjunctive (1)**
    29:5
**connection (4)**
    11:14;13:20;32:14;
    33:12
**consent (1)**
    12:21
**consider (2)**
    5:22;8:19
**considered (4)**
    20:20;22:16;28:10;
    29:20
**considering (2)**

6:14;19:6
**constitute (1)**
    23:25
**constitutes (2)**
    23:13;30:7
**constituting (1)**
    23:12
**Constitution (1)**
    13:5
**contains (3)**
    23:11;26:15,18
**contend (1)**
    20:11
**contends (11)**
    16:24;17:13;19:5,
    12,23;20:2;21:11,17;
    22:9;25:8,12
**continue (10)**
    6:4,18,25;7:5,20;
    8:23;16:17;21:5,8;
    31:13
**continues (6)**
    9:19,19,20;18:10;
    23:22;32:18
**continuing (7)**
    21:7,25;23:16,20,
    24;28:20;29:6
**contribute (3)**
    21:16;22:2;29:16
**control (5)**
    11:23,24;14:23;
    18:4;20:1
**controlled (1)**
    19:4
**controlling (1)**
    30:4
**controls (1)**
    24:8
**conversion (8)**
    11:2;16:3;17:13,19;
    18:1,3;20:25;22:5
**convert (18)**
    5:21;10:10,23;
    11:19;15:24;17:2,21;
    20:20,25;21:24;
    22:18,25;23:3,11,13,
    19;29:10;30:6
**converted (3)**
    9:12;15:14;20:13
**cooperate (3)**
    11:18,18;15:3
**cooperation (2)**
    19:2;21:22
**cost (2)**
    16:25;30:24
**costly (1)**
    19:6
**costs (2)**
    17:14;26:19
**co-trustee (1)**
    4:6
**counsel (10)**
    4:22;5:8;7:23,24,

24;12:13,19;20:24;
    30:23;34:4
**counsel's (1)**
    15:12
**couple (1)**
    31:13
**course (3)**
    3:18;7:18;8:4
**Court (84)**
    3:3,4,22;4:3,8,14,
    17,20,24;5:4;6:13;
    7:10,15,16,19,19,22;
    8:1,6,9,15,21,25;9:13;
    10:11,13;11:1;13:22;
    14:9,16;15:3,7,16,17,
    20,20,23,24;16:12;
    17:2,3;20:5;22:16;
    23:3,6,18;24:4,9;
    28:22,24;29:4,9,17,
    23,24;30:2,3,4,8,16;
    31:7,20;32:1,5,8,19,
    19,22,24,24;33:15,16,
    20,25;34:11,15,17,20;
    35:4,7,9,11,15,17
**courtroom (2)**
    4:24;30:21
**courts (3)**
    23:12;24:2;30:5
**Court's (2)**
    9:3;32:16
**cover (1)**
    12:1
**create (1)**
    16:22
**creates (1)**
    20:2
**creating (1)**
    22:7
**credit (3)**
    18:17;25:16;26:13
**creditor (2)**
    4:5;10:22
**creditors (5)**
    9:14;18:22;23:5,8;
    31:6

### D

**date (1)**
    31:17
**dated (2)**
    25:1;28:7
**day (3)**
    11:12;13:6;16:9
**days (3)**
    26:15;30:11;31:12
**deadline (1)**
    33:15
**deal (3)**
    3:16;13:17;15:3
**dealt (2)**
    3:20;21:24
**debtor (59)**

5:6;6:5,7,19;7:1,5;
8:23;9:9,9;10:22,24,
25;11:5,6,7,9,17,22;
12:1,4,4,11,14,15;
13:4,22;14:5,6,20;
15:6,6,11;22:18,19,
21;23:22;24:3;25:13,
15;29:3,10;30:20,22,
22,25;31:4,4,14;32:2,
6,13,14;33:1,12,14,
17,21;35:2,7
**debtor-in- (1)**
22:24
**debtor-in-possession (3)**
17:22;22:20,20
**debtor-not-in (1)**
5:2
**debtors (4)**
17:15;20:8,10,10
**debtor's (7)**
7:24;14:17,20,22;
22:8;24:2;25:12
**decade (1)**
6:1
**declaration (10)**
6:10;7:3;11:13;
16:9,10;22:13;32:25;
33:4,10,15
**declarations (3)**
15:18;16:4;22:13
**declining (1)**
23:23
**deem (3)**
8:13;9:2;34:1
**defunct (1)**
17:9
**delay (3)**
6:2;8:16;11:21
**delayed (1)**
6:17
**demonstrate (5)**
23:16;24:7;27:8;
29:3,9
**demonstrated (3)**
17:23;18:2;28:25
**demonstrates (1)**
29:10
**demonstrating (3)**
18:24;23:9;28:19
**denied (3)**
20:8;29:1;30:9
**deny (2)**
19:25;23:18
**depleting (1)**
20:22
**deposited (4)**
25:18,21,24;26:1
**deposition (1)**
26:4
**describe (1)**
24:14
**Desert (1)**
13:15

**despite (1)**
15:10
**determines (1)**
23:6
**determining (1)**
23:13
**Development (2)**
4:11;18:11
**difference (2)**
11:3;32:4
**different (3)**
11:20;15:8;18:23
**diminution (5)**
23:17,21;24:1;
28:21;29:7
**directed (1)**
19:1
**disclosed (2)**
25:2;32:12
**disclosure (5)**
5:5,9;21:3;33:17,23
**disclosures (6)**
3:15;7:21;8:1,4;
9:13;32:13
**discovery (1)**
13:20
**discrepancies (1)**
16:1
**discretion (1)**
23:13
**discuss (1)**
33:14
**dismiss (5)**
23:4,10,14;29:9;
32:15
**dismissal (4)**
31:12,14,16;32:3
**dismisses (1)**
32:6
**dispersed (1)**
27:25
**disposable (1)**
11:8
**disputes (1)**
13:20
**disqualify (2)**
3:13;7:23
**disqualifying (1)**
5:16
**distinguish (1)**
15:13
**distribution (1)**
14:1
**distributions (1)**
27:16
**District (1)**
30:2
**divert (2)**
18:10,25
**diverting (1)**
18:17
**docket (1)**
5:7

**Doctors (3)**
18:13;27:12,23
**documents (1)**
15:3
**dollars (18)**
13:10,11,13,23,25;
25:25;26:2,8,15,16,
17,17,23;27:1,12,13,
15,24
**done (4)**
5:14,15;17:12;
28:21
**drive (1)**
9:19
**DSI (1)**
3:11
**due (1)**
28:8
**Dulberg (13)**
3:5,5,6,7,22;5:4;
6:22;12:18;30:10,13;
33:25;34:13,14
**during (6)**
8:10;22:21;26:4;
27:15,20,24

**E**

**earn (2)**
9:12,13
**earning (1)**
10:4
**earns (1)**
10:7
**effective (2)**
16:25;30:25
**effectively (1)**
30:25
**eight (1)**
13:25
**either (4)**
7:10;23:19;25:7;
28:20
**else (1)**
34:10
**elsewhere (1)**
16:21
**email (1)**
35:5
**emerge (1)**
17:10
**employment (6)**
7:25;8:3,11;25:15;
32:12;34:3
**empowered (1)**
22:8
**ending (11)**
25:17,19,22;26:2,
14,24,25;27:2,6,7,7
**engage (4)**
12:10;20:11;30:22;
34:23
**engaging (1)**

12:14
**enough (1)**
9:23
**entered (1)**
17:6
**entities (11)**
17:24;18:10,22,24,
25;19:5,14;25:4;27:9,
17;28:14
**entity (1)**
17:10
**equitable (3)**
24:15,23,24
**establish (2)**
22:5;23:15
**established (3)**
4:7;19:23;22:3
**estate (46)**
9:9,21,25;10:1,5,5;
11:4,16,18,19;12:20;
13:9,9,11,12,14;14:2,
3,5,8,21;16:15;17:25;
18:10;19:1;20:12,23,
24;21:9;22:23;23:5,8,
17,21;24:1;25:9,9,13;
28:10,16,21,23;29:7;
31:5,6;33:13
**estate's (4)**
13:19;14:23;21:1;
22:6
**et (3)**
7:21;14:15,15
**even (8)**
11:9;12:12;16:21;
19:23;21:21;29:23;
33:3;35:2
**event (1)**
11:9
**everybody (1)**
13:22
**Everything's (1)**
8:25
**evictions (1)**
13:17
**evidence (8)**
7:13;19:9;21:14;
22:10;23:10;24:6;
28:9,22
**evidentiary (3)**
15:17;16:8,9
**exactly (1)**
7:19
**examiner (1)**
23:7
**examining (1)**
24:1
**example (1)**
34:22
**examples (1)**
18:23
**exception (2)**
17:17;29:12
**excuse (1)**

5:13
**exercisable (1)**
24:25
**exists (4)**
17:8,18;20:25;
23:10
**expects (1)**
26:9
**expenses (6)**
10:2;12:16;18:9;
19:19;26:18,21
**expensive (1)**
19:8
**explain (1)**
19:15
**explaining (2)**
6:10;14:21
**explanation (1)**
19:9
**expressly (1)**
20:7
**extraordinarily (1)**
9:10

**F**

**face (2)**
13:23,25
**facilitate (1)**
11:21
**fact (1)**
28:24
**failed (5)**
15:2,3;22:10;24:10;
29:6
**fails (1)**
23:19
**failure (1)**
19:3
**faith (2)**
20:20;21:21
**false (1)**
12:23
**familiar (2)**
3:23;5:19
**family (1)**
12:5
**fashion (1)**
15:7
**FEBRUARY (10)**
3:1;5:7,8,9;16:2,6,
7,12;22:14;25:23
**feed (2)**
12:5,5
**fees (3)**
12:22;28:1,4
**Feldman (1)**
26:10
**fiduciary (2)**
22:22;31:5
**fifty (2)**
14:11;19:21
**fight (1)**

Case 2:26-ap-01186-NB    Doc 3    Filed 07/13/26    Entered 07/13/26 14:53:22    Desc
In Re: LESLIE KLEIN    Main Document    Page 139 of 242

February 28, 2024

31:4

**file (21)**
6:9,19,19;7:1,3,25;
8:2,3,11;20:1;31:14;
32:2,21,22;33:10,22,
23,25;34:2,22;35:7

**filed (34)**
3:13,14,15,15,16,
17;5:7,8,10;7:2;8:19;
10:23;11:13;12:14;
13:21;14:10;16:1,2,6,
7,11;17:10;18:2;
20:17,21;22:14;
23:24;24:4,10,11;
31:16;33:3,7;35:2

**filing (1)**
6:5

**Finally (2)**
15:16;28:2

**financial (5)**
4:11;19:11;24:3,4,
14

**find (1)**
30:3

**findings (1)**
30:14

**finds (5)**
28:22,24;29:17,23;
30:8

**firm (4)**
12:10;16:18,22;
34:22

**first (6)**
9:8;10:17;12:9,11;
29:14,19

**five (2)**
11:8;24:19

**five- (1)**
9:21

**flow (3)**
20:22;21:13;23:23

**FLP (5)**
5:1,9,10,13,16

**food (1)**
26:18

**forced (1)**
29:15

**forensic (1)**
4:12

**forfeited (1)**
20:18

**form (1)**
6:5

**former (2)**
18:16;28:3

**forward (2)**
5:23;30:24

**foster (1)**
11:20

**found (2)**
17:3;23:25

**foundation (1)**
22:15

**fourteen (1)**
27:11

**Franklin (2)**
4:5,6

**Frankly (1)**
14:19

**fraudulent (1)**
20:11

**FRBP (1)**
20:2

**front (1)**
31:22

**fully (1)**
6:3

**fund (3)**
17:25;18:11;21:17

**further (10)**
6:2,17;11:21;21:18;
25:20;26:12;27:20;
34:13;35:14,14

**future (3)**
21:12;24:24;29:17

### G

**gaining (1)**
11:24

**gas (1)**
26:20

**generating (1)**
17:16

**Good (16)**
3:6;4:2,3,8,10,14,
15,17,18,20,21,24;
5:4;20:19;33:17;
34:19

**Gordon (1)**
10:18

**grocery (1)**
26:20

**Group (4)**
5:2,11;16:16;18:13

**Group's (1)**
5:9

**gun (1)**
3:12

### H

**hand (1)**
14:3

**happening (1)**
35:9

**happens (1)**
31:21

**head (1)**
12:5

**hear (1)**
7:22

**heard (1)**
5:18

**hearing (10)**
6:9,23;7:20;8:10,

22;12:12;23:2;31:12;
33:20;34:1

**hearsay (1)**
22:15

**heavily (1)**
30:1

**held (4)**
18:21;19:4;21:15;
25:1

**help (1)**
14:6

**hidden (1)**
11:25

**highlight (3)**
7:15;20:18,19

**highlights (11)**
16:14,23;18:1,19,
23;19:18,25;20:7,15,
22;22:7

**hire (1)**
20:23

**hits (1)**
9:23

**Holding (1)**
15:4

**holds (1)**
31:1

**homeowners (1)**
18:20

**homeowner's (1)**
26:5

**honest (1)**
20:9

**Honor (48)**
3:6,10,12,14,17;4:2,
10,15,18,21;5:1;6:12;
7:9,17;9:3;10:9,15,17,
19,21;11:1,17;12:2,
24;13:8,24;14:4,19;
15:5,10,16,22;30:13,
18;31:2,18,25;32:11;
34:9,14,16,18,21;
35:8,10,12,14,16

**hostage (1)**
15:4

**hotel (2)**
28:4,6

**housekeeping (1)**
31:25

**human (1)**
12:4

**hundred (3)**
24:19;26:13;28:17

**hypothetical (1)**
22:2

### I

**idea (2)**
14:24;15:8

**illegally (1)**
18:15

**immaterial (1)**

19:6

**immediately (1)**
3:16

**implies (1)**
21:16

**important (5)**
9:5,10;13:2,4;24:9

**improper (1)**
15:7

**inability (1)**
30:6

**inapplicable (3)**
17:18;21:24;29:12

**inappropriate (2)**
5:12,13

**Inc (1)**
4:11

**included (2)**
16:3;27:5

**including (6)**
18:11;24:3,17;
27:17;28:15;29:21

**income (16)**
9:24;11:8;12:16,21;
16:20;17:16;18:5,8;
19:10;20:12,13,24;
21:12,17;22:2;29:16

**incorporated (1)**
24:17

**incur (2)**
10:1;23:22

**incurred (2)**
26:19,21

**independent (1)**
10:10

**indicate (1)**
8:21

**indicated (2)**
24:25;31:10

**indicates (1)**
27:22

**indicating (1)**
33:1

**indiscernible (1)**
19:3

**individual (3)**
10:22;12:22;19:13

**individuals (2)**
5:25;27:17

**information (8)**
7:4;15:2;18:8,14;
19:11;24:23;28:11;
33:15

**initial (2)**
24:9,10

**insolvent (2)**
14:4,5

**instance (1)**
11:11

**instrument (1)**
10:3

**insufficient (1)**
21:10

**insurance (10)**
9:23;12:6;16:15;
17:6;18:20,21;25:10;
26:3,5,8

**insured (1)**
26:6

**intend (8)**
3:23;5:20;6:4,18,
25;7:4;33:16,21

**intended (1)**
22:21

**intends (1)**
15:20

**interest (21)**
13:19,22;16:15;
17:5,19;18:20;19:21;
22:6;24:16,18,19,20,
23,24;25:1,5,7,11;
26:13;28:14,17

**interests (4)**
23:5,7;24:16;25:9

**interference (2)**
28:11;34:18

**interrupt (1)**
31:19

**into (12)**
14:1;18:10,18;
25:18,21,25;26:2;
27:2,9,12,13,15

**intracompany (1)**
27:19

**investigating (2)**
21:6,8

**invests (1)**
17:5

**invited (1)**
9:4

**invoice (1)**
28:7

**involuntary (1)**
30:7

**involved (1)**
19:14

**IOLTA (1)**
27:6

**Irrevocable (1)**
4:6

**Isaac (1)**
26:11

**Israel (2)**
26:19;28:2

**issue (7)**
5:5;8:1,7,9;9:17;
22:17;34:6

**issued (1)**
15:25

**issues (7)**
5:11;11:12;13:4,5,
6;15:10;20:6

### J

**January (11)**

16:1;25:23;26:16,
16,17,19,20,22,23,25;
27:1
**Jeffrey (1)**
3:6
**jeopardy (1)**
21:12
**Jersey (1)**
30:2
**John (3)**
3:8;4:21;10:15
**joined (2)**
3:8,10
**joint (1)**
24:18
**Jones (2)**
3:7;4:22
**judgment (1)**
9:22
**July (5)**
25:17;27:4,22;28:7,
8
**jump (1)**
3:19
**jumped (1)**
3:12
**June (1)**
25:17
**justified (1)**
11:2
**justify (1)**
18:1

**K**

**keeping (2)**
14:24;15:8
**Kerzner (1)**
26:11
**keys (1)**
31:1
**Klein (63)**
5:3;7:20;9:12,18;
10:3,6;14:25;15:2;
16:1,7,11,14,18,21;
17:7,21;18:1,5,7,9,15,
17;19:4,11,13,15,18,
21,23;20:3,8,15,16,
18;21:14,16,21;22:12,
24;24:9,12,14,18,22;
25:1,2,2,6,8,18,25;
26:9;28:2,7,11,14,19,
24;29:5,14,25;31:10;
35:18
**Klein's (19)**
17:24;18:18,19,21,
24;19:2,6,12;20:13,
19,22;21:22;24:5,13;
25:16,20,21;26:4,12
**knowledge (1)**
22:15
**known (1)**
13:21

**Kogan (4)**
12:12;18:16;28:3;
33:9

**L**

**labor (1)**
11:6
**lack (2)**
21:19;22:15
**lacks (1)**
18:4
**last (2)**
14:18;25:17
**laundry (2)**
10:24;11:5
**Law (6)**
5:2,9,10;9:19;
16:20;25:13
**LBR (1)**
29:20
**LCG (3)**
24:20;25:2,11
**least (4)**
14:10;24:21;25:4;
27:9
**lectern (1)**
5:3
**led (2)**
18:7;19:3
**Legal (3)**
18:12;24:15,23
**Les (1)**
16:18
**Leslie (1)**
5:2
**less (2)**
19:6,8
**lessen (1)**
17:13
**LEW (1)**
30:11
**liability (1)**
9:20
**Lieberman (42)**
3:13;4:25;5:1,1,10,
22;6:4,12,25;7:7,9,14,
17;8:6,8,14,16,20,24;
9:1,3;12:18;14:17,19;
15:21,22;20:21;
29:25;31:10,18,25;
32:10;33:5,7,19,24;
34:3,9,22;35:4,8,10
**Lieberman's (1)**
10:17
**life (11)**
9:14;11:7;13:10,19;
14:2;16:16;17:5,6;
18:20;19:22;25:10
**lifestyle (2)**
17:25;18:11
**likelihood (4)**
17:9;21:9;23:18;

**likely (1)**
20:1
**limits (1)**
18:6
**liquidate (2)**
20:17;22:8
**liquidating (1)**
20:2
**list (4)**
10:24;11:5;23:11;
24:10
**listed (2)**
18:18;24:18
**litigate (1)**
16:17
**litigating (1)**
8:17
**litigation (3)**
11:15;17:11;22:7
**little (1)**
19:2
**living (6)**
9:12,14;10:4;19:19;
25:1,3
**LKA (36)**
16:20;18:11,18,19;
19:19,20;20:14,16;
21:9;24:10,21;25:3,7,
14,22;26:2,2,4,7,9,15,
23,25;27:2,5,6,7,7,9,
10,12,13,15,16,22;
28:15
**LKA's (1)**
25:19
**LLC (2)**
18:12;24:18
**LLP (2)**
4:5;5:2
**local (1)**
29:18
**longer (7)**
11:23;12:13;17:15,
22;21:18;22:24;33:1
**look (2)**
14:8;24:2
**LOS (1)**
3:1
**loss (6)**
23:17,20,24;24:6;
28:20;29:6
**losses (2)**
21:7;23:22
**Lucas (19)**
3:9;4:20,21,21;
6:22;10:13,15,15;
14:9,20;15:1;16:4;
30:17,18;31:7;33:25;
34:20,21;35:12
**Lucas' (1)**
32:20

**M**

**maintains (1)**
23:22
**makes (1)**
10:5
**making (3)**
7:25;14:20;21:12
**malpractice (1)**
9:21
**management (2)**
28:4,6
**Manasserian (1)**
4:5
**manner (2)**
30:25;33:22
**many (3)**
8:18,18,18
**March (6)**
4:7;31:13,15,23,24;
32:25
**Mark (1)**
5:1
**marketing (4)**
13:14;18:13;27:12,
24
**Maroko (3)**
4:14,15,15
**Marrama (2)**
20:19;21:23
**materially (1)**
21:1
**matter (13)**
3:24;5:17;6:3,24;
22:12;24:9;31:8,9;
32:1,1,11;33:2,11
**matters (3)**
3:4;33:14;35:18
**matured (1)**
13:24
**may (10)**
7:17;8:22;16:12;
17:3;22:18;23:24;
28:6;33:7;34:25;35:1
**mean (1)**
14:14
**means (4)**
6:5,6,7;22:25
**mediation (1)**
33:12
**membership (1)**
24:20
**Menlo (7)**
4:6,6;14:10;16:6;
20:4,6,15
**Menlo's (1)**
21:23
**mentioned (1)**
8:16
**merely (2)**
7:25;8:3
**merit (2)**

15:12,14
**met (2)**
17:2,14
**Michael (1)**
18:16
**might (3)**
11:9;19:6;28:23
**million (6)**
13:10,23,25;26:8,
10,11
**million-dollar (1)**
9:22
**mind (1)**
35:13
**miscellaneous (1)**
27:14
**missed (1)**
33:6
**misspoke (1)**
31:20
**misuse (1)**
18:25
**money (8)**
10:6;13:9;14:21;
19:2;20:14;24:7;
28:12,13
**monies (1)**
10:4
**monthly (1)**
21:2
**more (2)**
10:12;34:12
**morning (14)**
3:6;4:2,3,8,10,14,
15,17,18,20,21,24;
5:4,18
**MORs (2)**
19:10;21:2
**most (3)**
9:5;26:6;30:24
**motion (43)**
3:9,13,17,17;5:15,
16,21,21,21;6:8,21;
7:2,7,11,23;8:10,22;
10:21,23;12:14;
14:17;15:12,24;16:1,
3,7;19:25;20:7;21:23,
24;23:19;25:8;29:1;
30:8;31:9,11,15;32:3,
7,14,15,21,21
**motions (1)**
33:21
**mouth (1)**
12:5
**movant (5)**
23:9,19;28:19;29:2,
8
**move (2)**
22:25;30:24
**moving (3)**
5:23;23:15,21
**much (2)**
14:21;34:10

Case 2:26-ap-01186-NB   Doc 3   Filed 07/13/26   Entered 07/13/26 14:53:22   Desc
In Re: LESLIE KLEIN     Main Document     Page 141 of 242

February 28, 2024

**must (7)**
21:16;23:16,18,21;
29:2,9;31:11
**muted (1)**
4:9

## N

**naked (1)**
21:20
**Nathanson (1)**
29:21
**naturally (1)**
3:18
**ND (1)**
29:21
**near (1)**
20:16
**necessary (1)**
8:10
**need (10)**
6:8,9,20;7:1,2;
23:24;29:4,19;34:2;
35:7
**needed (1)**
5:14
**needs (7)**
7:24;12:7,23;18:5;
23:25;33:2;34:7
**negative (2)**
20:22;23:22
**negotiating (2)**
21:4;34:24
**net (2)**
27:4,21
**Nevertheless (1)**
32:18
**new (4)**
11:20;16:22;29:18;
30:2
**next (5)**
16:9;31:21,23,24;
32:10
**Nicholas (1)**
4:10
**Nick (1)**
3:11
**Nikko (1)**
4:4
**noncooperation (1)**
15:1
**nondebtor (6)**
17:24;18:10,22,24;
19:5;27:9
**nondischargeability (3)**
16:24;19:16;21:11
**none (1)**
14:21
**nonexclusive (1)**
23:11
**nonpublicly (1)**
24:16
**nonsensical (1)**

19:13
**nor (1)**
21:14
**noted (2)**
25:6;31:11
**notice (6)**
6:9,23;23:2;33:7;
34:2,4
**NTF (1)**
15:25
**number (6)**
3:4,9,20;12:19;
31:8,9
**numerous (3)**
27:10;29:18,20

## O

**objecting (1)**
21:20
**objection (8)**
3:15;5:9,10,14;
11:14;12:2;13:9;16:3
**objections (6)**
15:18;16:8,9;22:12,
14,17
**occasions (1)**
12:19
**office (1)**
26:20
**often (2)**
20:8;24:2
**Olson (1)**
12:11
**omitted (2)**
24:21;25:3
**omnibus (1)**
16:7
**once (3)**
19:25;22:3;32:16
**one (20)**
5:11;6:1,5,8,16,19;
9:6,6;12:9;13:8,24;
14:3;15:4;23:16;
24:19;26:10;33:22;
34:11,21;35:12
**only (11)**
7:1;11:3,19;16:14,
17;20:5;25:8,12;
28:15;33:11,18
**oOo- (1)**
3:2
**operating (3)**
17:10,15;24:6
**opportunity (1)**
7:8
**opposed (2)**
7:25;33:8
**opposition (6)**
5:10;14:10;15:19;
16:3;17:20;20:5
**oppositions (1)**
16:8

18:15
**payment (5)**
12:21;26:3,7;28:4,8
**payments (4)**
11:10;17:7;25:10;
28:6
**payroll (1)**
27:7
**pays (2)**
18:19;19:19
**penalty (3)**
6:10;7:3;24:12
**pendency (2)**
9:15;22:21
**pending (3)**
5:24;32:20;33:13
**per (1)**
17:20
**perceived (1)**
14:25
**percent (9)**
14:11;17:4;19:21,
22;24:19,20,21;
26:13;28:18
**perfectly (1)**
34:9
**perhaps (1)**
3:20
**period (4)**
22:11;27:15,20,25
**perjury (3)**
6:10;7:3;24:12
**personal (5)**
18:17;22:15;25:16,
21;26:6
**personally (1)**
30:22
**perspective (1)**
34:13
**persuasive (2)**
24:6;30:3
**Peter (1)**
4:16
**phase (2)**
11:20,20
**phone (2)**
30:21;35:5
**phonetic (8)**
13:12,13;18:12,13,
13;26:10,11;30:12
**pick (1)**
35:5
**pivot (1)**
12:1
**place (1)**
21:12
**plan (8)**
11:10,15;20:1;21:4,
17;22:2,10;29:17
**pleading (1)**
6:6
**pleadings (3)**
3:23;13:2,21

please (3)
7:10,15;30:11
**Poinsettia (1)**
13:13
**point (10)**
8:25;9:6,7,17;10:3,
17;12:1;21:20;33:17;
35:13
**points (2)**
7:15;9:5
**policies (6)**
13:24;16:15;17:6;
18:21;25:10;26:8
**policy (2)**
26:10,11
**Polycom (1)**
29:21
**portion (1)**
12:21
**possesses (2)**
25:13;28:16
**possession (3)**
5:2;9:10;22:25
**possible (1)**
30:25
**post-petition (13)**
5:6;10:7;11:3;
20:12,13,24;21:16;
22:2;25:25;28:13;
29:16;33:4,23
**posture (1)**
5:11
**potential (3)**
9:20;16:15;25:10
**potentially (1)**
11:11
**powers (1)**
24:25
**practice (4)**
9:19;16:20,21;
25:13
**preliminary (4)**
3:24;5:5;12:3;
22:12
**preparing (4)**
11:15;13:14;21:2,3
**pre-petition (3)**
18:6,15;25:23
**preponderance (1)**
23:10
**present (4)**
5:3;21:14;22:10;
30:20
**presented (2)**
22:4;28:22
**presumption (1)**
20:10
**prevailing (1)**
30:10
**previously (1)**
25:6
**primary (2)**
16:19;25:14

**order (5)**
3:3;5:16,17;30:11;
32:5
**orders (1)**
32:17
**ordinarily (1)**
20:11
**out (5)**
9:17;27:10;31:3;
32:19;33:9
**outgoing (1)**
12:16
**outset (1)**
12:10
**over (5)**
12:5;13:10,12,23;
18:4
**overrules (1)**
22:16
**owed (3)**
6:1,1;17:7
**own (1)**
24:15
**ownership (2)**
24:19;26:13
**owns (12)**
18:20;19:19;21:14;
24:8;25:4,4,10;26:7;
28:2,14,14,18
**Oxford (1)**
13:11

## P

**Pachulski (2)**
3:7;4:22
**paid (2)**
13:10;26:5
**Palm (1)**
13:15
**paper (3)**
6:19;33:22;35:3
**papers (3)**
9:4;10:12;14:14
**Park (1)**
13:12
**part (1)**
9:24
**participation (1)**
28:5
**parties (2)**
8:17;21:20
**partner (1)**
3:8
**partnership (1)**
24:18
**party (3)**
23:16,21;30:10
**party-in-interest (1)**
23:2
**payable (1)**
18:22
**paying (1)**

**prior (1)**
22:22
**procedural (3)**
5:11;15:25;32:11
**procedure (1)**
34:5
**proceed (7)**
5:20;6:17,23;7:6;
16:24;20:18;32:23
**proceedings (2)**
5:24;35:19
**process (1)**
13:14
**professional (2)**
12:6;27:25
**promise (1)**
7:11
**prong (4)**
23:19;24:2;29:2,4
**proof (2)**
6:6,19
**proper (2)**
3:16;32:4
**properties (2)**
13:16,18
**property (15)**
11:4;12:20;13:12,
13,15;18:10,25;20:12,
24;21:10;22:22;
24;24;28:2,10,23
**proposed (1)**
32:11
**proposition (1)**
30:6
**prospects (1)**
24:3
**provide (5)**
6:19;15:2;19:11;
24:23;33:14
**provided (1)**
18:8
**provides (3)**
19:8;22:18;23:1
**providing (3)**
7:4;24:15;28:11
**provisions (1)**
22:17
**punish (1)**
14:25
**pursuant (1)**
11:8
**pursue (1)**
17:12
**put (5)**
11:20;12:5;31:3;
32:8;34:4

**Q**

**quickly (1)**
8:17
**quite (1)**
12:13

**R**

**raise (2)**
33:17;34:6
**raised (5)**
5:11;20:6;22:12;
29:19,24
**rather (2)**
19:22;32:20
**re (2)**
9:8;10:18
**reached (1)**
11:25
**readily (1)**
31:22
**ready (5)**
6:2;10:11;11:14;
15:16,23
**real (3)**
16:15;25:9;28:2
**really (1)**
15:12
**reason (3)**
3:12;5:22;10:10
**reasonable (5)**
8:4;17:8;22:11;
23:18;29:3
**reasoning (1)**
9:11
**reasons (1)**
15:10
**Recalling (1)**
3:4
**receive (1)**
26:9
**received (5)**
13:11,12;18:14;
25:18;27:24
**receives (1)**
17:5
**recently (1)**
13:24
**recognize (1)**
10:11
**record (2)**
24:2;30:14
**records (1)**
24:4
**recovering (1)**
21:6
**reduce (1)**
21:1
**refer (1)**
22:21
**reference (2)**
21:23;30:14
**refund (1)**
25:18
**refunds (1)**
18:17
**refusal (1)**
11:17

**refuse (1)**
11:10
**refuses (1)**
19:11
**regarding (5)**
7:4;17:7;18:8;
19:12;25:16
**regardless (1)**
17:19
**regards (1)**
32:3
**regular (4)**
6:9,23;19:10;34:2
**rehabilitate (1)**
17:9
**rehabilitation (7)**
17:11;19:12,16;
21:9,19;23:18;29:4
**reiterate (1)**
7:10
**related (1)**
26:18
**relates (2)**
19:16;34:24
**relied (1)**
30:1
**relief (2)**
20:3,8
**remain (1)**
29:16
**remaining (1)**
21:6
**remains (2)**
9:18;20:3
**remedies (1)**
15:7
**reorganization (1)**
16:23
**repeat (2)**
9:4;13:1
**reply (10)**
5:22;6:14;7:11;
8:19;10:20;16:7;
20:21;29:14,19;31:10
**report (2)**
14:6;19:3
**represent (11)**
6:18;7:1,5,20;8:23;
32:13,14;33:1,11,16,
21
**representation (2)**
32:17;35:1
**representing (1)**
6:4
**request (2)**
20:9;23:1
**requested (1)**
28:8
**required (5)**
11:7;18:3;22:1;
24:14,22
**requirement (1)**
34:25

**requirements (1)**
21:3
**requires (3)**
9:13,15;17:1
**residence (1)**
26:6
**resign (1)**
16:21
**resolution (1)**
33:12
**respect (1)**
35:1
**respond (3)**
6:8,20;32:20
**response (7)**
3:15;7:1;10:17;
16:6;20:4;24:13,22
**responsibility (2)**
10:8;11:18
**rest (2)**
9:14;11:6
**restrictions (1)**
12:8
**result (1)**
21:7
**retain (1)**
12:19
**retained (1)**
6:11
**retains (1)**
22:22
**revenue (1)**
25:15
**review (2)**
27:5;29:24
**reviewed (1)**
7:12
**rewarded (2)**
11:17;18:3
**right (11)**
5:4;14:16;15:23;
17:21;20:18;21:17;
26:7;31:7;33:18;
34:11;35:17
**rights (1)**
24:25
**ripe (1)**
13:6
**Ron (1)**
4:15
**roof (1)**
12:5
**Roselio (1)**
26:10
**rule (6)**
5:20;6:2;10:11;
15:16,17,23
**rules (1)**
29:18
**ruling (7)**
8:6,15,22;11:1;
31:8;32:2,16
**run (1)**

16:20

**S**

**sale (3)**
13:11,13,15
**salient (1)**
7:16
**same (6)**
10:7,24;14:4;27:15,
25;28:12
**satisfy (2)**
23:19;29:2
**saying (3)**
3:16,17;14:21
**schedule (2)**
18:19;24:13
**schedules (6)**
24:10,11,12;25:3,7;
26:12
**scope (1)**
32:12
**second (3)**
9:17;29:2,4
**Section (2)**
22:18;23:6
**Security (4)**
18:18;25:20,24;
26:1
**seek (2)**
8:23;20:2
**seeking (1)**
32:15
**seems (1)**
15:11
**sell (2)**
13:17;17:16
**send (1)**
35:6
**sense (1)**
12:15
**sent (1)**
28:7
**service (2)**
6:6,20
**servitude (1)**
30:7
**set (5)**
6:8,22;8:22;33:15;
34:1
**seven (5)**
22:12;27:12,14;
30:11;31:12
**seventy-six (1)**
21:18
**several (1)**
26:22
**shall (1)**
23:3
**shape (1)**
6:5
**Sharp (20)**
3:8,10;4:12,17,18,

18,22;5:8;10:16;
11:13,14;12:9;16:5,
13;17:4;22:13;30:21,
23;34:17,18
**Sharp's (2)**
16:10;32:20
**shield (1)**
17:25
**shifts (1)**
22:3
**shortening (1)**
5:17
**show (3)**
19:10;23:21;29:6
**shown (1)**
29:13
**shows (1)**
26:3
**sic (1)**
15:24
**signals (1)**
35:6
**signed (3)**
6:10;7:3;24:12
**significant (10)**
8:4;16:14,18;24:7;
25:8,12;27:8;28:13,
16,23
**significantly (1)**
26:7
**similar (2)**
14:11;20:4
**simply (2)**
10:10;32:22
**situation (1)**
6:16
**six (1)**
22:13
**sixteen (2)**
27:18,23
**slave (1)**
11:6
**smoke (1)**
35:6
**smoothly (1)**
30:24
**Social (4)**
18:17;25:20,24;
26:1
**somebody (1)**
9:23
**somehow (1)**
10:1
**sorry (1)**
31:18
**sort (7)**
3:12,19;11:4,6;
12:7;13:16;31:3
**source (2)**
16:19;25:14
**Specialists (1)**
4:11
**specific (1)**

7:4
**specifically (1)**
6:11
**sponte (1)**
3:18
**Stang (2)**
3:7;4:22
**start (1)**
11:15
**starting (1)**
20:10
**state (2)**
19:18;21:15
**statement (2)**
12:3;26:14
**statements (2)**
21:3;24:7
**States (1)**
4:16
**stating (1)**
28:7
**statutory (1)**
22:17
**Stevens (10)**
4:1,2,4,4,8;14:9,13,
16;35:15,16
**Steves (1)**
14:12
**stipulation (1)**
17:7
**stock (1)**
24:16
**straight (2)**
12:24,25
**strategy (1)**
17:11
**sua (1)**
3:18
**Subchapter (1)**
16:11
**submitted (1)**
15:18
**substantial (6)**
13:19;23:16,20,24;
28:20;29:6
**substantially (1)**
20:4
**substantiate (1)**
8:12
**substituted (2)**
33:3,9
**substitution (4)**
32:22;33:2,5,8
**suffered (1)**
24:1
**sufficient (2)**
19:25;28:11
**suggest (4)**
9:25;10:9;15:5;
19:20
**suggests (2)**
9:11;14:23
**summarize (1)**

20:6
**summary (2)**
27:5,20
**supply (1)**
26:20
**support (1)**
15:18
**supporting (1)**
16:4
**supports (1)**
21:18
**suppose (1)**
8:2
**sure (2)**
12:13;33:24
**sweat (1)**
14:22

**T**

**table (2)**
8:25;12:23
**technically (1)**
35:2
**tentative (1)**
32:1
**term (1)**
22:20
**terminology (1)**
32:1
**terms (5)**
7:20;12:17;16:13;
23:20;29:8
**test (1)**
29:5
**testified (2)**
26:4,9
**therefore (1)**
28:25
**thereto (1)**
14:2
**Thirteenth (4)**
13:5;22:1;29:15,23
**thirty (2)**
13:23;26:8
**though (2)**
29:23;35:2
**thought (1)**
3:19
**three (1)**
27:9
**till (1)**
33:18
**times (1)**
25:20
**today (11)**
3:8,11;5:23;6:14;
8:19;12:12;30:1,15;
32:16,25;33:18
**today's (2)**
5:20;31:12
**told (1)**
12:22

**tools (2)**
15:3,5
**torts (1)**
10:8
**total (2)**
27:1,19
**totaling (8)**
26:8;27:11,13,14,
16,18,20,23
**towards (2)**
12:21;27:25
**track (1)**
24:2
**traded (1)**
24:16
**transferred (5)**
26:24;27:1,2;28:12,
13
**transfers (14)**
18:24;19:2;24:8;
26:22;27:8,10,11,13,
14,17,18,19,23,24
**transportation (1)**
26:19
**travel (2)**
26:18;28:1
**tried (1)**
12:10
**trigger (1)**
34:25
**Troszak (10)**
3:11;4:9,9,10,11;
12:9;16:4;22:13;
34:15,16
**Troszak's (1)**
16:8
**true (3)**
10:2;11:11,11
**Trust (12)**
4:6;11:15;16:6;
20:2,6,15;21:23;22:7;
25:1,3,19;27:6
**trustee (49)**
3:8;4:13,16,19,23;
5:12;10:1,4,14,16;
11:24;13:17;14:11;
15:11;16:2,5,13,16,
25;17:1,4,7,12,20,23;
18:1,2,5,7,8,9,14,19;
19:4,24;20:6;21:5,7,
13,16;22:4,4,9,23;
23:7;28:12;30:20;
32:23;34:23
**trustee's (7)**
5:10,14;7:24;15:12;
20:5,16;34:4
**trusts (1)**
24:24
**try (2)**
5:25;12:15
**trying (2)**
12:1;13:17
**turned (1)**

3:5
**Turning (2)**
22:17;23:1
**twenty-five (3)**
17:4;19:22;24:21
**twenty-three (1)**
25:4
**two (4)**
3:14;23:17;26:15;
32:5
**type (2)**
6:7;34:7
**typical (1)**
14:14

**U**

**unaware (1)**
32:4
**unclear (1)**
28:5
**uncooperative (1)**
20:3
**under (21)**
6:10;7:3;16:17,24;
17:17,23;20:9,18;
21:8;22:18,19;23:1,3,
3,4,6,15;24:12;28:25;
29:11,18
**underscore (2)**
9:5,6
**Understood (2)**
3:22;35:10
**undisclosed (1)**
28:17
**undisputed (1)**
22:24
**unhappy (1)**
18:4
**unincorporated (1)**
24:17
**United (1)**
4:16
**unless (4)**
22:19;23:6;29:10;
33:6
**unlikely (2)**
16:23;21:12
**unmatured (2)**
13:23;26:8
**unreasonable (1)**
19:24
**unusual (5)**
17:17;22:4;29:8,11,
11
**up (10)**
9:1;10:20;12:1;
13:4;19:13;21:10;
33:18,18;34:3;35:5
**upload (2)**
30:11;32:16
**upon (1)**
28:24

upset (1)
11:22
use (3)
17:24;20:14;28:4
using (1)
19:4
UST (1)
21:2

**V**

value (4)
13:23;19:20;23:23;
24:1
values (1)
19:7
various (3)
18:23;25:20;27:16
venture (1)
24:18
via (3)
5:15;25:11;30:11
video (1)
3:5
violate (2)
22:1;29:15
vocational (1)
12:6
voluntarily (3)
18:2;32:6,6
voluntary (4)
31:12,14,15;32:2

**W**

waiting (1)
5:25
waived (1)
29:17
waiver (1)
6:15
wants (4)
20:15;21:5;30:21,
23
wash (1)
20:14
way (7)
3:16;5:14;6:5,18;
8:2;15:1;17:24
ways (2)
10:6;15:7
WEDNESDAY (2)
3:1;31:23
week (3)
31:21,24;32:25
weeks (2)
3:14;31:13
what's (5)
7:10;9:4;14:7,14;
35:9
Whereupon (1)
35:19
whichever (1)

23:4
wholly (2)
25:4;28:14
wind (1)
21:10
winding (1)
19:13
wished (1)
31:11
wishes (1)
17:12
withdraw (4)
12:14;31:11;32:15,
21
withdrawal (1)
32:4
withdraws (1)
32:6
within (3)
14:23;30:11;31:12
without (3)
12:8;15:14;18:6
WL (1)
29:21
word (1)
14:18
words (1)
32:8
work (5)
9:14;12:23;21:18;
30:23;31:3
working (2)
9:9;10:4
worth (1)
31:2
wrongdoing (1)
20:7

**Y**

year (3)
5:24;16:12;25:17
years (2)
8:18;11:8
yesterday (2)
5:15;7:2
Young (1)
4:4

**Z**

zero (1)
14:6
Ziehl (2)
3:7;4:22

**1**

10,000 (1)
27:24
10:06 (1)
3:1
10:58 (1)

35:19
11 (22)
4:13,19,23;9:16,18;
10:16,23;11:2;14:24,
25;15:4,9,24;16:2,5,
11,13;21:6,25;29:16;
30:6,19
11,822 (1)
28:3
1104a (1)
23:7
1112a (2)
22:18;23:1
1112a1 (1)
17:21
1112b (3)
17:23;23:1;29:11
1112b1 (1)
17:1
1112b2 (1)
17:18
1112b4 (1)
23:11
1112b4A (4)
17:14;23:15;28:25;
29:5
112 (1)
27:19
1129a15 (1)
11:8
11th (1)
25:23
12/19 (2)
26:4,9
12964727 (1)
29:21
13 (1)
21:25
13th (2)
31:23,24
142,000 (1)
13:12
14th (3)
16:2,6;22:14
15 (5)
3:4,9,21;26:19;31:8
15,458 (1)
28:7
15th (1)
5:7
16 (2)
3:4;31:9
16,000 (1)
26:15
16th (1)
25:17
176 (1)
27:16
17th (2)
17:3;25:17
18 (1)
26:23
1810 (1)

26:14
19 (6)
24:14;26:16,16,17,
20,20
1983 (1)
4:7
1990 (1)
25:2
1st (2)
4:7;27:22

**2**

2,000 (1)
26:16
2.1 (1)
13:10
2005 (1)
20:3
2015 (2)
29:21,22
2022 (1)
28:5
2023 (2)
25:24;28:4
2024 (1)
3:1
21st (3)
16:7;26:20;27:4
22nd (3)
5:8;16:12;26:16
23 (10)
25:23;26:22,23;
27:1,4,4,22,22;28:7,8
23rd (2)
5:9;26:16
24th (2)
16:12;26:17
25 (1)
24:22
25th (1)
16:2
27,463 (1)
27:14
28 (1)
3:1
2nd (1)
28:7

**3**

3,430 (1)
25:24
3.5 (1)
26:9
3/8/23 (1)
24:11
30th (1)
26:25
314,000 (1)
27:11
31st (4)
27:1,4,22;28:8

329 (1)
32:12
399,652 (1)
27:20

**4**

4/10/23 (1)
24:11
40,500 (1)
27:13
4099 (2)
26:24;27:21
465 (2)
10:19;13:3

**5**

5,000 (1)
26:17
523 (1)
20:9

**6**

6416 (1)
25:17
663 (1)
5:7
683 (2)
10:19;13:3
6978 (1)
27:8
6th (3)
31:14,15;32:25

**7**

7 (21)
10:11,22,23;11:2;
14:24;15:15;16:17,
25;17:1,2,12;19:5,8;
20:17,19;21:8,25;
22:9,19;23:4;30:6
7,519 (1)
26:1
7/10/23 (1)
26:1
7/11/23 (1)
26:3
727 (1)
20:9

**8**

80,000 (1)
26:23
8144 (1)
27:6
885,000 (1)
13:11
8th (2)
25:1,23

Case 2:26-ap-01186-NB    Doc 3    Filed 07/13/26    Entered 07/13/26 14:53:22    Desc
In Re: LESLIE KLEIN    Main Document    Page 145 of 242

February 28, 2024

**9**

**9 (1)**
  31:15
**9,000 (1)**
  27:1
**9,500 (1)**
  26:16
**9013-1g4 (1)**
  29:20
**9040 (1)**
  27:2
**9044 (1)**
  27:3
**92,000 (2)**
  27:18,23
**9401 (1)**
  25:25
**9404 (4)**
  25:19,22;26:2;27:5
**9405 (1)**
  27:7
**9409 (1)**
  26:25
**941 (1)**
  25:22
**99,183.31 (1)**
  27:25

# EXHIBIT  L

1

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

-oOo-

In Re:                          ) Case No. 2:23-10990
                                ) Chapter 11
LESLIE KLEIN                     )
                                ) Los Angeles, California
                    Debtor.     ) Wednesday, December 18, 2024
_____ ) 10:30 AM

                                  ADV#: 2:23-01150
                                  VAGO, ET AL v. KLEIN, ET AL.

                                  ADV#: 2:23-01167
                                  SHARP, CHAPTER 11 TRUSTEE V.
                                  KLEIN, ET AL.

                                  ADV#: 2:24-01140
                                  SHARP, CHAPTER 11 TRUSTEE v.
                                  KLEIN, ET AL.

                                  #22.00 HRG RE MOTION FOR
                                  SUMMARY JUDGMENT ON ALL
                                  CLAIMS FOR RELIEF AGAINST
                                  DEFENDANTS

                                  #23.00 STATUS CONFERENCE RE
                                  COMPLAINT FOR QUIET TITLE AND
                                  AVOIDANCE OF UNRECORDED
                                  INTERESTS IN REAL PROPERTY
                                  LOCATED AT 322 N. JUNE ST.,
                                  LOS ANGELES, CA

                    TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE SANDRA R. KLEIN
                 UNITED STATES BANKRUPTCY JUDGE

APPEARANCES (All present by video or telephone):
For the Debtor:          LESLIE KLEIN, PRO SE

                         ERIC J. OLSON, ESQ.
                         EJOlsonLaw
                         301 East Colorado Boulevard
                         Suite 520
                         Pasadena, CA 91101
                         (626)224-5619

2

APPEARANCES (Continued):

For the Debtor:                  DANIEL A. CRAWFORD, ESQ.
                                  Crawford Law Group
                                  15303 Ventura Boulevard
                                  Floor 9
                                  Sherman Oaks, CA 91403
                                  (818)935-6568

For the Chapter 11              JEFFREY W. DULBERG, ESQ.
Trustee:                        Pachulski Stang Ziehl & Jones
                                  10100 Santa Monica Boulevard
                                  13th Floor
                                  Los Angeles, CA 90067
                                  (310)277-6910

                                JOHN W. LUCAS, ESQ.
                                  Pachulski Stang Ziehl & Jones
                                  One Sansome Street
                                  Suite 3430
                                  San Francisco, CA 94104
                                  (415)263-7000

For Joseph and Rachel           REEM J. BELLO, ESQ.
Vago:                           Goe Forsythe & Hodges LLP
                                  17701 Cowan
                                  Suite 210, Lobby D
                                  Irvine, CA 92614
                                  (949)798-2460

For Kenneth and Shoshana        SIMON ARON, ESQ.
Klein:                          Wolf, Rifkin, Shapiro, Schulman &
                                  Rabkin, LLP
                                  11400 West Olympic Boulevard
                                  Ninth Floor
                                  Los Angeles, CA 90064
                                  (310)478-4100

3

Court Recorder:                WANDA TOLIVER
                               United States Bankruptcy Court
                               Edward R. Roybal Federal Building
                               255 East Temple Street
                               Room 940
                               Los Angeles, CA 90012
                               (855)460-9641

Transcriber:                   MICHAEL DRAKE
                               eScribers, LLC
                               7227 N. 16th Street
                               Suite #207
                               Phoenix, AZ 85020
                               (800) 257-0885

Proceedings recorded by electronic sound recording;
transcript provided by transcription service.

4

LOS ANGELES, CALIFORNIA, WEDNESDAY, DECEMBER 18, 2024, 10:28 AM

-oOo-

(Call to order of the Court.)

THE COURT:  So then the only remaining matter are the Klein matters.  And I said those would be called at 10:30.  So we're a little early for that.  I don't know if -- and I cannot see on my screen who else may be in the Zoom room.  If anyone is here on the Klein matters, please turn your video on because you will show up in a different screen.

Hello, Mr. Dulberg.

MR. DULBERG:  Good morning, Your Honor.  I think the -- just to assist Your Honor with your calendar, I think the first item is the nondischargeability action involving the Vagos.  And I see Ms. Bello is on.  I know Your Honor is having trouble seeing folks.

THE COURT:  Yes.  Now I can see you.  That makes it much easier.  So hold on.  Let me get there.

MR. DULBERG:  So we're not technically appearing on that matter like I say.  But again, just to aid your video, we were -- Mr. Lucas and I have jumped on here.

THE COURT:  Okay.  Thank you.  Yes, I believe that will be quite brief.

So matter number 20 is Vago versus Klein.  Ms. Bello?

MS. BELLO:  Yes.  Good morning, Your Honor.  Reem Bellow of Goe Forsythe & Hodges on behalf of Erica and Joseph

5

Vago.

THE COURT:  Good morning.  And, Mr. Olson, do you represent Mr. Klein in this one?

MR. OLSON:  No.  I understood he was appearing in pro se.

THE COURT:  Okay.  Well, he's not here.

Ms. Bello, what would you like the Court to know?

MS. BELLO:  Your Honor, according to our joint status report, because of the issue of the appeal still out there, both plaintiff, my clients, and Mr. Klein who participated in preparing the joint status report and signed it, requested that the Court simply not set dates yet that continue out the status conference.

THE COURT:  And Ms. Bello, the appeal was -- I looked at the docket.  I didn't see an appeal of the order that I entered.  Did I miss it?

MS. BELLO:  No, Your Honor.  I apologize.  What was meant by the appeal is the debtor's pre-petition appeal of the Vagos judgment.

THE COURT:  Okay.  Understood.  And where is that in its way through the state court system?

MS. BELLO:  I don't think anything has happened since the bankruptcy was filed.

THE COURT:  Okay.

MS. BELLO:  We had reached out to the trustee after he

6

was appointed.

THE COURT: Hold on. I believe someone is speaking. Please let Ms. Bello speak. You'll be given an opportunity to speak when she's done.

Ms. Bello?

MR. KLEIN: Thank you.

MS. BELLO: Yes. We had reached out to the trustee. Nothing has really transpired. On that front, we've had discussions with the debtor regarding settlement of the entire proceeding, including the appeal. That has not yet been resolved. So nothing has really happened on the appeal, Your Hono, from the debtor taking any action. And I believe that might be Mr. Klein who was trying to speak earlier.

THE COURT: Okay. Mr. Klein, was that --

MR. KLEIN: I agree with everything -- I agree.

THE COURT: You agree what, Mr. Klein?

MR. KLEIN: This is Mr. Leslie Klein. I agree with what Ms. Bello said.

THE COURT: Okay. So basically you agree that this should be stayed pending the appeal, your state court appeal, but it really hasn't gone anywhere.

MR. KLEIN: That is correct. I would like to go to mediation. We went to two full days of mediation with an excellent mediator. His name is Ben Free (ph.). And I would like to go back to him to mediate this matter. I think it

7

could be settled.  I am convinced I could settle the case today.

THE COURT:  Well, Mr. Klein, that certainly is up to you and Ms. Bello, but I'm not involved in anything regarding the state court judgment.  So you would have to address that with Ms. Bello offline.

In terms of what to do regarding the status conference, I can continue it for six months.  And then maybe there might be --

MR. KLEIN:  Perfect.

THE COURT:  -- some type of resolution.  So I'm going to continue this to some time in June.

Ms. Bello, I don't know if you were on.  I will be retiring, so I will not be handling this case in June.  It will be reassigned sometime n the spring.  I'll ask you as plaintiff's counsel to get in touch with the new judge assigned to the case to get this on track on the judge's calendar sometime in June.

MS. BELLO:  Your Honor, if I may, would it be possible to -- is Your Honor retiring early in 2025?

THE COURT:  It will be sometime in the spring.  I'm not sure when the cases will be reassigned.

MS. BELLO:  Then maybe it makes more sense to continue it out for ninety days while Your Honor is still on the bench.

THE COURT:  The last date that I currently have for

8

hearing is February 26th, which has already gotten really full. And that's only eight weeks, not three months.  So --

MS. BELLO:  Okay.

THE COURT:  I think it's best to continue it to June. I you want to get it on earlier, you certainly can.  If you want me to say it should be on in April or May, I can say that. That's up to you.  It's just there's nothing to report right now.  And I don't think there's been much to report in this case.  So I didn't want you to have to come in and spend money just to say there's not much going on.

MS. BELLO:  Right.

THE COURT:  So I --

MS. BELLO:  All right.  That's fine, Your Honor.

THE COURT:  Okay.  So I'll continue it to June of 2025 for you to contact the new judge's chambers to get it on calendar.

MS. BELLO:  Yes, Your Honor.

THE COURT:  Okay.  Thank you.

MS. BELLO:  Thank you.

THE COURT:  All right.

MR. KLEIN:  Thank you, Your Honor.

THE COURT:  Thank you.

So then turning to the actual motion for summary judgment, I see Mr. Lucas turned his video on.

MR. DULBERG:  Your Honor, I just note that number 21

**Leslie Klein**

9

is the status conference on the other adversary that I thought -- Mr. Lucas and I thought it would make sense to deal with that first.

THE COURT:  Okay.  That's fine.

MR. DULBERG:  This is on Ken and Shoshana Klein as defendants.

THE COURT:  Yes.  Yes.  And I know there's a pending motion for summary judgment.  The motion and the opposition had come in.  I think the reply is due today if I'm --

MR. DULBERG:  That's right.  We're in the midst of getting it on file to do this afternoon.

THE COURT:  Okay.  Was there anything you'd like to add on that, Mr. Dulberg?

MR. DULBERG:  Not in particular.  Mr. Aron is on as well.  I didn't know if there was much to add at this point.  I think the report otherwise speaks for itself.

THE COURT:  Mr. Aron?

MR. ARON:  Good morning again, Your Honor.  Simon Aron for the defendants, Kenneth and Shoshana Klein.

I agree with Mr. Dulberg.  There isn't much to add.  I think the only outstanding question was one of mediation where we've been discussing the possibility of a mediation here. Defendants have come around to the position that it would make sense.  But I believe the trustee was still reserving its position on whether it wanted to proceed with mediation or he

10

wanted to proceed with mediation or not.

So other than that, I think we're on track.  And I believe the summary judgment hearings are set for February 5th, if I'm not mistaken.

THE COURT:  5th, That's correct.  That's correct.

MR. ARON:  So it might make it might make sense to continue the status conference to either that date or a date subsequent to allow that process to go through.

THE COURT:  Mr. Dulberg, what is your position about mediation?  Because it might be a good idea for the parties to consider that before the Court rules on the summary judgment.

MR. DULBERG:  Your Honor, we thought a couple of things.  1, we wanted to get these papers on.  And then 2, Mr. Aron filed a cross-motion for summary judgment.  So it just strikes me as being unlikely to be ripe for mediation at this point, given the sort of diametrical opposition or diametrically opposed positions I guess you would say that the parties are taking on the same set of facts, roughly speaking.

So our view was mediation works best when there is some -- when there's room.  And frankly, Your Honor, I just don't know that this is there yet.  We've been focused on getting these reply papers on.  The schedule is tight.  Two weeks from the opposition deadline, there were a slew of declarations and materials put in in addition to the cross-motion.  So to be honest, that's been taking up a lot of

11

the time since.  Maybe once the dust settles and Mr. Aron's client and my client at a time to sort of take in more of what each side has had an opportunity to say, we can discuss that. But up until now, we sort of have not been there yet.

THE COURT:  Understood.  I've reviewed the papers.  I know what came in.  I'm well aware of what's being argued in both sides' briefs.

MR. DULBERG:  Thank you, Your Honor.

THE COURT:  In terms of the cross-motion, it's basically the opposition but just brought it as an affirmative motion.

MR. DULBERG:  Something to that effect.

THE COURT:  Mr. Aron, you may disagree with the Court's characterization of that.  But it's basically the opposition as a motion.

MR. ARON:  Your Honor, I disagree somewhat.  I would --

THE COURT:  Okay.

MR. ARON:  There's no denying there's an extreme amount of overlap.  The parties have -- both have a set of facts.  And they argue those set of facts.  We do obviously both in the opposition.  More to the point, in the opposition that the trustee hasn't carried its burden and that the cross-motion asserts somewhat, again concurrently, based upon the same facts, that there actually are facts.  The facts

12

actually support judgment for the defendants rather.  So --

THE COURT:  Right.  Right.

MR. ARON:  Can't argue.

THE COURT:  Okay, yeah.  It's --

MR. ARON:  Can't --

THE COURT:  It's the same set of facts.  It's just which lens you look through it at or through --

MR. ARON:  Precisely.

THE COURT:  Okay.

MR. ARON:  Precisely.

THE COURT:  All right.  That's fine.  That's fine. All right.  So then --

MR. DULBERG:  Your Honor, if I just might add, we otherwise are fine with Mr. Aron's suggestion about having the status report -- excuse me, the status conference and moving it to the date of the next hearing.

THE COURT:  Yeah.  I think that's appropriate.  So we'll just continue that to February 5th at 9.

MR. DULBERG:  Very well.  Thank you.

THE COURT:  Okay.  Thank you.

So then that gets us to the motion for summary judgment.  I have read the pleadings.  I'm very familiar with the facts.  I'm very familiar with the law.  Please don't reiterate what's in the pleadings.  But if there's something you would like to highlight, I'm interested in hearing it.  I

**Leslie Klein**

13

don't know who for the trustee would be arguing Mr. Lucas or Mr. Dulberg.

MR. DULBERG:  I'm going to yield the floor to Mr. Lucas.  Thank you,  Your Honor.

THE COURT:  Okay.  All right.  So Mr. Lucas, the floor is yours.  You are the movant.  You have the burden.

MR. LUCAS:  Thank you, Your Honor.  Good morning. John Lucas, Pachulski Stang Ziehl & Jones, for the trustee/plaintiff in this summary judgment motion before the Court.

Your Honor, one thing that I would like to do is just a couple of housekeeping matters so that I can proceed to my argument.  I think it's important for me to look at adversary docket number 33, which is a declaration from myself which contains documents produced by the defendants.  There's five exhibits:  the premarital agreement and an amendment to the premarital agreement, Barbara's admissions, the other defendant's admissions, and the defendants' responses to interrogatories.  I'm asking for the Court to admit those documents into evidence.

THE COURT:  Any objection, Mr. Olson?

MR. OLSON:  No.

THE COURT:  They're admitted, Mr. Lucas.

MR. LUCAS:  Thank you, Your Honor.

Adversary docket number 34 is a request for judicial

14

notice.  There are Exhibits A through K.  A through E include the petition in various orders regarding the trustee's appointment.  That's A through E.  F are the schedules and statements.  G is an order disallowing the homestead exemption stopped by the debtor.  H is a duly recorded copy of the June Street property deed.  I is a duly recorded copy of the second amended Klein living trust.  Exhibits J and K are the complaint and answer in the adversary proceeding respectively.  We ask for those exhibits to be admitted into evidence.

THE COURT:  The Court admits those.  All of them are either filed in this adversary in the main bankruptcy case or were publicly filed documents.  And so the Court can take judicial notice of each of those documents, although the Court cannot take judicial notice of the truth of the contents of those documents.  I can go through the law.  I already had that written out in a ruling, but you short-circuited that for me, Mr. Lucas, so thank you.

MR. LUCAS:  Your Honor, I'm just trying to proceed in the way that if I have argument, I sort of want the facts to be in the record.

THE COURT:  I appreciate it.

MR. LUCAS:  And then the third point, which is similar, Your Honor, at adversary docket 36 is the trustee's statement of facts.  And then in response to the defendants' objection to that is adversary docket 48, where the trustee

15

replies to the defendants' statement.  And we can see in six points raised by the defendant that we agree with the change l But otherwise, we believe that the defendants' attempt to create a factual dispute fails.  We're doing nothing other than citing to the documents which are already in the record.  And we believe that our statement of facts, as modified by docket number 48, should be admitted into evidence.

THE COURT:  And Mr. Lucas, I go through the facts based upon the evidence in the record.  So I'm going to hold on that.  I will lay out the uncontroverted facts in my ruling.

MR. LUCAS:  Thank you, Your Honor.

Then one thing --

MR. OLSON:  Your Honor, if I could --

THE COURT:  Who's --

MR. OLSON:  -- there has been a motion to continue this hearing based on the fact that there has been a filing in the probate court in the LA Superior Court.

THE COURT:  Thank you for the reminder, Mr. Olson.  So there was a motion filed.  And there was no briefing on this, and the Court intentionally didn't set a briefing.  A motion was filed on 12/11, one week before today's hearing.  And today's hearing was scheduled more than two and a half months ago.  And the debtor filed a motion for continuance of the hearing on the motion for summary judgment.

So I'm just going to go through the facts, and then

16

I'll rule on that motion for continuance.

And Mr. Lucas, I did not give you a chance to respond, but I am addressing it now.

Mr. Olson, you could have set it for hearing.  You could have filed an application for order shortening time.  You did not do that.  You certainly knew about today's hearing date more than two and a half months ago.  You also could have filed something explaining why you were seeking to have it heard today, but you didn't.  It just was hanging out there.  It just so happened that I did see it on the docket.  So on March --

MR. OLSON:  Your Honor actually, it was filed by Attorney Crawford.  And I don't know why he's not on the --

THE COURT:  He is on the -- he is on the Zoom, Mr. Olson.  I can see him.

MR. OLSON:  Oh.

THE COURT:  So the complaint was filed by the trustee seeking to quiet title and avoid unrecorded interest in the June Street property on May 23rd.

On May 29th, a first amended complaint was filed against Klein, the second amended Klein living trust, the marital deduction trust, the survivor's trust, and Barbara Klein, seeking to quiet title and avoid unrecorded interest in the June Street property.

On July 12th, answers were filed -- an answer was filed by all defendants.

17

On July 29th, a joint status report was filed that docket 23, the trustee mentioned that he believed once discovery was complete, the complaint could be resolved via summary judgment.

On August 21st, a status conference, the Court set the following deadlines:  August 31st to propound discovery, September 30th to file dispositive motions.

On September 12th, debtor filed a motion for order joining necessary parties.  The Court denied the motion at an October 16th hearing.

On September 20th, ten days before the deadline, the trustee filed the motion for summary judgment.  Shortly thereafter, the Court set the briefing deadline and set the matter for hearing today.  The opposition was due October 15th, and the reply was due October 30th.  And debtor filed a timely opposition.  At no time did debtor mention any request to continue the hearing.

On 12/4, a status report was filed.  For the first time, debtor mentioned that he thought the proper venue was, quote, in the Superior Court in probate.  But he has said nothing more about that.

On 12/11, as I mentioned, one week before today's hearing -- and again, this hearing was scheduled more than two and a half months ago, debtor filed the motion for continuance of the hearing on the summary judgment.  Debtor claims that

18

issues regarding the motion for summary judgment all relate to the internal affairs of the Klein trust and the respective rights of the beneficiaries and cannot be decided by this Court.  Klein argued that all issues regarding the internal affairs of the Klein trust, including his role, the existence and effect of the subtrust, and the interests of the beneficiaries in the property are subject to the exclusive jurisdiction of the probate Court and must be decided by that court.  Klein indicated that he filed a petition in the LA Superior Court which has been set for hearing in February.  He claims that that court's decision will establish Conclusively the existence and effectiveness of the marital deduction trust and the credit trust.

Klein also on 12/11 filed a amended schedule AB which expressly he claims address allocation of the interest in the property.  The Court notes that Klein had previously filed his schedules in April, most recently April of 2023.  So we're now 21 months later when Klein files an amended schedule AB to supposedly address the interest in the property.

Klein claims that he retained new counsel, Mr. Crawford, to assist with litigating this case, and due to the complexity of the case, Crawford needs a continuance.

In support of the motion, Klein filed a declaration of Mr. Crawford who indicates he was retained on 12/2, two weeks ago.  And he filed a petition in the probate Court to confirm

19

the validity of the marital deduction trust and the credit trust and to affirm Mr. Stein's allocation of the property to the subtrust and beneficiaries.  I'm not sure if that was a typo or why -- I don't know who Mr. Stein is.

Attached to that declaration is a caption page, just one page, of a document filed in LA Superior Court 24STPB13777. And the caption of that document is, quote, verified petition for order conveying trust assets into the second amended marital deduction trust and credit trust dated 4/8/90 of Erica Klein.

In terms of jurisdiction, Klein asserts that the probate court, rather than this Court, has exclusive jurisdiction to determine some of the issues regarding the living trust, the marital deduction trust, and the credit trust.  To support his position, Klein sides Cal Probate Code 17000, which indicates that probate court has exclusive jurisdiction of proceedings regarding the internal affairs of trusts.  Probate code 17200 contains a list of what proceedings concerned the internal affairs of a trust.  After reviewing that list, as well as the cases cited by Klein, the Court finds that that argument is unavailing.

As an initial matter, the cover page of the petition that Klein filed on 12/9 does not support but rather undercuts his position, the title of that petition.  And only one page was provided in support of this motion for continuance was

20

seeking an order conveying trust assets into the second amended marital deduction trust and credit trust.  It does not in any way indicate that it is seeking a determination of the internal affairs of a trust.

And as noted by In re Rens, 633 B.R. 594 (B.A.P. 9th Cir. 2021), a case cited by Klein, this Court's jurisdiction is not governed by California law but rather by federal law.  Even if that were not the case, the applicable statutes, 17000 and 17200, read together reveal that exclusive jurisdiction is limited to disputes among parties to the trust itself such as a beneficiary and a trustee.  And that's directly out of the In re Rens case.  Here there is no dispute between the beneficiaries and any trustee of the trust.

In terms of continuance, the Court has broad discretion to determine whether a request for continuance should be granted.  That's U.S. v. Kloehn, 620 F.3D 1122 (9th Cir. 2010).  The Court only abuses its discretion if its denial of a continuance is arbitrary or unreasonable.

The Ninth Circuit uses four factors to determine whether to grant a request for a continuance:  1, whether the movement was diligent in preparing his defense or whether his request for a continuance appears to be a delay tactic; 2, whether granting a continuance would be useful; 3, whether granting a continuance will inconvenience the Court and opposing party; and 4, whether the movement will be prejudiced

21

by denial of a continuance.

After considering the factors that the Ninth Circuit has announced courts should consider, the Court finds that all factors weigh against continuing today's hearing.  The request for a continuance appears to be a delay tactic.  The MSJ was filed almost three months ago.  It was not until the eleventh hour that Klein decides this Court does not have jurisdiction over estate property, but instead it is in the exclusive jurisdiction of the probate court.

On 12/2, two weeks before today's hearing, Klein filed amended schedule A and B, which he argues, quote, expressly addresses allocation of interest in property.  The problem for Klein is his attempt to address allocation of interest in property now is unavailing.

As the Court noted when summarizing the timeline, Klein filed bankruptcy in 2023.  His most recent amendment before a week ago was April 10th, 2023.  Now, 21 months later, he has attempted to clarify the trust assets.  And it is a -- certainly a delay tactic in the Court's mind.

The second factor whether granting a continuance would be useful, the Court finds it would not be useful.  The parties have had ample opportunity to present their arguments, and the Court is ready to rule.  There is no justifiable reason to continue this matter.

The third factor, whether granting a continuance will

22

inconvenience the Court and opposing party.  Granting a continuance would significantly prejudice the Court and the trustee.  As noted, the motion was filed three months ago.  Klein had more than three and a half weeks to file an opposition, which he did.  The Court spent considerable time preparing for this hearing.  And the trustee has been litigating against Klein regarding this property for almost nine months.  Granting a continuance would inconvenience both the Court and the trustee.

And finally, whether movant will be prejudiced by denial of the continuance.  The Court finds that Klein has not advanced any argument that he would be prejudiced or otherwise negatively impacted by a denial of the continuance.  Even the evidence that the supposedly demonstrated that he was seeking a petition before the probate court does not support that argument.

Therefore, the Court denies the motion to continue the ruling on the MSJ.  And it will proceed with the hearing on the MSJ as well as its ruling.

So Mr. Lucas, I'll turn it back to you.

MR. LUCAS:  Yeah.  Thank you, Your Honor.

And again, not to belabor the point, my client, the trustee, did file an opposition to the motion to continue just for the record.  And, Your Honor, I would like to make some comments about the pending probate action after this summary

23

judgment motion has been considered by the Court.

THE COURT:  That's fine.  Mr. Lucas, I'm sorry.  I looked at this when it was filed within a day.  When did you -- when did you file an opposition?  Because I did not see that.

MR. LUCAS:  On Monday morning around 8:30 a.m.

THE COURT:  Okay.  And that's why, because I worked it up last week.

MR. LUCAS:  Yeah.

THE COURT:  But I appreciate that.  But I have ruled.  I assume you don't oppose that ruling that I made.

MR. LUCAS:  No, Your Honor.  We're wholly supportive of it.  And you said many of the same things that we said in our opposition.

THE COURT:  Okay.  Thank you.  And Mr. Lucas, why don't you proceed with your argument on the MSJ?  As I think you know, you've been before me, I do thoroughly read the papers and am very familiar with the facts and the law.  But if there's something you'd like to highlight, I'm interested in hearing that.

MR. LUCAS:  Your Honor, to that point, I will not -- Your Honor, our motion, which is filed at docket number 32, it goes through painstaking detail of citing not just the law but, of course, the facts that support the ruling that we believe we're entitled to as a matter of law.

And so for every factual statement that's in our

24

motion, there is a specific footnote reference to where that facts come from.  And all of those facts here have been admitted into evidence.

So, Your Honor, on a high level we believe that the quiet title claim is ripe.  The June Street property is described in the complaint.  And the complaint describes who the trustee currently believes is the owner of the property. We believe that the complaint describes the purported adversity.  And it seeks to determination about who owns the property.  And it includes a prayer for the determination of the title against the adverse claims.  And, Your Honor, we want to move forward in seeking relief on the quiet title.

And, Your Honor, on that point, on the quiet title, we believe that the June Street property is owned by the debtor and is his property of the debtor's bankruptcy estate because the June Street property is held by the second amended Klein living trust.  And whether it's held by the Klein living trust, the marital deduction trust, or the survivor's trust, Your Honor, Mr. Klein is the trustee and the beneficiary on an income and a principal basis of all the trust as it sets forth in the trust itself.  And he has unfettered discretion and control of what to do with those assets.

And so, as a self-settled trust, as this Court, I believe, already found in connection with the motion to join the necessary parties a couple of months ago, a self-settled

25

trust is statutorily precluded from shielding the June Street property or any other assets for that matter from creditors with claims against the debtor by virtue of any spendthrift clause.  And, Your Honor, We go through in detail.  We cite the case law in there.  But we believe that that is the sort of the essence of what is going on here and of the why we're entitled to the relief that we're seeking that this piece of property is property of the estate.  Whether it's held by the Klein living trust or the MDT for that matter or the survivor's trust, they all go to the debtor's control and beneficiary status under any of the hats or any of the roles that he holds under that trust.

THE COURT:  Thank you, Mr. Lucas.

Mr. Olson?

MR. LUCAS:  I have more to go on.  Do you want me to finish?

THE COURT:  Oh, I'm sorry.  I thought I didn't mean to cut you off.  You just took a pause.  And so I thought that was it, Mr. Lucas.  No, I --

MR. LUCAS:  Okay.  So, I mean, I'm trying to be brief, and that was just sort of the quiet title piece, Your Honor.  But in further support of the quiet title piece, Your Honor, and I won't go into excruciating detail on this either, but as we know, Your Honor, earlier in the case, the debtor sought an exemption with respect to the June Street property.  And the case law from the United States Supreme Court holds that no

26

property can be exempt and thereby immunized from claims unless it first falls within property of the estate.

And so Mr. Klein has a sort of a very, I think, curious, to say the least, sort of evolving story about the June Street property.  It's supposedly half in, half out.  And then when it got to the answer, it's all held by the MDT.  But, Your Honor, I don't understand.

And then at the same time, the debtor has said in his schedules, which were filed and signed under penalty of perjury, that in the ten years prior to the bankruptcy filing, that there had been no change or any transfer of his assets into a self-settled trust.

And so it's my understanding that the June Street property is held by the second amended trust or whatever subtrusts that are -- exist under there, Your Honor, they all point to Mr. Klein, his control, and his beneficial interest in the June Street property.  And as such, it should be considered and is property of the estate.

And, Your Honor, on to the next piece, the debtor's current spouse, Barbara -- And I'm using first names because everybody has the last name of Klein.  And so no disrespect is meant by that.  I'm just trying to keep people straight.  But Barbara purportedly has a life estate in the June Street property.  One small aside, the document that purportedly creates that life estate, it was granted directly, and it

27

appears personally from the debtor himself but not in his capacity as trustee, which I would think would be the party that would be authorized to provide life estates with respect to the June Street property. But nevertheless, Barbara admitted in her responsive discovery pleadings that the amended marital property agreement was never recorded, and as such, Your Honor, that interest can be avoided under 544 of the Bankruptcy Code.

And, Your Honor, with respect to the other defendants, whether it be the MDT or the survivor's trust, Your Honor, there is no documentation that has been recorded in the county of Los Angeles that we're able to determine that shows that the MDT, the survivor's trust, or any other entity for that matter or a person owns the June Street property. The June Street property deed itself reflects who the owner is. It's the only recorded document that outlines who owns the June Street property.

And out of an abundance of caution, we're seeking 544(a) relief with respect to all the other defendants because there has been nothing produced and there's nothing as far as that we've been able to uncover that shows that any interest, ownership interest with respect to the June Street property has been duly recorded as it must be. And to the extent that they have some sort of interest, which we still haven't been able to uncover, it too or those too should be avoided, Your Honor,

28

under 544(a)(3) of the Bankruptcy Code.

And, Your Honor, I will leave it at that.  And I'm happy to answer any questions that the Court has.  But we do rely on our motion, all of the exhibits and references that are in the record, the points that are cited in our motion, and also our objections and responses to the objections filed by the defendants.

THE COURT:  Thank you.

Mr. Olson.

MR. OLSON:  Yes.  There are a number of critical points overlooked in the argument.  And the first is that, while the evidence presented by the trustee indicates that the house is owned by the credit trust, for some reason, the credit trust is not joined as a defendant.  So at least at this point the it falls in a 12(b)(6) basis.

THE COURT:  Mr. Olson, I want you to continue, but please state your argument again.

Mr. Crawford, your tile was lighting up, and I was having problems hearing Mr. Olson.  So Mr. Crawford, if you could please mute yourself unless you were going to argue because I want the record to be clear.

Mr. Olson, if you could repeat again what you said about the credit trust.

MR. OLSON:  Yes.  The recorded second amended trust, which has as explicitly an asset of that trust, is recorded.

29

And it provides that Erica Klein, her community interest goes to the marital deduction trust or the credit trust, depending on circumstances.

For some reason, the trustee has not joined the credit trust, although he has presented evidence showing that the property is held by the -- or for the benefit of the credit trust, several years of ledgers to that effect.  Under the circumstances -- and this is a quiet title action.  And the statute defining a quiet title action specifically requires that all parties having any claims must be named as named as defendants.  For some reason, the trustee has not seen fit to join them as defendants.  And so at least at this point, the motion fails simply because under Rule 12(b)(6).

Now they could certainly amend and state whatever claims they have against the credit trust.  But in the absence of having named them at all without any explanation as well as the failure to name the children, which I realize we had a motion on which deals with whether I had sufficient authority, standing, whatever under Rule 19, there has been no similar action by the trustee.  And in the absence of the credit trust having been joined, the Court can not at this time grant a motion for summary judgment against other parties.  There is an --

THE COURT:  So, Mr. Olson, I'm looking at the opposition that you filed on October 15th.  And I don't see any

30

argument regarding that the credit trust had to be joined.  You say on page 18, heading 4, the complaint omits to join necessary parties, the children and the beneficiaries of the marital deduction trust and credit trust.  But you didn't say the trust themselves were not joined.  You already litigated a joinder motion, which I denied.  But this is a new argument that you're making because that's not what's here.

MR. OLSON:  Your Honor, at the time when I filed that opposition, I did not realize that they had failed to name the credit trust.  I specifically referred to that problem in the joint report that we filed.  And failure to state -- in state nomenclature, failure to state a cause of action can be raised and should be dealt with at any time it appears.

THE COURT:  Someone is on the -- excuse me, Mr. Olson.

MR. OLSON:  Yes.

THE COURT:  Someone is on the phone.  And you need to mute yourself because you're interfering with the record.  Unless you're appearing in this case, please mute yourself.

Mr. Lucas and Mr. Crawford, I see your hands are raised.  I'll give Mr. Olson a chance to finish his argument.  Then I'll go in the order that I just mentioned.

Mr. Olson, please continue.

MR. OLSON:  Yes.  I also wanted to call to the attention of the Court -- and this does appear in my original opposition, at some points there was a typo in the section

31

number, but I think this situation falls under Probate Code 15304(b) which specifically indicates in an exception where the amount as to whether or not there is -- this is a self-settled trust, this -- insofar as the marital deduction trust and the credit trust are concerned, this is specifically a distribution of property from Erica, the deceased spouse, and is exempt from being swept in as property of a self-settled trust, the notion that this is -- this has to -- goes to some trusts, if you will, is Erica's property, not Leslie's property.  And anything resting on the idea that this is a self-settled trust by Leslie is simply specifically incorrect under California law, subsection B.  The materials that the trustee relies on would fall under subsection A.  But this is specifically exempted.

THE COURT:  Thank you, Mr. Olson.  I'll go to Mr. Crawford first actually because, Mr. Lucas, you are the movant. So you get the last word.

Mr. Crawford?  And Mr. Olson has already argued.  So I'm not going to allow you to reargue the same points.  If there's one or two points that you want to highlight, that's fine.

MR. CRAWFORD:  Thank you, Your Honor.  I heard your ruling on the motion to continue, and I appreciate that.

I want to say that for the record, that I think that despite the late hour of bringing this up, the question of the exclusive jurisdiction of the probate court, I think that with

32

respect to the allocation of properties between the trusts, that's a matter for the -- relating to the internal the operation of the trust.  And that's an issue which should be within the exclusive jurisdiction of the probate court.

The other thing is that with respect to Mr. Klein's unfettered access to the income and principal, despite the spendthrift provision argument that plaintiffs have made, this also relates to the internal affairs of the trust.  This relates to the power and authorities and benefits between Mr. Klein and the other beneficiaries.  This is also a matter that should be committed to the exclusive jurisdiction of the probate court.

And again, this is the state of the law.  And I appreciate that this was brought up at a late hour, but it was brought up.  And I believe that these -- that it was also raised in the opposition.  This should preclude a summary judgment at this point.  These questions create --

THE COURT:  Hold on.  Mr. Crawford, Mr. Crawford, where was the exclusive jurisdiction of the probate Court raised in the opposition?  Please cite the page and the line for me.

MR. CRAWFORD:  I'll withdraw that.  I'm not familiar enough with it.  I thought it had been raised in there.  And if it wasn't, it wasn't.  I apologize.

But in any event, even if it's not raised, it is a --

33

it is a legal point which should influence and direct this Court's ruling, I believe.  It is the state of the law or it isn't, but I believe it is.  And I believe that these are -- these raise disputed issues of material fact which should preclude summary judgment, the obvious ones being where the allocation of the June Street property goes.

There is one clear issue which is a disputed issue of fact based on the evidence before the Court now, which is whether the 2013 ledgers and the ledgers following that would show the allocation of the property to the subtrusts are effective or not.  This is actually addressed in the reply papers by plaintiffs.  They say the an issue is the credibility.  I believe they used the word credibility of the ledgers.  Well, if you're raising the issue of credibility of evidence, that creates -- that shows and concedes a disputed issue of fact.

THE COURT:  Thank you, Mr. Crawford.  So in terms of the motion for continuance, that's been denied.  I understand you disagree with the Court's ruling.  That's been denied.

In terms of this motion, Mr. Olsen has already argued. Again, I gave you leeway to argue one or two points.  I think we're getting past that now.  Now there's two attorneys arguing for the same side.  And it's definitely time to move on, Mr. Crawford.

As I mentioned, I have considered all of the facts,

34

all of the evidence, all of the arguments.  If there's anything further, briefly I'll allow you to address the Court.  But then I'm going to go back to Mr. Lucas.

MR. CRAWFORD:  The last thing I say is going to be that that what I had mentioned about them raising the credibility of the evidence is in the reply brief at page 7, starting at line 14.  They say that this is not credible.  If there's an issue of credibility, that raises a disputed issue of material fact.  And that should preclude summary judgment. Thank you, Your Honor.

THE COURT:  Thank you, Mr. Crawford.

Mr. Lucas?

MR. LUCAS:  Thank you, Your Honor.  I'm going to go just a little bit of the opposite order that I intended because I want to go off of just exactly what Mr. Crawford was talking about of a disputed issue.

Your Honor, and I quote  TW Electric Service, Inc.  v. Pacific Electric contractors at 809 F.2d 626 at 630 (9th Cir. 1987).  Disputes over irrelevant or unnecessary facts will not preclude grant of summary judgment; rather, following of a properly submitted summary judgment motion, the burden shifts to the opposing party to set forth specific facts showing that there is a genuine issue for trial.  It's our view, Your Honor, there are no facts that have been, Your Honor.

And so the opposing party cannot simply assert the

35

mere existence of some alleged factual dispute between the parties, nor can it rest upon the mere allegations or denials and pleadings.  And that's all that's happening here, Your Honor.  Thus, That's for an issue to be genuine, there must be real evidence such that a reasonable jury could reach a verdict in favor of the nonmoving party.  None of that's here, Your Honor in our view.

And so to try to sort of say that we're creating the credibility dispute, Your Honor, we're just pointing out that there is no evidence.  And this action that is apparently pending in LA Superior Court probate Division isn't a fact-finding.  It is a reformation action that is in violation of the automatic stay, which I will talk about later.

And Your Honor, as for the credit trust and whether or not the credit trust should or should not be a defendant in this action, one thing that's really -- just sort of just sort of jumps out at the plaintiff, the trustee, Your Honor, is if you look at docket number 41, I believe, which is the defendants' answer -- in the defendant's answer -- and remember, Your Honor, when the debtor filed his schedules and statements in the spring of 2023, then the debtor said that half June street property was owned by him personally, and the other half was owned by the marital deduction trust or the MDT.

But now the answer's filed, it doesn't say that the creditor trust owns it.  It says that the June Street property

36

is wholly owned by the MDT.  But there's no description or there are no documents.  It's just a conclusion.  It says this is how things are now.  There's no description or documents explaining about how it got there.  There might be some sort of statement that says non-estate assets were used to purchase the debtor's interest, and this is why the MDT wholly owns the property now.  We've never seen any of these documents.  These are just assertions, denials in attempts to try to create a factual dispute.

And Your Honor, as for -- Mr. Olson also said that after Erica died -- Erica died in December of 2012.  And in April of 2013, the second living -- the second amended Klein living trust, along with Erica's death certificate, was recorded.  The trust was recorded in the same fashion that it existed before her death.  And it exists today.  And so there was no event or transfer that was automatic by virtue of Erica's unfortunate death.

Instead, the trust documents in article 3, which is titled trust allocation after first spouse's death, outlines the rules and procedures the trustee, who is the debtor, may use to allocate and distribute property after Erica's death.  For example, article 3A of the Klein living trust provides the marital deduction trust shall consist of the minimum amount that will entirely eliminate or reduce as far as possible the federal estate tax after allowance of other deductions.

37

And so, Your Honor, you could find that reference at the request for judicial notice, Exhibit I, Article 3, pages 4 and 5.

THE COURT:  And I'm looking at that document, Mr. Lucas.  I have it in front of me.

MR. LUCAS:  Okay.  And then it also goes on to say that all trust may be funded in cash in kind, party in each.

And, Your Honor, the above-cited provisions of the Klein living trust do not provide that specific property would be transferred to the MDT or to the survivor's trust or the creditor's trust for that matter.  Instead, the distribution or allocation of property to any trust is dependent upon the minimum amount, which is a legal way to avoid taxation.  Nothing controversial about that, but somebody has to do something.  It isn't automatic.  And nothing was done.  There was no determination made by the trustee, who was the debtor.  Or the Klein -- and the Klein living trust didn't do anything, and everything just sort of sits where it is.

And remember, Your Honor, if even if all of the property was transferred to the marital deduction trust, Mr. Klein is -- I mean, the debtor, Your Honor, is the trustee of that trust who has unfettered discretion to use, sell, destroy.  He can do anything he wants with it.  And, Your Honor, he's also the beneficiary.  And so it doesn't get them anywhere, in our view, even if it is in the MDT.

38

And so, Your Honor, I wanted to respond to those couple of points. And I will cede the podium now unless I have further questions after further argument.

THE COURT: Thank you. All right. I'm ready to rule.

The motion was amply briefed by both sides. So before the Court is a motion for summary judgment filed by the trustee. The Court has considered all of the evidence submitted by the trustee as well as the opposition submitted by the debtor and the evidence submitted in support of the opposition, as well as the reply and the evidence submitted in support thereof.

So the following facts are uncontroverted: The debtor filed a bankruptcy petition on February 22nd, 2023. It was a Chapter 11 case. On May '23, the U.S. Trustee's Office filed a notice of appointment of Chapter 11 trustee. And on that same day, the trustee accepted his appointment as Chapter 11 trustee.

On March 8th, 2023, the debtor filed schedules and statement of financial affairs. On Schedule AB, debtor listed the property at 322 North June Street, the property at issue here as fifty percent owned by debtor and fifty percent owned by the marital deduction trust of the debtor's deceased spouse, Erica Klein. According to the SOFA, in response to question 19, which asks within ten years before you filed for bankruptcy, did you transfer any property to a self-settled

39

trust or a similar device of which you are a beneficiary, debtor responded that he had not.

Schedule C property claimed as exempt indicated that the property was held in the marital deduction trust and that Barbara Klein, the debtor's current spouse, had a life estate interest in the property.

The debtor, in his individual capacity, and Barbara entered into a premarital agreement dated November 25th, 2013. The debtor, in his individual capacity, and Barbara entered into a first amendment to the premarital agreement dated November 25th, 2015 in which the debtor agreed that Barbara, quote, may also live at the house at North June Street, where the parties lived during her lifetime.

Schedule AB reflected that debtor listed a 678,391 exemption in the property under California Code of Civil Procedure 704.703.  After litigation, however, the Court limited the debtor's exemption in the property to 189,050.

The real property deed for the property was recorded on December 14th, 1977 and reflects that it was owned by Leslie Klein and Erica Klein as trustees under the Klein living trust of 1975.

On April 18th, 1990, the debtor and his former spouse, Erica, created the second amended Klein living trust, which was recorded on April 13th, 2013.  The living trust includes the property.  Under the living trust, the debtor and Erica were

40

co-settlor, co-trustees, and co-beneficiaries of income and principal during their lifetime.

On December 12th, 2013, Erica died.  Under the living trust, upon Erica's death, the debtor became the surviving settlor and assumed the role of trustee.  Under the living trust, the trustee here, Klein, served as trustee for all trusts under this instrument.  Under the living trust, the debtor serves as trustee for the marital deduction trust.

Under the living trust, the marital deduction trust provides that the debtor is both the income and beneficiary -- income beneficiary and principal beneficiary.  Under the living trust, the marital deduction trust provides that trustee may use both the income from the marital deduction trust and principal of that trust for the benefit of the debtor.  Under the living trust, the marital deduction trust provides that the trustee, here the debtor, shall pay to or -- for the income beneficiary all net income of the trust in convenient installments at least annually.  Under the living trust, the marital deduction trust provides that the surviving spouse, here the debtor, shall pay to or for the principal beneficiary as much of the principal as is necessary for the principal beneficiary's health, education, or support to maintain the principal beneficiary's accustomed manner of living.

Under the living trust, the debtor serves as the trustee for the survivor's trust.  Under the living trust, the

**Leslie Klein**

41

survivor's trust provides that the debtor is both the income beneficiary and the principal beneficiary.  Under the living trust, the survivor's trust provides the trustee may use both the income from the survivor's trust and the principal of the survivor's trust for the benefit of the debtor.  Under the living trust, the survivor's trust provides that the trustee shall pay to or for the income beneficiary as much of the net income as the trustee considers necessary for the income beneficiary's health, education, support, comfort, welfare, or happiness to maintain, at a minimum the income beneficiaries accustomed manner of living.  Under the living trust, the survivor's trust provides that the trustee shall pay to or for the principal beneficiary as much of the principal as is necessary for the principal beneficiary's health, education, support, comfort, welfare, or happiness to maintain, at a minimum the principal beneficiary's accustomed manner of living.

Under the living trust, the marital deduction trust, survivor's trust, and any other trust created under the living trust, the trustee had the power to A, retain or abandon any property held by the trust, including the property; B manage, control, grant, auction, sell for cash or deferred payments with or without security, convey, exchange, partition, divide, improve, and repair trust property, including the trust property.  The living trust contains a spendthrift clause.

42

On May 29th, 2024, the plaintiff filed an amended complaint which is the operative pleading in this case.  As noted previously, it lists the second amended Klein living trust, marital deduction trust, survivor's trust, and Barbara Klein as defendants.

On July 12th, each of the defendants filed a consolidated answer.  In the answer, the defendants represent that the survivor's trust transferred its fifty percent interest in the property to the marital deduction trust.

Argument.  Sharp argues that the uncontroverted facts demonstrate that the elements of quiet title are matte.  He contends that the living trust and the associated underlying trusts, survivor's trust, marital deduction trust, and credit trust, were self-settled by Klein because Klein was the settlor of the living trust, the trustee and beneficiary of the subtrust, and has complete control over the living trust and subtrusts.

Sharp argues that generally, California law recognizes the validity of spendthrift trusts.  When a trust beneficiary, however, exercise excessive control over a trust, the trust assets are not protected by an anti-alienation provision in a spendthrift clause.  In situations where the settlor acts as the beneficiary, California law voids any spendthrift clause.  The trustee cites In re Salkin and Cutter v. Seror for this proposition.

43

Sharp contends that the facts here are analogous to those cases. And he asserts that because the Klein living trust and the subtrusts were all self-settled, any spendthrift clause doesn't protect the property, meaning that the property is property of the estate, regardless of which trust holds the property.

Sharp contends that Klein, when he included the property in his exemptions, admitted that the property is property of his estate. Sharp cites a Supreme Court case, Owen v. Owen, to support his position that a debtor cannot exempt property unless it is property of the estate.

Sharp highlights that Klein has not produced any evidence that the property was transferred from the living trust to any other trust or party, nor has he submitted any writing reflecting that the property was granted to another entity, as required by Cal Civil Code 109.2, and he should be judicially estopped from arguing the property is not property of the estate.

Sharp acknowledges that Klein claims Barbara holds an interest in the property which Klein asserts is not subject to avoidance. Sharp argues, however, that under 544(a)(3), he is a bona fide purchaser for value, holding a senior and perfected security interest. And he may avoid any junior unrecorded interest Barbara claims. Sharp contends that Klein has failed to produce any written recorded document demonstrating that

44

Barbara or any subtrust hold an interest in the property. Sharp contends that he has strong armed powers under 544(a)(3) which allow him to avoid any transfers that would be junior to a bona fide purchaser.

According to Sharp, under California law, a BFP without actual or constructive notice may take free of a prior equitable interest or constructive interest in the property. Sharp argues that as of the petition date, any interest Barbara may have obtained through a premarital agreement was not recorded, and he can avoid any such interest based on his strong arm powers because marital agreements involving real property are unenforceable against a bankruptcy estate unless they are perfected by recordation in accordance with applicable law.

Sharp contends that because the premarital agreement between Barbara and Klein was not recorded, he would not have had constructive notice of Barbara's alleged interest in the property.

Sharp argues that 544(a)(3) authorizes him to avoid the trust interests in the property.  He contends there are no documents recorded or produced that the subtrusts were granted any interest in the property.  And Klein admitted in the SOFA that during the ten years before filing bankruptcy, he had not transferred any property to a self-settled trust.

Therefore, Sharp argues that he holds a senior and

45

perfected interest in the property regarding any subtrust.  He contends that even if, however, there were unrecorded documents purporting to convey the property, it would not make a difference because examining the recorded real estate records regarding the property on the petition date would not have provided the necessary constructive notice to a BFP.  He asserts that Klein's estate owns the entire property.  To the extent that Barbara, the marital deduction trust, the survivor trust, or any other entity holds an interest in the property, he alleges that 550 permits Sharp to recover the property.

Sharp concludes by stating that Klein's defenses are irrelevant or invalid because, 1, there's no evidence demonstrating that any entity other than the living trust holds an interest in the property; and 2, Klein admitted in the SOFA that he had not transferred the property to any self-settled trust.  Even if, however, a trust holds an interest in the property, it is self-settled.  And Sharp, as a BFE, is entitled to avoid any claim to interest.

Klein responds that the MDT -- whoever is on the phone, please mute yourself.  I'll ask the court recorder to mute you.

Klein responds that the MDT and credit trust are not self-settled; rather, he contends, they were funded entirely by Erica from her share of community property.  He asserts that Erica provided him with a life estate in the property, and it

46

was never intended to be an income-producing property. According to Klein, the MDT acquired the "second half" of the property from the survivor's trust in exchange for other proceeds from Erica. Klein cites Probate Code 15305 to support his position that when a settlor of a trust is also a beneficiary, a creditor can only reach the maximum amount, not exceeding the amount of the settlers proportionate contribution.

Klein contends that because the MDT and credit trust were entirely funded by Erica, the amount attributable to him is zero. He distinguishes Cutter and Salkin and argues that the MDT and credit trust were not self-settled because they were established by the living trust provisions and were funded by Erica.

Klein asserts that Sharp's belief that the property was not properly conveyed to the living trust through a written deed is mistaken. He contends that a State of Heggstad, a 1993 California Appellate Court case, establishes that a proper declaration is sufficient to create a trust in real property and a written deed is unnecessary. He claims that judicial estoppel is inapplicable. It doesn't address the property because it belongs to the MDT and credit trust.

Klein contends that Sharp has failed to show any right to avoid the MDT, credit trust, or Barbara's interest in the property under 544(a)(3). According to Klein, Sharp has not

47

demonstrated why the ledger is associated with the living trust, which were provided in response to interrogatories, do not establish that the property belongs to the MDT and/or credit trust or why a transaction inside a family trust must be recorded.

Klein argues that Sharp cannot set aside Barbara's interest in the property under 544.  He relies in In re Zubenko, a 2015 case contending that constructive or inquiry notice in accordance with Civil Code 19 can defeat a trustee's BFP claim and open a notorious possession of real property is sufficient to put a purchaser on notice.

Klein contends that Barbara's presence at the property would put anyone on notice of her rights, and a potential buyer would not be a BFP.

Finally, Klein argues that the necessary parties, the beneficiaries, were not joined in this manner.

In reply, Schaap argues that the undisputed facts show that as of the petition date, the property is owned by the living trust, and for the reasons stated in the motion, summary judgment should be granted.  He contends that the living trust and any subtrusts are self-settled and wholly controlled by Klein, which the Court found when ruling on the joinder motion.

Sharpe argues that the living trust provisions do not predetermine allocation or distribution of trust property among the subtrusts.  Rather, he contends that the living trust

48

provisions outline the procedures Klein may use to allocate and distribute assets after Erica died.  But the living trust did not mandate how Klein was to distribute or allocate any assets, including the property.

Sharp asserts there's no evidence to show that any trust property was transferred to the trust.  According to Sharp, the subtrust did not hold any property.  They were not properly formed because the existence of a trust res is necessary for formation of a trust res.

Sharp contends that despite Klein's assertions, that the ledgers show that the property was transferred to the MDT and/or credit trust.  There is no right in complying with Cal Civil Code 1092, and the ledgers were never recorded.

Sharp highlights that the recording of the living trust is likewise insufficient because the living trust did not effectuate any transfer or ownership of the property.

Sharp reiterates that Barbara's interest in the property is not recorded, and her presence at the property is insufficient for a constructive notice.

Sharp questions the efficacy of the amendment to the premarital agreement because Klein, in his individual capacity, didn't have the power or authority to convey any interest in the property.

Finally, sharp notes that Klein's arguments regarding joinder have already been addressed and rejected by the Court.

49

Legal standard:  FRBP 7056 provides that FRCP 56 applies to motions for summary judgment in adversary proceedings.  The Court shall grant summary judgment if the movant shows there is no genuine dispute of any material fact, and the movement is entitled to judgment as a matter of law.

A fact is material for purposes of Rule 56 if it might affect the outcome of the suit under governing law.  The dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

When the movant has carried the burden, the opponent must do more than simply show that there is some metaphysical doubt as to the material facts.  Where the record taken as a whole could not lead to a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge ruling on an MSJ.

When opposing parties tell two different stories, one of which is blatantly contradicted by the record so that no reasonable jury could believe it, a court should not adopt the version of the facts for purposes of ruling on a motion for summary judgment.

The party seeking summary judgment always bears the initial responsibility of informing the Court of the basis for the motion and identifying those portions of the pleadings,

50

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

If the nonmoving party carries its burden, summary judgment should not be granted -- excuse me.  If the moving party carries its burden, summary judgment should not be granted if the nonmoving party can point to sufficient evidence supporting the claimed factual dispute such that a fact-finder is needed to resolve the parties' differing versions of the truth at trial.

The nonmoving party may not merely question the credibility of the movant to foreclose summary judgment.  Rather, the nonmoving party must go beyond the pleadings and, by its own evidence, set forth specific facts showing there is a genuine issue for trial.

When ruling on a summary judgment motion, the Court must view the underlying facts in the light most favorable to the party opposing the motion.

Analysis.  The Court has already addressed the request for judicial notice.  Now turning to the substance of the motion.

There's a fundamental issue that the Court must next address:  who owns the property.  In Klein's schedule AB, he listed the property, indicated it was valued at 4.9 million.  The value of his portion was 2.45.  And fifty percent is held

51

by the debtor and fifty percent held by his, Erica's irrevocable marital deduction trust.  He expanded on that information by stating debtor's principal residence paid in full.  The property is held in the marital deduction trust.  The debtor's current spouse, Barbara Klein, has a life estate in the residence.

On schedule C, Klein claimed a 678,391 exemption in the property.  In Klein's statement of financial affairs, he responded no to question 19 which states within ten years before you filed for bankruptcy, did you transfer any property to a self-settled trust or similar device of which you are a beneficiary?  Klein signed all of his schedules and SOFA under penalty of perjury.

In the answer, Klein indicated that the marital deduction trust owned 100 percent of the property, and neither the survivor trust nor bankruptcy estate held any interest in the property except for Klein's life estate.

In the opposition, Klein claims that based on the ledger dated 1 -- excuse me, 9/10/13 titled Klein marital deduction trust dated 4/8/90 as of 9/10/13, the MDT wholly owned the property.

In the opposition, Klein also claims that the 2014 to 2023 ledgers, which are titled marital deduction trust dated 4/8/90 as of 12/31/14 to 12/31/23, demonstrate that the credit trust wholly owns the property.

52

Sharp contends that Klein is judicially estopped from arguing that the property is not property of the estate based on his claiming a homestead exemption in the property.  Klein responds that Sharp didn't address that the property belongs to the MDT and/or credit trust.  In the reply, Sharp contends that despite Klein's various assertions regarding ownership of the property, the undisputed facts show that as of the petition date, the property was owned by the living trust, and Klein was the trustee and beneficiary of the living trust and the subtrust.

Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by asserting one position and then later seeking an advantage by taking a clearly inconsistent position.  The purpose of the doctrine is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment.

Courts consider three factors when determining if judicial estoppel applies; whether 1, the party's later position is clearly inconsistent with its earlier position; 2, whether the party succeeded in persuading the court to accept its earlier position; and 3, whether the party seeking to assert an inconsistent position would derive an unfair advantage if not estopped.  The Ninth Circuit has limited application of judicial estoppel to cases where the court

53

relied on or accepted the party's previous inconsistent position.

A few months after Klein filed bankruptcy, Erica and Joseph Vago objected to Klein's claimed homestead exemption of 678,391.  Klein opposed the objection and filed a declaration in support of the opposition in which he acknowledged claiming a 679,391 homestead exemption in the property.  He stated that the property was his primary residence, indicated that given his financial situation, his homestead exemption is necessary for support of his wife and him.  And he indicated he wasn't seeking to hold on to his previous lifestyle, but he was merely trying to protect his homestead exemption.  He signed that declaration under penalty of perjury.

After considering the parties' pleadings and arguments during a hearing on the Vago objection, when all parties were afforded an opportunity to be heard, the Court entered an order allowing Klein a 189,050-dollar exemption in the property. According to the Supreme Court, a person cannot claim an exemption in property unless that property is part of the bankruptcy estate of that person.

Here, Klein's current position is clearly inconsistent with his earlier position.  He now claims either the MDT or credit trust owns 100 percent of the property, whereas when he filed his schedules and opposed the Vagos' objection, he claimed that fifty percent of the property was part of his

54

bankruptcy estate.  Klein succeeded in persuading the Court to accept his earlier position, and the Court allowed Klein a 189,050-dollar homestead exemption in the property.

Finally, Klein would obtain an unfair advantage if he were not estopped and if the Court were to credit his current position that the MDT and/or credit trust owns 100 percent of the property Klein previously represented to this Court and the Court relied on his representation that he owned percent of the property when it allowed his homestead exemption.

Therefore, the Court finds that Klein is judicially estopped from claiming that the MDT and/or credit trust owns 100 percent of the property.  And as Klein represented in his schedules, he at least owns fifty percent of the property via his interest in the Klein living trust.

Looking at the remaining fifty percent interest, sharp argues the property is wholly owned by the living trust, and there are no documents evidencing that the property is owned by any other party or trust.  Sharp contends that even if the subtrust own part of all of the property, as Klein asserts, because the spendthrift provision in the living trust is invalid, the entire property is property of the estate.

Klein responds that the living trust provides that upon Erica's death, her community property interest would go to either the MDT or credit trust.  Klein contends that the ledgers demonstrate that the MDT and/or creditor trust to own

55

the property.  Klein asserts that Sharp did not provide any authority that the transfer of the property to the trust had to be via a recorded deed.

In reply, Sharp reiterates there's no evidence that the property was ever transferred from the living trust, and the living trust did not predetermine allocation and distribution of trust assets.

Sharp argues that the ledgers are unrecorded, are insufficient to transfer real property, and no document exists reflecting that the property was granted to any of the subtrusts as required by Cal Civil Code 1090.

The evidence regarding the living trust and subtrusts are as follows:  On 4/8/90, Klein and his then wife, Erica, as settlors, executed the living trust.  Klein and Erica were We're co-trustees and income and principal beneficiaries of the living trust.  Upon the death of Klein or Erica, the living trust provided for the creation of three subtrusts to be funded as follows, a surviving spouse trust, which would consist of the surviving spouse's interest in community property.  From the remainder of the deceased spouse's interest in community trust estate after payment of the spouse's taxes and expenses, a MDT was to be created which would consist of the minimum amount that would eliminate or reduce the federal estate tax, and a credit trust which would consist of the balance of the deceased spouse's community property trust estate.  The living

56

trust provided that all trusts "may be funded in cash or kind."

Regarding the MDT, the living trust provided that the income and principal beneficiary would be the surviving spouse. The trustee would pay, and here the trustee is Klein, to the surviving spouse, who is also Klein, all net income of the MDT. If the trustee considers the income insufficient, the trustee here Klein, would pay as much of the principal as is necessary for the surviving spouse's health, education, or support to maintain the surviving spouse's accustomed manner of living. And again the surviving spouse is Klein.

And the surviving spouse's death, the trustee shall distribute any accrued interest to the surviving spouse's estate and any remaining principal, according to the credit trust distribution provisions.

Regarding the credit trust, the living trust provides that the income and principal beneficiary would be the surviving spouse, here Klein.  After the surviving spouse passes, Klein and Erica's children, Kenneth, Sherry, Richard, and Jason, are the beneficiaries.  The trustee, that's Klein, shall pay to the surviving spouse the income of the credit trust.  If the trustee considers the income insufficient, the trustee, here Klein, shall pay as much of the principal as is necessary for the surviving spouse's health, education, and support to maintain the surviving spouses accustomed manner of living.  Upon the death of the surviving spouse, the remainder

57

of the credit trust was to be distributed to the children of the settlors.  And those are Klein's children and Erica's children.

Klein misconstrues the trustee's stance regarding the property.  The trustee's argument is not whether or when the property was transferred to the living trust.  The trustee acknowledges that the property was transferred to Klein and Erica as trustees of the 1975 Klein living trust in 1977.  Rather, the trustee contends there's no evidence demonstrating if or when the property was transferred from the Klein living trust to the MDT or if it were transferred to any other trust or party  By the living trust express terms, the survivor's trust and the MDT would only be funded after one of the settlors of the living trust, Klein or Erica, died.  It's undisputed that Erica died in 2012.  And it was only after that date that the survivor's trust and/or marital deduction trust could have been established and/or funded.

Klein argues that the Estate of Heggstad supports his position that a written deed of trust is not required to transfer a property into a trust.  The Court finds that Klein's reliance on this case is unpersuasive.

In that case, Heggstad executed a will naming his son, Glenn, as executor and a revocable living trust, naming Halvard as trustee and Glenn as a successor of trustee.  The Heggstad family trust identified all the trust property in an attached

58

schedule, which included a property located at 100 Independence Drive in Menlo Park. That property remained in Halvard's name, and there was no grantee conveying the property to the trust. All other property listed in the family trust schedule have been formally transferred via deeds to the family trust.

One month after executing the estate documents, Halvard married Nancy Rhodes. Nancy was not provided for in the will or the family trust. The party agreed she was entitled to one-third of Halvard's estate under California la, but nothing under the trust.

After Halvard died, Glenn was appointed as executor of Halvard's estate and became successor trustee of the family trust. Shortly thereafter, the family trust documents were recorded. During probate, Glenn petitioned the court for instructions regarding the disposition of the property, claiming the language in the family trust which stated Halvard Heggstad declares that he has set aside and transferred to Halvard Heggstad in trust as trustee the property described in schedule A attached to this instrument was sufficient to place the property into the trust. Nancy objected and argued that there was not a properly executed document. The probate court determined that the language in the family trust was sufficient to create a trust in the subject property.

Nancy appealed, challenging the probate court's ruling that an executed grant deed was not required to transfer the

59

property to the trust.  The Court of Appeals held that the declaration was sufficient to transfer the property to the family trust.  According to the Appellate Court, a written declaration was sufficient to create a revocable living trust. The Appellate Court noted that when trust property is real estate, the statute of frauds requires that a declaration of trust be in writing and signed by the trustee.  Because Halvard's declaration satisfied these requirements and there was no requirement that there be a separate writing conveying the property, the court decided that a valid trust was created for the property.

The Court finds that Heggstad is inapplicable here. Sharp is not questioning the creation of the living trust or that the living trust holds the property.  Instead, Sharp's position is that there is no evidence that demonstrates the property was transferred from the living trust to any other trust or to any other person, in contrast to the declaration of Heggstad which was attached to the trust documents specifically mentioned -- to the trust documents, and it was specifically mentioned the property and was recorded.  The ledgers are unrecorded, are separate from the living trust.  They're not attached to that document, nor are they mentioned in it.  And they do not contain any evidence of a transfer.

According to Cal Civil Code 1092, a grant of an estate and real property may be made in substance as follows:  AB

60

grant to CD all that real property situated in whatever county and witness my hand.  Neither the 2013 ledger nor the 2014-2023 ledgers contain any language that could be construed as complying with this provision of the Civil Code.

Further, as noted, when ruling on the joinder motion, there is no evidence before the Court that upon Erica's passing, the MDT survivor trust or credit trust were actually created or funded with any assets.  The California Probate Code establishes that trust property is required to create a trust.  Absent trust res, there is no trust.

Additionally, if any such trusts had been created, there would have had to have been TINs issued by the IRS.  And if the subtrust had been created and funded, they would have had to have filed tax returns.  But there's no evidence of that in the record.  Because there is no evidence that the MDT and/or credit trust were created or funded with the property, the Court finds that fifty percent of the property, which was Erica's community property at the time she died, is held by the living trust and is part of Klein's bankruptcy estate.

Even if the property had been transferred to either the MDT or credit trust -- and as noted, the Court finds there is no evidence that that occurred -- the next issue that the Court must address is whether the spendthrift provision in the living trust is valid and would prevent the trustee from reaching the trust corpus.

61

When a bankruptcy case is filed, an estate is created and includes all legal or equitable interests of the debtor and property.  And interest of the debtor and property becomes property of the estate.  Notwithstanding any provision in an agreement, transfer instrument, or applicable non-bankruptcy law that restricts conditions -- that restricts or conditions transfer of such interests by the debtor.  541(c)(2), however, provides that a restriction on the transfer of a beneficial interest in the debtor in a trust that is enforceable under applicable non-bankruptcy law is enforceable in a case under this title.

The living trust is a self-settled trust which is a trust in which the settlor is also the person who is to receive the benefits of the trust.

A spendthrift provision in a trust is a clause that prohibits the beneficiary's interest from being assigned and prevents a creditor from attaching that interest.

To the extent a debtor holds a beneficial interest in a trust, that beneficial interest becomes property of the estate unless it is protected by a valid spendthrift provision.

Although spendthrift provisions are typically valid under California law, they are invalid when the settlor is also a beneficiary of the trust.

Here, the Klein living trust contains the following provisions:  No beneficiary shall anticipate a signed

62

encumbrance subject to any creditor claim or to legal process, any interest in principle or income before its actual receipt by any beneficiary.  The beneficial and legal interest in this trust, its principal, and its income, shall be free from interference or control of any beneficiary's creditor and shall not be subject to claims of any such creditor or liable to the attachment, execution, bankruptcy, or any other process of law.

Sharp argues that the living trust and the subtrusts are self-settled, provide Klein with absolute control over the trust and discretion over the trust's assets.  And they are statutorily precluded from shielding assets through a spendthrift clause.

Klein responds that the MDT and credit trusts were not self-settled and self-funded by Klein, but instead by Erica. And he contributed zero to those trusts.

Sharp replies that the living trust and subtrusts are self-settled and wholly controlled by Klein for his benefit. And the spendthrift provision does not yield any property held by these trusts from the creditor.  The living trust provided that Klein and Erica were the settlors of the living trust, and Klein and Erica were the co-trustees and beneficiaries of the income and principal of the living trust.  It is undisputed that the living trust was funded with community property.

Upon Erica's death, the living trust provided that the trust were to be created.  And the MDT and Credit Trust were to

63

be funded with Erica's proportion of community property. According to the living trust, the subtrusts were to be controlled by Klein as trustee.  And Klein was the income and principal beneficiary of the subtrust.

Klein, as sole trustee and beneficiary of the subtrust, had full and complete control of the use, sale, and distribution of the subtrust assets.  As trustee and sole beneficiary, Klein was and is able to use any and all principal and income from the living trust in each one of the sub trusts for his own benefit.  Because Klein was the settlor, trustee, and beneficiary of the living trust, and assuming any subtrusts were ever created and funded, which, as the Court noted, there is no evidence to demonstrate that that actually occurred, Klein is now the trustee and sole beneficiary of the subtrust. And the Court finds that the subtrusts, like the living trust, are self-settled trusts.

Sharpe argues that Cutter and Salkin demonstrate that the spendthrift provision in the living trust is invalid because Klein is settlor, trustee, and beneficiary of that trust and the subtrusts.

Klein attempts to distinguish Cutter and Salkin, arguing that the MDT and credit trusts were not self-settled by Klein but rather by Erica.  Sharp replies that the Court held that the living trust and subtrusts are self-settled in the ruling on the Joinder motion.

64

The Court has previously ruled that the living trusts and subtrusts are self-settled, and it did so in the context of the joinder motion.  So the Court is not going into details on the cases.  But the Court finds that both Cutter and Salkin are almost identical here.

The Court finds that the spendthrift provision of the living trust is invalid.  Upon Erica's death, Klein was to allocate the community property to either the survivor's trust, the MDT, or the credit trust.  Klein, as a settlor, the trustee, and the beneficiary of the living trust, and the trustee and beneficiary of each of the subtrusts, had and has complete control over the use, the distribution of assets which are intended for his own benefit.  This control and power renders the spendthrift provision contained in the living trust invalid for that trust and for the subtrust as well if they were ever created and funded.

Turning to Probate Code 15305, Klein cites Probate Code 15305 and argues that because the MDT and/or credit trust were entirely funded by Erica, the amount attributable to him is zero.  And the property is not property of the estate. Sharpe doesn't address this issue.

The Court notes that Klein's reference to 15305, which addresses children and child and spousal support, was most likely a scrivener's error, and the Court believes that Klein meant to cite Probate Code 15304.  The Court does not find

65

Klein's reliance on this probate code section persuasive.  The BAP in Cutter held that under 541, the Bankruptcy Court should have granted summary judgment regarding the entire Cutter corpus, including the-- I can't say it, the Ermatinger property, the BAP recognized that ordinarily Section 15304(b) only permits the portion of a trust corpus that is contributed by the debtor beneficiary to be included in the bankruptcy estate.  According to the BAP, this exclusion is inapplicable when the debtor beneficiary has control over and is able to reach trust property which was contributed by others.

When a debtor beneficiary has this control and reach, the estate is entitled to the maximum amount the trust can distribute to the debtor beneficiary.  Because Cutter had complete control over the creditor trust for his benefit, the spendthrift clause was invalid, and the entire Cutter trust corpus, including the property at issue, was part of the bankruptcy estate.

Because the living trust here provided that Klein was the trustee and the principal and interest beneficiary and he had complete control of the trust assets, the trust corpus, including the trust property, is property of the bankruptcy estate, regardless of whether Erica contributed any or all of the assets to the living trust or any other subtrust.

Klein, as settlor and trustee and beneficiary of the living trust, had and did have complete control over the

66

property held by the living trust in all distributions.  Klein also had and has complete control over the use, distribution, and benefit for the entire trust corpus purportedly held by the subtrusts.  Therefore, any amount contributed by the -- to the sub trust by Erica would not be shielded by Probate Code 15306(4)(b) or B from being included in Klein's bankruptcy estate.

Turning to the actual causes of action in the complaint, to state a claim for quiet title, a complaint must include the subject property's description.  Plaintiffs allege title to the property, the adverse claim against which a determination is sought, and the date as of which the determination is sought, and a prayer for the determination of the title against the adverse claim.  The Court finds that the complaint meets all of the requirements for a quiet title action.  Here, the complaint describes the property providing both its legal description and street address.  It seeks a determination that, as of the petition date, Klein's estate holds 100 percent interest in the property.  It indicates that adverse claims for which it seeks a determination that neither the MDT, Barbara, or any other party holds an interest in the property.  And the trustee indicates he is entitled to a judicial determination under Section 760.010, quieting the property's title as of the petition date.

Based on the analysis above and allegations in the

67

complaint, the Court finds that there is no genuine issue of material fact, and the trustee has established all elements of quiet title.

Turning to the trustee's avoidance powers, Sharp argues he is a BFP for value, holding a senior ownership in the property, and he can avoid any junior unrecorded interest in the property.  As a BFP under 544(a), Sharp contends he can avoid any interest Barbara or any of the subtrust claim in the property because, as of the petition date, there were no recorded documents evincing any such interest or providing constructive notice to Sharp.

Klein responds that Sharp cannot set aside Barbara's interest in the property under 544(a) because it was conveyed via a premarital agreement and forced amendment to the premarital agreement.

Klein cites Zubenko and contends that Barbara's presence at the property would put anyone on constructive notice or inquiry notice, and any buyer would not be a BFP.

In the reply, Sharp reiterates there's no recorded documents demonstrating Barbara or the subtrust hold any interest in the property, and there are no facts that would provide a BFP with constructive notice of Barbara's or any subtrust's purported interest.

544(a) provides the trustee shall have as of the commencement of the case and without regard to any knowledge of

68

the trustee or of any creditor the rights, powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by A BPF of real property.  Section 544 creates the strong arm powers of the trustee, one of which close a trustee with the status of a BFP of real property.  Although 544(a)(3) provides the trustee takes the power of a BPF over real property without regard to any knowledge of the trustee or any creditor, that does not override provisions of state law which impute notice of claims to real estate.  State law determines whether a trustee has constructive notice, or whether the trustee's status as a BFP will defeat the rights of persons against whom a trustee seeks to assert powers.

Under California law, every conveyance of real property must be recorded in order to be valid against a BFP of the same property who in good faith and for valuable consideration records first.  That's CCC 1214.

CCC 19 defines constructive notice as every person who has actual notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact has constructive notice of the fact itself in all cases in which by prosecuting such inquiry he might have learned such fact.

In Zubenko, Peter Zubenko bought real property in Sacramento encumbered by a note and deed of trust.  He defaulted and a trustee sale was initiated.  A notice of

69

default, election to sell was recorded with the Sacramento Recorder in May 2014.  And a notice of the trustee sale was also recorded with the Sacramento Recorder in August of that year.

Herbert U.S. Real Estate Company was the winning bidder at the trustee's sale and received a trustee's deed upon sale.  Shortly after the trustee's deed was issued, but before recording it, Zubenko filed a Chapter 13 petition.  Herbert sought relief from stay to record the trustee's deed.  Zubenko opposed, and the Bankruptcy Court held an initial hearing during which the issue of avoidance of Herbert's unrecorded interest was raised.

According to the court, although California is a race-notice jurisdiction, Cal Civil Code 1217 provides that unrecorded instruments are valid between those who have notice of the unrecorded instrument.  This means that a person who has actual notice of circumstances to put a prudent person upon inquiry notice requiring a particular fact has constructive notice of that fact and can defeat a trustee's claim under 544. The Zubenko court concluded that based on the notice of default election to sell and notice of trustee sale, which were recorded with the Sacramento Recorder, a prudent purchaser would have inquired regarding the status of the Sacramento property.  Therefore, the court found that the trustee could not use his strong arm powers to avoid Herbert's unrecorded

70

instrument.

This Court finds that client's reliance on Zubenko is unpersuasive.  In contrast to Zubenko, where the court found that the recordings with the Sacramento Recorder were sufficient to provide constructive notice, it is undisputed that neither the premarital agreement nor the first amendment to that agreement were ever recorded.  Although Klein contends that Barber's presence in the property would put anyone on notice of her rights, he provided no authority to support his contention that a spouse here or wife who lives in a property with her spouse, is sufficient to provide notice of the wife's purported interest in the property.

Rather, many courts have held that when title holder jointly occupies property with a stranger to title claiming an interest in the property, the occupancy by the stranger to the title does not provide constructive notice of his or her interest.

In such circumstances, the law regards possession as being with the title holder, and there is no presumption of an interest of the joint occupant inconsistent with the title in the other joint occupant.  And that's in re Thomas, 147 B.R. 526 (9th Cir. 1992).  As the BAP noted, this rule is often applied when the joint occupants are related to one another.

Based on the facts here, the Court finds there is no evidence demonstrating that Sharp had constructive notice that

71

Barbara, or anyone else for that matter other than Klein, had any interest in the property.

Regarding the MDT and survivor trust, sharp argues he holds a senior perfected ownership in the property because there are no recorded documents memorializing the MDT and/or survivor's trust interest in the property, nor are there any recorded documents that would put him on constructive notice of the MDT and/or survivor's trust's alleged interest in the property.

Klein responds the living trust created the survivor trust and subtrust upon Erica's death, and the ledgers associated with the living trust demonstrate that the subtrust hold 100 percent of the property and are enough to put Sharp on notice and removed any backup claim.  Sharp reiterates this no evidence showing that the property was ever transferred, the ledgers are insufficient to demonstrate a property transfer, and the ledgers were never recorded.

Per Civil code 1214, every conveyance of real property must be recorded or is void against a subsequent purchaser who in good faith and for valuable consideration records first. Although Klein contends the ledgers demonstrate that the property was transferred to the MDT, none of the ledgers were recorded.  And there are no recorded documents evidencing that any entity other than Klein's bankruptcy estate or the living trust holds an interest in the property.  Therefore, Sharp, as

72

a BFP, may use his strong arm powers under 544 to avoid any interest the survivor trust and/or MDT might have in the property.

In the opposition, Klein argues that joinder of Klein's children as beneficiaries of the credit trust is necessary, because without them, a ruling on this issue could lead to a non-binding result and would be a waste of judicial resources.

Sharp replies that Klein's arguments have already been addressed and rejected.  The Court held a hearing about two months ago on Klein's joinder a motion and made explicit, detailed findings regarding why joinder of the children was unnecessary and denied that motion.

So in conclusion, the Court finds that based on the evidence presented, there is no genuine issue of material fact. The living trust owns 100 percent of the property.  It is appropriate to quiet title in favor of the trustee.  And the motion for summary judgment is granted in its entirety.

Mr. Lucas, you are the prevailing party.  I'll ask that you upload an order within seven days.

MR. LUCAS:  Your Honor, thank you.  We will upload an order.  And I propose that it contains some language providing access or control over this property so that the trustee can ensure that the debtor moves out of the property so that we can sell it, Your Honor.

73

THE COURT:  That would be a logical inference, Mr. Lucas, but that wasn't a request in the motion at all.

MR. LUCAS:  Okay, Your Honor.

THE COURT:  I appreciate why you want to do that.  I truly do.  But I don't think it would be fair to add that to the order unless it were something that were had been requested in the motion and that the debtor had a fair opportunity to respond to.

So I am granting the motion for summary judgment.

MR. LUCAS:  Understood, Your Honor.  Understood.

THE COURT:  And you don't need to reiterate everything that was said.  It will be for the reasons stated on the record the motion is granted.  That's matter number 22.

Matter number 22 is the status conference in this matter.  It's moot based upon the ruling.

All right.  Mr. Lucas, anything further?

MR. LUCAS:  Yes, Your Honor.  I do have one other request, Your Honor.  And I don't think it's controversial.

So Mr. Olson and Mr. Crawford today made it clear that they commenced an action in LA Superior Court in the probate division.  I believe Your Honor recited the case number.  It's case number 24STPB13777.  It's cited in their motion to continue.

And, Your Honor, this is not a fact-finding lawsuit.  This is an action that was filed to reform documents to remove

74

property of the estate.  This is a willful, intentional, clear violation of the automatic stay, Your Honor.  And I am asking Your Honor to enter an order sua sponte or on my oral motion here to require Mr. Crawford and Mr. Olson and the debtor who's behind all this to dismiss the action.  Mr. Sharp wasn't even named in the action.  Mr. Sharp wasn't served in the action. This is something that the debtor, Mr. Klein, has no control, no authorization to do.  Nevertheless, he continues to do it.

Your Honor, we think it is a waste of time, a waste of estate resources to have to file a motion to enforce the automatic stay which is supposed to be automatic.  But Mr. Olson and now Mr. Crawford and the debtor, they do not care about court orders, Your Honor.  And I'm sorry if I'm a little bit heated, Your Honor, but this is got to stop.  The debtor has no regard for this Court's order, no regard for the process.  And if it's not Mr. Olson, now it's Mr. Crawford. And if it's not going to be one of them, it will be one of the other nine attorneys that the debtor sort of rifles through.

Using property of the estate to pay Mr. Crawford -- and I don't think Mr. Crawford has filed an attorney disclosure, as he's here representing the debtor.  And I know that Mr. Olson hasn't even though I've asked him to do it countless number of times, Your Honor.  Your Honor, it just has to stop.  And we're requesting that the Court enter an order requiring the action to be stayed, dismissed, removed with

75

prejudice because it is a violation.  And it's void in itself.

THE COURT:  Mr. Crawford?

MR. CRAWFORD:  Yeah.  Thank you, Your Honor.

First of all, obviously this is not really properly before the Court today I think.  I would ask for at least an opportunity to -- maybe for the Court to set an order to show cause or something like that, at least an opportunity to respond.

Second, of course, in light of today's ruling, we might reconsider the position ourselves.  But I think it would be appropriate at least, respectfully, to give us an opportunity to respond before making any kind of decisions with respect to my actions or with respect to the probate petition.

THE COURT:  Mr. Lucas?

MR. LUCAS:  Your Honor, may I just -- one thing.  As a Courtesy, my partner, Mr. Dulberg, has talked to Mr. Crawford. We sent Mr. Crawford and Mr. Olson an email about this.  This isn't a surprise.

And, Your Honor, Mr. Klein has been in bankruptcy since February of '23.  This is not -- this is blatant disregard.  And there can be nothing more appropriate now than ensuring that estate resources are preserved and that Mr. Crawford and Mr. Olson and the debtor are not permitted to make an end-run around this Court's ruling today and going to continue to prosecute this action which is violating the

76

automatic stay and harming property of the estate and causing the trustee to have to incur unnecessary fees and expenses.

There's nothing more to say.  A request for another date is nothing more than a request to delay and to continue the confusion and the purposefulness of the debtor's actions to date.

THE COURT:  And I understand your frustration, Mr. Lucas.  Obviously, I've been presiding over this for almost two years.  I know what's happened in every hearing in every case. I'm aware of the revolving door of attorneys that Mr. Klein has had.  And that has created an issue separate and apart from this.

I do have to ensure that the process is fair.  So what I will do, I'll have you draft it and upload it.  I'll set a hearing on an order to show cause why Mr. Olson and Mr. Crawford and Mr. Klein should not be sanctioned for knowingly violating the automatic stay.

MR. LUCAS:  And, Your Honor, I'm uploading this order. Am I to understand that Your Honor will fill in the date and time then?

THE COURT:  That's correct.  Upload the order.  I'll fill in a date and time.  There will be an opportunity to respond, but it will be an order to show cause.  It will be very narrow.  It will be focused on why filing that probate proceeding -- and I'm looking for the -- I had the motion

77

before me, and now I can't locate it because there's a lot of documents on my bench.  But why filing that probate proceeding, which I believe was maybe about a week ago, is not a violation of the stay and why Mr. Olson and Mr. Crawford and Mr. Klein should not be sanctioned for violating the automatic stay.

MR. DULBERG:  Your Honor, I don't know if -- this is Mr. Dulberg.

I don't know if Mr. Crawford will offer it up.  We have the case number for the probate proceeding.  We could -- if Your Honor wanted to read it into the record, I'm happy to.

THE COURT:  I read it into the record when I was ruling on the continuance motion.

MR. DULBERG:  That's what I had thought.

THE COURT:  Yeah.

MR. DULBERG:  Thank you.

THE COURT:  But with moving papers around, Mr. Crawford -- oh, here it is.  It's 24STPB13777.  And I believe that was filed on December 11th -- on December 9th.  It was within about a week.

MR. DULBERG:  I believe it's -- I believe it's the 9th.

THE COURT:  Yeah.  Thank you.

Mr. Olson, you have your hand raised.  And then we'll conclude this hearing.

MR. OLSON:  Yes.  The Court had ordered the attorney

78

for the trustee to prepare and order on the motion for summary judgment. And I would request that the order include that it does not apply to parties who are not named as defendants and specifically including the credit trust.

THE COURT: Mr. Olson, that request is denied. The order will be for the reasons stated on the record, the motion for summary judgment is granted. That's all it's going to say. And the record will speak for itself.

All right. So in terms of how we proceed, Mr. Lucas, you're going to upload an order on the summary judgment ruling. Again, it will be very brief. I wouldn't want you to try to recreate all of the ruling.

You'll also upload a order for an order to show cause why filing what is captioned a verified petition for order conveying trust assets into the second amended MDT and credit trust dated 4/8/90 of Erica Klein is not a violation of the automatic stay and why Mr. Olson and Mr. Crawford and Mr. Klein should not be sanctioned for that filing.

MR. LUCAS: Understood, Your Honor. And we thank you for your time.

THE COURT: Thank you.

(Whereupon these proceedings were concluded at 12:25 PM)

79

I N D E X

| RULINGS: | PAGE | LINE |
|---|---|---|
| Motion to continue is denied. | 22 | 17 |
| Motion for summary judgment is granted. | 72 | 18 |

80

C E R T I F I C A T I O N

I, Michael Drake, certify that the foregoing transcript is a true and accurate record of the proceedings.

_____

/s/ MICHAEL DRAKE, CER-513, CET-513

eScribers

7227 N. 16th Street, Suite #207

Phoenix, AZ 85020

Date:  December 26, 2024

Leslie Klein

December 18, 2024

## A

**AB (6)**
18:14,18;38:19;
39:14;50:23;59:25
**abandon (1)**
41:20
**able (5)**
27:12,21,24;63:8;
65:9
**above (1)**
66:25
**above-cited (1)**
37:8
**absence (3)**
29:15,20;50:3
**Absent (1)**
60:10
**absolute (1)**
62:9
**abundance (1)**
27:18
**abuses (1)**
20:17
**accept (2)**
52:21;54:2
**accepted (2)**
38:16;53:1
**access (2)**
32:6;72:23
**accordance (2)**
44:13;47:9
**according (14)**
5:8;38:23;44:5;
46:2,25;48:6;52:16;
53:18;56:13;59:3,24;
63:2;65:8;69:13
**accrued (1)**
56:12
**accustomed (5)**
40:23;41:11,16;
56:9,24
**acknowledged (1)**
53:6
**acknowledges (2)**
43:19;57:7
**acquired (1)**
46:2
**action (19)**
4:13;6:12;22:25;
29:8,9,20;30:12;
35:10,12,16;66:8,16;
73:20,25;74:5,6,6,25;
75:25
**actions (2)**
75:13;76:5
**acts (1)**
42:22
**actual (6)**
8:23;44:6;62:2;
66:8;68:19;69:17
**actually (7)**

11:25;12:1;16:11;
31:15;33:11;60:7;
63:13
**add (5)**
9:13,15,20;12:13;
73:5
**addition (1)**
10:24
**Additionally (1)**
60:11
**address (11)**
7:5;18:15,19;21:13;
34:2;46:21;50:23;
52:4;60:23;64:21;
66:17
**addressed (4)**
33:11;48:25;50:19;
72:10
**addresses (2)**
21:12;64:23
**addressing (1)**
16:3
**admissions (3)**
13:17,18;50:1
**admit (1)**
13:19
**admits (1)**
14:10
**admitted (8)**
13:23;14:9;15:7;
24:3;27:5;43:8;44:22;
45:14
**adopt (1)**
49:20
**advanced (1)**
22:12
**advantage (4)**
52:12,13,24;54:4
**adversary (8)**
9:1;13:13,25;14:8,
11,23,25;49:2
**adverse (4)**
24:11;66:11,14,20
**adversity (1)**
24:9
**affairs (8)**
18:2,5;19:17,19;
20:4;32:8;38:19;51:8
**affect (1)**
49:7
**affidavits (1)**
50:2
**affirm (1)**
19:2
**affirmative (1)**
11:10
**afforded (1)**
53:16
**afternoon (1)**
9:11
**again (11)**
4:19;9:18;11:24;
17:23;22:22;28:17,

22;32:13;33:21;
56:10;78:11
**against (13)**
16:20;21:4;22:7;
24:11;25:3;29:15,22;
44:12;66:11,14;
68:12,15;71:19
**ago (10)**
15:23;16:7;17:24;
18:25;21:6,17;22:3;
24:25;72:11;77:3
**agree (7)**
6:15,15,16,17,19;
9:20;15:2
**agreed (2)**
39:11;58:8
**agreement (13)**
13:16,17;27:6;39:8,
10;44:9,15;48:21;
61:5;67:14,15;70:6,7
**agreements (1)**
44:11
**aid (1)**
4:19
**allegations (2)**
35:2;66:25
**allege (1)**
66:10
**alleged (3)**
35:1;44:17;71:8
**alleges (1)**
45:10
**allocate (4)**
36:21;48:1,3;64:8
**allocation (11)**
18:15;19:2;21:12,
13;32:1;33:6,10;
36:19;37:12;47:24;
55:6
**allow (4)**
10:8;31:18;34:2;
44:3
**allowance (1)**
36:25
**allowed (2)**
54:2,9
**allowing (1)**
53:17
**almost (4)**
21:6;22:7;64:5;
76:8
**along (1)**
36:13
**although (7)**
14:13;29:5;61:21;
68:6;69:13;70:7;
71:21
**always (1)**
49:23
**amend (1)**
29:14
**amended (17)**
14:7;16:19,20;

18:14,18;19:8;20:1;
21:11;24:16;26:14;
27:5;28:24;36:12;
39:23;42:1,3;78:15
**amendment (6)**
13:16;21:16;39:10;
48:20;67:14;70:6
**among (2)**
20:10;47:24
**amount (11)**
11:20;31:3;36:23;
37:13;46:6,7,10;
55:23;64:19;65:12;
66:4
**ample (1)**
21:22
**amply (1)**
38:5
**analogous (1)**
43:1
**Analysis (2)**
50:19;66:25
**and/or (13)**
47:3;48:12;52:5;
54:6,11,25;57:16,17;
60:16;64:18;71:5,8;
72:2
**ANGELES (2)**
4:1;27:12
**announced (1)**
21:3
**annually (1)**
40:18
**answer's (1)**
35:24
**anti-alienation (1)**
42:21
**anticipate (1)**
61:25
**apart (1)**
76:11
**apologize (2)**
5:17;32:24
**apparently (1)**
35:10
**appeal (9)**
5:9,14,15,18,18;
6:10,11,20,20
**appealed (1)**
58:24
**Appeals (1)**
59:1
**appear (1)**
30:24
**appearing (3)**
4:18;5:4;30:18
**appears (4)**
20:22;21:5;27:1;
30:13
**Appellate (3)**
46:18;59:3,5
**applicable (4)**
20:8;44:13;61:5,10

**application (2)**
16:5;52:25
**applied (1)**
70:23
**applies (2)**
49:2;52:19
**apply (1)**
78:3
**appointed (2)**
6:1;58:11
**appointment (3)**
14:3;38:15,16
**appreciate (5)**
14:21;23:9;31:22;
32:14;73:4
**appropriate (4)**
12:17;72:17;75:11,
21
**April (7)**
8:6;18:17,17;21:17;
36:12;39:22,24
**arbitrary (1)**
20:18
**argue (4)**
11:21;12:3;28:20;
33:21
**argued (5)**
11:6;18:4;31:17;
33:20;58:20
**argues (21)**
21:11;42:10,18;
43:21;44:8,19,25;
46:11;47:6,15,17,23;
54:16;55:8;57:18;
62:8;63:17;64:18;
67:5;71:3;72:4
**arguing (5)**
13:1;33:22;43:17;
52:2;63:22
**argument (15)**
13:13;14:19;19:21;
22:12,16;23:15;
28:11,17;30:1,6,20;
32:7;38:3;42:10;57:5
**arguments (5)**
21:22;34:1;48:24;
53:14;72:9
**arm (4)**
44:11;68:4;69:25;
72:1
**armed (1)**
44:2
**Aron (13)**
9:14,17,18,18;10:6,
14;11:13,16,19;12:3,
5,8,10
**Aron's (2)**
11:1;12:14
**around (4)**
9:23;23:5;75:24;
77:16
**article (3)**
36:18,22;37:2

eScribers, LLC    **(1) AB - article**

**aside (4)**
26:24;47:6;58:17;
67:12
**assert (3)**
34:25;52:23;68:13
**asserting (1)**
52:12
**assertions (3)**
36:8;48:10;52:6
**asserts (10)**
11:24;19:11;43:2,
20;45:7,24;46:15;
48:5;54:19;55:1
**asset (1)**
28:25
**assets (19)**
19:8;20:1;21:18;
24:22;25:2;26:11;
36:5;42:21;48:2,3;
55:7;60:8;62:10,11;
63:7;64:12;65:20,23;
78:15
**assigned (2)**
7:16;61:16
**assist (2)**
4:12;18:21
**associated (3)**
42:12;47:1;71:12
**assume (1)**
23:10
**assumed (1)**
40:5
**assuming (1)**
63:11
**Attached (5)**
19:5;57:25;58:19;
59:18,22
**attaching (1)**
61:17
**attachment (1)**
62:7
**attempt (2)**
15:3;21:13
**attempted (1)**
21:18
**attempts (2)**
36:8;63:21
**attention (1)**
30:24
**Attorney (3)**
16:12;74:20;77:25
**attorneys (3)**
33:22;74:18;76:10
**attributable (2)**
46:10;64:19
**auction (1)**
41:22
**August (3)**
17:5,6;69:3
**authorities (1)**
32:9
**authority (4)**
29:18;48:22;55:2;

70:9
**authorization (1)**
74:8
**authorized (1)**
27:3
**authorizes (1)**
44:19
**automatic (10)**
35:13;36:16;37:15;
74:2,11,11;76:1,17;
77:5;78:17
**avoid (14)**
16:17,22;37:13;
43:23;44:3,10,19;
45:18;46:24;67:6,8;
68:2;69:25;72:1
**avoidance (3)**
43:21;67:4;69:11
**avoided (2)**
27:7,25
**aware (2)**
11:6;76:10

## B

**back (3)**
6:25;22:20;34:3
**backup (1)**
71:14
**balance (1)**
55:24
**bankruptcy (27)**
5:23;14:11;21:16;
24:15;26:10;27:8;
28:1;38:13,25;44:12,
23;51:10,16;53:3,20;
54:1;60:19;61:1;62:7;
65:2,7,17,21;66:6;
69:10;71:24;75:19
**BAP (5)**
20:5;65:2,5,8;70:22
**Barbara (20)**
16:21;26:20,23;
27:4;39:5,7,9,11;
42:4;43:19,24;44:1,8,
16;45:8;51:5;66:21;
67:8,20;71:1
**Barbara's (9)**
13:17;44:17;46:24;
47:6,12;48:17;67:12,
16,22
**Barber's (1)**
70:8
**based (12)**
11:24;15:9,16;33:8;
44:10;51:18;52:2;
66:25;69:20;70:24;
72:14;73:15
**basically (3)**
6:19;11:10,14
**basis (3)**
24:20;28:15;49:24
**bears (1)**

49:23
**became (2)**
40:4;58:12
**becomes (2)**
61:3,19
**behalf (1)**
4:25
**behind (1)**
74:5
**belabor (1)**
22:22
**belief (1)**
46:15
**believes (3)**
24:7;50:2;64:24
**Bello (23)**
4:14,23,24;5:7,8,14,
17,22,25;6:3,5,7,18;
7:4,6,13,19,23;8:3,11,
13,17,19
**Bellow (1)**
4:25
**belongs (3)**
46:22;47:3;52:4
**Ben (1)**
6:24
**bench (2)**
7:24;77:2
**beneficial (5)**
26:16;61:8,18,19;
62:3
**beneficiaries (12)**
18:3,7;19:3;20:13;
30:3;32:10;41:10;
47:16;55:15;56:19;
62:21;72:5
**beneficiary (39)**
20:11;24:19;25:10;
37:24;39:1;40:10,11,
11,17,20;41:2,2,7,13;
42:15,19,23;46:6;
51:12;52:9;56:3,16;
61:23,25;62:3;63:4,5,
8,11,14,19;64:10,11;
65:7,9,11,13,19,24
**beneficiary's (7)**
40:22,23;41:9,14,
16;61:16;62:5
**benefit (8)**
29:6;40:14;41:5;
62:17;63:10;64:13;
65:14;66:3
**benefits (2)**
32:9;61:14
**best (2)**
8:4;10:19
**beyond (1)**
50:13
**BFE (1)**
45:17
**BFP (12)**
44:5;45:6;47:10,14;
67:5,7,18,22;68:5,11,

15;72:1
**bidder (1)**
69:6
**bit (2)**
34:14;74:14
**blatant (1)**
75:20
**blatantly (1)**
49:19
**bona (2)**
43:22;44:4
**both (12)**
5:10;11:7,20,22;
22:8;38:5;40:10,13;
41:1,3;64:4;66:17
**bought (1)**
68:23
**BPF (2)**
68:3,7
**BR (2)**
20:5;70:21
**brief (4)**
4:22;25:19;34:6;
78:11
**briefed (1)**
38:5
**briefing (3)**
15:19,20;17:13
**briefly (1)**
34:2
**briefs (1)**
11:7
**bringing (1)**
31:24
**broad (1)**
20:14
**brought (3)**
11:10;32:14,15
**burden (6)**
11:23;13:6;34:21;
49:10;50:4,6
**buyer (2)**
47:13;67:18

## C

**Cal (6)**
19:15;43:16;48:12;
55:11;59:24;69:14
**calendar (3)**
4:12;7:17;8:16
**CALIFORNIA (13)**
4:1;20:7;31:11;
39:15;42:18,23;44:5;
46:18;58:9;60:8;
61:22;68:14;69:13
**Call (2)**
4:3;30:23
**called (1)**
4:5
**came (1)**
11:6
**can (27)**

15;72:1
4:16;7:8;8:5,6;
11:3;13:12;14:12,15;
15:1;16:14;26:1;27:7;
29:21;30:12;35:2;
37:23;44:10;46:6;
47:9;50:7;65:12;67:6,
7;69:19;72:23,24;
75:21
**capacity (4)**
27:2;39:7,9;48:21
**caption (2)**
19:5,7
**captioned (1)**
78:14
**care (1)**
74:12
**carried (2)**
11:23;49:10
**carries (2)**
50:4,6
**case (28)**
7:1,14,17;8:9;
14:11;18:21,22;20:6,
8,12;25:5,23,25;
30:18;38:14;42:2;
43:9;46:18;47:8;
57:21,22;61:1,10;
67:25;73:21,22;76:9;
77:9
**cases (6)**
7:22;19:20;43:2;
52:25;64:4;68:21
**cash (3)**
37:7;41:22;56:1
**cause (5)**
30:12;75:7;76:15,
23;78:13
**causes (1)**
66:8
**causing (1)**
76:1
**caution (1)**
27:18
**CCC (2)**
68:17,18
**CD (1)**
60:1
**cede (1)**
38:2
**certainly (5)**
7:3;8:5;16:6;21:19;
29:14
**certificate (1)**
36:13
**challenging (1)**
58:24
**chambers (1)**
8:15
**chance (2)**
16:2;30:20
**change (2)**
15:2;26:11
**changing (1)**

52:16
**Chapter (4)**
38:14,15,16;69:8
**characterization (1)**
11:14
**child (1)**
64:23
**children (9)**
29:17;30:3;56:18;
57:1,2,3;64:23;72:5,
12
**Cir (4)**
20:6,17;34:18;
70:22
**Circuit (3)**
20:19;21:2;52:24
**circumstances (5)**
29:3,8;68:19;69:17;
70:18
**cite (3)**
25:4;32:20;64:25
**cited (4)**
19:20;20:6;28:5;
73:22
**cites (5)**
42:24;43:9;46:4;
64:17;67:16
**citing (2)**
15:5;23:22
**Civil (9)**
39:15;43:16;47:9;
48:13;55:11;59:24;
60:4;69:14;71:18
**claim (11)**
24:5;45:18;47:10;
53:18;62:1;66:9,11,
14;67:8;69:19;71:14
**claimed (5)**
39:3;50:8;51:7;
53:4,25
**claiming (5)**
52:3;53:6;54:11;
58:16;70:14
**claims (18)**
17:25;18:11,15,20;
24:11;25:3;26:1;
29:10,15;43:19,24;
46:20;51:18,22;
53:22;62:6;66:20;
68:9
**clarify (1)**
21:18
**clause (8)**
25:4;41:25;42:22,
23;43:4;61:15;62:12;
65:15
**clear (4)**
28:21;33:7;73:19;
74:1
**clearly (3)**
52:14,20;53:21
**client (3)**
11:2,2;22:22

**clients (1)**
5:10
**client's (1)**
70:2
**close (1)**
68:5
**co-beneficiaries (1)**
40:1
**Code (21)**
19:15,18;27:8;28:1;
31:1;39:15;43:16;
46:4;47:9;48:13;
55:11;59:24;60:4,8;
64:17,18,25;65:1;
66:5;69:14;71:18
**comfort (2)**
41:9,15
**commenced (1)**
73:20
**commencement (1)**
67:25
**comments (1)**
22:25
**committed (1)**
32:11
**community (10)**
29:1;45:24;54:23;
55:19,20,25;60:18;
62:23;63:1;64:8
**Company (1)**
69:5
**complaint (14)**
14:7;16:16,19;17:3;
24:6,6,8;30:2;42:2;
66:9,9,15,16;67:1
**complete (8)**
17:3;42:16;63:6;
64:12;65:14,20,25;
66:2
**complexity (1)**
18:22
**complying (2)**
48:12;60:4
**concedes (1)**
33:15
**concerned (2)**
19:19;31:5
**conclude (1)**
77:24
**concluded (2)**
69:20;78:22
**concludes (1)**
45:11
**conclusion (2)**
36:2;72:14
**Conclusively (1)**
18:11
**concurrently (1)**
11:24
**conditions (2)**
61:6,6
**conference (7)**
5:13;7:8;9:1;10:7;

12:15;17:5;73:14
**confirm (1)**
18:25
**confusion (1)**
76:5
**connection (1)**
24:24
**consider (3)**
10:11;21:3;52:18
**considerable (1)**
22:5
**consideration (2)**
68:17;71:20
**considered (4)**
23:1;26:17;33:25;
38:7
**considering (2)**
21:2;53:14
**considers (3)**
41:8;56:6,21
**consist (4)**
36:23;55:18,22,24
**consolidated (1)**
42:7
**constructive (17)**
44:6,7,17;45:6;
47:8;48:19;67:11,17,
22;68:11,18,20;
69:18;70:5,16,25;
71:7
**construed (1)**
60:3
**contact (1)**
8:15
**contain (2)**
59:23;60:3
**contained (1)**
64:14
**contains (5)**
13:15;19:18;41:25;
61:24;72:22
**contending (1)**
47:8
**contends (25)**
42:12;43:1,7,24;
44:2,15,20;45:2,23;
46:9,17,23;47:12,20,
25;48:10;52:1,5;
54:18,24;57:9;67:7,
16;70:7;71:21
**contention (1)**
70:10
**contents (1)**
14:14
**context (1)**
64:2
**continuance (22)**
15:23;16:1;17:24;
18:22;19:25;20:14,
15,18,20,22,23,24;
21:1,5,20,25;22:2,8,
11,13;33:18;77:12
**continue (19)**

5:12;7:8,12,23;8:4,
14;10:7;12:18;15:15;
17:17;21:24;22:17,
23;28:16;30:22;
31:22;73:23;75:25;
76:4
**continues (1)**
74:8
**continuing (1)**
21:4
**contractors (1)**
34:18
**contradicted (1)**
49:19
**contrast (2)**
59:17;70:3
**contributed (5)**
62:15;65:6,10,22;
66:4
**contribution (1)**
46:8
**control (19)**
24:22;25:10;26:16;
41:22;42:16,20;62:5,
9;63:6;64:12,13;65:9,
11,14,20,25;66:2;
72:23;74:7
**controlled (3)**
47:21;62:17;63:3
**controversial (2)**
37:14;73:18
**convenient (1)**
40:17
**convey (3)**
41:23;45:3;48:22
**conveyance (2)**
68:14;71:18
**conveyed (2)**
46:16;67:13
**conveying (5)**
19:8;20:1;58:3;
59:9;78:15
**convinced (1)**
7:1
**copy (2)**
14:5,6
**corpus (6)**
60:25;65:4,6,16,20;
66:3
**co-settlor (1)**
40:1
**co-trustees (3)**
40:1;55:15;62:21
**counsel (2)**
7:16;18:20
**countless (1)**
74:23
**county (2)**
27:11;60:1
**couple (4)**
10:12;13:12;24:25;
38:2
**course (2)**

23:23;75:9
**Court (202)**
4:3,4,16,21;5:2,6,7,
12,14,20,21,24;6:2,
14,16,19,20;7:3,5,11,
21,25;8:4,12,14,18,
20,22;9:4,7,12,17;
10:5,9,11;11:5,9,13,
18;12:2,4,6,9,11,17,
20;13:5,10,19,21,23;
14:10,10,12,13,21;
15:8,14,17,17,18,20;
16:13,16;17:5,9,13,
20;18:4,8,9,10,16,25;
19:6,12,12,16,20;
20:14,17,24;21:3,7,9,
15,21,23;22:1,2,5,9,
11,15,17;23:1,2,6,9,
14;24:23;25:12,16,
25;28:3,8,16;29:21,
24;30:14,16,24;31:14,
25;32:4,12,18,19;
33:8,17;34:2,11;
35:11;37:4;38:4,6,7;
39:16;43:9;45:20;
46:18;47:22;48:25;
49:3,20,24;50:16,19,
22;52:21,25;53:16,
18;54:1,2,5,7,8,10;
57:20;58:14,21;59:1,
3,5,10,12;60:6,17,21,
23;63:12,15,23;64:1,
3,4,6,22,24,25;65:2;
66:14;67:1;69:10,13,
20,24;70:2,3,24;
72:10,14;73:1,4,11,
20;74:13,24;75:2,5,6,
14;76:7,21;77:11,14,
16,22,25;78:5,21
**Courtesy (1)**
75:16
**courts (3)**
21:3;52:18;70:13
**Court's (9)**
11:14;18:11;20:6;
21:19;33:2,19;58:24;
74:15;75:24
**cover (1)**
19:22
**Crawford (34)**
16:12;18:21,22,24;
28:18,19;30:19;
31:15,17,21;32:18,18,
22;33:17,24;34:4,11,
15;73:19;74:4,12,16,
19,20;75:2,3,16,17,
23;76:16;77:4,8,17;
78:17
**create (7)**
15:4;32:17;36:8;
46:19;58:23;59:4;
60:9
**created (14)**

Leslie Klein

December 18, 2024

39:23;41:19;55:22;
59:10;60:8,11,13,16;
61:1;62:25;63:12;
64:16;71:10;76:11
**creates (3)**
26:25;33:15;68:4
**creating (1)**
35:8
**creation (2)**
55:17;59:13
**credibility (8)**
33:13,13,14;34:6,8;
35:9;49:15;50:12
**credible (1)**
34:7
**credit (50)**
18:13;19:1,9,14;
20:2;28:13,13,23;
29:2,4,6,15,20;30:1,4,
10;31:5;35:14,15;
42:13;45:22;46:9,12,
22,24;47:4;48:12;
51:24;52:5;53:23;
54:5,6,11,24;55:24;
56:13,15,20;57:1;
60:7,16,21;62:13,25;
63:22;64:9,18;72:5;
78:4,15
**creditor (11)**
35:25;46:6;54:25;
61:17;62:1,5,6,19;
65:14;68:1,8
**creditors (1)**
25:2
**creditor's (1)**
37:11
**critical (1)**
28:10
**cross-motion (4)**
10:14,25;11:9,24
**curious (1)**
26:4
**current (5)**
26:20;39:5;51:5;
53:21;54:5
**currently (2)**
7:25;24:7
**cut (1)**
25:17
**Cutter (9)**
42:24;46:11;63:17,
21;64:4;65:2,3,13,15

**D**

**date (18)**
7:25;10:7,7;12:16;
16:6;44:8;45:5;47:18;
52:8;57:16;66:12,18,
24;67:9;76:4,6,19,22
**dated (7)**
19:9;39:8,10;51:19,
20,23;78:16

**dates (1)**
5:12
**day (2)**
23:3;38:16
**days (4)**
6:23;7:24;17:11;
72:20
**deadline (3)**
10:23;17:11,13
**deadlines (1)**
17:6
**deal (1)**
9:2
**deals (1)**
29:18
**dealt (1)**
30:13
**death (13)**
36:13,15,17,19,21;
40:4;54:23;55:16;
56:11,25;62:24;64:7;
71:11
**debtor (63)**
6:9,12;14:5;15:23;
17:8,15,16,19,24,25;
24:14;25:3,23;26:8;
27:1;35:20,21;36:20;
37:16,21;38:9,12,18,
19,21;39:2,7,9,11,14,
22,25;40:4,8,10,14,
16,20,24;41:1,5;
43:10;51:1;61:2,3,7,9,
18;65:7,9,11,13;68:2,
3;72:24;73:7;74:4,7,
12,14,18,21;75:23
**debtor's (11)**
5:18;24:15;25:10;
26:19;36:6;38:22;
39:5,17;51:3,5;76:5
**deceased (4)**
31:6;38:22;55:20,
25
**DECEMBER (6)**
4:1;36:11;39:19;
40:3;77:18,18
**decided (3)**
18:3,8;59:10
**decides (1)**
21:7
**decision (1)**
18:11
**decisions (1)**
75:12
**declaration (11)**
13:14;18:23;19:5;
46:19;53:5,13;59:2,4,
6,8,17
**declarations (1)**
10:24
**declares (1)**
58:17
**deduction (32)**
16:21;18:12;19:1,9,

14;20:2;24:18;29:2;
30:4;31:4;35:23;
36:23;37:20;38:22;
39:4;40:8,9,12,13,15,
19;41:18;42:4,9,13;
45:8;51:2,4,15,20,23;
57:16
**deductions (1)**
36:25
**deed (12)**
14:6;27:15;39:18;
46:17,20;55:3;57:19;
58:25;68:24;69:6,7,9
**deeds (1)**
58:5
**default (2)**
69:1,20
**defaulted (1)**
68:25
**defeat (3)**
47:9;68:12;69:19
**defendant (3)**
15:2;28:14;35:15
**defendants (15)**
9:6,19,23;12:1;
13:15;16:25;27:9,19;
28:7;29:11,12;42:5,6,
7;78:3
**defendants' (5)**
13:18;14:24;15:1,3;
35:19
**defendant's (2)**
13:18;35:19
**defense (1)**
20:21
**defenses (1)**
45:11
**deferred (1)**
41:22
**defines (1)**
68:18
**defining (1)**
29:9
**definitely (1)**
33:23
**delay (4)**
20:22;21:5,19;76:4
**deliberately (1)**
52:16
**demonstrate (9)**
42:11;50:3;51:24;
54:25;63:13,17;
71:12,16,21
**demonstrated (2)**
22:14;47:1
**demonstrates (1)**
59:15
**demonstrating (5)**
43:25;45:13;57:9;
67:20;70:25

**denials (2)**
35:2;36:8
**denied (6)**
17:9;30:6;33:18,19;
72:13;78:5
**denies (1)**
22:17
**denying (1)**
11:19
**dependent (1)**
37:12
**depending (1)**
29:2
**depositions (1)**
50:1
**derive (1)**
52:23
**described (2)**
24:6;58:18
**describes (3)**
24:6,8;66:16
**description (4)**
36:1,3;66:10,17
**despite (4)**
31:24;32:6;48:10;
52:6
**destroy (1)**
37:22
**detail (3)**
23:22;25:4,22
**detailed (1)**
72:12
**details (1)**
64:3
**determination (10)**
20:3;24:9,10;37:16;
66:12,13,13,18,20,23
**determinations (1)**
49:15
**determine (4)**
19:13;20:15,19;
27:12
**determined (1)**
58:22
**determines (1)**
68:10
**determining (1)**
52:18
**device (2)**
39:1;51:11
**diametrical (1)**
10:16
**diametrically (1)**
10:17
**died (8)**
36:11,11;40:3;48:2;
57:14,15;58:11;60:18
**difference (1)**
45:4
**different (2)**
4:9;49:18
**differing (1)**
50:9

**diligent (1)**
20:21
**direct (1)**
33:1
**directly (2)**
20:11;26:25
**disagree (3)**
11:13,16;33:19
**disallowing (1)**
14:4
**disclosure (1)**
74:21
**discovery (3)**
17:3,6;27:5
**discretion (5)**
20:15,17;24:21;
37:22;62:10
**discuss (1)**
11:3
**discussing (1)**
9:22
**discussions (1)**
6:9
**dismiss (1)**
74:5
**dismissed (1)**
74:25
**disposition (1)**
58:15
**dispositive (1)**
17:7
**dispute (8)**
15:4;20:12;35:1,9;
36:9;49:4,8;50:8
**disputed (5)**
33:4,7,15;34:8,16
**disputes (2)**
20:10;34:19
**disregard (1)**
75:21
**disrespect (1)**
26:21
**distinguish (1)**
63:21
**distinguishes (1)**
46:11
**distribute (5)**
36:21;48:2,3;56:12;
65:13
**distributed (1)**
57:1
**distribution (8)**
31:5;37:11;47:24;
55:7;56:14;63:7;
64:12;66:2
**distributions (1)**
66:1
**divide (1)**
41:23
**Division (2)**
35:11;73:21
**docket (10)**
5:15;13:14,25;

14:23,25;15:6;16:10;
17:2;23:21;35:18
**doctrine (2)**
52:11,14
**document (9)**
19:6,7;26:24;27:16;
37:4;43:25;55:9;
58:21;59:22
**documentation (1)**
27:11
**documents (24)**
13:15,20;14:12,13,
15;15:5;36:2,3,7,18;
44:21;45:2;54:17;
58:6,13;59:18,19;
67:10,20;71:5,7,23;
73:25;77:2
**done (2)**
6:4;37:15
**door (1)**
76:10
**doubt (1)**
49:12
**draft (1)**
76:14
**drawing (1)**
49:16
**Drive (1)**
58:2
**due (4)**
9:9;17:14,15;18:21
**Dulberg (23)**
4:10,11,18;8:25;
9:5,10,13,14,20;10:9,
12;11:8,12;12:13,19;
13:2,3;75:16;77:6,7,
13,15,20
**duly (3)**
14:5,6;27:23
**during (6)**
39:13;40:2;44:23;
53:15;58:14;69:11
**dust (1)**
11:1

**E**

**earlier (7)**
6:13;8:5;25:23;
52:20,22;53:22;54:2
**early (2)**
4:6;7:20
**easier (1)**
4:17
**education (5)**
40:22;41:9,14;56:8,
23
**effect (3)**
11:12;18:6;29:7
**effective (1)**
33:11
**effectiveness (1)**
18:12

**effectuate (1)**
48:16
**efficacy (1)**
48:20
**eight (1)**
8:2
**either (7)**
10:7;14:11;25:22;
53:22;54:24;60:20;
64:8
**election (2)**
69:1,21
**Electric (2)**
34:17,18
**elements (2)**
42:11;67:2
**eleventh (1)**
21:6
**eliminate (2)**
36:24;55:23
**else (2)**
4:7;71:1
**email (1)**
75:17
**encumbered (1)**
68:24
**encumbrance (1)**
62:1
**end-run (1)**
75:24
**enforce (1)**
74:10
**enforceable (2)**
61:9,10
**enough (2)**
32:23;71:13
**ensure (2)**
72:24;76:13
**ensuring (1)**
75:22
**enter (2)**
74:3,24
**entered (4)**
5:16;39:8,9;53:16
**entire (6)**
6:9;45:7;54:21;
65:3,15;66:3
**entirely (4)**
36:24;45:23;46:10;
64:19
**entirety (1)**
72:18
**entitled (7)**
23:24;25:6;45:17;
49:5;58:9;65:12;
66:22
**entity (5)**
27:13;43:16;45:9,
13;71:24
**equitable (3)**
44:7;52:11;61:2
**Erica (32)**
4:25;19:9;29:1;

31:6;36:11,11;38:23;
39:20,23,25;40:3;
45:24,25;46:4,10,14;
48:2;53:3;55:13,14,
16;57:8,14,15;62:14,
20,21;63:23;64:19;
65:22;66:5;78:16
**Erica's (15)**
31:9;36:13,17,21;
40:4;51:1;54:23;
56:18;57:2;60:6,18;
62:24;63:1;64:7;
71:11
**Ermatinger (1)**
65:4
**error (1)**
64:24
**essence (1)**
25:6
**establish (2)**
18:11;47:3
**established (3)**
46:13;57:17;67:2
**establishes (2)**
46:18;60:9
**estate (53)**
21:8;24:15;25:8;
26:2,18,23,25;36:25;
39:5;43:5,9,11,18;
44:12;45:4,7,25;51:5,
16,17;52:2;53:20;
54:1,21;55:21,23,25;
56:13;57:18;58:6,9,
12;59:6,24;60:19;
61:1,4,20;64:20;65:8,
12,17,22;66:7,18;
68:10;69:5;71:24;
74:1,10,19;75:22;
76:1
**estates (1)**
27:3
**estopped (5)**
43:17;52:1,24;54:5,
11
**estoppel (4)**
46:21;52:11,19,25
**Even (11)**
20:7;22:13;32:25;
37:19,25;45:2,16;
54:18;60:20;74:5,22
**event (2)**
32:25;36:16
**everybody (1)**
26:21
**evidence (37)**
13:20;14:9;15:7,9;
22:14;24:3;28:12;
29:5;33:8,15;34:1,6;
35:5,10;38:7,9,10;
43:13;45:12;48:5;
49:8,15;50:7,14;55:4,
12;57:9;59:15,23;
60:6,14,15,22;63:13;

70:25;71:15;72:15
**evidencing (2)**
54:17;71:23
**evincing (1)**
67:10
**evolving (1)**
26:4
**exactly (1)**
34:15
**examining (1)**
45:4
**example (1)**
36:22
**exceeding (1)**
46:7
**excellent (1)**
6:24
**except (1)**
51:17
**exception (1)**
31:2
**excessive (1)**
42:20
**exchange (2)**
41:23;46:3
**exclusion (1)**
65:8
**exclusive (9)**
18:7;19:12,16;20:9;
21:8;31:25;32:4,11,
19
**excruciating (1)**
25:22
**excuse (4)**
12:15;30:14;50:5;
51:19
**executed (4)**
55:14;57:22;58:21,
25
**executing (1)**
58:6
**execution (1)**
62:7
**executor (2)**
57:23;58:11
**exempt (4)**
26:1;31:6;39:3;
43:10
**exempted (1)**
31:13
**exemption (14)**
14:4;25:24;39:15,
17;51:7;52:3;53:4,7,
9,12,17,19;54:3,9
**exemptions (1)**
43:8
**exercise (1)**
42:20
**Exhibit (1)**
37:2
**exhibits (5)**
13:16;14:1,7,9;28:4
**exigencies (1)**

52:17
**exist (1)**
26:15
**existed (1)**
36:15
**existence (4)**
18:5,12;35:1;48:8
**exists (2)**
36:15;55:9
**expanded (1)**
51:2
**expenses (2)**
55:21;76:2
**explaining (2)**
16:8;36:4
**explanation (1)**
29:16
**explicit (1)**
72:11
**explicitly (1)**
28:25
**express (1)**
57:12
**expressly (2)**
18:15;21:11
**extent (3)**
27:23;45:8;61:18
**extreme (1)**
11:19

**F**

**F2d (1)**
34:18
**F3D (1)**
20:16
**fact (16)**
15:16;33:4,8,16;
34:9;49:4,6,13;50:3;
67:2;68:20,21,22;
69:18,19;72:15
**fact-finder (1)**
50:8
**fact-finding (2)**
35:12;73:24
**factor (2)**
21:20,25
**factors (4)**
20:19;21:2,4;52:18
**facts (34)**
10:18;11:21,21,25,
25,25;12:6,23;14:19,
24;15:6,8,10,25;
23:17,23;24:2,2;
33:25;34:19,22,24;
38:12;42:10;43:1;
47:17;49:12,16,21;
50:14,17;52:7;67:21;
70:24
**factual (5)**
15:4;23:25;35:1;
36:9;50:8
**failed (3)**

30:9;43:24;46:23
**fails (2)**
15:4;29:13
**failure (3)**
29:17;30:11,12
**fair (3)**
73:5,7;76:13
**faith (2)**
68:16;71:20
**fall (1)**
31:13
**falls (3)**
26:2;28:15;31:1
**familiar (4)**
12:22,23;23:17;
32:22
**family (10)**
47:4;57:25;58:4,5,
8,12,13,16,22;59:3
**far (2)**
27:20;36:24
**fashion (1)**
36:14
**favor (2)**
35:6;72:17
**favorable (1)**
50:17
**February (6)**
8:1;10:3;12:18;
18:10;38:13;75:20
**federal (3)**
20:7;36:25;55:23
**fees (1)**
76:2
**few (1)**
53:3
**fide (2)**
43:22;44:4
**fifty (9)**
38:21,21;42:8;
50:25;51:1;53:25;
54:13,15;60:17
**file (7)**
9:11;17:7;22:4,23;
23:4;50:2;74:10
**filed (57)**
5:23;10:14;14:11,
12;15:19,21,23;16:5,
7,11,16,19,24,25;
17:1,8,12,15,18,24;
18:9,14,16,23,25;
19:6,23;21:6,10,16;
22:3;23:3,21;26:9;
28:6;29:25;30:8,11;
35:20,24;38:6,13,14,
18,24;42:1,6;51:10;
53:3,5,24;60:14;61:1;
69:8;73:25;74:20;
77:18
**files (1)**
18:18
**filing (7)**
15:16;26:10;44:23;

76:24;77:2;78:14,18
**fill (2)**
76:19,22
**finally (4)**
22:10;47:15;48:24;
54:4
**financial (3)**
38:19;51:8;53:9
**find (3)**
37:1;49:13;64:25
**findings (1)**
72:12
**finds (17)**
19:20;21:3,21;
22:11;54:10;57:20;
59:12;60:17,21;
63:15;64:4,6;66:14;
67:1;70:2,24;72:14
**fine (7)**
8:13;9:4;12:11,11,
14;23:2;31:20
**finish (2)**
25:15;30:20
**first (14)**
4:13;9:3;16:19;
17:18;26:2,20;28:11;
31:15;36:19;39:10;
68:17;70:6;71:20;
75:4
**fit (1)**
29:11
**five (1)**
13:15
**floor (2)**
13:3,5
**focused (2)**
10:21;76:24
**folks (1)**
4:15
**following (5)**
17:6;33:9;34:20;
38:12;61:24
**follows (3)**
55:13,18;59:25
**footnote (1)**
24:1
**forced (1)**
67:14
**foreclose (1)**
50:12
**formally (1)**
58:5
**formation (1)**
48:9
**formed (1)**
48:8
**former (1)**
39:22
**Forsythe (1)**
4:25
**forth (3)**
24:20;34:22;50:14
**forward (1)**

24:12
**found (4)**
24:24;47:22;69:24;
70:3
**four (1)**
20:19
**frankly (1)**
10:20
**frauds (1)**
59:6
**FRBP (1)**
49:1
**FRCP (1)**
49:1
**Free (3)**
6:24;44:6;62:4
**front (2)**
6:8;37:5
**frustration (1)**
76:7
**full (4)**
6:23;8:1;51:4;63:6
**functions (1)**
49:17
**fundamental (1)**
50:22
**funded (16)**
37:7;45:23;46:10,
13;55:17;56:1;57:13,
17;60:8,13,16;62:23;
63:1,12;64:16,19
**further (6)**
25:21;34:2;38:3,3;
60:5;73:16

**G**

**gaining (1)**
52:12
**gave (1)**
33:21
**generally (1)**
42:18
**genuine (9)**
34:23;35:4;49:4,8,
14;50:3,15;67:1;
72:15
**gets (1)**
12:21
**given (3)**
6:3;10:16;53:8
**Glenn (4)**
57:23,24;58:11,14
**Goe (1)**
4:25
**goes (5)**
23:22;29:1;31:8;
33:6;37:6
**Good (8)**
4:11,24;5:2;9:18;
10:10;13:7;68:16;
71:20
**governed (1)**

20:7
**governing (1)**
49:7
**grant (8)**
20:20;29:21;34:20;
41:22;49:3;58:25;
59:24;60:1
**granted (12)**
20:16;26:25;43:15;
44:21;47:20;50:5,7;
55:10;65:3;72:18;
73:13;78:7
**grantee (1)**
58:3
**granting (7)**
20:23,24;21:20,25;
22:1,8;73:9
**guess (1)**
10:17

**H**

**half (9)**
15:22;16:7;17:24;
22:4;26:5,5;35:22,23;
46:2
**Halvard (5)**
57:23;58:7,11,16,
18
**Halvard's (4)**
58:2,9,12;59:8
**hand (2)**
60:2;77:23
**handling (1)**
7:14
**hands (1)**
30:19
**hanging (1)**
16:9
**happened (4)**
5:22;6:11;16:10;
76:9
**happening (1)**
35:3
**happiness (2)**
41:10,15
**happy (2)**
28:3;77:10
**harming (1)**
76:1
**hats (1)**
25:11
**heading (1)**
30:2
**health (5)**
40:22;41:9,14;56:8,
23
**heard (3)**
16:8;31:21;53:16
**hearing (28)**
8:1;12:16,25;15:16,
21,22,24;16:4,6;
17:10,14,17,23,23,25;

18:10;21:4,10;22:6,
18;23:19;28:19;
53:15;69:10;72:10;
76:9,15;77:24
**hearings (1)**
10:3
**heated (1)**
74:14
**Heggstad (8)**
46:17;57:18,22,24;
58:17,18;59:12,18
**held (22)**
24:16,17;25:8;26:6,
14;29:6;39:4;41:21;
50:25;51:1,4,16;59:1;
60:18;62:18;63:23;
65:2;66:1,3;69:10;
70:13;72:10
**Hello (1)**
4:10
**Herbert (2)**
69:5,8
**Herbert's (2)**
69:11,25
**high (1)**
24:4
**highlight (3)**
12:25;23:18;31:19
**highlights (2)**
43:12;48:14
**himself (1)**
27:1
**Hodges (1)**
4:25
**hold (9)**
4:17;6:2;15:9;
32:18;44:1;48:7;
53:11;67:20;71:13
**holder (2)**
70:13,19
**holding (2)**
43:22;67:5
**holds (14)**
25:11,25;43:5,19;
44:25;45:9,13,16;
59:14;61:18;66:19,
21;71:4,25
**homestead (8)**
14:4;52:3;53:4,7,9,
12;54:3,9
**honest (1)**
10:25
**Hono (1)**
6:12
**Honor (92)**
4:11,12,14,24;5:8,
17;7:19,20,24;8:13,
17,21,25;9:18;10:12,
20;11:8,16;12:13;
13:4,7,11,24;14:18,
23;15:11,13;16:11;
22:21,24;23:11,20,21;
24:4,11,13,19;25:4,

20,21,23;26:7,15,19;
27:7,9,10,25;28:2;
30:8;31:21;34:10,13,
17,23,24;35:4,7,9,14,
17,20;36:10;37:1,8,
19,21,23;38:1;72:21,
25;73:3,10,17,18,21,
24;74:2,3,9,13,14,23,
23;75:3,15,19;76:18,
19;77:6,10;78:19
**hour (3)**
21:7;31:24;32:14
**house (2)**
28:13;39:12
**housekeeping (1)**
13:12

## I

**idea (2)**
10:10;31:10
**identical (1)**
64:5
**identified (1)**
57:25
**identifying (1)**
49:25
**immunized (1)**
26:1
**impacted (1)**
22:13
**important (1)**
13:13
**improve (1)**
41:24
**impute (1)**
68:9
**inapplicable (3)**
46:21;59:12;65:8
**Inc (1)**
34:17
**include (3)**
14:1;66:10;78:2
**included (4)**
43:7;58:1;65:7;
66:6
**includes (3)**
24:10;39:24;61:2
**including (9)**
6:10;18:5;41:21,24;
48:4;65:4,16,21;78:4
**income (26)**
24:20;32:6;40:1,10,
11,13,16,17;41:1,4,7,
8,8,10;55:15;56:3,5,6,
16,20,21;62:2,4,22;
63:3,9
**income-producing (1)**
46:1
**inconsistent (6)**
52:14,20,23;53:1,
21;70:20
**inconvenience (3)**

20:24;22:1,8
**incorrect (1)**
31:11
**incur (1)**
76:2
**incurred (1)**
68:3
**Independence (1)**
58:1
**indicate (1)**
20:3
**indicated (6)**
18:9;39:3;50:24;
51:14;53:8,10
**indicates (6)**
18:24;19:16;28:12;
31:2;66:19,22
**individual (3)**
39:7,9;48:21
**inference (1)**
73:1
**inferences (1)**
49:16
**influence (1)**
33:1
**information (1)**
51:3
**informing (1)**
49:24
**initial (3)**
19:22;49:24;69:10
**initiated (1)**
68:25
**inquired (1)**
69:23
**inquiry (5)**
47:8;67:18;68:20,
22;69:18
**inside (1)**
47:4
**insofar (1)**
31:4
**installments (1)**
40:18
**instead (5)**
21:8;36:18;37:11;
59:14;62:14
**instructions (1)**
58:15
**instrument (5)**
40:7;58:19;61:5;
69:16;70:1
**instruments (1)**
69:15
**insufficient (6)**
48:15,19;55:9;56:6,
21;71:16
**integrity (1)**
52:15
**intended (3)**
34:14;46:1;64:13
**intentional (1)**
74:1

**intentionally (1)**
15:20
**interest (68)**
16:17,22;18:15,19;
21:12,13;26:16;27:7,
21,22,24;29:1;36:6;
39:6;42:9;43:20,23,
24;44:1,7,7,8,10,17,
22;45:1,9,14,16,18;
46:24;47:7;48:17,22;
51:16;54:14,15,23;
55:19,20;56:12;61:3,
9,16,17,18,19;62:2,3;
65:19;66:19,21;67:6,
8,10,13,21,23;69:12;
70:12,15,17,20;71:2,
6,8,25;72:2
**interested (2)**
12:25;23:18
**interests (4)**
18:6;44:20;61:2,7
**interference (1)**
62:5
**interfering (1)**
30:17
**internal (7)**
18:2,4;19:17,19;
20:3;32:2,8
**interrogatories (3)**
13:19;47:2;50:1
**into (16)**
13:20;14:9;15:7;
19:8;20:1;24:3;25:22;
26:12;39:8,10;57:20;
58:20;64:3;77:10,11;
78:15
**invalid (7)**
45:12;54:21;61:22;
63:18;64:7,15;65:15
**involved (1)**
7:4
**involving (2)**
4:13;44:11
**irrelevant (2)**
34:19;45:12
**irrevocable (1)**
51:2
**IRS (1)**
60:12
**issue (25)**
5:9;32:3;33:7,7,12,
14,16;34:8,8,16,23;
35:4;38:20;49:14;
50:3,15,22;60:22;
64:21;65:16;67:1;
69:11;72:6,15;76:11
**issued (2)**
60:12;69:7
**issues (4)**
18:1,4;19:13;33:4
**item (1)**
4:13

## J

**Jason (1)**
56:19
**John (1)**
13:8
**join (3)**
24:24;29:12;30:2
**joinder (9)**
30:6;47:22;48:25;
60:5;63:25;64:3;72:4,
11,12
**joined (6)**
28:14;29:4,21;30:1,
5;47:16
**joining (1)**
17:9
**joint (7)**
5:8,11;17:1;30:11;
70:20,21,23
**jointly (1)**
70:14
**Jones (1)**
13:8
**Joseph (2)**
4:25;53:4
**judge (2)**
7:16;49:17
**judge's (2)**
7:17;8:15
**judgment (39)**
5:19;7:5;8:24;9:8;
10:3,11,14;12:1,22;
13:9;15:24;17:4,12,
25;18:1;23:1;29:22;
32:17;33:5;34:9,20,
21;38:6;47:20;49:2,3,
5,22,23;50:5,6,12,16;
65:3;72:18;73:9;78:2,
7,10
**judicial (12)**
13:25;14:13,14;
37:2;46:20;50:20;
52:11,15,19,25;66:23;
72:7
**judicially (3)**
43:17;52:1;54:10
**July (3)**
16:24;17:1;42:6
**jumped (1)**
4:20
**jumps (1)**
35:17
**June (27)**
7:12,14,18;8:4,14;
14:5;16:18,23;24:5,
14,16;25:1,24;26:5,
13,17,23;27:4,14,14,
16,22;33:6;35:22,25;
38:20;39:12
**junior (3)**
43:23;44:3;67:6

**jurisdiction (13)**
18:8;19:11,13,17;
20:6,9;21:7,9;31:25;
32:4,11,19;69:14
**jury (4)**
35:5;49:9,16,20
**justifiable (1)**
21:23

## K

**keep (1)**
26:22
**Ken (1)**
9:5
**Kenneth (2)**
9:19;56:18
**kind (3)**
37:7;56:1;75:12
**Klein (172)**
4:5,8,23;5:3,10;6:6,
13,14,15,16,17,22;
7:3,10;8:21;9:5,19;
14:7;16:20,20,22;
18:2,4,5,9,14,16,18,
20,23;19:10,11,15,20,
23;20:6;21:7,10,13,
16;22:4,7,11;24:16,
17,19;25:8;26:3,16,
21;29:1;32:10;36:12,
22;37:9,17,17,21;
38:23;39:5,20,20,20,
23;40:6;42:3,5,14,14;
43:2,7,12,19,20,24;
44:16,22;45:14,19,22;
46:2,4,9,15,23,25;
47:6,12,15,22;48:1,3,
21;51:5,7,12,14,18,
19,22;52:1,3,8;53:3,5,
17;54:1,2,4,7,10,12,
14,19,22,24;55:1,13,
14,16;56:4,5,7,10,17,
18,19,22;57:4,7,8,10,
14,18;61:24;62:9,13,
14,17,20,21;63:3,3,5,
8,10,14,19,21,23;
64:7,9,17,24;65:18,
24;66:1;67:12,16;
70:7;71:1,10,21;72:4;
74:7;75:19;76:10,16;
77:4;78:16,17
**Klein's (22)**
32:5;45:7,11;48:10,
24;50:23;51:8,17;
52:6;53:4,21;57:2,20;
60:19;64:22;65:1;
66:6,18;71:24;72:5,9,
11
**Kloehn (1)**
20:16
**knew (1)**
16:6
**knowingly (1)**

76:16
**knowledge (2)**
67:25;68:8

---

**L**

---

**LA (6)**
15:17;18:9;19:6;
35:11;58:9;73:20
**language (4)**
58:16,22;60:3;
72:22
**last (5)**
7:25;23:7;26:21;
31:16;34:4
**late (2)**
31:24;32:14
**later (5)**
18:18;21:17;35:13;
52:13,19
**law (26)**
12:23;14:15;20:7,7;
23:17,22,24;25:5,25;
31:11;32:13;33:2;
42:18,23;44:5,14;
49:5,7;61:6,10,22;
62:7;68:9,10,14;
70:18
**lawsuit (1)**
73:24
**lay (1)**
15:10
**lead (2)**
49:13;72:7
**learned (1)**
68:22
**least (8)**
26:4;28:14;29:12;
40:18;54:13;75:5,7,
11
**leave (1)**
28:2
**ledger (3)**
47:1;51:19;60:2
**ledgers (16)**
29:7;33:9,9,14;
48:11,13;51:23;
54:25;55:8;59:20;
60:3;71:11,16,17,21,
22
**leeway (1)**
33:21
**legal (7)**
33:1;37:13;49:1;
61:2;62:1,3;66:17
**legitimate (1)**
49:16
**lens (1)**
12:7
**Leslie (3)**
6:17;31:10;39:19
**Leslie's (1)**
31:9

**level (1)**
24:4
**liable (1)**
62:6
**life (7)**
26:23,25;27:3;39:5;
45:25;51:5,17
**lifestyle (1)**
53:11
**lifetime (2)**
39:13;40:2
**light (2)**
50:17;75:9
**lighting (1)**
28:18
**likely (1)**
64:24
**likewise (1)**
48:15
**limited (3)**
20:10;39:17;52:24
**line (2)**
32:20;34:7
**list (2)**
19:18,20
**listed (4)**
38:19;39:14;50:24;
58:4
**lists (1)**
42:3
**litigated (1)**
30:5
**litigating (2)**
18:21;22:7
**litigation (1)**
39:16
**little (3)**
4:6;34:14;74:13
**live (1)**
39:12
**lived (1)**
39:13
**lives (1)**
70:10
**living (107)**
14:7;16:20;19:14;
24:17,17;25:8;36:12,
13,22;37:9,17;39:20,
23,24,25;40:3,5,7,9,
11,15,18,23,24,25;
41:2,6,11,11,17,18,19,
25;42:3,12,15,16;
43:2,13;45:13;46:13,
16;47:1,19,20,23,25;
48:2,14,15;52:8,9;
54:14,16,20,22;55:5,
6,12,14,16,16,25;
56:2,9,15,25;57:6,8,
10,12,14,23;59:4,13,
14,16,21;60:19,24;
61:12,24;62:8,16,19,
20,22,23,24;63:2,9,
11,15,18,24;64:1,7,

10,14;65:18,23,25;
66:1;71:10,12,24;
72:16
**locate (1)**
77:1
**located (1)**
58:1
**logical (1)**
73:1
**look (3)**
12:7;13:13;35:18
**looked (2)**
5:14;23:3
**looking (4)**
29:24;37:4;54:15;
76:25
**LOS (2)**
4:1;27:12
**lot (2)**
10:25;77:1
**Lucas (48)**
4:20;8:24;9:2;13:1,
4,5,7,8,23,24;14:17,
18,22;15:8,11;16:2;
22:20,21;23:2,5,8,11,
14,20;25:12,14,18,19;
30:19;31:15;34:3,12,
13;37:5,6;72:19,21;
73:2,3,10,16,17;
75:14,15;76:8,18;
78:9,19

---

**M**

---

**main (1)**
14:11
**maintain (5)**
40:22;41:10,15;
56:9,24
**makes (2)**
4:16;7:23
**making (2)**
30:7;75:12
**man (1)**
68:20
**manage (1)**
41:21
**mandate (1)**
48:3
**manner (6)**
40:23;41:11,16;
47:16;56:9,24
**many (2)**
23:12;70:13
**March (2)**
16:10;38:18
**marital (34)**
16:21;18:12;19:1,9,
14;20:2;24:18;27:6;
29:2;30:4;31:4;35:23;
36:23;37:20;38:22;
39:4;40:8,9,12,13,15,
19;41:18;42:4,9,13;

44:11;45:8;51:2,4,14,
19,23;57:16
**married (1)**
58:7
**material (8)**
33:4;34:9;49:4,6,
12;50:3;67:2;72:15
**materials (2)**
10:24;31:12
**matte (1)**
42:11
**matter (19)**
4:4,19,23;6:25;
17:14;19:22;21:24;
23:24;25:2,9;27:13;
32:2,10;37:11;49:5;
71:1;73:13,14,15
**matters (3)**
4:5,8;13:12
**maximum (2)**
46:6;65:12
**may (24)**
4:7;7:19;8:6;11:13;
16:18,19;36:20;37:7;
38:14;39:12;40:12;
41:3;42:1;43:23;44:6,
9;48:1;50:11;56:1;
59:25;68:1;69:2;72:1;
75:15
**maybe (5)**
7:8,23;11:1;75:6;
77:3
**MDT (45)**
25:9;26:6;27:10,13;
35:23;36:1,6;37:10,
25;45:19,22;46:2,9,
12,22,24;47:3;48:11;
51:20;52:5;53:22;
54:6,11,24,25;55:22;
56:2,5;57:11,13;60:7,
15,21;62:13,25;
63:22;64:9,18;66:21;
71:3,5,8,22;72:2;
78:15
**mean (3)**
25:16,19;37:21
**meaning (1)**
43:4
**means (1)**
69:16
**meant (3)**
5:18;26:22;64:25
**mediate (1)**
6:25
**mediation (9)**
6:23,23;9:21,22,25;
10:1,10,15,19
**mediator (1)**
6:24
**meets (1)**
66:15
**memorializing (1)**
71:5

**Menlo (1)**
58:2
**mention (1)**
17:16
**mentioned (9)**
17:2,19,22;30:21;
33:25;34:5;59:19,20,
22
**mere (2)**
35:1,2
**merely (2)**
50:11;53:11
**metaphysical (1)**
49:11
**midst (1)**
9:10
**might (11)**
6:13;7:9;10:6,6,10;
12:13;36:4;49:6;
68:22;72:2;75:10
**million (1)**
50:24
**mind (1)**
21:19
**minimum (5)**
36:23;37:13;41:10,
16;55:22
**misconstrues (1)**
57:4
**miss (1)**
5:16
**mistaken (2)**
10:4;46:17
**modified (1)**
15:6
**moment (1)**
52:17
**Monday (1)**
23:5
**money (1)**
8:9
**month (1)**
58:6
**months (13)**
7:8;8:2;15:22;16:7;
17:24;18:18;21:6,17;
22:3,8;24:25;53:3;
72:11
**moot (1)**
73:15
**more (13)**
7:23;11:2,22;15:22;
16:7;17:21,23;22:4;
25:14;49:11;75:21;
76:3,4
**morning (6)**
4:11,24;5:2;9:18;
13:7;23:5
**most (4)**
18:17;21:16;50:17;
64:23
**motion (63)**
8:23;9:8,8;11:11,

---

15;12:21;13:9;15:15,
19,20,23,24;16:1;
17:8,9,12,24;18:1,23;
19:25;22:3,17,23;
23:1,21;24:1,24;28:4,
5;29:13,18,22;30:6;
31:22;33:18,20;
34:21;38:5,6;47:19,
22;49:21,25;50:16,18,
21;60:5;63:25;64:3;
72:11,13,18;73:2,7,9,
13,22;74:3,10;76:25;
77:12;78:1,6
**motions (2)**
17:7;49:2
**movant (6)**
13:6;22:10;31:15;
49:4,10;50:12
**move (2)**
24:12;33:23
**movement (3)**
20:21,25;49:5
**moves (1)**
72:24
**moving (3)**
12:15;50:5;77:16
**MSJ (5)**
21:5;22:18,19;
23:15;49:17
**much (10)**
4:17;8:8,10;9:15,
20;40:21;41:7,13;
56:7,22
**must (13)**
18:8;27:23;29:10;
35:4;47:4;49:11;
50:13,17,22;60:23;
66:9;68:15;71:19
**mute (5)**
28:20;30:17,18;
45:20,21
**myself (1)**
13:14

## N

**name (5)**
6:24;26:21;29:17;
30:9;58:2
**named (5)**
29:10,10,16;74:6;
78:3
**names (1)**
26:20
**naming (2)**
57:22,23
**Nancy (4)**
58:7,7,20,24
**narrow (1)**
76:24
**necessary (13)**
17:9;24:25;30:3;
40:21;41:8,14;45:6;

47:15;48:9;53:9;56:7,
23;72:6
**need (2)**
30:16;73:11
**needed (1)**
50:9
**needs (1)**
18:22
**negatively (1)**
22:13
**neither (4)**
51:15;60:2;66:20;
70:6
**net (3)**
40:17;41:7;56:5
**nevertheless (2)**
27:4;74:8
**new (4)**
7:16;8:15;18:20;
30:6
**next (4)**
12:16;26:19;50:22;
60:22
**nine (2)**
22:8;74:18
**ninety (1)**
7:24
**Ninth (3)**
20:19;21:2;52:24
**nomenclature (1)**
30:12
**non-bankruptcy (2)**
61:5,10
**non-binding (1)**
72:7
**nondischargeability (1)**
4:13
**None (2)**
35:6;71:22
**non-estate (1)**
36:5
**nonmoving (7)**
35:6;49:9,14;50:4,
7,11,13
**nor (7)**
35:2;43:14;51:16;
59:22;60:2;70:6;71:6
**North (2)**
38:20;39:12
**note (2)**
8:25;68:24
**noted (9)**
20:5;21:15;22:3;
42:3;59:5;60:5,21;
63:12;70:22
**notes (3)**
18:16;48:24;64:22
**notice (38)**
14:1,13,14;37:2;
38:15;44:6,17;45:6;
47:9,11,13;48:19;
50:20;67:11,18,18,22;
68:9,11,18,19,21,25;

69:2,14,15,17,18,19,
20,21;70:5,9,11,16,
25;71:7,14
**notion (1)**
31:7
**notorious (1)**
47:10
**Notwithstanding (1)**
61:4
**November (2)**
39:8,11
**number (15)**
4:23;8:25;13:14,25;
15:7;23:21;28:10;
31:1;35:18;73:13,14,
21,22;74:23;77:9

## O

**objected (2)**
53:4;58:20
**objection (5)**
13:21;14:25;53:5,
15,24
**objections (2)**
28:6,6
**obligation (1)**
68:2
**obtain (1)**
54:4
**obtained (1)**
44:9
**obvious (1)**
33:5
**obviously (3)**
11:21;75:4;76:8
**occupancy (1)**
70:15
**occupant (2)**
70:20,21
**occupants (1)**
70:23
**occupies (1)**
70:14
**occurred (2)**
60:22;63:13
**October (4)**
17:10,14,15;29:25
**off (2)**
25:17;34:15
**offer (1)**
77:8
**Office (1)**
38:14
**offline (1)**
7:6
**often (1)**
70:22
**Olsen (1)**
33:20
**Olson (41)**
5:2,4;13:21,22;
15:13,15,18;16:4,11,

14,15;25:13;28:9,10,
16,19,22,24;29:24;
30:8,14,15,20,22,23;
31:14,17;36:10;
73:19;74:4,12,16,22;
75:17,23;76:15;77:4,
23,25;78:5,17
**omits (1)**
30:2
**once (2)**
11:1;17:2
**one (24)**
5:3;9:21;13:11;
15:12,21;17:22;19:6,
24;26:24;31:19;33:7,
21;35:16;49:18;
52:12;57:13;58:6;
63:9;68:5;70:23;
73:17;74:17,17;75:15
**ones (1)**
33:5
**one-third (1)**
58:9
**only (10)**
4:4;8:2;9:21;19:24;
20:17;27:15;46:6;
57:13,15;65:6
**oOo- (1)**
4:2
**open (1)**
47:10
**operation (1)**
32:3
**operative (1)**
42:2
**opponent (1)**
49:10
**opportunity (9)**
6:3;11:3;21:22;
53:16;73:7;75:6,7,12;
76:22
**oppose (1)**
23:10
**opposed (4)**
10:17;53:5,24;
69:10
**opposing (6)**
20:25;22:1;34:22,
25;49:18;50:18
**opposite (1)**
34:14
**opposition (24)**
9:8;10:16,23;11:10,
15,22,22;17:14,16;
22:5,23;23:4,13;
29:25;30:9,25;32:16,
20;38:8,10;51:18,22;
53:6;72:4
**oral (1)**
74:3
**order (29)**
4:3;5:15;14:4;16:5;
17:8;19:8;20:1;30:21;

34:14;53:16;68:15;
72:20,22;73:6;74:3,
15,24;75:6;76:15,18,
21,23;78:1,2,6,10,13,
13,14
**ordered (1)**
77:25
**orders (2)**
14:2;74:13
**ordinarily (1)**
65:5
**original (1)**
30:24
**others (1)**
65:10
**otherwise (4)**
9:16;12:14;15:3;
22:12
**ourselves (1)**
75:10
**out (14)**
5:9,12,25;6:7;7:24;
14:16;15:10;16:9;
20:11;26:5;27:18;
35:9,17;72:24
**outcome (1)**
49:7
**outline (1)**
48:1
**outlines (2)**
27:16;36:19
**outstanding (1)**
9:21
**over (14)**
21:8;34:19;42:16,
20;62:9,10;64:12;
65:9,14,25;66:2;68:7;
72:23;76:8
**overlap (1)**
11:20
**overlooked (1)**
28:11
**override (1)**
68:9
**Owen (2)**
43:9,10
**own (5)**
50:14;54:19,25;
63:10;64:13
**owned (15)**
24:14;28:13;35:22,
23;36:1;38:21,21;
39:19;47:18;51:15,
21;52:8;54:8,16,17
**owner (2)**
24:7;27:15
**ownership (5)**
27:22;48:16;52:6;
67:5;71:4
**owns (13)**
24:9;27:14,16;
35:25;36:6;45:7;
50:23;51:25;53:23;

54:6,11,13;72:16

## P

**Pachulski (1)**
13:8
**Pacific (1)**
34:18
**page (7)**
19:5,6,22,24;30:2;
32:20;34:6
**pages (1)**
37:2
**paid (1)**
51:3
**painstaking (1)**
23:22
**papers (6)**
10:13,22;11:5;
23:17;33:12;77:16
**Park (1)**
58:2
**part (5)**
53:19,25;54:19;
60:19;65:16
**participated (1)**
5:10
**particular (3)**
9:14;68:20;69:18
**parties (17)**
10:10,18;11:20;
17:9;20:10;21:21;
24:25;29:10,22;30:3;
35:2;39:13;47:15;
49:18;52:16;53:15;
78:3
**parties' (2)**
50:9;53:14
**partition (1)**
41:23
**partner (1)**
75:16
**party (25)**
20:25;22:1;27:2;
34:22,25;35:6;37:7;
43:14;49:9,14,23;
50:4,6,7,11,13,18;
52:12,21,22;54:18;
57:12;58:8;66:21;
72:19
**party's (2)**
52:19;53:1
**passes (1)**
56:18
**passing (1)**
60:7
**past (1)**
33:22
**pause (1)**
25:17
**pay (9)**
40:16,20;41:7,12;
56:4,7,20,22;74:19

**payment (1)**
55:21
**payments (1)**
41:22
**penalty (3)**
26:9;51:13;53:13
**pending (4)**
6:20;9:7;22:25;
35:11
**people (1)**
26:22
**Per (1)**
71:18
**percent (17)**
38:21,21;42:8;
50:25;51:1,15;53:23,
25;54:6,8,12,13,15;
60:17;66:19;71:13;
72:16
**Perfect (1)**
7:10
**perfected (4)**
43:22;44:13;45:1;
71:4
**perjury (3)**
26:10;51:13;53:13
**permits (2)**
45:10;65:6
**permitted (1)**
75:23
**person (8)**
27:14;53:18,20;
59:17;61:13;68:18;
69:16,17
**personally (2)**
27:1;35:22
**persons (1)**
68:12
**persuading (2)**
52:21;54:1
**persuasive (1)**
65:1
**Peter (1)**
68:23
**petition (18)**
14:2;18:9,25;19:7,
22,24;22:15;38:13;
44:8;45:5;47:18;52:7;
66:18,24;67:9;69:8;
75:13;78:14
**petitioned (1)**
58:14
**ph (1)**
6:24
**phone (2)**
30:16;45:20
**piece (4)**
25:7,20,21;26:19
**place (1)**
58:19
**plaintiff (3)**
5:10;35:17;42:1
**plaintiffs (3)**

32:7;33:12;66:10
**plaintiff's (1)**
7:16
**pleading (1)**
42:2
**pleadings (7)**
12:22,24;27:5;35:3;
49:25;50:13;53:14
**please (9)**
4:8;6:3;12:23;
28:17,20;30:18,22;
32:20;45:20
**PM (1)**
78:22
**podium (1)**
38:2
**point (13)**
9:15;10:16;11:22;
14:22;22:22;23:20;
24:13;26:16;28:14;
29:12;32:17;33:1;
50:7
**pointing (1)**
35:9
**points (8)**
15:2;28:5,11;30:25;
31:18,19;33:21;38:2
**portion (2)**
50:25;65:6
**portions (1)**
49:25
**position (21)**
9:23,25;10:9;19:15,
24;43:10;46:5;52:13,
14,20,20,22,23;53:2,
21,22;54:2,6;57:19;
59:15;75:10
**positions (2)**
10:17;52:16
**possession (2)**
47:10;70:18
**possibility (1)**
9:22
**possible (2)**
7:19;36:24
**potential (1)**
47:13
**power (5)**
32:9;41:20;48:22;
64:13;68:7
**powers (8)**
44:2,11;67:4;68:1,
4,13;69:25;72:1
**prayer (2)**
24:10;66:13
**Precisely (2)**
12:8,10
**preclude (4)**
32:16;33:5;34:9,20
**precluded (2)**
25:1;62:11
**precludes (1)**
52:12

**predetermine (2)**
47:24;55:6
**prejudice (2)**
22:2;75:1
**prejudiced (3)**
20:25;22:10,12
**premarital (10)**
13:16,17;39:8,10;
44:9,15;48:21;67:14,
15;70:6
**prepare (1)**
78:1
**preparing (3)**
5:11;20:21;22:6
**pre-petition (1)**
5:18
**presence (4)**
47:12;48:18;67:17;
70:8
**present (1)**
21:22
**presented (3)**
28:12;29:5;72:15
**preserved (1)**
75:22
**presiding (1)**
76:8
**presumption (1)**
70:19
**prevailing (1)**
72:19
**prevent (1)**
60:24
**prevents (1)**
61:17
**previous (2)**
53:1,11
**previously (4)**
18:16;42:3;54:7;
64:1
**primary (1)**
53:8
**principal (27)**
24:20;32:6;40:2,11,
14,20,21,21,23;41:2,
4,13,13,14,16;51:3;
55:15;56:3,7,13,16,
22;62:4,22;63:4,8;
65:19
**principle (1)**
62:2
**prior (2)**
26:10;44:6
**pro (1)**
5:4
**probate (32)**
15:17;17:20;18:8,
25;19:12,15,16,18;
21:9;22:15,25;31:1,
25;32:4,12,19;35:11;
46:4;58:14,21,24;
60:8;64:17,17,25;
65:1;66:5;73:20;

75:13;76:24;77:2,9
**problem (2)**
21:12;30:10
**problems (1)**
28:19
**Procedure (1)**
39:16
**procedures (2)**
36:20;48:1
**proceed (7)**
9:25;10:1;13:12;
14:18;22:18;23:15;
78:9
**proceeding (5)**
6:10;14:8;76:25;
77:2,9
**proceedings (4)**
19:17,18;49:3;
78:22
**proceeds (1)**
46:4
**process (6)**
10:8;52:15;62:1,7;
74:16;76:13
**produce (1)**
43:25
**produced (4)**
13:15;27:20;43:12;
44:21
**prohibiting (1)**
52:15
**prohibits (1)**
61:16
**proper (2)**
17:19;46:18
**properly (5)**
34:21;46:16;48:8;
58:21;75:4
**properties (1)**
32:1
**property (241)**
14:6;16:18,23;18:7,
16,19;19:2;21:8,12,
14;22:7;24:5,7,10,14,
15,16;25:2,7,8,24;
26:1,2,5,14,17,18,24;
27:4,6,14,15,17,22;
29:6;31:6,7,9,9;33:6,
10;35:22,25;36:7,21;
37:9,12,20;38:20,20,
25;39:3,4,6,15,17,18,
18,25;41:21,21,24,25;
42:9;43:4,4,5,6,8,8,9,
11,11,13,15,17,17,20;
44:1,7,12,18,20,22,
24;45:1,3,5,7,9,10,14,
15,17,24,25;46:1,3,
15,19,21,25;47:3,7,
10,12,18,24;48:4,6,7,
11,16,18,18,23;50:23,
24;51:4,8,10,15,17,
21,25;52:2,2,3,4,7,8;
53:7,8,17,19,19,23,

eScribers, LLC

Leslie Klein

December 18, 2024

25;54:3,7,9,12,13,16,
17,19,21,21,23;55:1,
2,5,9,10,19,25;57:5,6,
7,10,20,25;58:1,2,3,4,
15,18,20,23;59:1,2,5,
10,11,14,16,20,25;
60:1,9,16,17,18,20;
61:3,3,4,19;62:18,23;
63:1;64:8,20,20;65:5,
10,16,21,21;66:1,11,
16,19,22;67:6,7,9,13,
17,21;68:2,4,6,7,15,
16,23;69:24;70:8,10,
12,14,15;71:2,4,6,9,
13,15,16,18,22,25;
72:3,16,23,24;74:1,
19;76:1
**property's (2)**
66:10,24
**proportion (1)**
63:1
**proportionate (1)**
46:7
**propose (1)**
72:22
**proposition (1)**
42:25
**propound (1)**
17:6
**prosecute (1)**
75:25
**prosecuting (1)**
68:21
**protect (3)**
43:4;52:15;53:12
**protected (2)**
42:21;61:20
**provide (8)**
27:3;37:9;55:1;
62:9;67:22;70:5,11,
16
**provided (12)**
19:25;45:6,25;47:2;
55:17;56:1,2;58:7;
62:19,24;65:18;70:9
**provides (17)**
29:1;36:22;40:10,
12,15,19;41:1,3,6,12;
49:1;54:22;56:15;
61:8;67:24;68:6;
69:14
**providing (3)**
66:16;67:10;72:22
**provision (12)**
32:7;42:21;54:20;
60:4,23;61:4,15,20;
62:18;63:18;64:6,14
**provisions (8)**
37:8;46:13;47:23;
48:1;56:14;61:21,25;
68:9
**prudent (3)**
68:19;69:17,22

**publicly (1)**
14:12
**purchase (1)**
36:5
**purchaser (5)**
43:22;44:4;47:11;
69:22;71:19
**purported (3)**
24:8;67:23;70:12
**purportedly (3)**
26:23,24;66:3
**purporting (1)**
45:3
**purpose (1)**
52:14
**purposefulness (1)**
76:5
**purposes (2)**
49:6,21
**put (9)**
10:24;47:11,13;
67:17;68:19;69:17;
70:8;71:7,13

## Q

**quiet (14)**
16:17,22;24:5,12,
13;25:20,21;29:8,9;
42:11;66:9,15;67:3;
72:17
**quieting (1)**
66:23
**quite (1)**
4:22
**quote (5)**
17:20;19:7;21:11;
34:17;39:12

## R

**race- (1)**
69:13
**raise (1)**
33:4
**raised (9)**
15:2;30:12,20;
32:16,20,23,25;69:12;
77:23
**raises (1)**
34:8
**raising (2)**
33:14;34:5
**rather (11)**
12:1;19:12,23;20:7;
34:20;45:23;47:25;
50:13;57:9;63:23;
70:13
**rational (1)**
49:13
**re (5)**
20:5,12;42:24;47:7;
70:21

**reach (4)**
35:5;46:6;65:10,11
**reached (2)**
5:25;6:7
**reaching (1)**
60:25
**read (5)**
12:22;20:9;23:16;
77:10,11
**ready (2)**
21:23;38:4
**real (18)**
35:5;39:18;44:11;
45:4;46:19;47:10;
55:9;59:5,25;60:1;
68:3,6,7,10,14,23;
69:5;71:18
**realize (2)**
29:17;30:9
**really (6)**
6:8,11,21;8:1;
35:16;75:4
**reargue (1)**
31:18
**reason (4)**
21:23;28:13;29:4,
11
**reasonable (3)**
35:5;49:8,20
**reasons (3)**
47:19;73:12;78:6
**reassigned (2)**
7:15,22
**receipt (1)**
62:2
**receive (1)**
61:13
**received (1)**
69:6
**recent (1)**
21:16
**recently (1)**
18:17
**recited (1)**
73:21
**recognized (1)**
65:5
**recognizes (1)**
42:18
**reconsider (1)**
75:10
**record (17)**
14:20;15:5,9;22:24;
28:5,21;30:17;31:23;
49:12,19;60:15;69:9;
73:12;77:10,11;78:6,
8
**recordation (1)**
44:13
**recorded (36)**
14:5,6;27:6,11,16,
23;28:24,25;36:14,
14;39:18,24;43:25;

44:10,16,21;45:4;
47:5;48:13,18;55:3;
58:14;59:20;67:10,
19;68:15;69:1,3,22;
70:7;71:5,7,17,19,23,
23
**recorder (5)**
45:20;69:2,3,22;
70:4
**recording (2)**
48:14;69:8
**recordings (1)**
70:4
**records (3)**
45:4;68:17;71:20
**recover (1)**
45:10
**recreate (1)**
78:12
**reduce (2)**
36:24;55:23
**Reem (1)**
4:24
**reference (3)**
24:1;37:1;64:22
**references (1)**
28:4
**referred (1)**
30:10
**reflected (1)**
39:14
**reflecting (2)**
43:15;55:10
**reflects (2)**
27:15;39:19
**reform (1)**
73:25
**reformation (1)**
35:12
**regard (4)**
67:25;68:7;74:15,
15
**regarding (23)**
6:9;7:4,7;14:2;18:1,
4;19:13,17;22:7;30:1;
45:1,5;48:24;52:6;
55:12;56:2,15;57:4;
58:15;65:3;69:23;
71:3;72:12
**regardless (2)**
43:5;65:22
**regards (1)**
70:18
**reiterate (2)**
12:24;73:11
**reiterates (4)**
48:17;55:4;67:19;
71:14
**rejected (2)**
48:25;72:10
**relate (1)**
18:1
**related (1)**

70:23
**relates (2)**
32:8,9
**relating (1)**
32:2
**reliance (3)**
57:21;65:1;70:2
**relied (2)**
53:1;54:8
**relief (4)**
24:12;25:7;27:19;
69:9
**relies (2)**
31:12;47:7
**rely (1)**
28:4
**remainder (2)**
55:20;56:25
**remained (1)**
58:2
**remaining (3)**
4:4;54:15;56:13
**remember (2)**
35:20;37:19
**reminder (1)**
15:18
**remove (1)**
73:25
**removed (2)**
71:14;74:25
**renders (1)**
64:14
**Rens (2)**
20:5,12
**repair (1)**
41:24
**repeat (1)**
28:22
**replies (4)**
15:1;62:16;63:23;
72:9
**reply (10)**
9:9;10:22;17:15;
33:11;34:6;38:10;
47:17;52:5;55:4;
67:19
**report (9)**
5:9,11;8:7,8;9:16;
12:15;17:1,18;30:11
**represent (2)**
5:3;42:7
**representation (1)**
54:8
**represented (2)**
54:7,12
**representing (1)**
74:21
**request (14)**
13:25;17:16;20:15,
20,22;21:4;37:2;
50:19;73:2,18;76:3,4;
78:2,5
**requested (2)**

5:11;73:6
**requesting (1)**
74:24
**require (1)**
74:4
**required (5)**
43:16;55:11;57:19;
58:25;60:9
**requirement (1)**
59:9
**requirements (2)**
59:8;66:15
**requires (2)**
29:9;59:6
**requiring (2)**
69:18;74:25
**res (3)**
48:8,9;60:10
**reserving (1)**
9:24
**residence (3)**
51:3,6;53:8
**resolution (1)**
7:11
**resolve (1)**
50:9
**resolved (2)**
6:11;17:3
**resources (3)**
72:8;74:10;75:22
**respect (9)**
25:24;27:3,9,19,22;
32:1,5;75:13,13
**respectfully (1)**
75:11
**respective (1)**
18:2
**respectively (1)**
14:8
**respond (6)**
16:2;38:1;73:8;
75:8,12;76:23
**responded (2)**
39:2;51:9
**responds (7)**
45:19,22;52:4;
54:22;62:13;67:12;
71:10
**response (3)**
14:24;38:23;47:2
**responses (2)**
13:18;28:6
**responsibility (1)**
49:24
**responsive (1)**
27:5
**rest (1)**
35:2
**resting (1)**
31:10
**restriction (1)**
61:8
**restricts (2)**

61:6,6
**result (1)**
72:7
**retain (1)**
41:20
**retained (2)**
18:20,24
**retiring (2)**
7:14,20
**return (1)**
49:9
**returns (1)**
60:14
**reveal (1)**
20:9
**reviewed (1)**
11:5
**reviewing (1)**
19:19
**revocable (2)**
57:23;59:4
**revolving (1)**
76:10
**Rhodes (1)**
58:7
**Richard (1)**
56:18
**rifles (1)**
74:18
**right (15)**
8:7,11,13,20;9:10;
12:2,2,11,12;13:5;
38:4;46:23;48:12;
73:16;78:9
**rights (5)**
18:3;47:13;68:1,12;
70:9
**ripe (2)**
10:15;24:5
**role (2)**
18:5;40:5
**roles (1)**
25:11
**room (2)**
4:7;10:20
**roughly (1)**
10:18
**rule (7)**
16:1;21:23;29:13,
19;38:4;49:6;70:22
**ruled (2)**
23:9;64:1
**rules (2)**
10:11;36:20
**ruling (23)**
14:16;15:10;22:18,
19;23:10,23;31:22;
33:2,19;47:22;49:17,
21;50:16;58:24;60:5;
63:25;72:6;73:15;
75:9,24;77:12;78:10,
12

## S

**Sacramento (6)**
68:24;69:1,3,22,23;
70:4
**sale (6)**
63:6;68:25;69:2,6,
7,21
**Salkin (5)**
42:24;46:11;63:17,
21;64:4
**same (10)**
10:18;11:25;12:6;
23:12;26:8;31:18;
33:23;36:14;38:15;
68:16
**sanctioned (3)**
76:16;77:5;78:18
**satisfied (1)**
59:8
**Schaap (1)**
47:17
**schedule (12)**
10:22;18:14,18;
21:11;38:19;39:3,14;
50:23;51:7;58:1,4,19
**scheduled (2)**
15:22;17:23
**schedules (8)**
14:3;18:17;26:9;
35:20;38:18;51:12;
53:24;54:13
**screen (2)**
4:7,9
**scrivener's (1)**
64:24
**se (1)**
5:5
**second (15)**
14:6;16:20;19:8;
20:1;21:20;24:16;
26:14;28:24;36:12,
12;39:23;42:3;46:2;
75:9;78:15
**section (5)**
30:25;65:1,5;66:23;
68:4
**security (2)**
41:23;43:23
**seeing (1)**
4:15
**seeking (13)**
16:8,17,22;20:1,3;
22:14;24:12;25:7;
27:18;49:23;52:13,
22;53:11
**seeks (4)**
24:9;66:17,20;
68:12
**self-funded (1)**
62:14
**self-settled (24)**

24:23,25;26:12;
31:3,7,10;38:25;
42:14;43:3;44:24;
45:15,17,23;46:12;
47:21;51:11;61:12;
62:9,14,17;63:16,22,
24;64:2
**sell (5)**
37:22;41:22;69:1,
21;72:25
**senior (4)**
43:22;44:25;67:5;
71:4
**sense (4)**
7:23;9:2,24;10:6
**sent (1)**
75:17
**separate (3)**
59:9,21;76:11
**September (3)**
17:7,8,11
**Seror (1)**
42:24
**served (2)**
40:6;74:6
**serves (2)**
40:8,24
**Service (1)**
34:17
**set (19)**
5:12;10:3,18;11:20,
21;12:6;15:20;16:4;
17:5,13,13;18:10;
34:22;47:6;50:14;
58:17;67:12;75:6;
76:14
**sets (1)**
24:20
**settle (1)**
7:1
**settled (1)**
7:1
**settlement (1)**
6:9
**settlers (1)**
46:7
**settles (1)**
11:1
**settlor (10)**
40:5;42:14,22;46:5;
61:13,22;63:10,19;
64:9;65:24
**settlors (4)**
55:14;57:2,14;
62:20
**seven (1)**
72:20
**several (1)**
29:7
**shall (13)**
36:23;40:16,20;
41:7,12;49:3;56:11,
20,22;61:25;62:4,5;

67:24
**share (1)**
45:24
**Sharp (53)**
42:10,18;43:1,7,9,
12,19,21,24;44:2,5,8,
15,19,25;45:10,11,17;
46:23,25;47:6;48:5,7,
10,14,17,20,24;52:1,
4,5;54:15,18;55:1,4,8;
59:13;62:8,16;63:23;
67:4,7,11,12,19;
70:25;71:3,13,14,25;
72:9;74:5,6
**Sharpe (3)**
47:23;63:17;64:21
**Sharp's (2)**
46:15;59:14
**Sherry (1)**
56:18
**shielded (1)**
66:5
**shielding (2)**
25:1;62:11
**shifts (1)**
34:21
**short-circuited (1)**
14:16
**shortening (1)**
16:5
**Shortly (3)**
17:12;58:13;69:7
**Shoshana (2)**
9:5,19
**show (12)**
4:9;33:10;46:23;
47:17;48:5,11;49:11;
52:7;75:6;76:15,23;
78:13
**showing (4)**
29:5;34:22;50:14;
71:15
**shows (4)**
27:12,21;33:15;
49:4
**side (2)**
11:3;33:23
**sides (2)**
19:15;38:5
**sides' (1)**
11:7
**signed (6)**
5:11;26:9;51:12;
53:12;59:7;61:25
**significantly (1)**
22:2
**similar (4)**
14:23;29:19;39:1;
51:11
**Simon (1)**
9:18
**simply (5)**
5:12;29:13;31:11;

34:25;49:11
**sits (1)**
37:18
**situated (1)**
60:1
**situation (2)**
31:1;53:9
**situations (1)**
42:22
**six (2)**
7:8;15:1
**slew (1)**
10:23
**small (1)**
26:24
**SOFA (4)**
38:23;44:22;45:14;
51:12
**sole (3)**
63:5,7,14
**somebody (1)**
37:14
**someone (3)**
6:2;30:14,16
**sometime (3)**
7:15,18,21
**somewhat (2)**
11:16,24
**son (1)**
57:22
**sorry (3)**
23:2;25:16;74:13
**sort (15)**
10:16;11:2,4;14:19;
25:5,20;26:3,4;27:24;
35:8,16,16;36:4;
37:18;74:18
**sought (4)**
25:23;66:12,13;
69:9
**speak (4)**
6:3,4,13;78:8
**speaking (2)**
6:2;10:18
**speaks (1)**
9:16
**specific (4)**
24:1;34:22;37:9;
50:14
**specifically (9)**
29:9;30:10;31:2,5,
11,13;59:18,19;78:4
**spend (1)**
8:9
**spendthrift (18)**
25:3;32:7;41:25;
42:19,22,23;43:3;
54:20;60:23;61:15,
20,21;62:12,18;
63:18;64:6,14;65:15
**spent (1)**
22:5
**sponte (1)**

74:3
**spousal (1)**
64:23
**spouse (17)**
26:20;31:6;38:22;
39:5,22;40:19;51:5;
55:18;56:3,5,10,17,
17,20,25;70:10,11
**spouses (1)**
56:24
**spouse's (10)**
36:19;55:19,20,21,
25;56:8,9,11,12,23
**spring (3)**
7:15,21;35:21
**stance (1)**
57:4
**standard (1)**
49:1
**standing (1)**
29:19
**Stang (1)**
13:8
**starting (1)**
34:7
**state (14)**
5:21;6:20;7:5;
28:17;29:14;30:11,
11,12;32:13;33:2;
46:17;66:9;68:9,10
**stated (5)**
47:19;53:7;58:16;
73:12;78:6
**statement (7)**
14:24;15:1,6;23:25;
36:5;38:19;51:8
**statements (2)**
14:4;35:21
**States (2)**
25:25;51:9
**stating (2)**
45:11;51:3
**status (16)**
5:8,11,12;7:7;9:1;
10:7;12:15,15;17:1,5,
18;25:10;68:5,11;
69:23;73:14
**statute (2)**
29:9;59:6
**statutes (1)**
20:8
**statutorily (2)**
25:1;62:11
**stay (9)**
35:13;69:9;74:2,11;
76:1,17;77:4,5;78:17
**stayed (2)**
6:20;74:25
**Stein (1)**
19:4
**Stein's (1)**
19:2
**still (4)**

5:9;7:24;9:24;
27:24
**stop (2)**
74:14,24
**stopped (1)**
14:5
**stories (1)**
49:18
**story (1)**
26:4
**straight (1)**
26:22
**stranger (2)**
70:14,15
**Street (23)**
14:6;16:18,23;24:5,
14,16;25:1,24;26:5,
13,17,23;27:4,14,14,
16,22;33:6;35:22,25;
38:20;39:12;66:17
**strikes (1)**
10:15
**strong (5)**
44:2,11;68:4;69:25;
72:1
**sua (1)**
74:3
**sub (2)**
63:9;66:5
**subject (6)**
18:7;43:20;58:23;
62:1,6;66:10
**submitted (6)**
34:21;38:8,8,9,10;
43:14
**subsection (2)**
31:12,13
**subsequent (2)**
10:8;71:19
**substance (2)**
50:20;59:25
**subtrust (19)**
18:6;19:3;42:16;
44:1;45:1;48:7;52:10;
54:19;60:13;63:4,6,7,
14;64:15;65:23;67:8,
20;71:11,12
**subtrusts (20)**
26:15;33:10;42:17;
43:3;44:21;47:21,25;
55:11,12,17;62:8,16;
63:2,11,15,20,24;
64:2,11;66:4
**subtrust's (1)**
67:23
**succeeded (2)**
52:21;54:1
**successor (2)**
57:24;58:12
**sufficient (11)**
29:18;46:19;47:11;
50:7;58:19,22;59:2,4;
68:19;70:5,11

**suggestion (1)**
12:14
**suit (1)**
49:7
**summarizing (1)**
21:15
**summary (35)**
8:23;9:8;10:3,11,
14;12:21;13:9;15:24;
17:4,12,25;18:1;
22:25;29:22;32:16;
33:5;34:9,20,21;38:6;
47:19;49:2,3,22,23;
50:4,6,12,16;65:3;
72:18;73:9;78:1,7,10
**Superior (6)**
15:17;17:20;18:10;
19:6;35:11;73:20
**support (21)**
12:1;18:23;19:15,
23,25;22:15;23:23;
25:21;38:9,11;40:22;
41:9,15;43:10;46:4;
53:6,10;56:8,24;
64:23;70:9
**supporting (1)**
50:8
**supportive (1)**
23:11
**supports (1)**
57:18
**supposed (1)**
74:11
**supposedly (3)**
18:19;22:14;26:5
**Supreme (3)**
25:25;43:9;53:18
**sure (2)**
7:22;19:3
**surprise (1)**
75:18
**surviving (17)**
40:4,19;55:18,19;
56:3,5,8,9,10,11,12,
17,17,20,23,24,25
**survivor (6)**
45:8;51:16;60:7;
71:3,10;72:2
**survivor's (23)**
16:21;24:18;25:9;
27:10,13;37:10;
40:25;41:1,3,4,5,6,12,
19;42:4,8,13;46:3;
57:12,16;64:8;71:6,8
**swept (1)**
31:7
**system (1)**
5:21

**T**

**tactic (3)**
20:22;21:5,19

**talk (1)**
35:13
**talked (1)**
75:16
**talking (1)**
34:15
**tax (3)**
36:25;55:23;60:14
**taxation (1)**
37:13
**taxes (1)**
55:21
**technically (1)**
4:18
**ten (5)**
17:11;26:10;38:24;
44:23;51:9
**terms (8)**
7:7;11:9;19:11;
20:14;33:17,20;
57:12;78:9
**the- (1)**
65:4
**thereafter (2)**
17:13;58:13
**thereby (1)**
26:1
**Therefore (6)**
22:17;44:25;54:10;
66:4;69:24;71:25
**thereof (1)**
38:11
**third (2)**
14:22;21:25
**Thomas (1)**
70:21
**thoroughly (1)**
23:16
**though (1)**
74:22
**thought (8)**
9:2,2;10:12;17:19;
25:16,17;32:23;77:13
**three (6)**
8:2;21:6;22:3,4;
52:18;55:17
**Thus (1)**
35:4
**tight (1)**
10:22
**tile (1)**
28:18
**timeline (1)**
21:15
**timely (1)**
17:15
**times (1)**
74:23
**TINs (1)**
60:12
**title (25)**
16:17,22;19:24;
24:5,11,12,13;25:20,

21;29:8,9;42:11;
61:11;66:9,11,14,15,
24;67:3;70:13,14,16,
19,20;72:17

**titled (3)**
36:19;51:19,23

**today (8)**
7:2;9:9;16:9;17:14;
36:15;73:19;75:5,24

**today's (7)**
15:21,22;16:6;
17:22;21:4,10;75:9

**together (2)**
20:9;50:2

**took (1)**
25:17

**touch (1)**
7:16

**track (2)**
7:17;10:2

**transaction (1)**
47:4

**transfer (16)**
26:11;36:16;38:25;
48:16;51:10;55:2,9;
57:20;58:25;59:2,23;
61:5,7,8;68:2;71:16

**transferred (19)**
37:10,20;42:8;
43:13;44:24;45:15;
48:6,11;55:5;57:6,7,
10,11;58:5,17;59:16;
60:20;71:15,22

**transfers (1)**
44:3

**transpired (1)**
6:8

**trial (4)**
34:23;49:14;50:10,
15

**trier (1)**
49:13

**trouble (1)**
4:15

**truly (1)**
73:5

**trust (325)**
14:7;16:20,21,21;
18:2,5,12,13;19:1,2,8,
9,9,14,14,15,19;20:1,
2,2,4,10,13;21:18;
24:17,17,18,18,20,21,
23;25:1,9,9,11;26:12,
14;27:10,13;28:13,14,
23,24,25;29:2,2,5,7,
15,20;30:1,4,4,5,10;
31:4,4,5,7,10;32:3,8;
35:14,15,23,25;36:13,
14,18,19,22,23;37:7,
9,10,11,12,17,20,22;
38:22;39:1,4,20,23,
24,25;40:4,6,7,8,9,9,
12,12,13,14,15,15,17,

18,19,24,25,25;41:1,
3,3,4,5,6,6,11,12,18,
18,19,19,20,21,24,24,
25;42:4,4,4,8,9,12,13,
13,14,15,16,19,20,20;
43:3,5,14,14;44:20,
24;45:8,9,13,16,16,
22;46:3,5,9,12,13,16,
19,22,24;47:2,4,4,19,
20,23,24,25;48:2,6,6,
8,9,12,15,15;51:2,4,
11,15,16,20,23,25;
52:5,8,9;53:23;54:6,
11,14,16,18,20,22,24,
25;55:2,5,6,7,12,14,
16,17,18,21,24,25;
56:1,2,14,15,15,21;
57:1,6,8,11,11,12,13,
14,16,16,19,20,23,25,
25;58:3,4,5,8,10,13,
13,16,18,20,22,23;
59:1,3,4,5,7,10,13,14,
16,17,18,19,21;60:7,
7,9,9,10,10,16,19,21,
24,25;61:9,12,12,13,
14,15,19,23,24;62:4,
8,10,16,19,20,22,23,
24,25,25;63:2,9,11,
15,18,20,24;64:7,8,9,
10,14,15,18;65:6,10,
12,14,15,18,20,20,21,
23,25;66:1,3,5;68:24;
71:3,6,10,11,12,25;
72:2,5,16;78:4,15,16

**trustee (91)**
5:25;6:7;9:24;
11:23;13:1;14:25;
16:16;17:2,12;20:11,
13;22:3,6,9,23;24:7,
19;27:2;28:12;29:4,
11,20;31:12;35:17;
36:20;37:16,21;38:7,
8,15,16,17;40:5,6,6,8,
12,16,25;41:3,6,8,12,
20;42:15,24;52:9;
56:4,4,6,6,11,19,21,
22;57:6,9,24,24;
58:12,18;59:7;60:24;
63:3,5,7,10,14,19;
64:10,11;65:19,24;
66:22;67:2,24;68:1,5,
5,6,8,10,12,25;69:2,
21,24;72:17,23;76:2;
78:1

**trustee/plaintiff (1)**
13:9

**trustees (2)**
39:20;57:8

**trustee's (13)**
14:2,23;38:14;47:9;
57:4,5;67:4;68:11;
69:6,6,7,9,19

**trusts (15)**

18,19,24,25,25;41:1,
19:18;31:8;32:1;
40:7;42:13,19;56:1;
60:11;62:13,15,19;
63:9,16,22;64:1

**trust's (2)**
62:10;71:8

**truth (2)**
14:14;50:10

**try (3)**
35:8;36:8;78:11

**trying (5)**
6:13;14:18;25:19;
26:22;53:12

**turn (2)**
4:8;22:20

**turned (1)**
8:24

**turning (5)**
8:23;50:20;64:17;
66:8;67:4

**TW (1)**
34:17

**two (13)**
6:23;10:22;15:22;
16:7;17:23;18:24;
21:10;31:19;33:21,
22;49:18;72:10;76:8

**type (1)**
7:11

**typically (1)**
61:21

**typo (2)**
19:4;30:25

---

**U**

**unavailing (2)**
19:21;21:14

**uncontroverted (3)**
15:10;38:12;42:10

**uncover (2)**
27:21,25

**under (50)**
25:10,11;26:9,15;
27:7;28:1;29:7,13,19;
31:1,11,13;39:15,20,
25;40:3,5,7,7,9,11,14,
18,24,25;41:2,5,11,
18,19;43:21;44:2,5;
46:25;47:7;49:7;
51:12;53:13;58:9,10;
61:9,10,22;65:2;
66:23;67:7,13;68:14;
69:19;72:1

**undercuts (1)**
19:23

**underlying (2)**
42:12;50:17

**understood (6)**
5:4,20;11:5;73:10,
10;78:19

**undisputed (5)**
47:17;52:7;57:15;

62:22;70:5

**unenforceable (1)**
44:12

**unfair (2)**
52:23;54:4

**unfettered (3)**
24:21;32:6;37:22

**unfortunate (1)**
36:17

**United (1)**
25:25

**unless (9)**
26:1;28:20;30:18;
38:2;43:11;44:12;
53:19;61:20;73:6

**unlikely (1)**
10:15

**unnecessary (4)**
34:19;46:20;72:13;
76:2

**unpersuasive (2)**
57:21;70:3

**unreasonable (1)**
20:18

**unrecorded (11)**
16:17,22;43:23;
45:2;55:8;59:21;67:6;
69:11,15,16,25

**up (11)**
4:9;7:3;8:7;10:25;
11:4;23:7;28:18;
31:24;32:14,15;77:8

**upload (6)**
72:20,21;76:14,21;
78:10,13

**uploading (1)**
76:18

**upon (16)**
11:24;15:9;35:2;
37:12;40:4;54:23;
55:16;56:25;60:6;
62:24;64:7;68:20;
69:6,17;71:11;73:15

**use (11)**
36:21;37:22;40:13;
41:3;48:1;63:6,8;
64:12;66:2;69:25;
72:1

**used (2)**
33:13;36:5

**useful (3)**
20:23;21:21,21

**uses (1)**
20:19

**using (2)**
26:20;74:19

---

**V**

**Vago (4)**
4:23;5:1;53:4,15

**Vagos (2)**
4:14;5:19

**Vagos' (1)**
53:24

**valid (6)**
59:10;60:24;61:20,
21;68:15;69:15

**validity (2)**
19:1;42:19

**valuable (2)**
68:16;71:20

**value (3)**
43:22;50:25;67:5

**valued (1)**
50:24

**various (2)**
14:2;52:6

**venue (1)**
17:19

**verdict (2)**
35:5;49:9

**verified (2)**
19:7;78:14

**version (1)**
49:21

**versions (1)**
50:9

**versus (1)**
4:23

**via (5)**
17:3;54:13;55:3;
58:5;67:14

**video (3)**
4:8,19;8:24

**view (5)**
10:19;34:23;35:7;
37:25;50:17

**violating (3)**
75:25;76:17;77:5

**violation (5)**
35:12;74:2;75:1;
77:3;78:16

**virtue (2)**
25:3;36:16

**void (2)**
71:19;75:1

**voidable (1)**
68:3

**voids (1)**
42:23

---

**W**

**wants (1)**
37:23

**waste (3)**
72:7;74:9,9

**way (4)**
5:21;14:19;20:3;
37:13

**WEDNESDAY (1)**
4:1

**week (6)**
15:21;17:22;21:17;
23:7;77:3,19

**weeks (5)**
8:2;10:23;18:24;
21:10;22:4
**weigh (1)**
21:4
**weighing (1)**
49:15
**welfare (2)**
41:9,15
**what's (4)**
11:6;12:24;30:7;
76:9
**whereas (1)**
53:23
**Whereupon (1)**
78:22
**whole (1)**
49:13
**wholly (8)**
23:11;36:1,6;47:21;
51:20,25;54:16;62:17
**Who's (2)**
15:14;74:4
**wife (3)**
53:10;55:13;70:10
**wife's (1)**
70:11
**willful (1)**
74:1
**winning (1)**
69:5
**withdraw (1)**
32:22
**within (7)**
23:3;26:2;32:4;
38:24;51:9;72:20;
77:19
**without (6)**
29:16;41:23;44:6;
67:25;68:7;72:6
**witness (1)**
60:2
**word (2)**
31:16;33:13
**worked (1)**
23:6
**works (1)**
10:19
**writing (3)**
43:15;59:7,9
**written (6)**
14:16;43:25;46:16,
20;57:19;59:3

**Y**

**year (1)**
69:4
**years (6)**
26:10;29:7;38:24;
44:23;51:9;76:9
**yield (2)**
13:3;62:18

**Z**

**zero (3)**
46:11;62:15;64:20
**Ziehl (1)**
13:8
**Zoom (2)**
4:7;16:13
**Zubenko (9)**
47:8;67:16;68:23,
23;69:8,9,20;70:2,3

**1**

**1 (5)**
10:13;20:20;45:12;
51:19;52:19
**10:28 (1)**
4:1
**10:30 (1)**
4:5
**100 (8)**
51:15;53:23;54:6,
12;58:1;66:19;71:13;
72:16
**109.2 (1)**
43:16
**1090 (1)**
55:11
**1092 (2)**
48:13;59:24
**10th (1)**
21:17
**11 (3)**
38:14,15,16
**1122 (1)**
20:16
**11th (1)**
77:18
**12/11 (3)**
15:21;17:22;18:14
**12/2 (2)**
18:24;21:10
**12/31/14 (1)**
51:24
**12/31/23 (1)**
51:24
**12/4 (1)**
17:18
**12/9 (1)**
19:23
**12:25 (1)**
78:22
**1214 (2)**
68:17;71:18
**1217 (1)**
69:14
**12b6 (2)**
28:15;29:13
**12th (4)**
16:24;17:8;40:3;
42:6

**13 (1)**
69:8
**13th (1)**
39:24
**14 (1)**
34:7
**147 (1)**
70:21
**14th (1)**
39:19
**15304 (1)**
64:25
**15304b (2)**
31:2;65:5
**15305 (4)**
46:4;64:17,18,22
**153064b (1)**
66:6
**15th (2)**
17:14;29:25
**16th (1)**
17:10
**17000 (2)**
19:16;20:8
**17200 (2)**
19:18;20:9
**18 (2)**
4:1;30:2
**189,050 (1)**
39:17
**189,050-dollar (2)**
53:17;54:3
**18th (1)**
39:22
**19 (5)**
29:19;38:24;47:9;
51:9;68:18
**1975 (2)**
39:21;57:8
**1977 (2)**
39:19;57:8
**1987 (1)**
34:19
**1990 (1)**
39:22
**1992 (1)**
70:22
**1993 (1)**
46:17

**2**

**2 (4)**
10:13;20:22;45:14;
52:20
**2.45 (1)**
50:25
**20 (1)**
4:23
**2010 (1)**
20:17
**2012 (2)**
36:11;57:15

**2013 (6)**
33:9;36:12;39:8,24;
40:3;60:2
**2014 (2)**
51:22;69:2
**2014-2023 (1)**
60:2
**2015 (2)**
39:11;47:8
**2021 (1)**
20:6
**2023 (7)**
18:17;21:16,17;
35:21;38:13,18;51:23
**2024 (2)**
4:1;42:1
**2025 (2)**
7:20;8:14
**20th (1)**
17:11
**21 (3)**
8:25;18:18;21:17
**21st (1)**
17:5
**22 (2)**
73:13,14
**22nd (1)**
38:13
**23 (3)**
17:2;38:14;75:20
**23rd (1)**
16:18
**24STPB13777 (3)**
19:6;73:22;77:17
**25th (2)**
39:8,11
**26th (1)**
8:1
**29th (3)**
16:19;17:1;42:1

**3**

**3 (4)**
20:23;36:18;37:2;
52:22
**30th (2)**
17:7,15
**31st (1)**
17:6
**32 (1)**
23:21
**322 (1)**
38:20
**33 (1)**
13:14
**34 (1)**
13:25
**36 (1)**
14:23
**3A (1)**
36:22

**4**

**4 (3)**
20:25;30:2;37:2
**4.9 (1)**
50:24
**4/8/90 (5)**
19:9;51:20,24;
55:13;78:16
**41 (1)**
35:18
**48 (2)**
14:25;15:7

**5**

**5 (1)**
37:3
**526 (1)**
70:22
**541 (1)**
65:2
**541c2 (1)**
61:7
**544 (5)**
27:7;47:7;68:4;
69:19;72:1
**544a (4)**
27:19;67:7,13,24
**544a3 (6)**
28:1;43:21;44:2,19;
46:25;68:6
**550 (1)**
45:10
**56 (2)**
49:1,6
**594 (1)**
20:5
**5th (3)**
10:3,5;12:18

**6**

**620 (1)**
20:16
**626 (1)**
34:18
**630 (1)**
34:18
**633 (1)**
20:5
**678,391 (3)**
39:14;51:7;53:5
**679,391 (1)**
53:7

**7**

**7 (1)**
34:6
**704.703 (1)**
39:16

**Leslie Klein**

**December 18, 2024**

**7056 (1)**
  49:1
**760.010 (1)**
  66:23

**8**

**8:30 (1)**
  23:5
**809 (1)**
  34:18
**8th (1)**
  38:18

**9**

**9 (1)**
  12:18
**9/10/13 (2)**
  51:19,20
**9th (6)**
  20:5,16;34:18;
  70:22;77:18,21